# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA

JANE DOE,

      Plaintiff,

      v.

GEORGIA DEPARTMENT OF
CORRECTIONS, *et al.*,

      Defendants.

Case No. 1:23-cv-5578-MLB

# STATEMENT OF INTEREST OF THE UNITED STATES

# INTRODUCTION

This case implicates the statutory and constitutional requirements to provide medically necessary care for people with gender dysphoria.  Jane Doe, who is incarcerated by the Georgia Department of Corrections (GDC), claims that the Defendants are violating Titles II and III of the Americans with Disabilities Act (ADA) by denying her equal access to GDC's services, programs, and activities and failing to accommodate her gender dysphoria.  Ms. Doe alleges that her gender dysphoria is a disability that falls outside the ADA's exclusion for "gender identity disorders not resulting from physical impairments" and "transsexualism" (the "GID Exclusion").[1]  She also claims that GDC is violating the Eighth Amendment by refusing to provide her with medically necessary gender-affirming surgery.

The United States respectfully submits this Statement of Interest to clarify the proper interpretation of the GID Exclusion.  At the time of the ADA's passage,

---

[1] Ms. Doe also claims GDC is violating Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which prohibits recipients of federal funds from excluding individuals from participation in, denying them the benefits of, or subjecting them to discrimination under any program or activity on the basis of disability.  Like the ADA, the Rehabilitation Act also excludes individuals with "gender identity disorders not resulting from physical impairments" and "transsexualism" from the statute's definition of "individual with a disability."  29 U.S.C. § 705(20)(F)(i).  Because of the textual similarities between Title II of the ADA and Section 504, "the same standards govern claims under both" and courts rely on cases construing these provisions "interchangeably."  *Ingram v. Kubik*, 30 F.4th 1241, 1256 (11th Cir. 2022) (quoting *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1133 (11th Cir. 2019)).

the terms "gender identity disorder" and "transsexualism" referred to the mere fact of identifying as a different gender from one's sex assigned at birth.  Here, however, Ms. Doe is not alleging that merely identifying as a different gender qualifies as a disability.  Instead, she is relying on her diagnosis of gender dysphoria—a condition characterized by clinically significant distress or impairment in social, occupational, or other important areas of functioning, which only some transgender individuals experience.  That condition does not fall within the GID Exclusion.

In addition, the Eighth Amendment requires prison officials to provide incarcerated people with adequate medical care for serious medical conditions.  It is well established that gender dysphoria is a serious medical condition.  Prison officials demonstrate deliberate indifference to a substantial risk of serious harm— and thus violate the Eighth Amendment—when they categorically refuse to provide medically necessary gender-affirming surgery to an incarcerated individual with gender dysphoria.

## INTEREST OF THE UNITED STATES

The United States submits this Statement of Interest pursuant to 28 U.S.C. § 517, which permits the Attorney General to attend to the interests of the United States in any case pending in federal court.  Congress charged the Department of Justice with enforcement and implementation of Title II of the ADA, 42 U.S.C.

§§ 12131-12134, which prohibits disability discrimination by public entities in the provision of their services, programs, or activities, including those of state prisons, *see Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 209-10 (1998).  The United States therefore has a strong interest in supporting the proper and uniform application of the ADA, and in furthering Congress's intent to create "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities," as well as Congress's intent to reserve a "central role" for the federal government in enforcing the ADA.  42 U.S.C. § 12101(b)(2)-(3).  The United States also enforces the Civil Rights of Institutionalized Persons Act, 42 U.S.C. §§ 1997 *et seq*., which authorizes the Department of Justice to investigate conditions of confinement in correctional facilities and bring a civil action against a State or local government to enforce the rights of incarcerated people subjected to unconstitutional conduct or conditions.

