# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JANE DOE,

        *Plaintiff*,

v.

GEORGIA DEPARTMENT OF
CORRECTIONS, *et al.*,

        *Defendants.*

Case No. 1:23-cv-5578-MLB

# DEFENDANTS' DISCLOSURE OF EXPERT REPORT OF KRISTOPHER E. KALIEBE, M.D.

# <u>TABLE OF CONTENTS</u>

I.  Background and Qualifications ................................................... 3

II.  Summary of Main Points ........................................................ 12

III.  Opinion .............................................................................. 14

  A.  Psychotherapy .................................................................. 14

  B.  WPATH is an advocacy organization whose published guidelines do not establish "standards of care." .............................................. 18

  C.  Sex-transition interventions have not been shown to be medically necessary, especially in the correctional context. ................................. 32

    1.  Sex-reassignment surgeries, and other "gender affirming" surgeries, have not been shown to be medically necessary. ........................................... 32

    2.  Non-medical social-transitioning interventions are not medically necessary in the correctional context. ..................................................... 38

    3.  Comorbidities, such as personality disorders, complicate sex-transition interventions. ....................................................................... 40

  D.  Plaintiff Jane Doe ................................................................ 42

  E.  Gender identity lacks a biological basis, and gender dysphoria is a subset of gender identity disorder. ......................................................... 44

IV.  Conclusion .......................................................................... 45

V.  References ............................................................................ 47

# EXPERT DECLARATION OF
# DR. KRISTOPHER E. KALIEBE, M.D.

## I.    Background and Qualifications

1.    I have been retained by counsel for Defendants in the above-captioned lawsuit to provide an expert opinion concerning care of patients with gender dysphoria. I will explore how clinical care has been affected by the lack of an open, scientific dialogue regarding how best to treat gender dysphoric patients. I have reviewed existing literature related to gender dysphoria and corrections.

2.    My opinion will be based primarily on my own experience as a physician, psychiatrist, and professor, as well as the relevant literature in this area. I have also reviewed numerous court filings in this case, including the expert declarations of Drs. Isabell S. Lowell, Jeehea Sonya Haw, and Jens Urs Berli; the complaint; the memorandum of law in support of Plaintiff's motion for a preliminary injunction; and Plaintiff's declaration. I may wish to supplement my opinions or the bases for them as new evidence comes to light or new research is published.

3.    I am over the age of 18, am qualified to give this declaration, and have actual knowledge of the matters stated herein. If called to testify in this matter, I would testify truthfully and based on my expert opinion. I am being compensated at a rate of $450 per hour. Depositions and testimony are billed in 4-hour increments. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony that I provide.

4.       I am a professor at the University of South Florida in Tampa, Florida. I am Board Certified in Psychiatry, Child and Adolescent Psychiatry, and Forensic Psychiatry. My clinical work has been primarily in university-based clinics, Federally Qualified Health Centers, and juvenile corrections.

5.       I was awarded my medical degree in 1999 and subsequently completed general psychiatry, child and adolescent psychiatry, and forensic psychiatry training. This training includes education in human biology, human sexuality, development, brain functioning, normal development, and psychopathology. Gender dysphoria (then labeled "gender identity disorder") and gender dysphoria treatment were part of my professional training.

6.       From 2005 to 2016, I was Assistant Professor at Louisiana State University Health Science Center – New Orleans. I was the training director of the LSU Child Psychiatry Fellowship for 2 years. From 2016 to August 2023, I was an Associate Professor at the University of South Florida, where my clinical roles mainly included University clinics, working with juvenile corrections and supporting primary care physicians through the Florida Medicaid Psychiatric Medication hotline. I have also worked in adult corrections, at the Orleans Parish Prison. I cover on call at Tampa General Hospital. I also practice forensic psychiatry, working on both child and adult cases in both criminal and civil court. I was

promoted to full professor at the University of South Florida effective August 1, 2023.

7.    I work in two university-based training clinics. For my entire stay at the University of South Florida, I have supervised a child and adolescent psychiatry clinic, and in January 2023, I added an adult psychiatry resident clinic to my schedule.

8.    As a supervising physician at the University of South Florida's Outpatient Clinic and Silver Child Development Center, my role is to function as a clinical supervisor and instructor. Psychiatry residents and Child Psychiatry residents serve as the primary patient evaluators and clinicians. I also evaluate new patients directly and then see patients as needed. I oversee the residents' work product and function as the physician of record. In this clinic I evaluate and treat pediatric patients with gender dysphoria. In addition to these direct clinical experiences, my duties at the Silver Child Development Center include training residents regarding the treatment of patients, including those with gender dysphoria.

9.    Similarly, at the University of South Florida's Outpatient Psychiatry Center, my duties include supervising and instructing psychiatry residents. At this clinic as well, general psychiatry residents serve as the primary patient evaluators and clinicians, and I evaluate new patients directly and see them afterward as needed.

I oversee the residents' work product and function as the physician of record. As part of my role in this clinic, I evaluate and treat adult patients with gender dysphoria.

10.    Within the juvenile justice system, I also evaluate and treat patients with gender dysphoria. And I have been consulted to provide a second opinion and coordinate care regarding a patient with gender dysphoria in the Louisiana juvenile correctional system.

11.    I have extensive teaching experience, including teaching medical students, general psychiatry residents, child and adolescent psychiatry fellows, and forensic psychiatry fellows. I have years of extensive positive feedback from medical students and psychiatrist residents.

12.    I practice and support conventional medicine, and I have also strongly advocated for the expansion of Federally Qualified Health Centers, along with improved collaboration of mental health with primary care. (Kaliebe 2016; Kaliebe 2017.)

13.    My support of, and attempts to improve conventional medicine, are balanced by a healthy degree of caution. The history of medicine is filled with examples of the harms that can come with unproven, unnecessary, aggressive, or counterproductive interventions. As such, I've presented twice at the Preventing Overdiagnosis conference.

14.    I am a member of the American Academy of Child and Adolescent Psychiatry, the American Academy of Psychiatry, and the Law and the American Psychiatric Association. I recently joined Heterodox Academy, and I co-chair their newly formed Campus Community at the University of South Florida. I have been most active in the American Academy of Child and Adolescent Psychiatry (AACAP). I was awarded status as a Distinguished Fellow at AACAP in 2016. I first presented regarding media at the 2004 AACAP annual conference and have now presented at the annual conference 25 times. I served as co-chair of the Media Committee from 2013 to 2021, and was an author on the AACAP's clinical practice guidelines for telepsychiatry. I served as the Liaison from AACAP to the American Academy of Pediatrics from 2016 to 2022. I have also served AACAP in the state affiliates, acting as the Louisiana Council for Child Psychiatry as secretary/treasurer for 4 years and as president for 2 years.

15.    I have extensive experience in psychotherapy and have received additional training in Cognitive Behavioral Therapy and trauma-focused therapies. I have been providing psychotherapy and teaching psychotherapy to psychiatry trainees throughout my career. I currently routinely supervise psychiatry residents at the University of South Florida regarding psychotherapy. I created and taught a Cognitive Behavioral Therapy practicum for Louisiana State University residents

from 2007 to 2016. I was a member of the Association for Behavioral and Cognitive

Therapies from 2004 to 2016.

16.    I have 2 publications related to gender dysphoria recently published.

a.    AACAP News, with David Atkinson, MD, entitled, *Adolescent Onset Gender Dysphoria, Our Perspective*, 304-05 (Nov/Dec 2023).

b.    Letter to the Editor, The Journal of the American Academy of Psychiatry and the Law, *A reply to Legal, Mental Health, and Societal Considerations Related to Gender Identity and Transsexualism*, Vol 51, (4) 608-09 (2023).

17.    I also practice and teach forensic psychiatry and have testified in deposition or trial in the following cases over the past five years:

18.    **Civil Testimony (retained by the defense):**

a.    In the Interest of RW, LL, AP Minor Children, Circuit Court of the 13th Judicial Circuit, Juvenile Division, Judge Lisa Campbell, Tampa, FL (Jan. 28, 2020).

b.    August Dekker, et al., Plaintiffs, v. Simone Marstiller, et al., Case No. 4:22-cv-00325-RH-MAF, Defendants, United States District Court, Tallahassee, FL (May 18, 2023).

19.    **Civil Testimony:**

8

a.    Jeffrey Spivey, petitioner/father and Teresa Spivey N/K/A Teresa Cartwright, respondent/mother, Case No. 2016DR0471, Circuit Court of the 12th Judicial Circuit, Judge Kevin Bruning, Manatee County, FL (Feb. 28, 2020).

b.    Jennifer McCarthy and Shaun Byers, Case No. 2018DR – 001829, in the Circuit Court of the 6th Judicial Circuit, Judge Stephen Berlin, Pinellas County, FL (Dec. 5, 2023).

20.    **Civil Testimony (court appointed):**

a.    Re: The Marriage of Robyn Cohen McCarthy and John McCarthy, 11th Judicial Circuit, Family Division, Dade County, Judge Jason Dimitris, Miami FL (Nov. 1, 2019).

21.    **Criminal Testimony (retained by the defense):**

a.    The State of Florida v. Bill Paul Marquardt, 5th Judicial Circuit, Sumner County, Florida, Judge William Hallman III, Bushnell, FL (Dec. 19, 2019).

b.    The State of Florida v. Bill Paul Marquardt, 5th Judicial Circuit, Sumner County, Florida, Judge Mary P. Hatcher, Bushnell, FL (Aug. 24, 2022).

    c.    State of Florida v. Justin Mitchell Pennell, 2020CF000159FAXWS, 6th Judicial Circuit Pasco County, FL (Mar. 23, 2022).

    d.    State of Florida v. Jacob Randall Young, 2021CF001299CFAXWS-3, Circuit Court, Pasco County, FL (July 6, 2023).

    e.    State of Florida v. Benjamin Smiley, Case No. CF 15 – 004903, CF 15 – 005388 (Dec. 11, 2023).

22.   **Civil Depositions (retained by the defense):**

    a.    Z.M.L., a minor, through her parents and guardians, v. D.R. Horton, Inc., a foreign corporation authorized to do business in Florida, United States District Court, Middle Division of Florida, Tampa, FL (May 6, 2021).

    b.    Julie Tarallo, as parent and legal guardian of E.C., v. Blue Rock Premier Properties, Case No. 20-CA-002394, Civil Division, 13th Judicial Circuit, Hillsborough County, FL (June 3, 2022).

    c.    The Estate of Jean Lindor, deceased minor, by and through the Personal Representative of the Estate, James Lacroix and Nouse Andree Lacroix, individually, Plaintiffs, v. Bos. Transport, LLC,

a Florida Limited Liability Company, and Orestes Zamora Fleites, individually (Dec. 5, 2022).

d. August Dekker, et al., Plaintiffs, v. Simone Marstiller, et al., Defendants, Case No. 4:22-cv-00325-RH-MAF, United States District Court, Tallahassee FL (Mar. 20, 2023).

e. K.C., et al., Plaintiffs, v. The Individual Members of the Medical Licensing Board of Indiana, in their official capacities, et al., Defendants, Case No. 1:23-cv-00595-JHP-KMB, United States District Court, Indianapolis Division (June 1, 2023).

23. **Civil Depositions (retained by the plaintiff):**

a. Carlton Collins, individually, and on behalf of his minor son, Connor Samuel Collins v. David R. Wallace, Sr., M.D. Louisiana's 14th judicial district, Civil Suit: 2019 – 4128 – D (Mar. 4, 2022).

24. **Criminal Deposition (retained by the defense):**

a. State of Florida v. Justin Mitchell Pennell, 2020CF000159FAXWS, 6th Judicial Circuit, Pasco County, FL (Mar. 11, 2022).

      b.    State of Florida v. Jacob Randall Young, 2021CF001299CFAXWS-3, Circuit Court, Pasco County, FL (June 30, 2023).

25.    A list of my publications and other qualifications and experience is attached to this report as Exhibit "A."

## II.    Summary of Main Points

26.    The World Professional Association for Transgender Health (WPATH) document that is labelled "Standards of Care" should neither be treated as authoritative nor be used to determine which interventions are "medically necessary," especially in the correctional context. WPATH and its U.S. counterpart (USPATH) often base their recommendations on low-quality evidence, and many of the interventions they recommend have not been shown to benefit individuals experiencing gender dysphoria. WPATH and USPATH also openly engage in political and other advocacy, which undermines any suggestion they should be viewed as neutral arbiters of medical scientific evidence.

27.    Sex-reassignment surgeries, and other sex-transition surgeries, have not been shown to be medically necessary. Sex-reassignment surgery is a medical intervention with substantial risks, and there is little reliable data supporting that sex-reassignment surgery causes meaningful long-term benefits in improving mental health or reducing suicide risks. This again is particularly true in prison settings.