## BACKGROUND

### I.    Overview of Gender Dysphoria

Sometimes, an individual's gender identity—the gender with which they identify—does not match their sex "assigned" at birth, typically based on sex chromosomes and visible sex characteristics, like genitalia.  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 511 (5th ed. text

rev. 2022) (DSM-5-TR).[2] "Transgender" is a term referring to individuals whose gender identity differs from their assigned sex. *Id.*

Gender dysphoria is different from being transgender; it is a serious medical condition experienced by *some* transgender individuals and appears as a diagnostic category in the DSM-5-TR. Gender dysphoria is "clinically significant distress or impairment in social, occupational, or other important areas of functioning" resulting from the incongruence between gender identity and assigned sex. DSM-5-TR at 512-13. Left untreated, individuals with gender dysphoria can experience significant adverse health outcomes, including risks for suicidality and surgical self-mutilation. World Pro. Ass'n for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, at S106 (Sept 15, 2022) (WPATH Standards).[3]

Importantly, not all transgender people experience gender dysphoria. *See id.* at S252. Some transition to their gender identity without significant distress, such as by using pronouns and names matching their gender identity or by modifying their appearance, including adopting clothing and grooming styles that align with their gender identity. *See* Am. Psychiatric Ass'n, *What is Gender Dysphoria?* (Aug. 2022), https://perma.cc/3B9U-6TLK (APA Q&A). When the mismatch

---

[2] The DSM-5-TR is available online at https://perma.cc/U4KQ-HA98.
[3] The WPATH Standards are available online at https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644.

"causes clinically significant distress and impairment," however, a diagnosis of gender dysphoria may apply and require medically necessary clinical interventions, such as hormone therapy or gender-affirming surgery, to reduce adverse health consequences.  WPATH Standards at S17-S18.

## II.     Factual Background

Ms. Doe's Complaint (ECF No. 1) and the supporting materials for her Motion for Preliminary Injunction (ECF Nos. 2, 4) detail her medical history and treatment while incarcerated in GDC.  The United States summarizes the allegations on which this Statement of Interest relies.[4]

Ms. Doe is a transgender woman incarcerated at Phillips State Prison, a GDC facility in Buford, Georgia, that houses men.  Compl. ¶ 57.  Ms. Doe began living as a woman, consistent with her gender identity, in 1988.  *Id*. ¶¶ 55-56.  Ms. Doe has clinically significant distress resulting from an incongruence between her sex assigned at birth and her gender identity.  *Id*. ¶¶ 42, 55 & n.7.  Ms. Doe was diagnosed with gender dysphoria in 2015.  *Id*. ¶ 61.

Ms. Doe has received recommendations from four GDC health care

---

[4] The United States assumes the facts asserted in Ms. Doe's Complaint and Motion for Preliminary Injunction to be true for the purposes of this Statement of Interest. To satisfy the burden for a preliminary injunction, a plaintiff must offer proof beyond unverified allegations in pleadings, such as by submitting affidavits and other evidence. *See Legendary Strikes Mobile Bowling, LLC v. Luxury Strike LLC*, No. 1:22-CV-05065-ELR, 2023 WL 4401541, at *3 (N.D. Ga. May 15, 2023) (discussing evidentiary standard for preliminary injunctions).

providers for an array of gender-affirming care, including gender-affirming surgeries. *Id.* ¶¶ 69-72, 114-15. Since July 2019, Ms. Doe has been in solitary confinement within GDC.[5] *Id.* ¶¶ 81, 88-90. While incarcerated, Ms. Doe has had inconsistent hormone therapy. *Id.* ¶¶ 64-65, 76-86, 124-33. She previously had access to brassieres but has never had access to certain gender-affirming commissary items, including make-up and wigs. *Id.* ¶¶ 67-68. In 2022 and 2023, Defendants denied Ms. Doe's requests for surgical assessment and referral for non-medical reasons, allegedly because of a "blanket ban" on gender-affirming surgical care. *Id.* ¶¶ 97-98, 122-23. In December 2023, Ms. Doe sued Defendants alleging violations of the ADA and the Eighth Amendment to the U.S. Constitution. ECF No. 1.