28.     Non-medical social-transitioning interventions are not medically necessary in the correctional context. There are no controlled studies to guide treatment decisions for natal males expressing gender dysphoria in carceral settings. On an individual basis, prison officials and the inmate's clinician can decide whether low-risk, low-cost social-transitioning items are appropriate accommodation to provide gender dysphoric inmates, but the fact that some social-transitioning items, such as wigs, are psychologically pleasing to inmates with gender dysphoria does not mean that such interventions are medically necessary.

29.     Transfer of biological males with gender dysphoria to women's prison appears unnecessary and inappropriate. Even if it is desired by natal males with gender dysphoria to be housed in a women's prison, whatever individual benefits to these natal males must be weighed against the significant costs and harms involved, including the significant harm to the emotional and physical well-being of female prisoners.

30.     Plaintiff's experts opine that Plaintiff Jane Doe is a good candidate for sex-reassignment surgery. There is insufficient evidence to conclude that sex-reassignment surgery is medically necessary, so Plaintiff's experts' opinions to that effect for Plaintiff do not rest on strong footing. And although my opinion is limited as I have not personally examined Plaintiff, the documents provided cast considerable doubt on whether Plaintiff is a good candidate for sex-reassignment

surgery. Indeed, Plaintiff appears to have significant preexisting medical and mental health issues that increase the risk of sex-reassignment surgery and raise serious doubts about whether surgical interventions would actually improve Plaintiff's overall mental and physical health.

## III.    Opinion

### A.    Psychotherapy

31.    Patients presenting with gender dysphoria have real symptoms, typically with other comorbid mental health disorders. These patients require validation and support. I recommend their mental health treatment start with psychosocial supports and psychotherapy. In psychiatry, we typically refer to other providers such as social workers, psychologists and licensed clinical therapists who tend to provide the bulk of psychotherapy. Despite this, as noted in my background, I have extensive experience with psychotherapy, and additional training beyond most psychiatrists.

32.    Quality psychotherapy includes the process of exploring patient life history, emotions, coping style, and thought patterns. This includes validating how patients feel, but it also includes teaching patients to not be guided solely by their feelings. Psychotherapy involves getting patients to recognize their own thought patterns, disturbed emotions, and, when appropriate, includes challenging irrational, self-defeating, and harmful beliefs.

33.     There is not an evidence base to support strictly "affirmative" psychotherapy for gender dysphoria, where therapists actively agree with a patient's self-assessment. Automatically agreeing with patient viewpoints is a radical departure from traditional mental health treatments and psychotherapy. Psychiatrists do not "affirm" hopelessness in depression, delusions in schizophrenia, or distorted body image in anorexia or body dysmorphic disorder. The similarities between body dysmorphic disorder and gender dysphoria, and the contrast in how they are approached, provide significant evidence of how ideological and political forces have influenced medical practice. (Kohls 2022.)

34.     In psychotherapy with a patient with gender dysphoria, the therapist would not advise a patient to change a gender identity, but also should not "agree" that a patient is the opposite sex. (Hakeem 2012.) It is surely reasonable and compassionate for a psychotherapist to prefer a patient no longer to suffer with gender dysphoria. Yet the false binary of affirmative psychotherapy versus conversion therapy for gender dysphoria is being used to push therapists from any consideration that acceptance of one's biological sex or resolution of gender dysphoria is a positive event.

35.     This categorizing of quality psychotherapy as conversion therapy is a serious misunderstanding of the complexities of ethical and effective psychotherapy. (D'Angelo 2021.) The term "conversion therapy" is often misused by the supporters

of affirmative care as an attempt to devalue and pathologize approaches other than purely affirming a patient's gender self-identification. (Griffin 2021; Evans 2021.) The only conversation therapy that has significant research is the attempt to change, or convert, sexual orientation.

36.    Time-tested and widely effective psychotherapy approaches include supportive therapy or cognitive behavioral therapy. Cognitive behavioral therapy has proven effective for virtually every mental health condition it has been researched for, including the full range of anxiety disorders, depressive and mood disorders, disturbed anger, sleep disturbance, and trauma reactions including Post Traumatic Stress Disorder. Due to the high levels of comorbidity of psychiatric disorders in patients with gender dysphoria, cognitive behavioral therapy could be extremely helpful as the same approach and techniques have proven effective with so many problems including anxiety, depression, and in reducing self-harm.

37.    Advocates of affirmative treatment dismissal of other approaches can be especially harmful in the cases of gender dysphoria presenting in the context of severe pre-existing psychiatric illness. Psychotherapy could lead to the resolution of these comorbid illnesses.

38.    Take, for example, trauma. There is longstanding psychiatric literature showing that exposure to sexual trauma can lead to changes in gender expression (Cosentino 1993), and this has also been revealed by recent research on

detransitioners (Littman 2021). A recent review on Dissociative Identity Disorder and co-occurring Gender Dysphoria showed frequent childhood sexual abuse. (Soldati 2022.)

39.    A core feature of Post-Traumatic Stress Disorder (PTSD) is avoidance. Repeatedly patients have described to me their physical and emotional distress when they are exposed to trauma reminders. Thus, they frequently have difficulty engaging in psychotherapy for PTSD. Even if they participate, they often actively avoid discussing their trauma. This is unfortunate as trauma-focused therapies have a solid evidence base.

40.    Furthermore, based on the link between sexual abuse and gender dysphoria seen in detransitioners, assessment and treatment of trauma symptoms should be prioritized. It is possible that for many patients, the delivery of trauma-based psychotherapy may cause the desistence of gender dysphoria, which in some cases could be considered a co-occurring disorder related to the trauma.

41.    Another feature which links gender dysphoria to trauma is the well-known phenomenon of traumatized individuals feeling "cut off" or disconnected from their bodies. (Van der Kolk 1994.) Van der Kolk and other prominent PTSD experts recommend mind-body techniques and experiential moving meditations such as yoga to help the body process trauma. These techniques help ground people in the physical world, mindfully experience their bodies and increase positive

physical sensations. While only small studies exist, yoga is being used with success in many settings including prisons. Yoga and other somatic therapies should be studied as a component of comprehensive treatment for gender dysphoria.

**B.  WPATH is an advocacy organization whose published guidelines do not establish "standards of care."**

42.    Published guidelines from World Professional Association for Transgender Health (WPATH) do not establish a "standards of care." WPATH cannot be depended on to produce balanced scientific and clinically appropriate guidelines, due to the activist orientation of the organization. As such, members of WPATH, and other advocates—which in total comprise a small number of physicians—have been able to leverage moralized claims and low-quality evidence to promote medical interventions for gender dysphoria. There has simultaneously been a silencing and censorship of more balanced and mainstream viewpoints.

43.    It is easy to substantiate claims that WPATH is an advocacy organization. Examining their press releases and policy statements is sufficient to establish this fact. Before that analysis, what follows is some background.

44.    WPATH is an international, multidisciplinary, professional association whose reported "mission is to promote evidence-based care, education, research, public policy, and respect in transgender health."  WPATH Standards of Care (SOC) documents share some features with what a medical organization would call clinical practice guidelines. The 2011 edition of WPATH's SOC documents are known as

SOC-7, and the 2022 version is SOC-8. The authors of SOC-8 state: "The overall goal of SOC-8 is to provide health care professionals (HCPs) with clinical guidance to assist [transgender and gender-diverse] TGD people in accessing safe and effective pathways to achieving lasting personal comfort with their gendered selves with the aim of optimizing their overall physical health, psychological well-being, and self-fulfillment."

45.    Dahlen et al. reviewed WPATH SOC-7 as part of a systematic review and quality assessment of international clinical practice guidelines for gender minority/trans people. They noted that WPATH SOC-7 "contains no list of key recommendations nor auditable quality standards." (Dahlen et al., 2021.) Among the principal findings was that WPATH SOC-7 "cannot be considered [the] 'gold standard.'" In the review, WPATH scored poorly on editorial independence, applicability, and rigor of development. The reviewers noted that WPATH tended to prioritize stakeholder involvement rather than methodological rigor.

46.    Among the implications were that "[c]linicians should be made aware that gender minority/trans health [clinical practice guidelines] outside of HIV-related topics are linked to a weak evidence base" and that "[o]rganizations producing guidelines and aspiring to higher-level quality could use more robust methods, handling of competing interests and quality assessment." Yet despite the well-known methodological weakness to SOC-7, WPATH created SOC-8 with many of the same

problems, only selectively using the conventions expected to create a trustworthy clinical practice guideline. WPATH SOC-8 did not clearly document what systematic reviews were attempted, raising the possibility that reviews were stopped or buried upon unfavorable results.

47.    WPATH SOC-8 obscures the most important element required for a trustworthy clinical practice guideline: the assessment of the strength of the evidence used to make recommendations. Hiding the strength of evidence hides critical data from readers trying to evaluate the evidence base for an organization's recommendations. (Murad 2017.) My analysis is supported by the British Medical Journal Investigations Unit's review of the evidence for transgender treatments, including the WPATH SOC-8. (BMJ 2023 p.382.) The British Medical Journal (BMJ) investigators interviewed Gordan Guyatt, M.D., an internationally recognized leader on systematic reviews and, in fact, the co-developer and first author of the original GRADE guidelines. BMJ also interviewed expert Mark Helfand, professor of medical informatics and clinical epidemiology at Oregon Health and Science University. Helfand noted that "WPATH's recommendations lack a grading system to indicate the quality of the evidence—one of several deficiencies."

48.    This same BMJ article highlighted transparency issues with the guidelines: "Both Guyatt and Helfand noted that a trustworthy guideline would be

transparent about all commissioned systematic reviews: how many were done and what the results were." (BMJ 2023 pp.380-82.)

49.    While a complete review of SOC-8 is beyond the scope of this report, I must note five major concerns as a mental health professional:

50.    **First**, SOC-8 makes no analysis for why it prioritizes gender affirmation of gender identity over affirmation and acceptance of the physical sexed body. For clinicians and psychotherapists, these trade-offs are complex matters and fundamental to treatment. SOC-8 treats the question as though it had a clear answer supported by the evidence: affirmation of self-reported gender identity always. The underlying theory that affirmation of gender identity is preferable to body acceptance runs through the document, and arises more out of ideology than evidence. This bias alone makes SOC-8 untrustworthy.

51.    **Second**, SOC-8 suggests consumer-driven medical and surgical interventions and deems these medically necessary without adequate supporting evidence. In no other field of medicine does a life-altering intervention become medically necessary based on the desire of the patient. If the author's used another metric to gauge medical necessity, they hid how this analysis was done. This claim of automatic medical necessity is especially problematic in the context of patients with significant psychiatric morbidity.

52.    **Third,** SOC-8 approached gender incongruence as psychologically healthy, which is accurate when discussing gender non-conformity, but unknown regarding gender dysphoria/gender incongruence. Ethical medical professionals support gender non-conformity, which is often associated with same-sex attraction. There is not enough science to determine in what circumstances gender incongruence/gender dysphoria may be psychologically healthy. This is a critical point because when adopting the theory that all gender expressions are psychologically healthy, WPATH associates comorbidities, such as suicidality and depression, as being caused by society, rather than individual psychopathology. From the "minority stress" framework, it becomes the unusual role of physicians and mental health providers to work to change society to accommodate all gender identities (as in this theory, society is the source of the pathology). It is not clear that physicians and mental health provides have the skills, knowledge, and expertise to change society, and when society does change at their request, there is a risk of significant unintended harmful consequences.

53.    As WPATH has a goal to change society, SOC guidelines consistently recommend changes to institutions, such as prisons, without a review of the tradeoffs and harms involved. Placing biological males expressing a female gender identity into biological women's spaces, disregards the special needs and circumstance of biological females who occupy prisons and other correctional spaces. As such, the

SOC-8 section on institutional care neglects the honest appraisals, stakeholder input, and nuance required to create a trustworthy recommendation regarding gender transition in correctional spaces. As usual, WAPTH's overstates the benefit of an affirming and medicalized approach and does not adequately review the risks.

54.    **Fourth,** SOC-8 normalizes self-mutilation via inclusion of "Eunichs" as just another non-binary category without any suggestion that these individuals require mental health assessment before any consideration of chemical or surgical procedures.

55.    **Fifth,** SOC-8 downplays concerns related to detransitioning. While this topic is explored, SOC-8 is less than upfront. As the literature emphasizes, with the recent cohort among a regime of less-restrictive access, the detransition rates is unknown.  (Cohn 2023; Jorgensen 2023.)

56.    Below will detail policy statements and press releases, but also other episodes I have learned about that have caused me to conclude that I do not feel comfortable relying on WPATH, or its U.S. affiliate, USPATH, to guide care of gender dysphoric patients.