---

[5] If GDC is relying on solitary confinement in an attempt to protect Ms. Doe from assaults in its prisons, this raises an issue under the Prison Rape Elimination Act (PREA). PREA Standards prohibit involuntary segregation based on vulnerability to abuse unless there are no alternate housing options. *See* 28 C.F.R. § 115.43(a). (explaining that incarcerated people shall not be placed in involuntary segregation "unless an assessment of all available alternatives has been made, and a determination has been made that there is no available means of separation from likely abusers" and that facilities may hold a person in involuntary segregation for less than 24 hours when it cannot immediately conduct such an assessment). In addition, any use of involuntary segregated housing for victims must be fully documented and justified. *See* 28 C.F.R. § 115.43(d) ("If an involuntary segregated housing assignment is made pursuant to [this standard], the facility shall clearly document: (1) the basis for the facility's concern for the inmate's safety; and (2) The reason why no alternative means of separation can be arranged.").

**DISCUSSION**

Ms. Doe seeks a preliminary injunction that would grant her access to individualized, medically necessary treatment for her gender dysphoria, as well as transfer to a women's facility.[6]  Pl.'s Mot. for Prelim. Inj. at 2-3, ECF No. 2.  Ms. Doe's claims implicate the proper interpretation of the GID Exclusion and the right to adequate medical care under the Eighth Amendment.[7]  This Statement of Interest provides the United States' view of those provisions.

## I.  Gender Dysphoria is Not Categorically Excluded from Coverage under the ADA.

The ADA protects from discrimination individuals who have a disability, which the statute defines as a "physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  Gender dysphoria—clinically significant distress or impairment resulting from an incongruence between gender identity and assigned sex—plainly falls within this

---

[6] Ms. Doe claims that GDC is violating the Eighth Amendment by refusing to house her in a facility that corresponds with her gender identity or provide medically necessary non-surgical treatments for her gender dysphoria. Compl. ¶¶ 181-92, 205-206, 257-61.  The United States has addressed the law applicable to these claims in its Statements of Interest in *Diamond v. Ward* and *Diamond v. Owens*.  U.S. Statement of Interest, ECF No. 65, *Diamond v. Ward*, Case No. 5:20-cv-00453 (M.D. Ga. Apr. 22, 2021); U.S. Statement of Interest, ECF No. 29, *Diamond v. Owens*, Case No. 5:15-cv-50 (M.D. Ga. April 3, 2015).
[7] Ms. Doe also argues that she is covered by the ADA because her gender dysphoria is a gender identity disorder resulting from a physical impairment.  Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Prelim. Inj. at 29, ECF No. 2-1.  This Statement of Interest takes no position on that argument.

definition.  But the ADA excludes certain conditions from coverage under the statute, including "gender identity disorders not resulting from physical impairments" and "transsexualism."  42 U.S.C. § 12211(b)(1).  "Gender dysphoria" does not fall within the GID Exclusion because it is not merely a "gender identity disorder" or "transsexualism."[8]

The GID Exclusion, Section 12211(b)(1) of the ADA, provides that "disability" does not include "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders."  42 U.S.C. § 12211(b)(1).[9] Because the ADA does not define "transsexualism" or "gender identity disorders," the phrases must be accorded their ordinary public meaning at the time of the statute's enactment.  *See Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018).  Additionally, where the context shows that Congress has employed a term of art, any specialized meaning will prevail over the common and ordinary meaning.  *See Garcia v. Vanguard Car Rental USA, Inc.*, 540 F.3d 1242, 1246 (11th Cir. 2008) (noting that Congress "presumptively adopts" the meaning of specialized terms it uses); *United States v. Cuomo*, 525 F.2d 1285, 1291 (5th Cir.

---

[8] Aside from this issue, the United States takes no position on other ADA issues before the Court.

[9] The statute also states that disability does not include compulsive gambling, kleptomania, pyromania, or psychoactive substance use disorders resulting from current illegal use of drugs.  42 U.S.C. § 12211(b)(2)-(3).