57.    For instance, there are calls for censorships and ideological hegemony at USPATH. Zander Keig, a longstanding WPATH member and former chair of the USPATH advocacy committee, discussed on a public podcast that he received a call from Dr. Joshua Safer, a WPATH board member, former president of USPATH, and

an author of the 2017 Endocrine Society Guideline. (Heterodorx podcast at 39:40-41:00 (Apr. 22, 2023), perma.cc/PB6A-K3VF.) According to Keig, who spoke about the episode publicly, Keig had agreed to be an advisor to the Gender Dysphoria Alliance, an organization composed of transgender people, detransitioners, and researchers that is "committed to thoughtful and respectful dialogue" and hearing from multiple perspectives regarding gender dysphoria. (April 22, 2023 Heterodorx podcast at 39:40-41:00.) Presumably because the Gender Dysphoria Alliance is not unquestioningly "affirming" in all circumstances, Dr. Safer asked Keig to resign from USPATH, or threatened to remove him as chair of the USPATH advocacy committee, because he was advising the Gender Dysphoria Alliance. Keig also stated that Dr. Safer suggested that he (Keig) lie about the reasons for resigning.

58.    Keig's experience is illuminating on multiple grounds. First, silencing a member of USPATH and cleansing USPATH leadership of dissenters brings into question the ethics and scientific integrity of Dr. Safer. This is made more concerning because Dr. Safer was an author of the Endocrine Society Clinical Practice Guidelines and other scientific research articles promoting transgender care. Second, as in this episode Dr. Safer appears to be representing the USPATH board, this shows an institutional problem. WPATH and USPATH claim to be open to scientific exchange and diversity of thought, but their leaders risk termination if they are

affiliated with a more open minded and less politicized group, such as the Gender Dysphoria Alliance.

59.    USPATH has become an uncomfortable place for clinicians or researchers whose data or perspectives do not support a narrow ideological viewpoint. (Ciszek 2021.) In 2016, for instance, renowned psychologist Kenneth Zucker had his USPATH conference presentation successfully drowned out by protestors because he had previously suggested that affirmation-only therapy could cause gender dysphoric children to "persist" when they would otherwise have their gender dysphoria "desist." After shutting down Dr. Zucker's panel, the activists made demands to the USPATH board, which subsequently removed Dr. Zucker from remaining panel and apologized to the activists (rather than Dr. Zucker) for allowing Dr. Zucker to attend the conference. The board thus rewarded the activists who silenced scholarly debate.

60.    Even prominent leaders at USPATH/WPATH, like Laura Edwards-Leeper and Erica Anderson, have acknowledged that, as they titled their Washington Post article, "The Mental Health Establishment is Failing Trans Kids." This failure is in large part due to a move away from clinically sound careful practice. USPATH and WPATH responded to the article by releasing an October 12, 2022 joint statement condemning "the use of the lay press … as a forum for the scientific debate." The board of USPATH then privately censured Anderson, who later

resigned as president. Rather than respond to alarming reports of poor care by two experienced clinicians with a call for an investigation of the facts, WPATH/USPATH chose to attempt to silence concerns and punish clinician urging caution.

61.    This public excoriation displays why Anderson and Edwards-Leeper went to the press: they cannot speak openly at USPATH. If these experts believed WPATH was open to reform from within, involving the lay press would not be necessary. WPATH leadership's response displays it is an organization more concerned about reputation management than following up on member concerns about patient safety. Curiously, they stated: "USPATH and WPATH oppose the use of the lay press, either impartial or of any political slant or viewpoint, as a forum for the scientific debate of these issues, or the politicization of these issues in any way." This was a strange statement for a politicized organization who has made efforts to suppress the viewpoints of clinicians and researchers, such as Kenneth Zucker, Lisa Littman, and Michael Bailey.

62.    This episode with Anderson and Edwards-Leeper should be considered efforts aimed toward "internal suppression." Internal suppression occurs when censorship arises within organizations. Internal suppression is the most dangerous form of suppression of scholarship because it foments groupthink and thus may sanctify misinformation as evidence-based or expert opinion. In the case of WPATH,

this groupthink recommends clinical practice that does not reflect the evidence base and has the potential to cause harm.

63.    Next, I provide a partial, brief review of WPATH and USPATH policy statements and press releases that display longstanding pattern of advocating for their position in a politicized and ideological manner in the lay press.

64.    "USPATH Position Statement on Legislative and Executive Actions Regarding the Medical Care of Transgender Youth" (Apr. 22, 2022), perma.cc/DAF2-WDT7: This position statement characterizes the Florida Department of Health as having misinterpretations and distortions, selectively responds to specific claims. It cites a highly biased and speculative retrospective recall article from Turban to insert a 70% lower odds of suicidality figure, rather than citing its own Systematic Review, which indicated no conclusions can be made regarding hormones' effect on completed suicide. The position statement erroneously claims that "Randomized and blinded trials of gender-affirming hormones would neither be feasible nor ethical." This position statement fails to meaningfully engage with the Florida Department of Health statement or its support.

65.    Similarly, the press release "WPATH/USPATH Denounce Florida Department of Health for Harmful Guidelines Targeting Trans Youth" (Apr. 21, 2022), perma.cc/8P7F-SZVT: This press release is a prime example of WPATH's attempt to demonize those who call for cautious care: "It is shameful to see yet

another attack from a state that is laser-focused on targeting trans and LGBQ people for political gain." This divisive rhetoric from WPATH/USPATH is clearly politicized, alarmist, and tribal. Note the use of language: "Denounce," "misrepresenting the science," "Harmful," "Targeting," "dangerous," and "in harm's way." There is no possible consideration that supporters of this guideline have good intentions to safeguard gender non-conforming youth.

66.    "WPATH Statement on Section 1557 of the Affordable Care Act (ACA)" (May 8, 2017), perma.cc/LLG4-98FH: "The World Professional Association for Transgender Health (WPATH) opposes the Trump administration's effort to curtail enforcement of section 1557 of the Affordable Care Act (ACA). 'WPATH leaders condemn any attempt to limit access to any health care, especially for marginalized or targeted populations, and especially when such actions are motivated by prejudice or on religious grounds.'" The WPATH leadership attempts to frame disagreements about medical necessity and quality care into a moralized tribal battle versus religious zealotry and bigoted hate. The choice to "condemn" reveals the divisive rhetoric, antagonism, and hostility of WPATH.

67.    "WPATH Statement on Yogyakarta Principles plus 10 and Healthcare Delivery" (July 29, 2019), perma.cc/T5ZJ-ENYT: "The Board of Directors of the World Professional Association for Transgender Health (WPATH) recognizes the Yogyakarta Principles plus 10 as operational policy guidelines that governments

should follow in order to ensure the health and rights of all persons under internationally accepted human rights declarations. In states and under laws that are in conflict with the Yogyakarta Principles plus 10, WPATH recommends that health professionals work within existing regulations and available mechanisms to advance the health and rights of all people in ways that move treatment closer to that advocated by the Yogyakarta Principles plus 10, with the primary objective of the immediate best interests of the patient or client."

68.    For background, The Yogyakarta Principles is a document about human rights in the areas of sexual orientation and gender identity. It includes much common sense and humane principles geared at accepting and promoting the welfare of gender-nonconforming individuals. But it also suggests a complete overhaul of sex- and gender-related legal frameworks without discussion or apparent consideration of any trade-offs and harms that may come from such adoption. WPATH endorsement of Yogyakarta Principles plus 10 (perma.cc/PN2R-QN6B) regarding healthcare delivery reveals an underlying stance geared toward toppling long-established law based on biological sex without regard to collateral damage that may occur when strident ideological stances interact with reality.

69.    WPATH's endorsement of this wide scope of legal principles shows that this organization comes from a fundamental civil rights ideology, rather than a clinical or scientific approach. WPATH's broad rights-based philosophical

underpinnings conflict with a nuanced science-based discussion of practical matters, such as whether biological males who identify as female should play on female sports teams or prisons are appropriate setting for gender transitions. Such a human-rights-based viewpoint also distorts dialogue about how to best promote the health and well-being of gender nonconforming people.

70.    Principle 31 calls for a "right to legal recognition without reference to … sex, gender, sexual orientation, gender identity, gender expression or sex characteristics." And Principle 3 states that "States shall … [e]nsure that all persons are accorded legal capacity in civil matters, without discrimination on the basis of sexual orientation or gender identity, and the opportunity to exercise that capacity, including equal rights to conclude contracts, and to administer, own, acquire (including through inheritance), manage, enjoy and dispose of property" and shall "[t]ake all necessary legislative, administrative and other measures to fully respect and legally recognise each person's self-defined gender identity."

71.    It is easy to grant that sexual orientation and gender identity should not prevent individuals from work or business. Yet calls for all levels of government and legal systems to pretend that biological sex is not a primary factor of human life is an entirely different matter. Gender self-identification has the potential for causing significant harm, especially as related to women-only spaces. WPATH wants

biological sex to not be used, recorded, or guide policy. This radical overhaul of society is an experiment with significant potential harms.

72.    "World Professional Association for Transgender Health (WPATH) Board of Directors and Ethics Committee Statement Opposing Legislation that Endangers Health" (Aug. 3, 2020), perma.cc/CG74-UP2K: Again, in this press release, WPATH "condemns" a ruling it disagrees with. WPATH claims that the U.S. Department of Health and Human Services rule denied "civil rights protections" and frames the rule as "permit[ting] hostile health care providers … to discriminate." WPATH chooses to neglect any discussion regarding debates over the quality of care, medical necessity and cost, and seeks to circumvent this via demands of government fiat to provide this care.

73.    "WPATH Identity Recognition Statement" (Nov. 15, 2017), perma.cc/8CWR-JG5Y: WPATH claims, without citation from research, that optimal physical and mental health arise from expression of gender identity. It claims this leads to the conclusion that identity documents should not have biological sex, but rather should have gender identity. WPATH further claims there should be no barriers from the medical community to access gender recognition. WPATH opposes all limits such as waiting periods or time periods living as their own gender. It also believes this should apply to those who are incarcerated. WPATH "recognizes that,

for optimal physical and mental health, persons must be able to freely express their gender identity, whether or not that identity conforms to the expectations of others."

74.     Based on these accounts, and others, I conclude that USPATH and WPATH are not trustworthy scientific-based organizations. They do not prioritize the best evidence and safeguarding patients, but instead express politically oriented advocacy.

75.     Again, I am not alone. In 2020, for example, the Department of Health and Human Services declined to "take a definitive view on any of the medical questions raised" "about treatments for gender dysphoria" because there was a "lack of high-quality scientific evidence supporting" the interventions and explained that the public "relied on the conclusions of an advocacy group (WPATH) rather than on independent scientific fact-finding." *Nondiscrimination in Health & Health Education Programs or Activities*, 85 Fed. Reg. 37,160, 37,186-98 (June 19, 2020).

**C.    Sex-transition interventions have not been shown to be medically necessary, especially in the correctional context.**

**1.    Sex-reassignment surgeries, and other "gender affirming" surgeries, have not been shown to be medically necessary.**

76.     Neither Gender dysphoria (GD) itself, nor what is the best psychotherapeutic or medical approach is well understood. My review of the research concludes that the evidence base for gender dysphoria treatments is mixed and generally low quality. Below I provide detail to this assessment.

77.    Sex-reassignment surgeries are medical interventions with substantial risks, especially as these interventions target otherwise healthy tissue. Thus, a high degree of evidence is expected before such a life-altering intervention. Until recently surgeries for gender dysphoria have been exceedingly rare; therefore, nominal long-term data exist. It is especially challenging to evaluate this evidence base due to changing definitions and epidemiology. Advocates of gender affirming treatments point to short-term improvements observed in some studies. It is possible that much of these improvements are placebo effects. Placebo effects are positive changes based on expectations. Placebo effects are routinely seen in other treatments, such as pills for depression. It is my opinion that insufficient data is available to make confident proclamation regarding the risks and benefits of surgical treatments of gender dysphoria.

78.    Sex-reassignment surgeries are interventions with overall low-quality supporting evidence. (Passos 2020.) These surgeries are accompanied by medical and mental health risk, high cost and are irreversible. Yet they are desired by patients and have a variable but positive association with improved short-term symptoms. WPATH promotes a claim that these surgeries must be considered medically necessary in all settings and with all populations. However, within correctional environments, many treatments are deferred or not available, particularly elective procedures. There has not been a rigorous scholarly exchange to determine when

sex-reassignment surgery should be considered medically necessary. Thus, at this time, there does not exist a method to determine which patients, in which situations, are likely to benefit and whether any benefits would outweigh risks.