1976) ("The sense of a word that is commonly used as a term of art in a particular

discipline is the relevant sense for purposes of statutory construction, where the

statute being construed deals with that discipline.").

When Congress enacted the ADA, "transsexualism" and "gender identity

disorders" referred to the mere fact of identifying as a different gender from one's

sex assigned at birth.  At that time, gender identity disorders constituted a category

of four related mental health disorders in the DSM-III-R, the contemporaneous

edition of the DSM.  *See Hall v. Florida*, 572 U.S. 701, 704 (2014) (recognizing

DSM as a text used by psychiatrists and experts).  Reference to the DSM-III-R in

construing "gender identity disorders" at the time of the ADA is therefore

informative.  *See Williams v. Kincaid*, 45 F.4th 759, 767 (4th Cir. 2022) (relying

on the version of the DSM in use when the ADA was passed to construe "gender

identity disorders"), *cert. denied*, 143 S. Ct. 2414 (2023).  Indeed, legislators—

including the author of the proposed GID Exclusion—explicitly cited the DSM-III-

R when discussing the proposed legislation's coverage.  *See, e.g.*, 135 Cong. Rec.

S11174-78 (daily ed. Sept. 14, 1989) (statement of Sen. William Armstrong)

(referencing the DSM-III-R); 135 Cong. Rec. S10772 (daily ed. Sept. 7, 1989)

(statement of Sen. Edward Kennedy) (explaining that Senator Armstrong's "long

list of various kinds of conduct . . . has been extracted from the DSM III").

Under the DSM-III-R, the essential feature of all gender identity disorders,

including what the DSM-III-R referred to as "transsexualism," was "an

incongruence between assigned sex (i.e., the sex that is recorded on the birth

certificate) and gender identity."  Am. Psychiatric Ass'n, *Diagnostic and Statistical*

*Manual of Mental Disorders* 71 (3rd ed. rev. 1987) (DSM-III-R); *see also id.* at 74-

76 (identifying transsexualism as a type of gender identity disorder).[10]  An

individual experiencing cross-gender identification or gender incongruence alone

could be diagnosed with a gender identity disorder, without any clinically

significant distress or impairment.  While the DSM-III-R acknowledged that

"[s]ome forms of gender identity disturbance are on a continuum," DSM-III-R at

71, none of the gender identity-related diagnoses for adults required "clinically

significant distress" or impairment.[11]  Instead, gender identity disorders in the

DSM-III-R focused on the medicalization of gender identity and nonconformity.

As observed by the Court of Appeals for the Fourth Circuit in *Williams v. Kincaid*:

"[I]n 1990, the gender identity disorder diagnosis marked being transgender as a

mental illness."  45 F.4th at 767.  By excluding "transsexualism" and "gender

---

[10] The DSM-III-R is also available online at https://perma.cc/4K9V-LBSA.

[11] *See, e.g.*, DSM-III-R at 76 (identifying that "persistent discomfort," a "sense of inappropriateness" and a "[p]ersistent preoccupation" about one's primary and secondary sex characteristics as criteria for a transsexualism diagnosis); *id.* at 77 (identifying "persistent or recurrent discomfort" and cross-dressing as criteria for a Gender Identity Disorder of Adolescence of Adulthood, Nontranssexual Type (GIDAANT) diagnosis); *cf. id.* at 73 (identifying "[p]ersistent and intense distress" about assigned sex as criterion for gender identity disorder of childhood).

identity disorders" from the definition of disability in the ADA, Congress thus excluded the mere fact of being transgender—*i.e.*, of simply identifying as a different gender from one's sex assigned at birth—as a covered disability.