79.    As activist physicians have gravitated to gender medicine, these physicians have used coercive techniques (similar to those at WPATH detailed above) to silence the open, honest discussion regarding sex reassignment. At some future point, the medical profession needs to arrive at a reasonable, yet thorough, process of evaluation, which spells out indications and contra-indications, acceptable costs, and medical risks of sex reassignment. Over time and with better data regarding costs and outcomes, perhaps a set of balanced conclusions can arise regarding a reasonable coverage for sex-reassignment surgeries. This would include weighing the appropriateness of sex-reassignment surgeries with relation to comorbid psychiatric- and physical-health problems. Until that open and honest discussion of the clinical justification and evidence base occurs, sex reassignment on demand within carceral settings cannot be termed prudent or "generally accepted"—let alone medically necessary.

80.    The recent Jackson review highlighted: "The majority of the 23 studies reviewed claimed that various forms of gender-affirming treatment were associated with reductions in suicidality; however, the validity and robustness of their results suffered from either a lack of measures of statistical significance and effect size,

correction for multiple testing, controlling for psychiatric diagnostic makeup or psychiatric treatment history, substance use, the interaction of time since receiving gender-affirming treatment, or any combination of these…. The lack of accounting for psychiatric comorbidity and other dynamic suicide risk-enhancing factors may be the greatest limitation in the body of literature to date regarding suicidality outcomes following gender-affirming treatment."

81.    Perhaps the clearest example of the cheerleading in academia and gender medicine is the 2020 Branstrom and Pachankis article, which was published with fanfare in the Journal of the American Psychiatric Association. It did show that individuals identifying as transgender have higher rates of being hospitalized after a suicide attempt. Yet there was not a statistically significant effect of surgery on hospitalization after a suicide attempt. Due to the terrible peer review, the authors had to publish an erratum had—after multiple letter's showed the author's original article overstated claims.

82.    The American Psychiatric Association made the unusual move of including a press release with this study. (Study Finds Long-Term Mental Health Benefits of Gender-Affirming Surgery for Transgender Individuals, APA (Oct. 14, 2019), perma.cc/YN4W-YGH8.) The APA clearly sought to promote the concept that gender affirming care was lifesaving. Of course, the APA did not make the same efforts to spread word of the August 1, 2020 erratum, but the important outcome

follows: "Upon request, the authors reanalyzed the data to compare outcomes between individuals diagnosed with gender incongruence who had received gender-affirming surgical treatments and those diagnosed with gender incongruence who had not. While this comparison was performed retrospectively and was not part of the original research question given that several other factors may differ between the groups, the results demonstrated no advantage of surgery in relation to subsequent mood or anxiety disorder-related health care visits or prescriptions or hospitalizations following suicide attempts in that comparison."

83.    A 2011 article reviewed sex-reassigned patients in Sweden from 1973 to 2003 and showed increased risk for suicide attempts and inpatient psychiatric care. (Dhejne 2011.)

84.    Furthermore, whether or not any of the published data applies to the natal males with gender dysphoria in incarcerated populations is even more unclear. The population of incarcerated natal males with gender dysphoria may skew toward characterological disorders found in highly increased numbers within prisons. It is unknown whether available studies apply to natal males with Bipolar Disorder or Borderline Personality Disorder. As mentioned above, it is not even clear if it applies to those with other major psychiatric comorbidities, such as PTSD, Major Depression, etc.

85.     WPATH, American Psychiatric Association, and the Endocrine Society portrayal of affirmative treatments for gender dysphoria as both effective and virtuous has had a chilling effect on scholarly dialogue regarding gender dysphoria in the medical community. This framework brands those who disagree regarding the evidence base as morally inferior and biased. Through mechanisms I will describe below, moralization has been counter-productive to developing trustworthy science and has contributed to the spread of misinformation regarding treatment approaches to gender dysphoria.

86.     Prudent physicians generally avoid being part of a partisan and moralized debate, and do not want to be harassed by gender activists. (Evans 2021.) As mentioned earlier, the highly politicized dialogue regarding the issue of transgender care mirrors a larger phenomenon within the academic community. On many complex and divisive issues within academia, there has been a push from activist individuals and groups demanding conformity of opinion with narrow, highly moralized viewpoints. (Bindewald 2021.) The example of gender dysphoria shows that academic medicine has not been immune to this same phenomenon.

87.     Pressures to make affirmative therapies the only treatment for gender dysphoria essentially push all parties involved to adopt a simple framework for gender dysphoria treatment. Yet simple does not represent the reality or the evidence base. All-or-nothing rhetoric can be an effective technique to rally support around a

political cause. Yet the treatment of gender dysphoria has complex ethical, legal, social, and clinical tradeoffs.

88.    Within psychiatry and medicine, we as practitioners face enormous suffering. Gender non-conforming patients do at times face harassment and discrimination. Patients expressing gender dysphoria have high rates of depression, anxiety, and self-harm.  All physicians and mental health professionals want to help. Those who are involved with gender affirmative care hope to relieve suffering.  Yet in medicine false hope can cause suffering.

89.    All humans, including physicians, tend to find arguments in favor of conclusions we want to believe, and this bias in known as motivated reasoning. (Peters 2020.) Supporters of gender affirming treatment want to believe they have found an ethical and evidence-based solution. This motivated reasoning explains the strong divergence between the enthusiastic support for gender affirming treatments and the relatively weak evidence base.

### 2. Non-medical social-transitioning interventions are not medically necessary in the correctional context.

90.    As stated above, there are no controlled studies to guide treatment decisions for natal males expressing gender dysphoria in carceral settings. On an individual basis, prison officials and the inmate's clinician can decide whether low-risk, low-cost social-transitioning "treatment" is an appropriate accommodation to provide gender dysphoric inmates, but the fact that some social-transitioning items,

such as wigs, are *psychologically pleasing* to inmates with gender dysphoria does not mean that such interventions are *medically necessary*.

91.     Social transitioning for gender dysphoria in carceral settings has not been studied to examine the outcomes of social transition, including tradeoffs, costs, and treatment effects. This context is a generally a data free zone.

92.     It appears unnecessary and inappropriate to transfer biological males to a female prison, and this includes natal males with gender dysphoria. Most importantly, there is not sufficient evidence to show that rewarding natal males with gender dysphoria access to female prison would benefit this population. Even if it is desired by natal males with gender dysphoria to be housed in a women's prison, whatever individual benefits to these natal males must be weighed against the significant costs and harms involved. These costs and harms come in many forms.

93.     To begin with, once a single male expressing gender dysphoria is rewarded with access to a female prison, then other male prisoners who claim female gender identity would have the right to seek transfer. As the most violent inmates and the vast majority of sex offenders are male, this would flood female prisons with violent inmates and male sex offenders. This would significantly harm the emotional and physical well-being of female prisoners. Even the presence of a single male body in such close quarters can be triggering for female victims of sexual abuse. Female prisoners suffer from extremely high rates of sexual trauma, many have been

sexually trafficked. (Karlsson 2020.) Placing these vulnerable women with biological males for the "treatment" and preference of the males is misguided. Furthermore, due to the advantage in size and strength, female prisoners would be at risk of physical violence from any male in their presence.

### 3. Comorbidities, such as personality disorders, complicate sex-transition interventions.

94.    Personality Disorders are enduring patterns of inner experience and behavior which deviates from expected and causes distress and impairment in functioning. The epidemiology of personality disorders in individuals with gender dysphoria is unknown and estimates vary. (Furlong 2022.) Many estimates have the population extremely increased, such as 50% of adults, but others show smaller increases. One review of emergency room visits of transgender patients diagnosed personality disorders at 4%, versus matched community sample of 1%. The hospitalized sample was at 5% versus 2% in controls. (Lam 2021.) Little scholarly guidance exists regarding specific approaches related to the various personality disorders with comorbid gender dysphoria.

95.    In Borderline Personality Disorder, there is, by definition, an unstable sense of self, and this leads to frequent personality changes. This typically means sudden shifts in employment, relationship, sexual identity, and frequent moves and changes in types of friends. Patients with Borderline Personality Disorder (BPD) often have early life trauma. Patients with BPD have high levels of emotional

dysregulation, self-harm and substance use. This population is extremely difficult to treat, and they often create chaos in their communities. They often experience any suggestion they should change as invalidating, and feeling invalidated, they lash out. Individuals with BPD often continually re-create conflict. As such, wherever those with BPD go, they feel persecuted and poorly treated.

96.    With an unstable sense of self being a core feature of the disorder, this patient population seems an especially poor candidate for affirming surgical interventions, especially irreversible ones. There are two psychotherapeutic approaches which have shown significant success, the most established is Dialectical Behavioral Therapy (Gillespie 2022), but Mentalization Base Therapy (Vogt 2019) also has significant evidence as a successful approach.

97.    In this patient population, a focus on gender affirming treatments as the solution to this constellation of serious mental health problems is extremely problematic, and could cause harm if it prevent access to evidenced-based treatments for their personality disorder. Affirming treatments may be especially problematic in the correctional context. Plaintiff has been diagnosed with Bipolar Disorder and Borderline Personality Disorder, among other conditions. If this is accurate, these comorbidities make the effectiveness of sex-transition interventions, such as sex-reassignment surgery, particularly unproven and risky.

98.     The carceral setting further complicates treatment. For example, in my experience with correctional facilities, inmates frequently use threats of self-harm and suicide to try to obtain concessions from prison officials. It is my understanding that the U.S. Court of Appeals for the First Circuit recognized this safety concern, and it is my experience that the concern remains true today. *See Kosilek v. Spencer*, 774 F.3d 63, 92-94 (1st Cir. 2014) (en banc). It is reasonable for prison administrators to have nearly insurmountable presumptions—if not outright prohibitions—against providing inmates benefits, such as unproven surgeries, special-order items, and housing placements, in response to self-harm or suicide threats in order to discourage false threats. In corrections, rewarding self-injury or threats of self-injury tends to increase overall self-harm, both for the individual patient and also within the system. In prisons, there is always a difficult balance of short- and long-term safety concerns, and each patient must be considered individually and as part of the system.

**D.     Plaintiff Jane Doe**

99.     Drs. Lowell, Haw, and Berli opine that Plaintiff is a good candidate for sex-reassignment surgery. As I explained, there is insufficient evidence for someone to conclude that sex-reassignment surgery is medically necessary, so Plaintiff's experts' opinions to that effect do not rest on strong footing. And although my opinion is limited as I have not personally examined Plaintiff, the documents

provided cast considerable doubt on whether that Plaintiff is a good candidate for sex-reassignment surgery.

100.    First, Drs. Lowell, Haw, and Berli are not neutral arbiters of best practice for patients expressing gender dysphoria within correctional environments. They all are personally and professionally invested in transgender medicine and within that sphere of medicine have broadly deferred to the recommendations of WPATH. Reliance on WPATH causes their recommendations to be wholly inadequate and ideological, as the recommendations flow from an organization committed to ideology and activism over science.

101.    Nowhere in the reports do I find substantial discussions of Plaintiff's complex mental health history and alternative explanations to Plaintiff's psychopathology. Nowhere is it mentioned that Plaintiff is a violent sex offender. Gender dysphoria does not explain Plaintiff's decades long history of self-harm. Plaintiff admits to having "anxiety and depression." Plaintiff claims to be persecuted and singled out by the Georgia state correctional system. Perhaps the opposite is true, and the system has devoted many resources toward Plaintiff, but Plaintiff is continually rejecting help and recreates conflict. Plaintiff has significant medical issues that increase the risk of surgery.

102.    Again, without having examined Plaintiff, it appears likely that Plaintiff has significant and persistent mental illness, such as a personality disorder.

Personality Disorders are a common comorbidity with gender dysphoria and personality disorders are common in correctional settings. Plaintiff's underlying psychopathology, perhaps a personality disorder, rather than gender dysphoria, appears more likely driving the self-harm, mood problems, and sense of persecution and also drives the need to lash out at the system, rather than working to improve coping skills and self-regulate.

103.    In sum, given Plaintiff's extensive history of serious mental illness, there should be considerable doubts as to whether a major surgical intervention would actually improve Plaintiff's mental or physical health.

## E.    Gender identity lacks a biological basis, and gender dysphoria is a subset of gender identity disorder.

104.    Plaintiff claims that gender identity has a biological basis. This can only be accurate in the most reductionist framework, and that all human experiences are on some level biological. The limited available twin studies show that environment and development factors are more influential than genetics, as monozygotic twins concordance rate is below 50%. (Karamanis 2022; Heylens 2012.) Furthermore, the genetic or other biological links also may not relate to gender dysphoria but same-sex attraction or other confounding variables.

105.    Gender identity does change in individuals and in populations over time. Thus, environmental influences do play a sizable role, such as generational factors, ideology, and cultural influence.

106. Neither brain scans nor any other method has found a biological basis to gender dysphoria. Any claims of biological basis are conjecture. (Levin 2023; Boucher 2020.)