Here, Ms. Doe is not alleging that merely identifying as a different gender qualifies as a disability. Instead, she is relying on her diagnosis of gender dysphoria. Gender dysphoria, added as a diagnosis in the DSM-5, "focuses on dysphoria as the clinical problem" and requires clinically significant distress or impairment in social, occupational, or other important areas of functioning. DSM-5-TR at 512. Accordingly, gender dysphoria is not a mere "gender identity disorder," nor is it simply a diagnosis of "transsexualism." Indeed, as noted above, not all transgender individuals experience gender dysphoria. Because gender dysphoria is not simply identifying with a different gender—but is instead characterized by clinically significant distress or impairment in social, occupational, or other important areas of functioning—gender dysphoria does not fall within the GID Exclusion.

That gender dysphoria is associated with the status of being transgender does not preclude coverage under the ADA for gender dysphoria. It is not unusual for the ADA to exclude a certain status or condition, but still encompass related conditions that meet the statute's definition of "disability." Pregnancy provides a useful example. The Court of Appeals for the Eleventh Circuit has recently

explained that both "[c]ourts and regulators have recognized that neither childbirth nor pregnancy qualifies as a disability under the [ADA]." *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1336 (11th Cir. 2022); *see also Farrell v. Time Serv., Inc.*, 178 F. Supp. 2d 1295, 1298 (N.D. Ga. 2001) ("[P]regnancy per se does not constitute a disability under federal law.").  Nonetheless, *Owens* instructs that although pregnancy and childbirth "themselves are not disabilities," "a pregnancy- or childbirth-related impairment may qualify as a disability, but only if that impairment substantially limits a major life activity." *Owens*, 52 F.4th at 1336 (citation omitted); *cf.* U.S. Equal Emp. Opportunity Comm'n, *Enforcement Guidance on Pregnancy Discrimination and Related Issues* (2015) (identifying anemia, sciatica, carpal tunnel syndrome, and gestational diabetes as pregnancy-related impairments under the ADA).  The same is true here.  The GID Exclusion excludes merely being transgender from the statute's coverage, but does not exclude impairments related to being transgender, such as the clinically significant impairments associated with gender dysphoria, which otherwise satisfy the ADA's definition of disability.

Additionally, reading this provision to foreclose ADA protections for gender dysphoria would contravene Congress's express directive to interpret the ADA's definition of "disability" broadly.  In 42 U.S.C. § 12102(4)(A), Congress instructs that "the definition of disability in this chapter shall be construed in favor of broad

coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter." *See also EEOC v. STME, LLC*, 938 F.3d 1305, 1316 (11th Cir. 2019) (recognizing ADA's directive for broad coverage).  Exceptions to a statute's "general statement of policy," like the GID Exclusion, are sensibly read "narrowly in order to preserve the primary operation of the [policy]." *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731 (1995) (quoting *Comm'r v. Clark*, 489 U.S. 726, 739 (1989)); *see also Williams*, 45 F.4th at 766 ("courts must construe the ADA's exclusions narrowly" because of Congress's directive to ensure broad coverage for people with disabilities).  Excluding gender dysphoria from coverage where the plain text covers it "would be for a court to take it upon itself to rewrite the statute in two impermissible ways: by penciling a new condition into the list of exclusions, and by erasing Congress' command to construe the ADA as broadly as the text permits." *Williams*, 45 F.4th at 770.  As recognized by the *Williams* court, "nothing in the ADA, then or now, compels the conclusion" that gender dysphoria falls within the GID Exclusion.  *Id.* at 769.  This reading of the GID Exclusion undermines the ADA's broad remedial purpose.

Furthermore, a broad interpretation of the GID Exclusion that encompasses gender dysphoria would implicate constitutional concerns.  *See Williams*, 45 F.4th at 773 (suggesting that there is "no legitimate reason why Congress would intend to exclude from the ADA's protections transgender people who suffer from gender

13

dysphoria").  The construction of the statute urged by the United States would avoid these constitutional issues.[12]

The GID Exclusion is thus properly interpreted as encompassing only gender identity disorders not resulting from a physical impairment as understood at the time of the ADA's passage and not as a bar to coverage for individuals with gender dysphoria.

## II. Refusing Medically Necessary Gender-Affirming Surgery to the Entire Category of Incarcerated Individuals with Gender Dysphoria, No Matter an Individual's Particular Circumstances, Violates the Eighth Amendment.