107. In the Lowell declaration, it was noted that the nomenclature changed from Gender Identity Disorder in DSM-IV to Gender Dysphoria from DSM-V. Lowell claimed this change was based on changes regarding the understanding of the condition. The DSM-V changes do focus on distress rather than identity, but in either case, it is a continuation of the same clinical problem of gender incongruence. Either diagnosis describes primarily the same clinical populations. This change still places those with gender dysphoria as a clear subset of those with gender identity disorder.

## IV.    Conclusion

108. It is scientific and medical consensus that patients with gender dysphoria typically also have a mix of anxiety, depression, self-harm, personality disorders, neurodevelopmental disorders, and trauma-related symptoms. Yet these mental health problems generally pre-date or co-occur with the development of gender dysphoria.

109. There is not a scientific or medical consensus that comorbid mental health disorders are due to "untreated" gender dysphoria. This claim does not match the data.

110.   The medical system has a long history of spurts of overdiagnosis and overtreatment. Many of our interventions such as frontal lobotomies were celebrated at the time. Eventually society sees the harm, pushes back, and the medical profession eventually reforms. The American opiate epidemic was ushered in by "expert" physicians who proposed physicians need more compassion because "pain is the 5th vital sign." (Mandell 2016; Adams 2016.) This turned out to be a large-scale social disaster instigated in large part by the medical community. Too much compassion can cause harm.

111.   The surgical interventions relevant to this case are not, in fact, medically necessary. This is true when it comes to the gravest concern of all, suicide. Based on long-term data in Sweden, sex-reassignment interventions have not been shown to be lifesaving. We do not have convening data that affirmative treatments reduce suicidality, and based on a recent study, we should be concerned that it could increase it. (Chen 2023.)

112.   When claims are made that there exists a scientific and medical consensus supporting sex-reassignment interventions for gender dysphoria, these claims rest on the assertions of a small group of physicians who are already personally invested in this type of care. They already have extremely powerful reasons to want to believe these sex-reassignment interventions are effective, and thus are biased. I know psychiatrists involved in gender affirming care and they are

smart, compassionate physicians. I have no doubt that they have received significant positive feedback from patients and families. This is consistent with multiple studies showing short-term benefit in mood and social dysphoria from affirming treatment. Short-term positives responses can also be explained by placebo effects, especially under the current conditions where most gender clinics offer multidisciplinary teams providing support and therapy along with hormones and medical procedures.

113.   The modern medical system does make serious mistakes at scale. We should be taking a cautious approach and encouraging rigorous open scholarly dialogue where physicians who doubt the merits of sex-reassignment surgeries can speak freely without being attacked. Prisoners are considered a vulnerable population. This is precisely why they need added protections to provide them, including those with gender dysphoria, the right care. Prisoners are a population where we should be skeptical, guard against over-treatment, and proceed with caution. For those reasons and the others cited above, sex-reassignment surgery in prison settings should not be considered the standard of care or medically necessary. More conservative and cautious treatments appear much more appropriate.

## V.    References

1.    Adams, J., Bledsoe, G. H., & Armstrong, J. H. (2016). Are pain management questions in patient satisfaction surveys driving the opioid epidemic?. American journal of public health, 106(6), 985.

2.    Bindewald, B., & Hawkins, J. (2021). Speech and inquiry in public institutions of higher education: Navigating ethical and epistemological challenges. Educational Philosophy and Theory, 53(11), 1074-1085.

3.    Boucher FJO, Chinnah TI. Gender Dysphoria: A Review Investigating the Relationship Between Genetic Influences and Brain Development. Adolesc Health Med Ther. 2020 Aug 5;11:89-99. doi: 10.2147/AHMT.S259168. PMID: 32801984; PMCID: PMC7415463.

4.    Block J. Gender dysphoria in young people is rising-and so is professional disagreement. BMJ. 2023 Feb 23;380:382. doi: 10.1136/bmj.p382. PMID: 36822640.

5.    Bränström, R., & Pachankis, J. E. (2020). Reduction in mental health treatment utilization among transgender individuals after gender-affirming surgeries: a total population study. American journal of psychiatry, 177(8), 727-734.

6.    Chen, D., Berona, J., Chan, Y. M., Ehrensaft, D., Garofalo, R., Hidalgo, M. A., ... & Olson-Kennedy, J. (2023). Psychosocial Functioning in Transgender Youth after 2 Years of Hormones. New England Journal of Medicine, 388(3), 240-250.

7.   Ciszek, E., Mocarski, R., Price, S., & Almeida, E. (2021). Discursive stickiness: Affective institutional texts and activist resistance. Public Relations Inquiry, 10(3), 295-310.

8.   Cohn, J. (2023). The Detransition Rate Is Unknown. Archives of Sexual Behavior, 1-16. Cosentino, C. E., Meyer-Bahlburg, H. F., Alpert, J. L., & Gaines, R. (1993). Cross-gender behavior and gender conflict in sexually abused girls. Journal of the American Academy of Child & Adolescent Psychiatry, 32(5), 940-947.

9.   D'Angelo, R., Syrulnik, E., Ayad, S., Marchiano, L., Kenny, D. T., & Clarke, P. (2021). One size does not fit all: In support of psychotherapy for gender dysphoria. Archives of Sexual Behavior, 50(1), 7-16.

10.  Dahlen, S., Connolly, D., Arif, I., Junejo, M. H., Bewley, S., & Meads, C. (2021). International clinical practice guidelines for gender minority/trans people: Systematic review and quality assessment. BMJ open, 11(4), e048943.

11.  Dhejne C, Lichtenstein P, Boman M, Johansson AL, Långström N, Landén M. Long-term follow-up of transsexual persons undergoing sex reassignment surgery: cohort study in Sweden. PLoS One. 2011;6(2):e16885.

12. Evans, M. (2021). Freedom to think: the need for thorough assessment and treatment of gender dysphoric children. BJPsych bulletin, 45(5), 285-290.

13. Furlong, Y., & Janca, A. (2022). Epidemiology of personality disorders in individuals with gender dysphoria. Current Opinion in Psychiatry, 35(1), 78-82.

14. Gillespie, C., Murphy, M., & Joyce, M. (2022). Dialectical Behavior Therapy for Individuals with Borderline Personality Disorder: A Systematic Review of Outcomes After One Year of Follow-Up. Journal of Personality Disorders, 36(4), 431-454.

15. Griffin, L., Clyde, K., Byng, R., & Bewley, S. (2021). Sex, gender and gender identity: a re-evaluation of the evidence. BJPsych Bulletin, 45(5), 291-299.

16. Hakeem, A. (2012). Psychotherapy for gender identity disorders. Advances in psychiatric treatment, 18(1), 17-24.

17. Heylens, G., De Cuypere, G., Zucker, K. J., Schelfaut, C., Elaut, E., Vanden Bossche, H., ... & T'Sjoen, G. (2012). Gender identity disorder in twins: a review of the case report literature. The Journal of Sexual Medicine, 9(3), 751-757.

18. Jorgensen SCJ. Transition Regret and Detransition: Meanings and Uncertainties. Arch Sex Behav. 2023 Jul;52(5):2173-2184.

19.    Kaliebe, K. E. (2016). The future of psychiatric collaboration in federally qualified health centers. Psychiatric Services, 67(8), 827-829.

20.    Kaliebe, K. E. (2017). Expanding our reach: Integrating child and adolescent psychiatry into primary care at federally qualified health centers. Journal of the American Academy of Child & Adolescent Psychiatry.

21.    Karamanis, G., Karalexi, M., White, R., Frisell, T., Isaksson, J., Skalkidou, A., & Papadopoulos, F. C. (2022). Gender dysphoria in twins: a register-based population study. Scientific Reports, 12(1), 13439.

22.    Karlsson, M. E., & Zielinski, M. J. (2020). Sexual Victimization and Mental Illness Prevalence Rates Among Incarcerated Women: A Literature Review. Trauma, Violence, & Abuse, 21(2), 326-349.

23.    Kohls, G., & Roessner, V. (2022). Editorial Perspective: Medical body modification in youth with gender dysphoria or body dysmorphic disorder–is current practice coherent and evidence-based?. Journal of Child Psychology and Psychiatry.

24.    Lam, J. S. H., Abramovich, A., Victor, J. C., Zaheer, J., & Kurdyak, P. (2022). Characteristics of transgender individuals with emergency department visits and hospitalizations for mental health. Psychiatric Services, 73(7), 722-729.

25. Littman, L. (2021). Individuals treated for gender dysphoria with medical and/or surgical transition who subsequently detransitioned: A survey of 100 detransitioners. Archives of Sexual Behavior, 50(8), 3353-3369.

26. Mandell, B. F. (2016). The fifth vital sign: A complex story of politics and patient care. Cleveland Clinic journal of medicine, 83(6), 400-401.

27. McPherson, S., & Freedman, D. E. (2023). Psychological outcomes of 12-15 year olds with gender dysphoria receiving pubertal suppression: assessing reliable change and recovery. medRxiv, 2023-05.

28. Murad, M. H. (2017, March). Clinical practice guidelines: a primer on development and dissemination. In Mayo Clinic Proceedings (Vol. 92, No. 3, pp. 423-433). Elsevier.

29. Passos, T.S., Teixeira, M.S. & Almeida-Santos, M.A. Quality of Life After Gender Affirmation Surgery: a Systematic Review and Network Meta-analysis. Sex Res Soc Policy 17, 252–262 (2020), https://doi.org/10.1007/s13178-019-00394-0.

30. Peters, U. (2020). What is the function of confirmation bias?. Erkenntnis, 1-26.

31. Rachel N. Levin, Laura Erickson-Schroth, Kristie Mak & E. Kale Edmiston (2023) Biological studies of transgender identity: A critical

review, Journal of Gay & Lesbian Mental Health, 27:3, 254-283, DOI: 10.1080/19359705.2022.2127042.

32.    Singer, J., Pilgrim, D., Hakeem, A. et al. Constraints on Free Academic and Professional Debate in the UK About Sex and Gender. Arch Sex Behav 52, 2269-2279 (2023), https://doi.org/10.1007/s10508-023-02687-3.

33.    Soldati, L., Hasler, R., Recordon, N., Clement, M., Köhl, J., & Perroud, N. (2022). Gender dysphoria and dissociative identity disorder: a case report and review of literature. Sexual Medicine, 10(5), 100553.

34.    Van der Kolk, B. A. (1994). The body keeps the score: Memory and the evolving psychobiology of posttraumatic stress. Harvard review of psychiatry, 1(5), 253-265.

35.    Vogt, K. S., & Norman, P. (2019). Is mentalization-based therapy effective in treating the symptoms of borderline personality disorder? A systematic review. Psychology and Psychotherapy: Theory, Research and Practice, 92(4), 441-464.

I declare, pursuant to 28 U.S.C. §1746, under penalty of perjury that the foregoing is true and correct.

Executed this ___30th___ day of January, 2024.

Kristopher E. Kaliebe, M.D.

# Exhibit A

# CURRICULUM VITAE

## Kristopher Edward Kaliebe, MD
**Professor**
**Psychiatry and Behavioral Neurosciences**

### University of South Florida, Morsani College of Medicine, Tampa Florida

**Address**

Psychiatry and Behavioral Neurosciences
3515 E. Fletcher Avenue, MDC 14
Tampa FL 33613
Office: 813974-5460
kkaliebe@usf.edu

**Citizenship**

*United States*

**Education**

**Graduate/Medical:** St. George's University
School of Medicine, Grenada, West Indies
Medical Doctor                                          January 1995- June 1999

**Undergraduate:** Columbia College,
Columbia University
New York, NY,
Bachelor of Arts, Biochemistry                    September 1988-May 1992

**Postgraduate Training**

Clinical Fellowships:
Fellow, Forensic Psychiatry   (PGY6)
Louisiana State University Medical Center
1542 Tulane Ave., New Orleans, LA 70112        July 2004 to June 2005

Fellow, Child and Adolescent Psychiatry (PGY 4-5)
Louisiana State University Medical Center
1542 Tulane Ave., New Orleans, LA 70112        July 2002 to June 2004

Chief Resident in Child and Adolescent Psychiatry
- Acted as liaison between Child Psychiatry Fellows and Administration
- Coordinated with Program Director lecture and rotation schedules
                                                       July 2003 to June 2004

Residency:

1

Resident, Psychiatry (PGY 2-3)
University of Medicine and Dentistry-
New Jersey Medical School
185 S Orange Ave, Newark, NJ 07103                    July 2000- June 2002

Internship: (PGY 1)
University of Medicine and Dentistry-
New Jersey Medical School
185 S Orange Ave, Newark, NJ 07103                    July 1999- June 2000

Diplomate, American Board of Psychiatry and Neurology:

- Board Certification in General Psychiatry, awarded 2004, active

- Specialty Board Certification Child and Adolescent Psychiatry, awarded 2005, active