A prison official's refusal to provide an incarcerated person adequate medical care constitutes cruel and unusual punishment in violation of the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 102-05 (1976); *Kuhne v. Fla. Dep't of Corr.*, 745 F.3d 1091, 1094 (11th Cir. 2014).  To establish a violation of the Eighth Amendment's guarantee of adequate medical treatment, an incarcerated person must first show an objectively serious medical need.  *Estelle*, 429 U.S. at 104.  She must then demonstrate that prison officials displayed "deliberate

---

[12] The doctrine of constitutional avoidance offers "a tool for choosing between competing plausible interpretations of a statutory text" and is based on the "reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts."  *Clark v. Martinez*, 543 U.S. 371, 381 (2005); *see also id.* at 380-81 ("If one [interpretation] would raise a multitude of constitutional problems, the other should prevail . . . ."); *Pine v. City of W. Palm Beach*, 762 F.3d 1262, 1270 (11th Cir. 2014) (courts should adhere to doctrine of constitutional avoidance "so long as the reading is not plainly contrary to legislative intent").

indifference" to that need by establishing that they had subjective knowledge of a risk of serious harm yet disregarded that risk through conduct that was more than mere negligence. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Kothmann v. Rosario*, 558 F. App'x 907, 912 (11th Cir. 2014).

Appellate courts have long recognized that gender dysphoria is a "serious medical need" for purposes of the Eighth Amendment. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 785 (9th Cir. 2019) (per curiam); *White v. Farrier*, 849 F.2d 322, 325 (8th Cir. 1988); *Meriwether v. Faulkner*, 821 F.2d 408, 412-13 (7th Cir. 1987). Absent adequate treatment, gender dysphoria can result in further psychological and physical suffering that the Eleventh Circuit has recognized as a serious medical need. *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) ("Under the Eighth Amendment, prisoners have a right to receive medical treatment for illness and injuries . . . and a right to be protected from self-inflicted injuries. . . .") (citing *Estelle*, 429 U.S. at 103-05, and *Edwards v. Gilbert*, 867 F.2d 1271, 1274-75 (11th Cir. 1989)). Whether prison officials had subjective knowledge of a risk of serious harm is a question of fact "subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1327 (11th Cir. 2007) (quoting *Farmer*, 511 U.S. at 842).

Although incarcerated people are not entitled to the medical treatment of their choice, prison officials must provide care that is "adequate in light of the severity of the condition and professional norms." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (citing *Farmer*, 511 U.S. at 832); *see McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999) ("[W]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference." (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989)).  Medical care, moreover, must be "individualized based on a particular prisoner's serious medical needs." *Kosilek v. Spencer*, 774 F.3d 63, 91 (1st Cir. 2014); *see also Keohane v. Fla. Dep't. of Corr. Sec'y*, 952 F.3d 1257, 1266-67 (11th Cir. 2020) ("It seems to us that responding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference'—anti-medicine, if you will.").  Thus, prison officials may not categorically bar the provision of medically necessary treatment or select which treatment to provide in an entirely arbitrary matter, particularly when such choices render care ineffective.  *See, e.g.*, *Konitzer v. Frank*, 711 F. Supp. 2d 874, 908-12 (E.D. Wis. 2010) ("[c]learly, what the defendants were doing to treat [an incarcerated individual with gender dysphoria] was not working" when she continued to self-mutilate and attempt suicide without access to gender expression

16

allowances); *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013) ("[J]ust

because [prison officials] have provided [an incarcerated individual] with *some*

treatment . . . it does not follow that they have necessarily provided her with

*constitutionally adequate* treatment.") (emphasis in original).

Courts have recognized that gender-affirming surgery may be the

appropriate treatment for some incarcerated individuals with gender dysphoria.