- Specialty Board Certification Forensic Psychiatry, awarded 2007, active


**Awards, Honors, Honorary Society Memberships:**

Department of Veterans Affairs Special Contribution Award for Clinical Service in Psychiatry
                                                 February 22, 2002

Outstanding Resident Award, Presented at the American Academy of Child and Adolescent Psychiatry, Miami, Florida,
                                                 October 17, 2003

Inducted into Berkeley Preparatory School Athletic Hall of Fame, Tampa, Florida,
                                                 November 7, 2003

Fellow, Louisiana State University Academy for the Advancement of Educational scholarship
                                                 October 2007 – 2016

*Best Doctors*, Louisiana in the subspecialty of Child and Adolescent Psychiatry
                                                 Awarded 2007, 2008, 2009,
                                                 2010, 2011, 2012, 2013,
                                                 2014, 2015 and 2016

*Best Doctors*, in Tampa Florida
                                                 2017, 2018, 2019, 2020,
                                                 2021, 2022,2023

2

*Top Doctor,* in Tampa Florida                             2023

Awarded status as a Distinguished Fellow of the American Academy of Child and Adolescent Psychiatry
                                                    July 6, 2016

Awarded Full Professor, University of South Florida, Department of Psychiatry, effective
                                                    July 1st, 2023


**Appointments:**

Professor, University of South Florida Medical School, Department of Psychiatry.
                                                    August 1, 2023 to present

Associate Professor, University of South Florida Medical School, Department of Psychiatry.                              September 2016 to July 31, 2023

- Supervise one afternoon weekly of outpatient Child and Adolescent Psychiatry Silver Center Resident Clinic with USF General Psychiatry Residents and Child and Adolescent Psychiatry fellows who performed assessment, consultation, and treatment.                              September 2016 to present
- Supervise one morning clinic of outpatient general psychiatry at the USF OPC Clinic who performed assessment, consultation, and treatment.
                                                    February 2023 to present

Tampa General Hospital Psychiatrist on Duty          September 2016 to present
        Manage the night, weekend and holiday clinical responsibilities of Tampa General Hospital including the over 1000 bed hospital and a 24-hour emergency room. Usually done in partnership with a psychiatric resident from the University of South Florida.

Facility Psychiatrist.  Tampa Residential Facility          September 2016 to present
- Performed psychiatric evaluations and treatment in Florida's juvenile correctional system.  Tampa Residential Facility is the most intensive level of mental health and substance abuse treatment, subcontracted to Truecore Solutions.

Facility Psychiatrist.  Les Peters Academy Residential Facility
                                                    May 2017 to present
- Performed psychiatric evaluations and treatment in Florida's juvenile correctional system, subcontracted to Truecore Solutions.

Staff Psychiatrist, Orleans Parish Justice System          March 2018 to July 2018
- Performed telepsychiatric evaluations and treatment in Orleans Parish Prison correctional system, subcontracted to Correct Care Solutions.

3

Facility Psychiatrist.  Charles Britt Academy Residential Facility

November 2019 to July 2022

Performed psychiatric evaluations and treatment in Florida's juvenile correctional system, subcontracted by Sequel.

Facility Psychiatrist. Columbus Youth Academy Residential Facility

June 2020 to present

Performed psychiatric evaluations and treatment in Florida's juvenile correctional system, subcontracted by Sequel.

Louisiana State University Health Science Center Assistant Professor of Clinical Psychiatry                                        July 2005 to June 2017

Louisiana State University Health Science Center Associate Professor of Clinical Psychiatry                                        July 2016 - 2017

Mental Health Medical Director, St. Charles Community Health Center, Luling, Louisiana                                        July 2005 to 2016

- Evaluated and treated a primarily Medicaid and underserved population of adult, child and adolescent patients in a Federally Qualified Health Care Center.

Coordinator for Child and Adolescent Integrated Mental and Behavioral Health Services, Louisiana Mental and Behavioral Health Capacity Project

September 2012 to July 2017

- Performed assessment, consultation, training, prevention, and education services to Federally Qualified Health Centers and community clinics in Coastal Louisiana.
- Evaluated and treat both on site and using remote video conferencing equipment (telehealth).

Staff Psychiatrist, Back-up coverage, Louisiana Juvenile Justice System    July 2016 to September 2022

- Performed psychiatric evaluations and treatment in Louisiana's juvenile correctional system, subcontracted to Wellpath (formerly Correct Care Solutions).
- Back up on call coverage for on-site psychiatrists
- As needed evaluated and treated remote video conferencing equipment (telehealth).

Staff Psychiatrist, Louisiana Juvenile Justice System        July 2010 to July 2016

- Performed psychiatric evaluations and treatment in Louisiana's juvenile correctional system, subcontracted to Correct Care Solutions.
- Evaluated and treated both on site and using remote video conferencing equipment (telehealth).

4

Staff Psychiatrist on Duty                                    October 2011 to July 2016
Children Hospital, Calhoun Campus. New Orleans, Louisiana
- Facilitated development of protocols and supervision regarding the training of Medical Students, General Psychiatry Residents and Child and Adolescent Psychiatric Fellows who utilize the Calhoun unit as primary training site for Child Psychiatry.
- Manage night and weekend clinical responsibilities for Children's Hospital emergency room and Inpatient Psychiatric Unit, including individually assessing all inpatients each weekend.

Staff Psychiatrist, Louisiana State University Juvenile Justice Program
                                                    July 2005 to August 2010
- Performed psychiatric evaluations and treatment in Louisiana's juvenile correctional system at Bridge City Center for Youth and Jetson Center for Youth.
- Evaluated and treated both on site and using remote video conferencing equipment (telehealth).

Staff Psychiatrist, Florida Parish Juvenile Detention Center,
                                                    July 2007 to August 2010
- Performed psychiatric evaluations and treatment using remote video conferencing equipment (telehealth).

Medical Officer on Duty                                    July 2002 to July 2005
New Orleans Adolescent Hospital. New Orleans, Louisiana
- Managed clinical responsibilities of Crisis Intervention Services, a 24-hour emergency mental health response team serving families, children and adolescents from the Southeast Louisiana region.
- Managed two psychiatric inpatient units including a twenty bed adolescent and ten bed children's unit after hours on call.
- On call physician for Crisis Respite, a short term residential facility for children and adolescents located on hospital grounds.

Psychiatrist on Duty                                    September 2003 to July 2005
New Orleans Veterans Administration Medical Center, New Orleans, Louisiana
- Managed clinical psychiatric responsibilities of a 450 bed hospital
- Managed clinical psychiatric responsibilities of a 27 bed inpatient psychiatric unit
- Managed clinical psychiatric responsibilities of 24-hour emergency room

Psychiatrist on Duty                                    September 2001 to June 2002
New Jersey Medical Center Veterans Administration
- East Orange Medical Center, East Orange, NJ
Managed clinical psychiatric responsibilities of 24 hour emergency room along with a 295 bed hospital, 30 Nursing Home and 30 Domiciliary beds.
- Lyons Hospital, Lyons, NJ
Managed clinical psychiatric responsibilities of 356 bed hospital.

5

**Teaching, Lecture**

Undergraduate Medical Student

BMS6920.002, BMS6920.001 University of South Florida:  Created five session elective: "Mind Body Medicine"  Developed as part of University of South Florida medical school elective curriculum from 2017-2022.  Offered for up to 12 students as a credited elective including study guide, organizing readings, and experiential class learning.

2017 to 2022

At Louisiana State University Health Science Center New Orleans:

4 one-hour lectures instructing all Medical Students (MS2) in Child and Adolescent mental health during Psychiatry Basic Science block

February 2004 to February 2016

LSU Physical therapy
Annual 2 two-hour lectures on a range of mental health topics annually

2012 to 2016

LSU Public Health
Annual 2 hour lecture on psychopharmacology to incoming Masters Level students in Public Health

2012 to 2016

**Graduate Medical Teaching**

MEL 8602 C65 M:  Child and Adolescent Psychiatry

Child and Adolescent Psychiatry Resident Teaching:

Arranged and co-instructed Forensics Lecture Series, bi-annually 10 lecture hours and 4 hours of individual lectures.

2016 to present.

Teach various topics within residency training. 1 lecture per year.

2016 to present.

University of South Florida General Psychiatry Residency:

Co-Produced elective track for 2 residents per year within University of South Florida Psychiatry Residency.  Supervision of Integrative Psychiatry residents within the University of South Florida's Integrative Psychiatry Track, biweekly sessions utilizing curriculum from the Andrew Weil Center for Integrative Medicine.

July 2020- present

6

Forensic Psychiatry Resident Teaching:

Teach child and corrections related forensic topics within residency training. 4 lectures per year.

2018 to present.

LSUHSC New Orleans, General Psychiatry Resident Teaching

- Created and taught one hour weekly (44 weeks per year) Cognitive Behavioral Therapy practicum for PGY 3 residents

    2007 to 2016
- One hour lecture on evolution and mood disorder each year for PGY3 residents

    2010 to 2016

LSUHSC New Orleans Child and Adolescent Psychiatry Resident Teaching

- One-hour didactic lectures on psychopharmacology for 8 weeks and cognitive behavior therapy for 4 weeks bi-annually

    2008-2016
- Organized and taught majority of the year-long bi-weekly one hour didactic program entitled Special Topics including a wide range of topics including development, forensic psychiatry, evolution, anthropology, nutrition, effects of technology, electronic media, sleep, exercise and physical activity, wellness and systems of care.

    2008 to 2016

LSU- Kenner Family Practice Residency:
Once yearly didactic lectures for 1 to 2 hours for Kenner Family Practice Residents

2009 to 2016

Created one session Mini-Course: "Optimizing Neurocognition through Nutrition." Developed and co-facilitated a module as part of Goldring Center for Culinary Medicine curriculum for medical students and other trainees with Annie Yeh, MD).  Offered as a 1 credit elective for Tulane medical students including study guide, organizing readings, online webinar to be viewed prior to class, case studies during class and test.

2014

At Louisiana State University Health Science Center New Orleans: Core Clinical Psychiatry Rotation Lecture, 1 hour lecture presented to MS3 students every six weeks to 3rd year medical students covering Child Psychiatry Basics.

October 2003 to June 2005

At University of Medicine and Dentistry- New Jersey Medical School, Department of Psychiatry

• Lecture: "The Media and Psychiatry" for General Psychiatry Residents, created as part of the Culture and Psychiatry Seminar

August 2001 and 2002

**Teaching, Supervisory**

At University of South Florida, Tampa Florida:

*Medical Student supervision*

University of South Florida -                                     2017 to present
MEL 8109 L69 M
BCC 7154 002 M   Psychiatry / Neurology Clerkship.  Medical Students rotation through clinic one afternoon weekly of outpatient Child and Adolescent Psychiatry Silver Center Resident Clinic

Psychiatry Elective, 2 to 4 week Medical Student rotation through Child and Adolescent Psychiatry Silver Center Resident Clinic

*Graduate Medical Education Supervision*

Child and Adolescent Psychiatry Residency

Supervise one afternoon weekly of outpatient Child and Adolescent Psychiatry Silver Center Resident Clinic with USF Child and Adolescent Psychiatry residents who performed assessment, consultation, and treatment.

September 2016 to June 2021

Supervise one afternoon weekly of outpatient Child and Adolescent Psychiatry correctional psychiatry with USF Child and Adolescent Psychiatry residents who observe clinical care in juvenile correctional facilities.

September 2016 to present

General Psychiatry Residency:

Supervise one afternoon weekly of outpatient Child and Adolescent Psychiatry Silver Center Resident Clinic with USF General Psychiatry Residents who performed assessment, consultation, and treatment.

September 2016 to present

Supervise one afternoon weekly of outpatient Adult Psychiatry Resident Clinic with USF General Psychiatry Residents at the Outpatient Psychiatry Clinic who performed assessment, consultation, and treatment.

8

Forensic Psychiatry Resident Teaching

Supervision of forensic psychiatry trainees within the University of South Florida forensic psychiatry training program**.** This includes review of resident competency evaluations along with co-evaluation of criminal defendants as individual cases arise.

2018 to present

At Louisiana State University Health Science Center New Orleans

LSU- Kenner Family Practice Residency:
- One month, once weekly half day mental health rotation at St Charles Community Health Center for all Kenner Family Practice Residents

2008 to 2016

Clerkship/Residency Directorship:

Child and Adolescent Psychiatry Fellowship Training Director, Louisiana State University Medical Center.  Oversaw and supervised resident physician training Managed administrative, evaluation and scheduling issues within the training program Collaborated with Louisiana State University psychiatric faculty to develop policies and procedures at various clinical site.