*See, e.g.*, *Fields v. Smith*, 653 F.3d 550, 554 (7th Cir. 2011) ("In the most severe

cases [of gender dysphoria], sexual reassignment surgery may be appropriate.");

*Edmo*, 935 F.3d at 803 (upholding preliminary injunction for incarcerated person

with gender dysphoria to receive gender-affirming surgery); *cf. Campbell v.

Kallas*, 936 F.3d 536, 544-49 (7th Cir. 2019) (prison officials did not violate

Eighth Amendment where two medical evaluations found surgery for incarcerated

transgender person not medically necessary or possible given her circumstances);

*Kosilek*, 774 F.3d at 96 (holding that prison officials who solicited the opinions of

multiple medical professionals and pursued the non-surgical option they

recommended did not demonstrate deliberate indifference to incarcerated

transgender person's gender dysphoria).  Accordingly, a refusal to provide

medically necessary gender-affirming surgery to the entire category of incarcerated

individuals with gender dysphoria, no matter an individual's particular

circumstances, demonstrates deliberate indifference to a serious medical need in

violation of the Eighth Amendment.  *See Fields*, 653 F.3d at 557-59 (enjoining

enforcement of statute prohibiting hormone therapy or gender-affirming surgery

for incarcerated transgender people); *Kosilek*, 774 F.3d at 91 (observing that

blanket ban on gender-affirming surgery would violate the Eighth Amendment);

*Rosati v. Igbinoso*, 791 F.3d 1037, 1040 (9th Cir. 2015) (incarcerated individual

with gender dysphoria stated Eighth Amendment claim based on allegation that

prison had a blanket policy against gender-affirming surgery).

Although the Eleventh Circuit has yet to decide whether and under what

conditions gender-affirming surgery must be provided consistent with the Eighth

Amendment, it has concluded that prison officials must consider an incarcerated

individual's medical needs when evaluating treatment options for gender

dysphoria.  *Keohane*, 952 F.3d at 1266-67.  And although the Eleventh Circuit has

held that prison officials do not violate the Eighth Amendment by refusing to

provide gender-affirming treatment after conducting an individualized assessment

of medical need and security considerations, it has noted "[u]nsurprisingly" that

other courts squarely addressing the issue have held blanket refusals to provide

medically-necessary treatment for gender dysphoria violate the Eighth

Amendment.  *Keohane*, 952 F.3d at 1267, 1274-77 (prison officials did not violate

the Eighth Amendment by denying plaintiff's social transitioning requests because

there were differing medical opinions as to the "proper course of treatment" and the requests presented "serious security concerns").

## CONCLUSION

Gender dysphoria does not fall within the GID Exclusion in the ADA.  In addition, the Eighth Amendment prohibits refusing medically necessary gender-affirming surgery to the entire category of incarcerated individuals with gender dysphoria, no matter an individual's particular circumstances.  For the foregoing reasons, the United States respectfully requests that the Court consider this Statement of Interest in this litigation.

Date:  January 8, 2024

For the United States of America:

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

REBECCA B. BOND
Chief, Disability Rights Section

STEVEN H. ROSENBAUM
Chief, Special Litigation Section

JENNIFER K. MCDANNELL
Deputy Chief, Disability Rights
Section

LAURA COWALL
KERRY KRENTLER DEAN
Deputy Chiefs, Special Litigation
Section

ALI SZEMANSKI
Trial Attorney, Disability Rights
Section

JULIANNA ASTARITA
MAGGIE FILLER
AMY SENIER
Trial Attorneys, Special Litigation
Section

Civil Rights Division
U.S. Department of Justice
150 M Street, N.E.
Washington, D.C. 20002
(202) 568-3884
ali.szemanski@usdoj.gov

RYAN K. BUCHANAN
United States Attorney
Northern District of Georgia

AILEEN BELL HUGHES
Georgia Bar No. 375505
Assistant United States Attorney
600 U.S. Courthouse
75 Ted Turner Dr. S.W.
Atlanta, GA  30303
(404) 581-6000
Aileen.Bell.Hughes@usdoj.gov

20