July 2010 to September 2012

Teaching Awards:

Association for Academic Psychiatry Honorary Fellow

October 2001- October 2002

Louisiana State University Child and Adolescent Psychiatry Department Outstanding Teacher Award for the 2006-2007 academic year

Louisiana State University Child and Adolescent Psychiatry Department Outstanding Teacher Award for the 2015-2016 academic year

PGY 3 Educator of the year award for the PGY 3 class at University of South Florida, awarded June 2023

## *Peer to Peer: Institutional Grand Rounds*

 "The Minds, They are a Changin' – An Overview and Update on MDMA and Psilocybin Grand Rounds University of South Florida Psychiatry Department, Tampa Florida

January 28 2022

"3 Simple Rules for Overcoming Obesity" University of South Florida Endocrinology Department, Tampa Florida

November 9, 2021

"A hard pill to swallow: psychotropic medications in foster care", University of South Florida, Department of Public Health, Tampa Florida

November 3, 2017

"Rules of Thumb: The importance of heuristic and cognitive biases in pediatric physical and mental health" Grand Rounds Children's Hospital, New Orleans

July 30, 2014,

Grand Rounds, Louisiana State University Department of Psychiatry, "Rules of Thumb, lifestyle interventions for mental health professionals." New Orleans, Louisiana

January 23, 2014

"Just say No, the Case against Stimulant Medication" Grand Rounds Children's Hospital, New Orleans, Louisiana

May 19th, 2010

"Violence: Neurobiology, Risk Assessment and Beyond", Grand Rounds Louisiana State University Department of Psychiatry, New Orleans, Louisiana

August 9, 2012

"Is ADHD a Nutritional Disorder", Grand Rounds Louisiana State University Department of Psychiatry, New Orleans, Louisiana

July 28, 2011

"Just say No, the Case Against Stimulant Medication", Grand Rounds Louisiana State University Department of Psychiatry, New Orleans, Louisiana

July 29th, 2010

Grand Rounds Department of Psychiatry, Louisiana State University School of Medicine, New Orleans, Louisiana "The Application of Darwinian Principles to Child Custody Evaluations", New Orleans, Louisiana

May 26th, 2005

"Attention Deficit Hyperactivity Disorder" Grand Rounds Department of Pediatrics, Louisiana State University School of Medicine, New Orleans, Louisiana

May 25th, 2005

"The Media, Our New Social World, How Should Pediatricians Respond?" Grand Rounds, Louisiana State University School of Medicine, Children's Hospital, New Orleans, Louisiana

June 2nd, 2004

"Attention Deficit Disorder" for Louisiana State University Health Science Center Juvenile Corrections Program Continuing Medical Education Presentation via telemedicine New Orleans, Louisiana

10

March 16th, 2004

"The Media, Relationships to Children and Psychiatry", Grand Rounds, Department of Psychiatry, Louisiana State University School of Medicine, New Orleans, Louisiana

June 4th, 2003

"The Media, Relationships to Children and Psychiatry", Grand Rounds, New Orleans Adolescent Hospital, New Orleans, Louisiana

March 28th 2003

**Lectures by Invitation**

"The Media, Relationships to Children and Psychiatry" Grand Rounds, University of West Virginia, Charleston, West Virginia,  Department of Psychiatry and Behavioral Science

April 10th 2003

"The Media and Child and Adolescent Psychiatry –An Evolving Relationship" Chair and Presenter, Media Theatre, Annual Conference of the American Academy of Child and Adolescent Psychiatry

October 21st, 2004

"The Media, Our New Social World, How Should Health Care Professionals Respond?" Continuing Medical Education Presentation Snowshoe Mountain Retreat, Snowshoe Mountain, West Virginia

September 19th, 2004

"The Application of Darwinian Principles to Child Custody Evaluations" Grand Rounds Department of Psychiatry, University of South Florida, Tampa, Florida

October 31st, 2005

"The Evaluation and Treatment of Traumatized Children and Adolescents with ADHD" Web Cast Presentation and Grand Rounds sponsored by the National Center for Child Traumatic Stress Network's Rural Consortium, New Orleans, Louisiana

January 25th, 2007

"Behavioral Disorder or Traumatized Child?" Louisiana Federation of Families for Children's Mental Health, Children's Mental Health Conference, Houma Louisiana

May 9th, 2008

"Behavioral Disorder or Traumatized Child?" Grand Rounds Tulane University Department of Child Psychiatry, New Orleans, Louisiana

March 13th, 2009

"Brother's Little Helper: The Simpsons Satirizes Stimulant Medication as a Response to Childhood Behavior Problems" Media Theatre, Annual meeting of the American Academy of Child and Adolescent Psychiatry, New York, New York  Kristopher Kaliebe MD, K. Dalope, MD

October 30, 2010

"Violence Risk Assessment" Louisiana Psychiatric Medical Association Annual Meeting, New Orleans, LA

March 2, 2013,

"Telepsychiatry in Juvenile Justice Settings" part of  "Telepsychiatry: Challenges and Successes Across Settings." Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Orlando FL

October 22, 2013

"What are they Missing, When Electronic Media Displaces Sleep, Academics and Exercise"  part of "Identifying and Treating Internet-Related Mental Health Problems: An Evidence-Based Approach" Clinical Perspectives. Annual meeting of the American Academy of Child and Adolescent Psychiatry, Toronto, Canada

October 24, 2014

"The Implications of the Pharmacological Treatment of Children" Michigan Drug Court Annual Conference, Lansing, Michigan

March 12, 2014

"Three rules to prevent and treat ADHD symptoms" as part of the Louisiana ADHD Symposium, organized by the Louisiana Department of Health and Hospitals ADHD Task Force, Baton Rouge, Louisiana

December 9, 2014

"Non-Pharmaceutical Interventions for ADHD", Invited Professorship: St George's University School of Medicine Complementary and Alternative Medicine Selective, St George's, Grenada, West Indies

August 28 – Sept. 3rd, 2014

"Screen Time and Childhood Behavior: Disruptive Influence or Easy Scapegoat" as part of "Caught in the Net, How Electronics effects Mental Illness" Chair and Presenter, Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, San Diego, California

October 30, 2014

"The Management of Childhood Obesity" and "Disordered Eating in Children and Adolescents" Oregon Psychiatric Medical Association Conference, Portland, Oregon

February 27 and 28, 2015

"Rules of Thumb: 3 Simple Rules to Optimize Physical and Mental Health" National Alliance for the Mentally Ill Louisiana Annual Conference, New Orleans, Louisiana
April 17, 2015

"ADHD overdiagnosis in Louisiana, a child and adolescent psychiatrist's perspective" Preventing Overdiagnosis Conference, National Institutes of Health (NIH), Bethesda Maryland
September 2, 2015

"An alternative to diagnosis-based practice in pediatric mental health" Preventing Overdiagnosis Conference: National Institutes of Health NIH Bethesda Maryland
September 2, 2015

"Shell Shocked: Growing up in the Murder Capital of America". Discussant for Media Theatre, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Holly Peek, MD, Kristopher Kaliebe, MD San Antonio, Texas
October 29, 2015

"Screen Time and Childhood Behavior: Disruptive Influence or Easy Scapegoat" as part of "Caught in the Net, How Electronics effects Mental Illness" Chair and Presenter, Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, San Antonio, Texas
October 31, 2015

"What are they (we) Missing? When Electronic Media Displaces Sleep, Academics, and Exercise" Grand Rounds University of South Florida Psychiatry Department, Tampa Florida
November 12th, 2015

ADHD overdiagnosis in Louisiana, a child and adolescent psychiatrist's perspective, Louisiana Psychological Association, New Orleans, LA
May 20, 2016

"Rules of Thumb: 3 Simple Rules to Optimize Physical and Mental Health" Crohns and Colitis Association of America Regional Conference, New Orleans, LA,
June 12, 2016

"Evaluating and Assuring the Effective and Safe Use of Psychotropic Medications in Children" Webinar: National Council of Juvenile and Family Court Judges, with Judge Constance Cohen; Janie Huddleston and Dr. Joy Osofsky, Ph.D.
June 24, 2016,

"Psychotropic Medications 101: What Judges Need to Know for Effective Decision Making" Florida Child Protection Summit, with Melinda Sczepanski, Orlando FL
September 9, 2016

13

"Communicating With the Media and the Public as Child and Adolescent Psychiatrists Around Disaster and Highly Traumatic Events." Workshop, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Media Training Workshop, New York, New York

October 27, 2016

"Evolutionary Biology is a Basic Science for Child and Adolescent Psychiatry" Special Interest Group, Annual meeting of the American Academy of Child and Adolescent Psychiatry, New York, New York

October 28, 2016

"Is War Ever Really Over? War-Affected Youth From Home to Host Country", Discussant, Clinical Perspectives. Annual meeting of the American Academy of Child and Adolescent Psychiatry, New York, New York

October 28, 2016

"Psychotropic Medications 101: The pertinent essentials for all involved in the child welfare system" Florida Child Protection Summit, with Melinda Sczepanski, Orlando, Florida

August 30, 2017

"Safe Use of Psychotropic Medications in Children." 2017 Safe Babies Court Teams Cross Sites Meeting, Fort Lauderdale, Florida

August 17, 2017

"Health Promotion in Pediatric Mental Health" Discussant, Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Washington, DC

October 23, 2017

"New Technologies, New Laws, New Childhood" as part of "Clinical Guidelines for Navigating Media Use" Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Washington, DC

October 24, 2017

"Screen Time and Childhood Behavior: Disruptive Influence or Easy Scapegoat" as part of "Caught in the Net, How Electronics effects Mental Illness" Chair and Presenter, Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Washington, DC

October 26, 2017

"The Business of News, the Role of Child and Adolescent Psychiatrists in the Media, and Risk Communication."   Member Services Forum, Annual meeting of the American Academy of Child and Adolescent Psychiatry: Washington, DC

October 27, 2017

14

"Caught in the net: a child psychiatrist's guide for navigating the internet age.", Workshop, International Association for Child and Adolescent Psychiatry and Allied Professions, Prague, Czechoslovakia

July 27, 2018

Chair, Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, "Caught in the Net: How Digital Media Shapes Mental Illnesses in Youth and How Psychiatrists Should Respond." Seattle, Washington

October 24, 2018

"Self-Care in the Child Welfare System" YMCA/Safe Children Coalition Conference, with Catarlyn Glenn, Sarasota Florida

April 18, 2019

"Psychotropic Medications 101: The pertinent essentials for all involved in the child welfare system" Florida Child Protection Summit, with Catarlyn Glenn, Orlando Florida

December 17, 2019

"Caught in the Net: How Digital Media Interacts with Mental Illness in Children and Adolescents", Annual Conference of the Florida Psychiatric Society, Tampa, Florida

September 21, 2019

"Effective Strategies for Higher Education and Beyond" Clinical Perspectives, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Mastering Information Flow for Transitional-Age Youth (TAY): as part of "Promoting Digital Citizenship in Transitional-Aged Youth (TAY) and College Students", Chicago, IL

October 19, 2019

"Caught in the Net: How Digital Media Interacts with Mental Illness", virtually presented at the Andrew Weil Center for Integrative Medicine, Tucson, Arizona

April 1, 2020

"A deeper dive into child and adolescent psychopharmacology for families and professionals involved in the child welfare system" Florida Child Protection Summit, with Catarlyn Glenn. Orlando, FL

September 3, 2020

"Screenagers: Next Chapter – How Online Behaviors Affect Depression and Anxiety Disorders in Adolescents", Media Theater (virtual) Annual meeting of the American Academy of Child and Adolescent Psychiatry

October 19, 2020.

"Helping Child Psychiatrists Navigate the Internet Age", "Career Focus: Setup Your Own Telepsychiatry Practice", "COVID-19 Related Psychiatric Issues"
Oasis Child and Adolescent Psychiatry Conference, Charleston, SC

May 17, 2021

15

"Conversation about health information, COVID, news, and related topics", discussant and breakout group leader, Digital Media and Mental Health Research Virtual Retreat

May 24th 2021

"The Social Dilemma: Helping Families Navigate the Pull, Pulse, and Power of Social Media", Media Theater, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Virtual

October 29, 2021

"Appealing Applications for Adolescent Mental Health: Social Media's Transformation During the COVID-19 Pandemic", Discussant, Clinical Perspective, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Virtual

October 25, 2021

"Angry Young Men, Common Threads in Different Types of Extremist Groups" as part of Political Extremism & Hate Group Recruitment of Adolescents", Clinical Perspective, Annual meeting of the American Academy of Child and Adolescent Psychiatry, Virtual

October 26, 2021

"Angry Young Men: Boys and Adolescent Males with Disruptive and Aggressive Behavior", "Nutritional Child Psychiatry" Oasis Child and Adolescent Psychiatry Conference, Charleston, SC

May , 1-2, 2022

"Sexts, Lies & Videogames: Adolescent Boys, the Internet, & Mental Health" Chair and presenter on violence and young men: Clinical Perspective, Annual Meeting of the American Academy of Psychiatry Annual Meeting, New Orleans, LA

May 25, 2022

"School-based Threat Assessment", Grand Rounds for the Geisinger Department of Psychiatry and Behavioral Health, Danville, PA

September 15, 2022

"Assessing and Addressing Digital Distraction, Misinformation, and Disarray", part of the Social Media Institute, Annual Meeting of the American Academy of Psychiatry Annual Meeting, Toronto, CA

October 19, 2022

"Mental Health Crisis in Men: Unique Challenges and Management", "Medical Update: Effects of Overweight and Obesity on Health" Oasis Psychiatry Conference, Río Grande, Puerto Rico

May 4, 2023

16

"Youth Traumatic Brain Injury", "Gender Dysphoria and its treatment: What does the evidence tell us?" "Social Media/Cyber bullying" Oasis Child and Adolescent Psychiatry Conference, Río Grande, Puerto Rico

May 8-9, 2023

"Working Psychotherapeutically in a Contested Space: Overcoming Challenges", presented and moderated panel as part of Psychotherapeutic Processes with Young People Experiencing Gender Dysphoria, Tampere, Finland June 16, 2023

Panelist, "The Etiology of Gender Dysphoria, The role of social and cultural context", October 10th; Panelist, "Current Gender Dysphoria Guidelines, Assessing the Quality", October 10th;  Panelist, "Question and Answers, Next Steps", October 12th, Society for Evidence Based Gender Medicine Conference, New York City, October 9th to 12th, 2023

 "How Online Experiences Impact Adolescent Mental Illness & What To Do About It" Discussant, , Annual Meeting of the American Academy of Psychiatry Annual Meeting, New York, NY October 28, 2023

"Social Media and Adolescent Mental Health: Are the Kids Alright?", Grand Rounds, University of Texas, Medical Branch, November 21, 2023

"Social Media and Adolescent Mental Health: Are the Kids Alright?", Grand Rounds, Tulane University, January 19, 2023

**Licensure:**

Florida Medical License, expires January 31st, 2025

Federal DEA Controlled Substances License, expires December 31, 2026

Certification: ECFMG Certificate 0-573-532-9

Forensic Training:

Florida Forensic Examiner Training completed through the University of South Florida Department of Mental Health Law and Policy

August 15-17, 2019

Certifications in Psychotherapy:

Basic Practicum in Rational Emotive Behavior Therapy completed at the Albert Ellis Institute in New York, NY

July 13, 2003

Advanced Practicum in Rational Emotive Behavior Therapy completed at the Albert Ellis Institute in New York, NY

July 20, 2003

17

Associate Fellowship in Rational Emotive Behavior Therapy completed at the Albert Ellis Institute in New York, NY,

July 15, 2005

Accelerated Resolution Therapy, Basic Training

April 1-3, 2017

Accelerated Resolution Therapy, Enhanced Training

Sept 31, October 1, 2018

Accelerated Resolution Therapy, Advanced Training

October 2,3, 2018

American Association of Medical Colleges Medical Education Research Certificate

October 13th, 2010

**Scholarly Activity**

*Funded block grants*

Co-investigator on the Mental and Behavioral Health Capacity Project from September 2012 to June 2017

*Unfunded research*

Supervisor mentoring Medical Students:

University of South Florida IRB: Faculty Advisor Co Investigator May 2021

What is the impact of coronavirus confinement on Japanese college students' mental health? STUDY002335

University of South Florida IRB: Faculty Advisor Co Investigator May 2021
Changes in college aged students' metabolic health due to Covid-19 confinement STUDY002341

PI as student supervisor, STUDY004118, IRB approved as Exempt Status, Palliative Care Patients' Attitudes & Openness to Psilocybin assisted Psychotherapy for Treatment of Existential Distress, Julia Wang

**Journal Publications:**

<u>Peer Reviewed</u>

18

**Kaliebe, Kristopher** and Adrian Sondheimer. "The media: Relationships to psychiatry and children." *Academic Psychiatry* 26.3 (2002): 205-215.

**Kaliebe, Kristopher** "Rules of thumb: three simple ideas for overcoming the complex problem of childhood obesity." *Journal of the American Academy of Child & Adolescent Psychiatry* 53.4 (2014): 385-387.

**Kaliebe, Kristopher.** "Dr Kaliebe Replies", Journal of the American Academy of Child & Adolescent Psychiatry, (2014) 53:10 1134.

**Kaliebe, Kristopher** "The Future of Psychiatric Collaboration in Federally Qualified Health Centers." *Psychiatric Services* (2016): appi-ps.

**Kaliebe, Kristopher,** and Josh Sanderson. "A Proposal for Postmodern Stress Disorder." The American journal of medicine 129.7 (2016): e79.

Osofsky, Howard J., Anthony Speier, Tonya Cross Hansel, John H. Wells II, **Kristopher E. Kaliebe**, and Nicole J. Savage. "Collaborative Health Care and Emerging Trends in a Community-Based Psychiatry Residency Model." *Academic Psychiatry* (2016): 1-8.

Yeh, Y. Y. and **K. Kaliebe**. "Impact of Nutrition on Neurocognition." *Southern medical journal* 109.8 (2016): 454.

**K. Kaliebe** Expanding Our Reach: Integrating Child and Adolescent Psychiatry Into Primary Care at Federally Qualified Health Centers. J Am Acad Child Adolesc Psychiatry. 56.11 (2017)

Kass, R. and **Kaliebe, K**., Stress and Inflammation: New Perspectives on Major Depressive Disorder. JAACAP Connect, p.22. Winter 2020

Tamburello, A., Penn, J., Negron-Muñoz, R., & **Kaliebe, K**. (2023). Prescribing Psychotropic Medications for Justice-Involved Juveniles. Journal of Correctional Health Care.

"Letter to the Editor", in response to "Berlin FS. Legal, mental health, and societal considerations related to gender identity and transsexualism. J Am Acad Psychiatry Law. 2023 Mar; 51(4):608-609

Case Reports, Technical Notes, Letters

Books, Textbook Chapters:

Weigle, P., Kaliebe, K., Dalope, K., Asamoah, T., & Shafi, R. M. A. (2021). 18 Digital Media Use in Transitional-Age Youth: Challenges and Opportunities. Transition-Age Youth Mental Health Care: Bridging the Gap Between Pediatric and Adult Psychiatric Care, 357.

Invited Publications

"Telepsychiatry in Juvenile Justice Settings", **K Kaliebe**, J Heneghan, T Kim, Child and Adolescent Clinics of North America, 20 (2011) 113-123

American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Telepsychiatry and AACAP Committee on Quality Issues. Clinical Update: Telepsychiatry With Children and Adolescents. J Am Acad Child Adolesc Psychiatry. 2017 Oct; 56(10):875-893. Epub 2017 Jul 25. PMID: 28942810.

**Kaliebe, Kristopher** and Paul Weigle. "Child Psychiatry in the Age of the Internet." (2017).  Child and Adolescent Psychiatric Clinics of North America, April 2018Volume 27, Issue 2, Pages xiii–xv

Gerwin, Roslyn L., **Kristopher Kaliebe,** and Monica Daigle. "The Interplay Between Digital Media Use and Development." Child and Adolescent Psychiatric Clinics 27.2 (2018): 345-355.

**Other Research and Creative Achievements:**

Poster Presentations:

"Collaborative Child and Adolescent Psychiatry within Primary Care Clinics in Coastal Louisiana" Poster, Annual meeting of the American Academy of Child and Adolescent Psychiatry, **Kristopher Kaliebe MD**, Joy Osofsky, PhD; Howard Osofsky, MD, PhD; Lucy King, BA; Tonya Hansel, PhD,  San Antonio, TX
                                        October 29, 2015

"Benefits of Integrating Young Child Psychiatric Services Into Primary Care Clinics in Underserved Communities" Poster, Annual meeting of the American Academy of Child and Adolescent Psychiatry, New York, NY Joy Osofsky, PhD; Howard Osofsky, MD, PhD; Lucy King, BA; Tonya Hansel, PhD, **Kristopher Kaliebe MD**
                                        October 28, 2016

 "Integrating child and adolescent psychiatry into community based primary care networks", Poster, International Association for Child and Adolescent Psychiatry and Allied Professions, Prague, Czechoslovakia **Kristopher Kaliebe MD**
                                        July 25, 2018

" The Prevalence of the Adverse Childhood Experiences (ACE) in Florida Youth Referred to the Department of Juvenile Justice"  Poster, Annual meeting of the American Academy of Psychiatry and the Law, Greg Iannuzzi, MD, Mark Greenwald, PhD**, Kristopher Kaliebe MD**
                                        October 25, 2018

Other articles:

"LSU's *Breakfast Club* emphasizes education and recruitment into Child and Adolescent Psychiatry", American Academy of Child and Adolescent Psychiatry News,
January 2004

"Trix are for Kids!", American Academy of Child and Adolescent Psychiatry News,
May, 2013

Expanded Psychiatric Care Can Transform Federally Qualified Health Centers, American Psychiatric Association News,
......                                                       Published online June 17, 2016

News Stories on Suicide, Fictional Content may Increase Risk for Contagion, Hansa Bhargava and **Kristopher Kaliebe**,  American Academy of Pediatrics News, *Mastering the Media Column*,
Published online July 10, 2019

Adolescent Onset Gender Dysphoria, Our Opinion, with David Atkinson, American Academy of Child and Adolescent Psychiatry News, Nov-Dec 2023 (published January 2024)

**Webinars and creation of enduring materials:**

*Rules for Optimal Health,* Webinar, University of South Florida Quality Parenting Initiative, Florida's Center for Child Welfare Information and Training Resources for Child Welfare Professionals*, released
......                                                       December 11, 2017

Florida's Center for Child Welfare Information and Training Resources, webinars series on pediatric mental health for child welfare professionals and caregivers, Kristopher Kaliebe with Catarolyn Johnson;
......                                                       June 1, 8, 15, 22 and 29, 2020

"Don't just sit there- Adapt and Optimize in a post Covid world" University of South Florida Global Health Conversation Series, presented virtually
September 22, 2020

Making self-care the Heart of Healthcare, CEU webinar for providers in Florida, for Simply Health, Clear Health Alliance, February 15, 2023

**Service**

Membership in Professional Organizations:

Member, American Academy of Child and Adolescent Psychiatry (AACAP),
2000 to present

AACAP Media Committee member
2003 –2021

C0-Chair, AACAP Media Committee

2013-2021

Media Committee Liaison to the Complementary and Integrative Medicine Committee of the AACAP

2012 to 2019

Liaison to the Committee on Communications and Media of the American Academy of Pediatrics, from American Academy of Child and Adolescent Psychiatry (AACAP)

2015 to 2022

Member Association for Behavioral and Cognitive Therapies

2004 – 2016

Member American Academy of Psychiatry and the Law

2004 to present

Member Zero to Three

2017 to 2021

Member Louisiana Council for Child Psychiatry (LCCP)

2003 to 2016

Louisiana Council for Child Psychiatry (LCCP)

Secretary-Treasurer

March 2010-March 2014

President

March 2014- June 2016

Member, American Psychiatric Association

2000 - 2012 , 2021 to present

Member, Heterodox Academy                   January 2023 to present

Co-chair, University of South Florida, Campus Community

December 2023 to present

LSUHSC Psychiatry Interest Group Faculty advisor

2008 to 2012

University of South Florida Medical School Integrative Medicine Student Interest Group faculty advisor

January 2020 to present

University of South Florida Medical School Mindfulness and Meditation in Medicine Group faculty advisor

January 2022 to November 2023

University of South Florida Interdisciplinary (university wide) Psychedelics Interest Group faculty advisor

March 2022 to March 2023

**Editorial Posts and Activities:**
      **Journal editorships,  Reviewer**

LSUHSC Institutional Review Board alternate reviewer 2008-2012

Safety Committee Member, Accelerated Resolution Therapy for Treatment of Complicated Grief in Senior Adults, University of South Florida

2017-19

Expert reviewer for *Adolescent Psychiatry* Thematic Special Issue: Coming of Age Online: Challenges of Treating the Internet Generation: (2), 4, 2014

Expert reviewer for *Academic Psychiatry* Media Column      June 2018

Expert Reviewer for *Pediatrics*      January 2021

Expert reviewer for *Academic Psychiatry* Media Column      March 2022

Expert Reviewer for *Harvard Review of Psychiatry*      May 2021

Expert Reviewer for *Journal of Correctional Health Care*      June 2023

Co-editor: Kaliebe, Kristopher, and Paul Weigle. Youth Internet Habits and Mental Health, An Issue of Child and Adolescent Psychiatric Clinics of North America, E-Book. Vol. 27. No. 2. Elsevier Health Sciences.      2018

Member, Planning Committee for the Digital Media and Mental Health Research Retreat hosted by the nonprofit Children and Screens.

May 24th, 25th 2021.

**Revised: January 2024**