## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

JANE DOE,

     Plaintiff,

v.

GEORGIA DEPARTMENT OF
CORRECTIONS; COMMISSIONER
TYRONE OLIVER, in his official
capacity; ASSISTANT
COMMISSIONER RANDY SAULS, in
his official capacity; STATEWIDE
MEDICAL DIRECTOR SHARON
LEWIS, in her official and individual
capacities; PHILLIPS STATE PRISON
WARDEN DESHAWN JONES, in his
official and individual capacities;
SERGEANT JAMAL KINTE
ROBERTS, in his individual capacity;
MHM CORRECTIONAL SERVICES,
LLC; STATEWIDE MENTAL
HEALTH DIRECTOR CHAD I.
LOHMAN, in his official capacity;
PHILLIPS STATE PRISON MENTAL
HEALTH DIRECTOR RHONDA
BILLINGS, in her official and
individual capacities; DR. SHERRI
SKIBINSKI, in her official and
individual capacities; DR. CATHLEEN
CLEARY, in her individual capacity;
DR. DONALD BOWLING, in his
individual capacity; NURSE
PRACTITIONER SIDNEY MOORE, in
his individual capacity; DR. WIL
AUSBORN, in his individual capacity;
JEREMY LANE, in his individual

Civ. Case No. 1:23-cv-05578-MLB

**COMPLAINT AND REQUEST
FOR RELIEF**

capacity; WELLPATH LLC; PHILLIPS STATE PRISON MEDICAL DIRECTOR LATONYA JAMES, in her official and individual capacities; DR. ANTHONY MULLOY, in his official and individual capacities; WELLPATH HEALTH SERVICES ADMINISTRATOR JEWELLANN CLARKE, in her official and individual capacities,

Defendants.

## COMPLAINT

## INTRODUCTION

1. Jane Doe[1] is a transgender woman being denied life-saving gender-affirming surgeries from the Georgia Department of Corrections ("GDC"). GDC is denying her this critical, medically necessary care because of GDC's unconstitutional "Blanket Ban" on providing gender-affirming surgeries to transgender people in their custody.

2. GDC has refused to treat Ms. Doe despite her severe and overwhelming gender dysphoria, which include two castration attempts, multiple suicide attempts, and almost daily self-harm. GDC's refusal to provide her with necessary care have

---

[1] With this complaint, Ms. Doe has filed a motion to proceed under a pseudonym and lays out the basis for that request therein. Pending the resolution of that motion, Plaintiff will proceed under a pseudonym in this Complaint and urges the Court to grant her corollary motion. Should the Court deny that motion, Plaintiff is prepared to promptly file true name versions of all documents with this Court.

worsened her gender dysphoria symptoms by feeding the thought that Ms. Doe might never be able to live in a body that looks like her gender identity.

3.     Notably, this is not a case where prison medical providers, in their independent medical judgment, have determined that surgical care is not required. To the contrary, GDC's very own medical providers, including three psychiatrists and a psychologist, have determined that Ms. Doe requires gender-affirming surgery (and other medically necessary forms of gender-affirming care) for her gender dysphoria and have recommended that she receive a surgical evaluation.

4.     Due to Defendants' enforcement of GDC's Blanket Ban on such healthcare regardless of medical necessity, however, the recommendations of four of GDC's providers have gone ignored and Ms. Doe has continued to suffer catastrophic gender dysphoria symptoms.

5.     GDC administrators and their contracted medical and mental health staff from Wellpath LLC ("Wellpath") and MHM Correctional Services, LLC ("MHM") have brazenly conveyed the existence of GDC's discriminatory and unconstitutional Blanket Ban to Ms. Doe.

6.     Phillips State Prison's mental health clinical director, Dr. Donald Bowling, would not evaluate her for surgery but told her: "If you were to attempt self-castration again, maybe while at the hospital, they'll just go ahead and cut your gonads out."

7.     Phillips State Prison's Warden Deshawn Jones told her in January 2023 that her surgery request was above his paygrade and over his head because GDC "doesn't do gender-affirming surgeries."

8.     Instead of caring for Ms. Doe's serious medical needs, Phillips State Prison's Mental Health Director Rhonda Billings asked her, "Why can't you accept things the way they are?"

9.     In July 2023, Ms. Doe's endocrinologist, Dr. Anthony Mulloy, a Wellpath employee, told her, "We know that GDC would never provide those surgeries, so the lawyers will have to hash that out."

10.    That same day, Dr. Latonya James, Medical Director of Phillips State Prison and a Wellpath employee, told Ms. Doe that "it has been the policy of GDC to not provide these surgeries."

11.    Through all of the pain that Ms. Doe has endured, Defendants, who are GDC, Wellpath, and MHM personnel, have made one thing clear: GDC does not allow a transgender person to access medically necessary gender-affirming surgeries, regardless of medical need.

12.    Ms. Doe's serious medical needs are urgent; Defendants need to end their unconstitutional and discriminatory treatment of Ms. Doe and provide Ms. Doe medically necessary care so that she can finally live without daily suffering from gender dysphoria.

13. A prison sentence should not include the utter disregard for medical needs. Defendants have discriminated against Ms. Doe on the basis of her gender dysphoria and have subjected Ms. Doe to cruel and unusual punishment through enforcing GDC's unconstitutional Blanket Ban on medically-necessary surgical treatment for gender dysphoria.

14. Ms. Doe brings this lawsuit to access the gender-affirming medical care that her mental health clinicians have found she needs. She is seeking everything her treating psychologist recommended in 2022. The recommended care she seeks includes gender-affirming surgeries, hormone therapy, buttock pads, breast pads, a wig, make-up, and women's commissary items. She also seeks a housing transfer to end the constant violence she has endured in men's prisons, which has included rape, robbery, and constant verbal harassment. These items are reasonable accommodations for her gender dysphoria.

15. GDC denied the gender-affirming surgeries because of its unconstitutional Blanket Ban. GDC was also unwilling to accommodate her gender dysphoria through non-surgical forms of gender-affirming care.

## JURISDICTION AND VENUE

16. This action arises under 42 U.S.C. § 1983, the Eighth Amendment of the U.S. Constitution, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act.

17.     This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

18.     Venue lies in the Northern District of Georgia under 28 U.S.C. § 1391 because all of the events giving rise to the claims in this action took place in Phillips State Prison, a prison facility in this District and the location where Ms. Doe is currently housed and most of the Defendants work.  Moreover, the offices of institutional defendants Wellpath and MHM are located in this District.

## PARTIES

19.     Plaintiff Jane Doe is incarcerated at Phillips State Prison.  Ms. Doe has been held at this facility since April 11, 2022.  She has been in GDC custody since 1992.

## GDC Defendants

20.     Defendant GDC is a department of the State of Georgia that is responsible for Georgia's prisons, as well as the actions and decisions that take place within its penal and carceral system.  Its central headquarters are located at 300 Patrol Road, Forsyth, Georgia 31029.  Defendant GDC is a state government agency and therefore a public entity within the meaning of the ADA.  At all relevant times, Defendant GDC was a recipient of federal financial assistance and therefore subject to the Rehabilitation Act.

21.     Defendant Tyrone Oliver is the current Commissioner of the GDC and responsible for the overall administration of GDC correctional facilities, including Phillips State Prison, and the training of all GDC correctional officers and administrative staff.  Commissioner Oliver is responsible for all GDC policies.  At all times relevant to this action, Defendant Oliver was acting under color of state law.  This suit is brought against Defendant Oliver in his official capacity.

22.     Defendant Randy Sauls is and was at all relevant times the Assistant Commissioner of Health Services of the GDC and responsible for the provision and administration of medical and mental health care, the training of medical and mental health staff, and the enforcement of medical and mental health policy.  He is an administrator of GDC and works closely with the medical and mental health administrators of third-party contractors Wellpath and MHM.  At all times relevant to this action, Defendant Sauls was acting under color of state law.  This suit is brought against Defendant Sauls in his official capacity.

23.     Dr. Sharon Lewis is the Statewide Medical Director for GDC.  Dr. Lewis is responsible for overseeing the medical policies and services across GDC facilities.  At all times relevant to this action, Defendant Lewis was acting under color of state law.  This lawsuit is brought against Dr. Lewis in her official and individual capacities.

24.     Defendant DeShawn Jones is the Warden of Phillips State Prison and

at all relevant times was responsible for the day-to-day administration of Phillips State Prison.  On information and belief, he is a current member of Ms. Doe's treatment committee and has decision-making power regarding her gender-affirming care.  At all times relevant to this action, Defendant Jones was acting under color of state law.  This suit is brought against Defendant Jones in his official and individual capacities.

25.    Defendant Sergeant Jamal Kinte Roberts is a Correctional Officer at Phillips State Prison.  Sgt. Kinte was responsible for the welfare of those in Phillips State Prison custody.  At all times relevant to this action, Defendant Kinte was acting under color of state law.  This suit is brought against Defendant Kinte in his individual capacity.

## MHM Defendants

26.    Defendant MHM Correctional Services, LLC ("MHM"), provides all the mental and behavioral health services for GDC pursuant to a contract.  Its headquarters in Georgia are located at 1745 Phoenix Blvd., Suite 240, Atlanta, Georgia 30349.  Because MHM contracts with the state of Georgia to provide functions traditionally reserved to the state, this action is brought against MHM as a government entity under 42 U.S.C. § 1983.  MHM and its employees engaged in action under color of state law.

27.    [This paragraph has been omitted upon amendment].

28. Defendant Chad I. Lohman is the current statewide Mental Health Director for GDC and is an MHM employee. As the mental health director, Defendant Lohman is responsible for planning and directing mental health policies, procedures, and services in GDC. At all times relevant to this action, Defendant Lohman was acting under color of state law. This suit is brought against Defendant Lohman in his official capacity.

29. Defendant Rhonda Billings is the current Phillips State Prison Mental Health Director. As the mental health director, she is responsible for planning and executing mental health policies, procedures, and services in Phillips State Prison. On information and belief, she is a current member of Ms. Doe's treatment committee and has decision-making power regarding Ms. Doe's gender-affirming care. At all times relevant to this action, Defendant Billings was acting under color of state law. This suit is brought against Ms. Billings in her official and individual capacities.

30. Dr. Sherri Skibinski is and was at all relevant times an attending psychologist at Phillips State Prison and an MHM employee. On information and belief, Dr. Skibinski is a current member of Ms. Doe's treatment committee and has decision-making power regarding Ms. Doe's gender-affirming care. At all times relevant to this action, Defendant Skibinski was acting under color of state law. This suit is brought against Defendant Skibinski in her individual and official capacities.

31.    Dr. Cathleen Cleary is and was at all relevant times an attending psychiatrist in GDC and an MHM employee. She met with Ms. Doe virtually during her stay in several facilities. At all times relevant to this action, Defendant Cleary was acting under color of state law. This suit is brought against Defendant Cleary in her individual capacity.

32.    Dr. Donald Bowling is and was at all relevant times a psychologist and clinical director of GDC and an MHM employee. As the clinical director, Dr. Bowling was responsible for training and supervising other mental health clinicians on GDC policies. He also treated patients and was responsible for evaluating Ms. Doe's mental health and assessing her candidacy for gender-affirming surgeries. At all times relevant to this action, Defendant Bowling was acting under color of state law. This suit is brought against Dr. Bowling in his individual capacity.

33.    Nurse Practitioner Sidney Moore is a mental health clinician in GDC and an MHM employee. Defendant Moore is responsible for training and supervising other mental health clinicians on GDC policies related to mental health. He also treated patients and was responsible for evaluating Ms. Doe's mental health and assessing her candidacy for gender-affirming surgeries. At all times relevant to this action, Defendant Moore was acting under color of state law. This suit is brought against Defendant Moore in his individual capacity.

34.    Dr. Wil Ausborn is a psychologist and an MHM employee. Dr.

Ausborn treated Ms. Doe and was previously a member of Ms. Doe's treatment committee. At all times relevant to this action, Defendant Ausborn was acting under color of state law. This suit is brought against Defendant Ausborn in his individual capacity.

35.     Mr. Jeremy Lane is and was at all relevant times a mental health unit manager and an MHM employee. At all times relevant to this action, Defendant Lane was acting under color of state law. This suit is brought against Defendant Lane in his individual capacity.

## Wellpath Defendants

36.     Wellpath provides all the medical services for GDC through a contract. Its headquarters in Georgia are located at 2077 Convention Center Concourse, Suite 150, Atlanta, Georgia 30337. Because Wellpath contracts with the state of Georgia to provide functions traditionally reserved to the state, this action is brought against Wellpath as a government entity under 42 U.S.C. § 1983. Wellpath and its employees engaged in action under color of state law.

37.     Dr. Latonya James was at all relevant times the Medical Director at Phillips State Prison and a Wellpath employee. Dr. James treats Ms. Doe and oversees her medical care. On information and belief, she is a current member of Ms. Doe's treatment committee and has decision-making power regarding her gender-affirming care. At all times relevant to this action, Defendant James was

acting under color of state law. This lawsuit is brought against Dr. James in her official and individual capacities.

38.     Dr. Anthony Mulloy is an endocrinologist and a Wellpath employee who provides specialized medical services to various GDC facilities. Dr. Mulloy treats Ms. Doe. At all times relevant to this action, Defendant Mulloy was acting under color of state law. This lawsuit is brought against Dr. Mulloy in his official and individual capacities.

39.     Health Services Administrator Jewellann Clarke is a Wellpath employee. On information and belief, Ms. Clarke is a current member of Ms. Doe's treatment committee and has decision-making power regarding her gender-affirming care. At all times relevant to this action, Defendant Clarke was acting under color of state law. This lawsuit is brought against Ms. Clarke in her official and individual capacities.

## BACKGROUND

40.     According to the American Psychiatric Association ("APA"), "[t]ransgender refers to the broad spectrum of individuals whose gender identity is different from their birth-assigned gender."[2] GDC regulations comport with the

---

[2] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 511 (5th ed. text revision 2022) [hereinafter DSM-5-TR]. The United States Supreme Court has defined a transgender person as someone "who was identified as [one sex] at birth but who now identifies as a [different sex]." *Bostock v. Clayton County*, 140 S. Ct. 1731, 1741 (2020).

APA's definition, stating that "gender identity" is the "internal sense of being male or female."[3]

41.    "There is now a scientific consensus that biological factors—most notably sexual differentiation in the brain—have a role in gender identity development and that a person's gender identity is hardwired and impervious to change."[4]  Recent medical research demonstrates that gender dysphoria "diagnoses have a physical etiology, namely hormonal and genetic drivers contributing to the in utero development of dysphoria."[5]

42.    The DSM-5, published by the APA in 2013, made significant changes based on an updated understanding of the psychological disorders that relate to gender.[6]  According to the DSM-5, gender dysphoria is the "clinically significant

---

[3] GDC Standard Operating Procedures 507.04.68(III)(A).

[4] Jennifer Levi & Kevin Barry, *Made to Feel Broken: Ending Conversion Practices and Saving Transgender Lives*, 136 Harv. L. Rev. 1112, 1117 (2023); *see also id.* at 1117 n.35 (collecting studies describing the biological etiology of transgender identity); Kevin M. Barry & Jennifer L. Levi, *The Future of Disability Rights Protections for Transgender People,* 35 Touro L. Rev. 25, 45 (2019) ("[T]he diagnosis of gender dysphoria in the DSM-5 rests upon a growing body of scientific research showing that gender dysphoria has a physical cause related to the interaction of the developing brain and sex hormones.")

[5] *Doe v. Mass. Dep't of Corr.*, No. 17-12255-RGS, 2018 WL 2994403, at *6 (D. Mass. June 18, 2018) (citing Michelle Duffy, *The Americans With Disabilities Act of 1990 and the Rehabilitation Act of 1973*, *in* Gender Identity and Sexual Orientation Discrimination in the Workplace: A Practical Guide (Christine Michelle Duffy ed., Bloomberg BNA 2014)).

[6] *See* American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders (5th ed. 2013) [hereinafter DSM-5].  There are important differences between gender dysphoria and an outdated diagnosis, gender identity disorder.  *See*

distress or impairment in social, occupational, or other important areas of functioning" that arises from the "marked incongruence" between a transgender person's sex assigned at birth and their gender identity or gender expression.[7]

43. In short, with gender dysphoria, the distress *is* the disability.

## GDC's Blanket Ban on Gender-Affirming Care

44. GDC has an established record of delaying or denying necessary medical services to transgender people in its custody who are diagnosed with gender dysphoria

45. The accepted clinical standard of care for treating gender dysphoria, established by the World Professional Association for Transgender Health ("WPATH"), the American Medical Association ("AMA"), the American Psychological Association ("APA"), and other major medical and mental health professional organizations, is to enable a person to live consistently with their gender

---

*Williams v. Kincaid*, 45 F.4th 759, 766-69 (4th Cir. 2022) (explaining that gender dysphoria has come to mean something different than gender identity disorder). Most notably, gender identity disorder considered anyone whose gender identity did not match their sex assigned at birth as inherently ill. In contrast, gender dysphoria refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's sex assigned at birth. *Compare* Am. Psych. Ass'n, Diagnostic & Statistical Manual of Mental Disorders 577 (4th ed., text revision) (2000) [hereinafter DSM-IV] *with* DSM-5-TR at 513.

[7] DSM-5-TR at 513. This is the definition of gender dysphoria with which Ms. Doe was diagnosed in 2015. There has been a revision to the DSM in 2022, and this Complaint will cite to the most recent version, DSM-5-TR, as the authoritative source on gender dysphoria; this definition, however, is unchanged between the different versions and thus does not impact any argument herein.

14

through counseling, hormone therapy, gender-affirming surgery, and the social and legal transition to the sex associated with a person's gender identity.

46.     According to the WPATH's most recent version of the "Standards of Care for the Health of Transgender and Gender Diverse People" ("WPATH Standards of Care"), "social transition" is the process of transgender people beginning and continuing to express their gender identity in ways that are authentic and socially perceptible.[8] Social transition in institutional settings for a transgender woman like Ms. Doe includes having hairstyles that affirm her gender such as through wigs; grooming products like make-up; women's clothing and undergarments; and the use of the individual's proper pronouns and chosen name by others. Social transition reduces gender dysphoria, depression, anxiety, self-harm ideation and behavior, and suicidal ideation and attempts.

47.     Recent litigation challenged GDC's former "freeze frame" policy, which prevented transgender people from accessing necessary hormone-replacement therapy ("HRT") unless they had a prescription from a community provider at the time of incarceration.[9] In one case, the United States Department of

---

[8] E. Coleman et al., *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. of Transgender Health S1, S107 (2022) [hereinafter WPATH SOC-8].
[9] *See Diamond v. Owens*, 131 F. Supp. 3d 1346, 1353 (M.D. Ga. 2015); Christina Alicia, *I'm a Trans Woman of Color in an All-Male Prison. I Had to Fight for My Right to Gender-Affirming Care Behind Bars*, Insider (Mar. 31, 2023, 11:40 AM

Justice issued a Statement of Interest condemning blanket bans on necessary gender-affirming care, arguing that the Eighth Amendment provides that medical care should include individualized assessment and treatment.[10]

48.    In response, GDC promulgated Standard Operating Procedure ("SOP") 507.04.68 (Management and Treatment of Offenders Diagnosed with Gender Dysphoria). According to that GDC policy, the "freeze frame" policy is no longer in effect.[11] The new policy provides that all people in GDC custody who "have been diagnosed with Gender Dysphoria will receive a current individualized assessment and evaluation."[12] A "multidisciplinary team composed of medical, mental health, security and PREA Coordinator's office" is formed within thirty days of a person's gender dysphoria diagnosis.[13] This team makes recommendations regarding housing, property items, shower arrangements, and any other relevant decisions and should reassess the transgender person in custody at least every six months.[14] In addition, the policy provides that "[t]he offender's own views with respect to his or her own safety shall be given serious consideration."[15] Georgia's written policies

EDT),        https://www.insider.com/trans-woman-of-color-male-prison-georgia-gender-affirming-care-2023-2.

[10] *See* Statement of Interest of the United States at 1-2, *Diamond v. Owens*, ECF No. 29, No. 5:15-cv-00050 (M.D. Ga. Apr. 3, 2015).

[11] *See* GDC SOP 507.04.68(IV)(C)(6).

[12] GDC SOP 507.04.68(IV)(C)(5).

[13] GDC SOP 507.04.68(IV)(B)(1).

[14] GDC SOP 507.04.68(IV)(B)(2), (6).

[15] GDC SOP 507.04.68(IV)(C)(1).

adhere to the guidance in the United States Department of Justice's Prison Rape Elimination Act ("PREA") Standards.[16]

49.     According to GDC SOP 507.04.68, "[i]f a referral from Mental Health is made to Medical, a treatment plan will be developed" that uses "accepted standards of care . . . as a reference."[17]  The treatment plan or denial thereof "must be approved by the Contract Vendor [a.k.a. Wellpath] Statewide Medical Director and reviewed with the GDC Statewide Medical Director [a.k.a. Defendant Sharon Lewis] and GDC Statewide Mental Health Director [a.k.a. Defendant Chad I. Lohman]."[18]

50.     The policy specifies that HRT may be provided if the Statewide Medical Director and Statewide Mental Health Director deem it medically necessary.[19]  The policy does not mention other forms of gender-affirming care.

51.     GDC is not following this policy.  Adherence to the policy is necessary to meet constitutional minimums and the PREA standards.  On information and belief, transgender people do not receive reevaluations every six months, struggle to access property items that others of their gender can access, do not have access to private showers, and experience extremely long delays in accessing medically

---

[16] *See* 28 C.F.R § 115.42.
[17] GDC SOP 507.04.68(IV)(C)(3).
[18] GDC SOP 507.04.68(IV)(C)(4).
[19] GDC SOP 507.04.68(IV)(D)(1)(d).

necessary care, including HRT.

52.     Furthermore, GDC's treatment of Ms. Doe raises the very reasonable inference that it still has a Blanket Ban on gender-affirming surgery—that is, without regard to an individualized medical assessment, GDC prevents Ms. Doe from accessing gender-affirming surgery because it simply refuses to offer that type of medical care to anyone, regardless of medical necessity.

53.     GDC decision-makers have admitted to Ms. Doe that GDC will not approve her gender-affirming surgery regardless of the medical necessity and despite the fact that all of Ms. Doe's providers who actually evaluated her need for surgery have recommended it.

## FACTUAL ALLEGATIONS

54.     Jane Doe is a 55-year-old transgender woman.

55.     She has identified as a woman since early childhood.  Beginning at a young age, she suffered from low self-esteem, depression, anxiety, and frustration from being forced to live as a boy even though she felt like a girl.  These distressing emotions that Ms. Doe experienced as a child are now understood to be attributed to her gender dysphoria.

56.     When Ms. Doe was around 20 years old, in or around 1988, she began living and expressing herself as a woman publicly.  She dressed in women's clothing while she worked as a limousine driver.  She wanted to complete her transition

through surgical reassignment. However, Ms. Doe's psychologist at the time refused to write her a referral for this surgery because of his personal religious beliefs. Feeling as if she lacked other options and in desperation, Ms. Doe attempted to complete her transition herself by trying to remove her testicles through self-castration; she lacerated her scrotum but was ultimately unsuccessful.

57.     Ms. Doe was incarcerated in 1992 and has been in GDC custody ever since. For that entire period, she has been housed only in men's facilities, which is and has been an incredibly dangerous and harmful placement for a transgender woman. She is currently being detained in Phillips State Prison, a men's prison where she has been housed since on or around April 11, 2022.

**Ms. Doe's Diagnoses While in GDC Custody**

58.     Ms. Doe's incarceration in 1992 halted her efforts to transition and exacerbated her gender dysphoria. In 1993, the clinical director at Valdosta State Prison diagnosed Ms. Doe with gender identity disorder under a prior version of the DSM. After receiving this diagnosis, Ms. Doe received individual and group psychotherapy to support her anxiety and depression related to her diagnosis.

59.     Even with access to counseling, Ms. Doe's discomfort in her body pushed her to self-harm numerous times in the early years of her incarceration. In 1994, she made lacerations to her face. On July 8, 1998, she attempted suicide by asphyxiation. She wrote a letter to her mother saying she feared for her life living

with men in prison and that all she wanted was to be transferred out of her all-male housing placement in Lee State Prison. And later in 1998, she attempted suicide by making lacerations to her wrists during her first stay in Phillips State Prison.

60. In addition to gender dysphoria, Ms. Doe has other medical conditions that affect her conditions of confinement. GDC medical staff diagnosed Ms. Doe with hypertension, chronic obstructive pulmonary disease ("COPD"), and asthma in 2009; they prescribed her with an oxygen tank for about seven years. Ms. Doe's medical conditions were well-documented in her medical records throughout her time in GDC and before she started any gender-affirming medical interventions.

61. On October 19, 2015, Ms. Doe's then-treating psychologist, Dr. Duane Harris, diagnosed Ms. Doe with gender dysphoria under the revised DSM-5 while she was in Johnson State Prison.

**Ms. Doe's Initial Gender-Affirming Care and Social Transition**

62. Ms. Doe notified GDC medical staff of her desire to start HRT as soon as she received her gender dysphoria diagnosis. She started HRT in November 2015, first taking only a testosterone blocker. Medical staff at her facility began this regimen before Ms. Doe met with an endocrinologist.

63. On January 13, 2016, while Ms. Doe was housed in Johnson State Prison, she met with Dr. Anthony Mulloy, an endocrinologist and Wellpath employee contracted to work across GDC facilities, who discussed HRT with her

and prescribed her dosage for a feminizing hormone.

64.     Dr. Mulloy initially prescribed her with 2 mg of estradiol and 50 mg of spironolactone, taken orally each day.  Estradiol is a dose of the feminizing hormone estrogen, and spironolactone is a testosterone blocker.  Spironolactone is also a diuretic used to treat high blood pressure.  Doctors often prescribe it in high doses, or in combination with other blood pressure medication, if feminizing hormones cause an increase in blood pressure.  Ms. Doe began spironolactone in November 2015 and started estradiol in late January or early February 2016.

65.     Ms. Doe's HRT continued without interruption through May 2019.  Her dosage was gradually raised over that time to 10 mg of transdermal estradiol, which she received twice per month, and a daily 200 mg dose of spironolactone, taken orally.

66.     Ms. Doe's HRT caused a significant feminization of her body and alleviated some of the distress she experienced for the four years she was on it.  Ms. Doe developed breasts; her baldness slowed; her facial and body hair growth slowed; fat redistributed around her thighs, hips, and buttocks; and her penis and testicles reduced in size.

67.     Because her physical transition led her to develop breasts, GDC staff provided her with brassieres temporarily in 2016 while she was at Johnson State Prison.  As a result of this physical transition, Ms. Doe's gender dysphoria symptoms

reduced.

68.     Ms. Doe never had access to social transition items like make-up, nail polish, wigs, or other beauty products that women in custody can access and that would allow her to help maintain a feminine appearance.  To the contrary, when Ms. Doe expressed her gender by tailoring her clothes and using homemade nail polish that she created out of wax, GDC officials took away her tailored clothing and nail polish.  And when her hair grew out, GDC staff held her down and shaved her head bald.  Ms. Doe wants to be able to access everything on the women's commissary item list and wants her family to be able to order women's items from GDC's special package program for her.  She also wants to order a wig to have a feminine appearance.  These medically necessary items have been recommended by GDC psychiatrists.

### Ms. Doe's Early Requests for Gender-Affirming Surgery in GDC

69.     HRT did not address Ms. Doe's gender dysphoria because severe symptoms persisted.  She has requested gender-affirming surgery ever since receiving her gender dysphoria diagnosis in 2015—including while she was receiving HRT.

70.     Two of her treating physicians at Johnson State Prison assessed her and discussed gender-affirming surgery with her.  First, on or around April 2016, Dr. McKinnon, a psychiatrist and MHM employee, stated that Ms. Doe would benefit

from consideration for "gender-reassignment surgery" because it would decrease the distress that she felt from being in the wrong body and hopefully decrease her recurrent self-injurious behavior and thoughts of self-mutilation. From April to May 2016, following this assessment, Ms. Doe informed a number of doctors and nurses that she was thinking about cutting off her penis and wanted vaginoplasty.

71.     Later that same year, Dr. Wil Ausborn, a psychologist at Johnson State Prison and MHM employee, said that Ms. Doe had a persistent need for gender-affirming care, including "sex reassignment surgery." Dr. Ausborn specifically said that Ms. Doe was a "candidate" for surgery.

72.     Dr. McKinnon's and Dr. Ausborn's assessments came while Ms. Doe was actively on HRT; both doctors believed she needed more treatment than HRT offered.

73.     But even with these two recommendations, the administrators responsible for Ms. Doe's care—the MHM, Wellpath, and GDC Defendants named in this case—prevented Ms. Doe from accessing the surgery she needed because of GDC's unconstitutional Blanket Ban on gender-affirming surgery.

74.     In or around June 2016, while in Johnson State Prison, Ms. Doe filed a grievance for consideration for gender-affirming surgery, but Warden Shawn Emmons denied it. Ms. Doe filed an appeal, but that also was denied by Dr. Sharon Lewis, GDC's Statewide Medical Director.

75.     After receiving the final denial of her gender-affirming surgery, and out of frustration and despair caused by her persistent gender dysphoria and continued denial of care, Ms. Doe attempted suicide by asphyxiation in February 2017.  As a result of that suicide attempt, Ms. Doe has serious neck pain that doctors informed her will manifest as arthritis.

### Wellpath Discontinued Ms. Doe's HRT in June 2019

76.     Although Ms. Doe could not access gender-affirming surgery, she continued taking HRT.  For most of the time she was taking HRT, her doctors didn't find her preexisting pulmonary conditions to be an issue.  As of September 2018, for example, Dr. Raymond Moody evaluated her and found that her hypertension was well controlled.

77.     But things changed on or around June 4, 2019, when Ms. Doe's primary care physician at Georgia State Prison, a male nurse practitioner and Wellpath employee, suddenly discontinued her HRT, first ending her estradiol regimen, then ending her spironolactone.  The primary care physician informed Ms. Doe that he believed her health risks (including her age, risk for blood clotting, and risk for stroke) were too high to continue taking estradiol, which could raise her blood pressure.  Ms. Doe felt that she had no option but to follow his medical advice and accept his recommendation to discontinue HRT.  Ms. Doe did not request this change in her treatment.

78.     There is no contraindication for estradiol based on high blood pressure, risk of stroke, age, or risk of blood-clotting because many alternatives exist to remedy these issues, such as increasing Ms. Doe's spironolactone dosage, since it is used to treat high blood pressure.  The Wellpath Defendants did not work with Ms. Doe to find any reasonable alternatives, such as prioritizing gender-affirming surgery, to treat her gender dysphoria.

79.     Ms. Doe requested to speak with Dr. Mulloy—who initially prescribed her the medication—about the change in care, and she filed between 15 and 25 sick call requests between 2019 and 2021 asking to see him.  The medical department refused to send the escorts needed for her transportation to the medical unit.

80.     Being suddenly removed from HRT affected Ms. Doe physiologically; she experienced significant emotional, psychological, and physical distress.  Over a span of two months following the discontinuation of HRT, Ms. Doe's body changed again, reverting to a more masculine form.  Her facial and chest hair returned, her breasts reduced in size, and her testicles and penis grew in size.  The fatty tissue around her thighs, hips, and buttocks diminished.  She felt very nauseous and vomited as a result of the quick cessation of hormones.  She felt severe emotional anguish, depression, and hopelessness.

81.     In July 2019, as Ms. Doe was dealing with the physiological distress of ending HRT, she was put into solitary confinement after she was sexually assaulted

at Valdosta State Prison in 2018, explained further below. Guards would not let her out of her cell for any reason. They did not take her to call-outs for the medical department, so she also would have been prevented from seeing her endocrinologist if the medical unit had scheduled her visit during that time.

82.     Without access to any medically necessary gender dysphoria treatment, her gender dysphoria symptoms became unmanageable and drove her to again attempt suicide through asphyxiation in December 2019.

83.     Defendants failed entirely to respond to Ms. Doe's suicide attempt and did not take Ms. Doe to a crisis stabilization unit as they should have under GDC policy.[20] Instead, Ms. Doe continued to languish in solitary confinement without the access to the gender-affirming care that she needed.

84.     On March 27, 2020, while in solitary confinement in Georgia State Prison, Ms. Doe filed a petition to restart her HRT. On May 19, 2020, a Nurse Practitioner—Ms. Doe's then regular physician—denied her request and said that HRT was "not recommended due to health." This physician provided her with this contraindication because he believed her hypertension and pulmonary issues in general meant that HRT increased her risk of stroke, heart attack, and blood clots. Ms. Doe pushed back against this contraindication and said that she would consent to additional risks because she wanted to restart HRT. But her self-advocacy made

_____

[20] Ga. Comp. R. & Regs. § 82-4-1-.12(8).

no difference.

85.     Being denied HRT as well as all gender-affirming care whatsoever caused Ms. Doe intense emotional anguish.  Her gender dysphoria got even worse.  She experienced panic attacks, insomnia, and loss of appetite, on top of her constant suicidal ideation.

86.     About four and a half months after medical staff discontinued her HRT, Ms. Doe started to beat her head against the wall repeatedly until she bled from her head.  She did this almost every day to prevent thoughts of self-castration or suicide; it was her only coping mechanism to address her gender dysphoria.

87.     Despite having awareness of this serious risk of harm to Ms. Doe, neither GDC nor Wellpath staff provided Ms. Doe with any mental or physical care—let alone gender dysphoria treatment—following these incidents.

**Defendants Deny Ms. Doe Medically-Necessary Gender-Affirming Surgery for Her Gender Dysphoria**

88.     Ms. Doe remained in solitary confinement for the rest of her stay in Georgia State Prison.  The staff did not allow her access to forms to make formal requests for gender-affirming care—or requests for anything, for that matter.

89.     Ms. Doe was relegated to seeking help for her conditions through speaking with mental health counselors who visited her cell only occasionally.  She told them that she needed gender dysphoria care and to talk with doctors about gender-affirming surgery.  But the counselors did not make any medical or mental

27

health appointments for her or take other steps to help her access the care she needed during the nearly three years she endured solitary confinement conditions in the Georgia State Prison.

90. Defendants transferred Ms. Doe to Ware State Prison in January 2022 and subsequently to Phillips State Prison—where she is presently detained—in April 2022; she has remained in solitary confinement settings in each of these facilities. Once she was out of Georgia State Prison, Ms. Doe began regularly submitting medical requests for gender-affirming surgeries that would alleviate her persistent feelings of gender dysphoria distress, which were exacerbated by her body regressing after the sudden cessation of HRT.

91. Specifically, she submitted medical requests for the following gender-affirming surgeries: an orchiectomy (removal of her testicles to minimize the testosterone in her body), voice feminization surgery, facial feminization surgery, laser hair removal, breast augmentation surgery, liposuction at the waist, and buttock augmentation.

92. Ms. Doe also made requests for gender-affirming items, including breast pads, buttock pads, and a wig. These items would treat her gender dysphoria by helping her look closer to how she had looked when she was on her full dosage of feminizing hormones.

93. Ware State Prison staff took some limited and ineffective steps to

respond to her requests. An MHM psychiatrist named Dr. Cathleen Cleary evaluated Ms. Doe on February 17, 2022. Dr. Cleary referred Ms. Doe back to Dr. Mulloy, but Wellpath staff thwarted her efforts to see Dr. Mulloy: each time she tried to see him, either Wellpath staff told her she did not have a properly scheduled appointment or the staff in the medical unit would fail to bring her an escort to the appointment on time. These scheduling mishaps—unreasonable delay caused by Defendants—continued until April 2023, over a year later.

94. Being denied access to gender dysphoria care caused Ms. Doe anxiety and frustration. In an attempt to prevent herself from resorting to self-castration in response to her worsening gender dysphoria, which she knew would cause serious injury and potentially death, or suicide, on March 1, 2022, she slammed her head against the wall so hard that she knocked one of her teeth out.

95. On March 9, 2022, Ms. Doe wrote a message to the mental health unit manager, Jeremy Lane—an MHM employee—stating that the emotional pain from her gender dysphoria caused her to take self-injurious behavior and have thoughts of self-castration again. Ms. Doe did not receive a response.

96. Ms. Doe wrote again to Mr. Lane and Dr. Cleary on March 21, 2022, requesting a psychological assessment for gender-affirming surgery. Ms. Doe had a tele-psych meeting with Dr. Cleary on March 24, 2022 and learned from Dr. Cleary that she had received Ms. Doe's letters and request for surgery.

97.     Ms. Doe's treatment committee finally met on March 30, 2022.  To Ms. Doe's understanding, the treatment committee included MHM employees Dr. W. Ausborn, Mr. Lane, Dr. Cleary, and Nurse Practitioner Sidney Moore.

98.     After their meeting, Dr. Cleary told Ms. Doe that she could not conduct a clinical assessment and referral for the surgeries Ms. Doe had requested because, due to GDC's Blanket Ban on surgical care, the MHM administration forbid their staff from performing psychological assessments for gender-affirming surgery.  Dr. Cleary stated that, when she challenged her MHM superiors as to why conducting such an evaluation was impermissible, she was told, "You [Dr. Cleary] must follow our rules or find somewhere else to work."

99.     Ms. Doe became suicidal in response to this update.  After this incident, on or around April 6, 2022, GDC medical staff evaluated Ms. Doe's mental health and enhanced her level of mental health services to Level III, "inpatient, supportive living," pursuant to GDC SOP 508.16.  Defendants put her in a suicide safety vest and placed her on strip cell observation status.

100.    About five days later, on April 11, 2022, Defendants transferred Ms. Doe to Phillips State Prison, where she was admitted to their medical crisis stabilization unit and placed on long-term suicide prevention status in solitary confinement conditions.

101.    On May 6, 2022, Ms. Doe sent a message to her new mental health

counselor, Mr. Teale, explaining her severe gender dysphoria and thoughts of self-castration and emphasizing her need for gender-affirming surgery.  She never heard back from him.

102.  On May 13, 2022, Ms. Doe met with Nurse Moore in person when he visited Phillips State Prison and once again requested an evaluation for gender-affirming surgery.  Nurse Moore mentioned GDC's Blanket Ban, telling her that GDC is unwilling to permit these types of surgeries, so they would not provide her with an assessment.  Nurse Moore also said that if Ms. Doe were willing to pay for the surgical procedures, then they could do the assessment and get the surgery approved.

103.  On May 22, 2022, Ms. Doe wrote to Dr. Donald Bowling, a psychologist and clinical director at Phillips State Prison and an MHM employee, requesting an assessment for gender-affirming surgery.  He did not respond either.

104.  On May 27, 2022, Ms. Doe met with Dr. Sherri Skibinski, the attending psychologist at Phillips State Prison and an MHM employee, and stated her need for gender-affirming surgery.  Dr. Skibinski claimed that she "was not qualified" to evaluate Ms. Doe for such procedures.  She conveyed GDC's directive that MHM employees were not to conduct evaluations for surgery but instead to work with incarcerated trans individuals to develop "coping skills."  Dr. Skibinski said she had no control over policies established between GDC and MHM senior executives.  Dr.

Skibinski's statements, too, point to GDC's Blanket Ban on gender-affirming surgery.

105. Ms. Doe wrote to Dr. Skibinski again on May 29, 2022 and reemphasized her need for surgery. Dr. Skibinski did not respond.

106. Through grievances, letters, and health service requests, Ms. Doe notified Phillips State Prison Warden DeShawn Jones, then GDC Commissioner Timothy Ward, and GDC Medical Director Sharon Lewis of her various needs and the MHM physicians' unwillingness to assess her for gender-affirming surgery. She argued to them in her grievances and appeals that the decisions to deny her evaluations for surgery were based on GDC's unconstitutional Blanket Ban. Her grievances and appeals were denied summarily.

107. On June 21, 2022, Dr. Bowling met with Ms. Doe and said that he "was not qualified" to assess her for gender-affirming surgery. Ms. Doe asked him if he had previously assessed, diagnosed, and referred other patients with gender dysphoria for treatment, and he said yes. Dr. Bowling callously told her: "If you were to attempt self-castration again, maybe while at the hospital, they'll just go ahead and cut your gonads out."

108. Ms. Doe notified the MHM administration, Commissioner Ward, and Medical Director Lewis of Dr. Bowling's statements by letter, but they refused to respond or take any action.

109.   Out of desperation and convinced that she would not receive gender-affirming surgery she needed because of GDC's illegal Blanket Ban, on July 17, 2022, Ms. Doe again attempted self-castration by tying threads of intertwined nylon strings around the base of her testicles.  Her goal was to remove her testicles and thus eliminate the source of testosterone that caused her distress.

110.   Five intensely painful days later, she met with mental health counselor Teale, who came to her cell as part of his rounds.  Ms. Doe told Mr. Teale that she was in extreme pain.  He asked what she had done, and she pulled down her pants to show him her bloody underwear.  Mr. Teale called for medical staff to bring Ms. Doe to the Phillips State Prison hospital floor, where she received emergency medical attention.  She rated her pain at 10 out of 10.  As a comparison, she previously broke her arm and rated that a 7 out of 10.

111.   For the next two weeks, the pain was excruciating and affected a number of her simple activities of daily living.  She took almost no showers because the water stung the wound.  She walked very little because of her swollen testicles.  She was unable to sit down; she could only lay down.  For up to a month afterwards, she felt an intense pain, almost like being electrocuted, that prevented her from moving quickly or for long periods of time.  The pain in her testicles was so strong that it would stop her in her tracks when she was walking.  To this day, Ms. Doe can sit for only 10 to 15 minutes before she needs to move because of the discomfort in

her scrotum.

112.  GDC's Blanket Ban caused Ms. Doe's distress over not getting the surgeries and therefore caused her to self-harm.  GDC's Blanket Ban caused Ms. Doe immense pain and suffering.

113.  Only after her self-castration attempt did the MHM mental health staff at Phillips State Prison finally provide Ms. Doe with an assessment for gender-affirming surgery.  These MHM staff, including Defendants Teale, Bowling, Skibinski, Moore, and Cleary, were on notice of Ms. Doe's needs and failed to take any action before she suffered extreme harm.  GDC Defendants Jones, Lewis, and Oliver also ignored her serious need for medical care.  This extensive delay contravened GDC policy that called for a treatment committee to evaluate Ms. Doe's needs every six months[21] and to give serious consideration to her views regarding her own safety.[22]  Ignoring Ms. Doe's statements that she was at risk of self-castrating directly contravened GDC policy.

114.  In 2022—six years after Ms. Doe began requesting this medically necessary care—two psychiatrists employed by MHM, Dr. Jordan Howard and Dr. Frady, finally evaluated Ms. Doe for gender-affirming surgery and other gender-affirming care needs.  She met with Dr. Frady on or around July 28, 2022 and with

---

[21] *See* GDC SOP 507.04.68(IV)(B)(6).
[22] GDC SOP 507.04.68(IV)(C)(1).

Dr. Howard in August, September, and October 2022.

115. Both psychiatrists recommended gender-affirming surgery.

116. After he completed his assessments, Dr. Howard found that Ms. Doe met the "criteria for gender dysphoria" and recommended that "affording her basic accommodations impacting her gender appearance may translate to a significant reduction in self-injurious behavior and minimize the patients [*sic*] notable distress related to her gender identity."

117. Regarding her readiness for surgery, Dr. Howard "believe[d] she has capacity regarding the pursuit of gender affirming treatment" and that her "comorbid psychiatric issues . . . are not actively distracting her from appreciating the benefits, risks, and realities surrounding gender affirming treatment."

118. In several of their meetings, Dr. Howard recognized Ms. Doe's need to transfer to a women's facility. Dr. Howard and Ms. Doe discussed the benefits of Ms. Doe being moved to a female facility, where she could outwardly present and live as her true self. Ms. Doe felt that being in a female facility would be better for her mental and physical health, and she felt buoyed that Dr. Howard also understood and supported this important element of her care needs.

119. Dr. Frady evaluated Ms. Doe on or around July 28, 2022, and sent a recommendation for surgery to Wellpath, the medical service provider that contracts with GDC for surgical care, and to Ms. Doe's treatment committee. Dr. Frady

recommended that Ms. Doe (1) remain on suicide prevention status; (2) receive gender-affirming items like breast pads, buttock pads, and wigs; (3) receive gender-affirming surgery; and (4) receive ongoing support with medication management.

120. Dr. Frady read his recommendation aloud to Ms. Doe on January 3, 2023 during a virtual appointment. Dr. Skibinski was also present. He told Ms. Doe that his evaluation was also in Ms. Doe's mental health records.

121. That same day, Ms. Doe met with members of her treatment committee: Defendants Warden Jones, Dr. Skibinski (the attending psychologist at Phillips State Prison and an MHM employee), Rhonda Billings (Mental Health Director at Phillips State Prison and an MHM employee), and Jewellann Clarke (the Health Services Administrator of Wellpath). Although Dr. Frady and Dr. Howard had both recommended that Ms. Doe receive the surgeries and other gender-affirming care that she had repeatedly requested, the treatment committee denied her these surgeries for non-medical reasons.

122. First, Dr. Skibinski noted that she had recommendations from Drs. Howard and Frady for gender-affirming treatment. Warden Jones said that the group had discussed it amongst themselves and determined that nothing in GDC policy allowed Ms. Doe to have surgery. Warden Jones said it was above his paygrade and over his head—that GDC "higher-ups" would not provide these clinically indicated surgeries because GDC "doesn't do gender-affirming surgeries." This clearly

referenced GDC's Blanket Ban on gender-affirming surgery. When Ms. Doe pushed back, Ms. Billings said, "Why can't you accept things the way they are?"

123. Ms. Doe grieved the treatment committee's refusal—based on GDC's Blanket Ban—to approve her for the specific surgeries recommended by Dr. Frady. She also grieved the treatment committee's denial of her requests for gender-affirming items that would help to restore her physical appearance to what it looked like while she was taking feminizing hormones, specifically buttock pads, breast pads, hair removal cream (to remove her facial and body hair), and a synthetic wig, following Dr. Frady's recommendations that she receive all these items. She timely appealed when GDC, MHM, and Wellpath administrators denied those grievances.

124. Finally, nearly four years after being removed from HRT and after requesting a consultation with him, Ms. Doe had an appointment with her endocrinologist, Dr. Mulloy, on or around April 26, 2023. Dr. Mulloy reiterated that the combination of her age, hypertension, and cardiac and pulmonary issues put her at higher risk when taking hormones. He did not specifically say how high her risk might be or provide other information to help her make an informed choice about her medical care.

125. Ms. Doe pushed Dr. Mulloy to put her back on HRT to remedy her gender dysphoria. Dr. Mulloy said that he would put her back on spironolactone, at a lower dose (100 mg daily compared to the 200 mg daily dose she was on

previously).  Ms. Doe restarted the dose on April 28, 2023, but she did not experience any significant changes from it in the same way she did on her previous higher dose. Her original dose of 200 mg was the clinically indicated dose; 100 mg was too low.

126.    Dr. Mulloy also said that he would be willing to consider prescribing Ms. Doe 1 mg of estradiol.  But he pointed out that it would not be a high enough dosage to make any changes; it would take about 20 mg of estradiol every two weeks—Ms. Doe's previous treatment regimen—to see feminizing effects.

127.    Ms. Doe saw Dr. Mulloy again on July 26, 2023—after Ms. Doe's counsel submitted a letter regarding her medical needs to GDC.  Dr. Mulloy decided to put Ms. Doe on 8 mg of estradiol every 2 weeks, but he refused Ms. Doe's request to increase her spironolactone dosage to 200 mg, saying he would see her again in three months.

128.    During that consultation, Dr. Mulloy told her that "GDC would never do these surgeries."  Dr. Latonya James, Medical Director at Phillips State Prison and a Wellpath employee, was present and agreed with Dr. Mulloy's statement.  Dr. James said, "We know that GDC would never provide those surgeries, so the lawyers will have to hash that out."  Dr. Mulloy agreed and said, "We do not have a contract for these types of surgeries, and it has been the policy of GDC to not provide these surgeries."

129.    On August 23, 2023, however, Dr. James suddenly removed Ms. Doe

from HRT once again, preventing her from getting her estradiol shot, based on Dr. James's reading of Ms. Doe's blood pressure.  Ms. Doe once again felt nauseous and had frequent headaches from the quick cessation of the HRT.  Since then, Ms. Doe has felt depressed and has felt like self-castrating again.

130.  Stopping Ms. Doe's estradiol suddenly left her gender dysphoria completely untreated once again.  Dr. James's radical decision to immediately halt Ms. Doe's medical care ignored Ms. Doe's medical history and high risk of detrimental symptoms associated with her untreated gender dysphoria.

131.  Three weeks later, on or around September 13, 2023, Dr. Mulloy restarted Ms. Doe's estradiol dosage of 8 mg every two weeks.  Ms. Doe has yet to see any significant changes to her body as a result of this low dosage.

132.  Dr. Mulloy reduced Ms. Doe's dosage to 6 mg every two weeks on or around November 1, 2023.  Dr. Mulloy said: "Your estradiol level is way too high. It needs to be right at 100."  Ms. Doe's estradiol level was around 300, in a standard range.  He also discussed taking Ms. Doe off spironolactone, but decided to leave her on it for the near future.

133.  Ms. Doe's HRT is below the target range for the medical standard of care.  Taking an individualized approach to her treatment, as the WPATH Standards of Care dictate, given that her body is not reacting to the medication with noticeable physiological changes, she needs to have an increased dosage that is sustained over

time, as well as the feminizing surgeries for which she has been approved by Defendants' own medical staff.

## Ms. Doe's Housing Placement is Unsafe for Her

1. Ms. Doe Has Been Sexually Assaulted While Housed in Men's Facilities in GDC

134. Transgender women such as Ms. Doe are at a heightened risk of assault or rape in men's facilities.

135. In 1996, Ms. Doe was raped while in Georgia State Prison. Because the rape seriously exacerbated her mental health conditions, her housing has since been limited to facilities that serve people with a Level III mental health status.

136. Notwithstanding this housing placement, GDC correctional officer Steven Hall repeatedly raped and physically assaulted Ms. Doe at the Georgia Diagnostic and Classification Prison, a men's facility, from October 2010 through October 2011 and April 2012 until May 2012. Ms. Doe filed a *pro se* lawsuit against Officer Hall and won in a trial by jury.

137. Another incarcerated person in Valdosta State Prison ("Valdosta") raped Ms. Doe at knifepoint on April 20, 2018. The man, who was a member of a gang, came into her cell holding a knife and forced Ms. Doe to have anal sex with him. Ms. Doe suffered anal bleeding from the rape. The GDC medical unit did not ever treat her or stitch up her injuries after her initial assessment.

138. Valdosta was overrun with gang members. Ms. Doe was friends with

a trans woman who was killed by a gang member in April 2018.

139.   Despite these two bases for her fears of violence or her actual experience thereof, the Lieutenant in Valdosta rebuffed Ms. Doe's request for protective custody, telling her, "Get your faggot ass back to the building."

140.   On January 12, 2019, another incarcerated person assaulted Ms. Doe in Georgia State Prison.  The man grabbed her neck, pushed her against the wall, and attempted to pull her pants down before Ms. Doe was able to fight him off.

141.   As a result of the trauma she experienced in several facilities across GDC, Ms. Doe continues to be highly anxious about other people assaulting her.

2.   Ms. Doe Has Been Housed in a Cell Without a Lock, Allowing Men to Enter Her Cell

142.   While Ms. Doe has been in Phillips State Prison, she lived in a cell without a functioning lock from April 2022 until October 2023.  She has notified Phillips State Prison officials, including Defendant Warden Jones, of this security issue numerous times, including through a formal grievance and appeal.  Defendant Jones admitted that the lock is faulty or missing, but did not acknowledge that she wants it replaced, nor did they make any efforts to replace it until nearly eighteen months later.  Ms. Doe has lived in fear that, at any time, someone could come into her cell to attack or rape her, or even try to kill her.  She is scared every day for her physical safety.

143.   Because she lived in a cell with no lock, Ms. Doe has been robbed by

another incarcerated person while in her cell in Phillips. Her attacker brandished a knife; Ms. Doe was so scared that he would attack her with it that she did not stand in his way. People have also taken her things while she is out of her cell.

144. After these incidents, the U.S. Department of Justice visited Phillips State Prison in May 2023. Their visit prompted Phillips officials to move Ms. Doe and another trans woman, Aries Hinson, from their harmful solitary confinement cells to a different unit. Even in the new unit, many cell door locks did not work. At least four men entered Ms. Doe's cell and propositioned her for sex. She fought off their advances, but on May 21, 2023, one man who threatened Ms. Doe ended up violently assaulting Ms. Hinson in the cell next to Ms. Doe. Ms. Doe, Ms. Hinson, and the other people housed with them were returned to their permanent cells—still without locks—shortly after this assault. Ms. Doe lives in fear that the person who assaulted Ms. Hinson or another person in custody will break into her cell.

145. GDC finally put a padlock on her cell on or around October 24, 2023.

146. While she has been in Phillips State Prison, men have beat other padlocks off the door with tools, so she remains concerned that the lock is not strong enough.

147. Ms. Doe lives in a unit with people who are in disciplinary segregation for assaulting others—even though Ms. Doe is placed there for involuntary

protective custody. In Phillips State Prison, solitary confinement and protective custody are functionally the same. Phillips State Prison had five killings in 2022 and a number of rapes or attempted rapes.[23] People inside carry knives and openly use drugs. They light trash cans on fire. Some of these same people approach Ms. Doe regularly to proposition her for sex.

148. These conditions are in the control of Phillips State Prison and the GDC. Ms. Doe's substantial fear of harm in this facility is attributable to the poor management of the prison by the GDC Defendants. If Defendant Jones honored the recognition from Dr. Howard and other psychiatrists that Ms. Doe would benefit from being housed in a women's facility, these concerns would be eliminated. Ms. Doe notified Defendant Jones of this recommendation from GDC's own mental health staff. Yet, Defendant Jones has kept Ms. Doe in a men's facility.

3. Sgt. Kinte Harassed Ms. Doe Repeatedly and Put Her in Danger

149. A Phillips State Prison guard, Sgt. Jamal Kinte Roberts, regularly makes transphobic and demeaning remarks to Ms. Doe and Ms. Hinson. When Ms. Doe stood up for both of them, Sgt. Kinte told her that she was going to hell and said, "I've got something for you, you little bitch." Ms. Doe took this to mean that

---

[23] *See, e.g.*, Danny Robbins & Jennifer Peebles, *Deadly Gang Attack Set in Motion by Guards at Phillips State Prison*, Atlanta Journal Constitution Online (Mar. 2, 2023, 5:19 AM), https://www.ajc.com/news/investigations/deadly-gang-attack-set-in-motion-by-guards-at-phillips-state-prison/YTPE3POKPZA5PAVL4L2QAGV6ZQ/#.

he would physically assault her, permit someone else to assault her, continue to harass her, or otherwise harm her by barring her access to things she needed like her food trays. GDC officials often do not feed her or compromise her food somehow. At the end of January 2023, for example, Officer Johnson, the corrections officer working the second shift, brought her a breakfast tray late and told her, "Here's your tray, you fucking faggot." He then spat in it and threw it on the floor outside of her cell. Sgt. Kinte had previously withheld Ms. Hinson's food tray, so Ms. Doe worried that he would do the same to her.

150. Ms. Doe tried to file a Prison Rape Elimination Act ("PREA") complaint about Sgt. Kinte's behavior, but Defendants thwarted her and did not allow her to complete the process. Ms. Doe reported Sgt. Kinte's behavior to unit manager Edwards, Lieutenant Shields, and the counselors at Phillips State Prison. Ms. Doe and Ms. Hinson wrote statements and signed a letter to Warden Jones. But neither Lt. Shields, nor unit manager Edwards, nor the mental health counselors spoke to them about the incident. Finally, Warden Jones told Ms. Doe that he would "handle it," but he did not speak with Ms. Doe or Ms. Hinson in any detail or conduct the full PREA process. Sgt. Kinte did not work in the housing unit for four to five days, but then he returned.

151. While in the temporary units in May 2023, after Ms. Hinson was assaulted and after Ms. Doe sought to file her PREA complaint, Warden Jones

ordered padlocks with keys to secure Ms. Hinson's and Ms. Doe's doors. But Sgt. Kinte removed both of the padlocks almost immediately, putting Ms. Doe and Ms. Hinson back at great risk. Deputy Warden Courtney McDay caught Sgt. Kinte on camera removing the locks, but Sgt. Kinte was not disciplined. He lied about removing the locks when he was questioned about it. The locks were not replaced until over 24 hours later. Phillips State Prison officials knew there was a great safety risk to Ms. Doe but still left her exposed. Ms. Doe suffered anxiety during that period, during which she was propositioned and threatened numerous times. And when she returned to her regular cell, she was once again placed in a cell with no lock until October 2023.

152.   Despite Sgt. Kinte's history of harassing Ms. Doe and Ms. Hinson and intentionally engaging in conduct to increase their risk of sexual and physical assault, Warden Jones has taken no steps to discipline or curtail Sgt. Kinte's behavior. Instead, Warden Jones gave Defendant Kinte a promotion to the rank of Lieutenant.

4.   Due to Defendants' Inaction, Ms. Doe Lacks Access to a Private Shower and is Harassed En Route to the Shower

153.   Defendants refuse to provide Ms. Doe with private shower time or ensure that she is safe from other people during her showers. There are no separate shower times for Ms. Doe or other transgender people, contrary to PREA and GDC

policy.[24]  None of the locks on the showers work, and there are no shower curtains. Other incarcerated people can see her body when she showers, and they make fun of her and threaten her.

154.  Ms. Doe is misgendered and treated with transphobic remarks multiple times a day by people living and working at Phillips State Prison.  When she goes to shower, the men she passes by yell transphobic and sexually suggestive things to her, such as, "Come here girl.  Give me some head.  Let me see them tits."

155.  These assaults do not stop at words.  On at least one occasion, Ms. Doe was fondled by another incarcerated person while she waited for an officer to escort her back to her cell from the showers.  Ms. Doe complained about this sexual assault, but Defendants did nothing about her complaint.

156.  These repeated, almost daily incidents damage her emotional and mental health.  Ms. Doe also lives in constant fear that at any point a rude remark by a guard or other incarcerated person will turn into something more aggressive and violent, as it has in the past and as it has for other incarcerated trans women Ms. Doe knows.

5.  GDC Has Unconstitutionally Held Ms. Doe in Solitary Confinement for No Reason

---

[24] *Cf.* GDC SOP 220.09(IV)(F) (mandating that "[t]ransgender offenders shall be given the opportunity to shower separately from other offenders" and specifying that "separate" means "[a]lone in a community shower at a separate time from other offenders" or "[a]lone in a shower with separate and private walls or curtains if in a group").

157. Ms. Doe has been trapped in prolonged solitary confinement for over four years. Her placement in solitary confinement is contrary to PREA standards, which state that involuntary segregated housing should not be used for protection unless an assessment of all available alternatives has been made, and for no longer than 30 days.[25] This long period of solitary confinement has been extremely harmful to Ms. Doe's physical and mental health.

158. Ms. Doe has grieved this issue since October 2020, when she was in Georgia State Prison. That grievance and appeal were denied. John Moore Jr., the GDC Office of Professional Standards ("OPS") officer who answered the appeal to her grievance, said that the record showed she was placed on involuntary administrative protective custody for the safety of the prison and herself and that she would remain there until further notice. Other than this vague statement, she has received no explanation for why she has been held in solitary confinement since 2019.

159. There is an extensive body of research showing that solitary confinement causes serious psychological harm, particularly for people like Ms. Doe who have preexisting psychiatric disabilities. Studies have shown that extended

---

[25] *See* 28 C.F.R. § 115.43(c).

stays in solitary confinement cause the mind to deteriorate.[26]  The American Public

Health Organization and the National Commission on Correctional Health Care have

stated that those experiencing mental illness "should be excluded from solitary

confinement of any duration."[27]  Dr. Jeffrey Metzner, the psychiatrist who audits

GDC's provision of mental health services, has concluded that "it is not ethically

defensible" to isolate seriously mentally ill people in segregation for 23 to 24 hours

per day.[28]  The World Professional Association for Transgender Health further

recommends that transgender individuals in particular not be housed in solitary

confinement for prolonged periods of time, "as isolation can cause severe

psychological harm and gross disturbances of functioning."[29]

160.  Ms. Doe has experienced changes to her thinking, her vision, and her

physical fitness due to her prolonged stay in solitary confinement.  She has seen

things out of the corner of her eyes that are not actually there, and she has noticed

her mental acumen slipping.

161.  GDC SOP 220.09.IV(E)(2) states: "Placing an offender in involuntary

---

[26] *See Hutchinson v. Florida*, 677 F.3d 1097, 1106 & n.15 (11th Cir. 2012) (Barkett, J., concurring) (collecting studies).

[27] Nat'l Comm'n on Corr. Health Care, Position Statement, *Solitary Confinement (Isolation)* 4 (Apr. 2016); *see* Am. Pub. Health Ass'n Policy No. 201310, *Solitary Confinement as a Public Health Issue* (2013).

[28] *See* Jeffrey Metzner et al., *Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics*, 38 J. Am. Acad. Psych. & L. 104, 107 (2010).

[29] WPATH, *Standards of Care – Eighth Edition*, Statement 11.8 (2022).

segregated housing to protect him or her from victimization is not permitted unless an assessment of all available alternatives has been made and it is determined that there is no available alternative means of separation from likely abusers . . . ."

162. GDC SOP 220.09(IV)(E)(4)(c) states that transgender offenders' risk levels for sexual victimization and abusiveness must be reassessed at least twice each year of their incarceration. The SOP specifies that "the offenders' own views as to their safety must be given serious consideration."[30]

163. Ms. Doe has been provided only two hearings to reassess her need for segregation in four years, in stark contrast with GDC's SOP requirement of once every thirty days.[31] Her last hearing was in February or March 2022 while she was in Ware State Prison, when Statewide Director of Field Operations, Stan Shepard, placed Ms. Doe in solitary confinement using an outdated disciplinary report. She has not had regular hearings—or, indeed, almost any hearings—regarding her continued need to be in segregation.

164. Then-Acting Statewide Mental Health Director Ducklinger visited Ms. Doe in Phillips State Prison while she was in solitary confinement in January or February 2023. He acknowledged to Ms. Doe and Counselor Teale that Ms. Doe

---

[30] GDC SOP 220.09(IV)(E)(5).
[31] GDC SOP 209.06(IV)(J)(1) (mandating a review of the status of administrative segregation and protective custody every seven days for the first sixty days, then at least every thirty days thereafter).

had been in solitary confinement far too long and he would try to get her out. He never followed up on this promise, and Ms. Doe has remained in solitary confinement ever since.

165. Ms. Doe's severe and persistent gender dysphoria and its symptoms, which include self-castration and suicide attempts, have placed Ms. Doe on Level III of GDC's mental health caseload. According to GDC policy, this means she should be housed in a "Supportive Living Unit dorm (SLU-III) with other Level III" individuals.[32] The SLU is a "structured therapeutic milieu" that provides a "broad spectrum of therapeutic activities and groups," including consistent contact with the prison's mental health staff.[33] Mental Health Level III patients cannot be placed in GDC's Tier II program, which Ms. Doe is in, without being specially screened and recommended for such placement by GDC's mental health staff.[34]

166. GDC is not permitted to house individuals on Mental Health Level III, like Ms. Doe, in the restrictive Special Management Unit.[35] But she is currently living in conditions that are indistinguishable from that unit.

167. Ms. Doe has been housed in a segregation dormitory with little to no access to outdoor recreation, mental health counselors, or other people for four years.

---

[32] GDC SOP 508.16(IV)(G)(2).
[33] GDC SOP 508.16(IV)(C)(3)(a).
[34] GDC SOP 209.08(IV)(B)(10).
[35] Settlement Agreement Regarding the Special Management Unit, *Gumm v. Ford*, No. 5:15-cv-0041, ECF No. 257-1 (M.D. Ga. May 7, 2019).

Her mental health has deteriorated significantly in this environment, where she is left with herself and her own mind, which is triggered by her gender dysphoria when she views her face or body in the mirror. These spirals of gender dysphoria lead to overwhelming feelings of depression, anxiety, and hopelessness. Because of her gender dysphoria, she has experienced frequent suicidal ideation, has attempted suicide, and has attempted self-castration in the past year. Her involuntary administrative custody cell is in the same hall as disciplinary segregation. Thus, she is at risk of harm from those in her unit who have assaulted others and can now more easily access her.

168. The continued unwillingness of Defendants working at Phillips State Prison, including Warden Jones, to reevaluate Ms. Doe and release her from solitary confinement has caused Ms. Doe intense emotional and physiological harm. Defendants need to reevaluate and release her from her solitary confinement unit immediately.

6. Ms. Doe's Gender Dysphoria Necessitates Her Prompt Transfer Out of Phillips State Prison

169. Since at least 2021, Ms. Doe has spoken with counselors about her strong interest in transferring to a women's facility. Most recently, she spoke about it with Dr. Skibinski and Dr. Howard in winter 2022 and with Warden Jones in summer 2023.

170. The WPATH Standards of Care, Georgia policy, and PREA standards

further recommend that institutions consider transgender women like Ms. Doe's housing preference and gender identity when deciding whether to house them in men's or women's facilities.[36]

171. Living in a women's facility would remove some of the daily harm Ms. Doe experiences living among men. She would no longer be vulnerable to the same extent when using the shower or simply conducting her activities of daily living. As GDC psychiatrists have indicated, her gender dysphoria symptoms could be alleviated if she were able to socially transition surrounded by women and would have easier access to female clothing and hygiene items.

172. In June 2023, mental health counselor Cooper asked Ms. Doe to write a statement about her long-term stay in solitary confinement. Warden Jones advised her to include her desire to transfer to a women's facility on that form. Warden Jones acknowledged that Phillips State Prison was not a safe facility for her to be housed in general population. Ms. Doe submitted the form in June 2023. She finally received a response from Deputy Warden of Care and Treatment McDay on October 11, 2023, about 5 months later, rejecting her request. She has appealed this grievance response.

173. It is a custom or policy for GDC to house transgender women who have not had gender-affirming surgery in men's facilities.

---

[36] WPATH SOC-8 at S108; GDC SOP 507.04.68(IV)(C)(1); 28 C.F.R. § 115.42(e).

174.   Because of GDC's Blanket Ban on accessing gender-affirming surgery,

Ms. Doe is concerned that there may be no way for a transgender woman currently

housed in a men's facility to be transferred to a women's facility.

**CLAIMS FOR RELIEF**

**Count 1**
**42 U.S.C. § 1983 – Eighth Amendment – Medical Deliberate Indifference –**
**Injunctive Relief and Damages**
**Against Oliver, Lohman, and Sauls, in their official capacity, and against**
**Jones, Billings, Skibinski, Clarke, and Lewis, in their official and individual**
**capacities**

175.   Under the Eighth Amendment to the United States Constitution, a party

that has knowledge of the need for medical care in prison and intentionally refuses

to provide that care is liable for deliberate indifference.[37]

176.   State actors for purposes of 42 U.S.C. § 1983 claims include agencies

of the state.  GDC is therefore a state actor.

177.   Private entities constitute state actors under 42 U.S.C. § 1983 when they

contract with the state to provide functions traditionally reserved to the state.[38]

MHM and Wellpath are government entities under 42 U.S.C. § 1983 because they

have contracted with Georgia to provide mental health and medical services for the

state.

---

[37] *Mandel v. Doe*, 888 F.2d 783, 787–88 (11th Cir. 1989).
[38] *See Ireland v. Prummell*, 53 F.4th 1274, 1288–89 (11th Cir. 2022); *Buckner v. Toro*, 116 F.3d 450, 452 (11th Cir. 1997).

178. Ms. Doe's gender dysphoria is a serious medical need.

179. Defendants employed by GDC, MHM, and Wellpath actually knew Ms. Doe had a serious medical need that posed a risk of serious harm to her without medically necessary treatment in the form of surgery and continued HRT. Ms. Doe's 2023 Treatment Committee, which included Defendants Jones, Billings, Skibinski, Lewis, Lohman, and Clarke (together, the 2023 Treatment Committee Defendants) received recommendations from four mental health professionals that detailed Ms. Doe's need for gender-affirming surgery and other gender-affirming care.[39] Ms. Doe's gender dysphoria and history of self-harm when denied medically necessary treatment was well-documented in her GDC medical records. These Defendants therefore had notice that Ms. Doe required this care and that denying it would pose significant risks, such as castration or death by suicide.

180. The 2023 Treatment Committee Defendants failed to provide Ms. Doe with medically necessary care in disregard of the serious risk of harm to Ms. Doe and in direct contradiction to GDC's policies and the WPATH Standards of Care, the accepted clinical standards for gender dysphoria care. The 2023 Treatment Committee's decision on or around January 3, 2023 to not provide Ms. Doe with an evaluation for gender-affirming surgery was an action taken under color of state law. The 2023 Treatment Committee Defendants' decision to deny Ms. Doe medically

---

[39] *See supra* ¶¶ 69–74, 114–123.

necessary care was based entirely on GDC's unconstitutional Blanket Ban on gender-affirming surgery. This Ban was based on nonmedical reasons and was not linked to an individualized assessment of Ms. Doe's medical needs, as putatively required by GDC policy.[40]

181. Moreover, the 2023 Treatment Committee denied Ms. Doe's access to gender-affirming care in the form of wigs, padding, and items from the women's commissary list and the special package program that would have assisted her social transition. These items are medically necessary because Dr. Frady found they would help to address her gender dysphoria.[41]

182. GDC, MHM, and Wellpath are liable entities because a policy decision was either made or ratified by a policymaker from each entity. During the relevant time period, senior leadership at GDC, MHM, and Wellpath had notice of this total Ban on providing medically necessary gender-affirming surgeries to trans individuals.[42]

183. Defendant Sauls, Assistant Commissioner of Health Services for GDC—who works closely with Wellpath and MHM and is responsible for the administration of medical care, the training of medical staff, and the enforcement of medical policy—adopted, ratified, and enforced GDC's Blanket Ban policy.

---

[40] *See supra* ¶¶ 122–128.
[41] *See supra* ¶¶ 114–123.
[42] *See, e.g.*, *supra* ¶¶ 96, 98, 104–105, 121.

184.  GDC Statewide Medical Director Lewis ratified and enforced GDC's Blanket Ban on gender-affirming surgery by denying Ms. Doe's requests for gender-affirming surgery and her subsequent grievance appeals, contrary to the recommendations of GDC's own providers recommending that Ms. Doe receive gender-affirming surgery.[43]

185.  GDC Commissioner Oliver's predecessor, former Commissioner Ward, ratified and enforced GDC's Blanket Ban on gender-affirming surgery by refusing to intervene when Ms. Doe contacted him about the 2023 Treatment Committee Defendants' decision.[44]

186.  Warden Jones enforced the Blanket Ban as a 2023 Treatment Committee member and GDC decisionmaker at the facility level.  Defendant Jones participated in the denial of Ms. Doe's access to evaluations for  gender-affirming surgery and other forms of gender-affirming care.[45]

187.  Warden Jones, who had authority to order the evaluation at the facility level, told Ms. Doe it was above his paygrade and over his head because GDC "doesn't do gender-affirming surgeries," further acknowledging the existence of an unconstitutional Blanket Ban.[46]  When Ms. Doe pushed back, Ms. Billings said,

---

[43] *See supra* ¶¶ 74, 106, 108, 113.
[44] *See supra* ¶¶ 106, 108.
[45] *See supra* ¶¶ 106, 113, 121–122.
[46] *See supra* ¶ 121.

"Why can't you accept things the way they are?"[47] These statements affirm Defendants' insistence on enforcing GDC's Blanket Ban and their unwillingness to provide Ms. Doe individualized medical treatment in reckless indifference to Ms. Doe's serious medical needs.

188. Attending psychologist at Phillips State Prison Dr. Skibinski referenced MHM policy and GDC's directive to not conduct evaluations for surgery.[48]

189. Dr. Cleary stated that when she challenged her MHM superiors as to why conducting such an evaluation was impermissible, she was told, "You must follow our rules or find somewhere else to work."[49]

190. Defendant Billings, the Phillips State Prison Mental Health Director, enforced and defended the policy in a conversation with Ms. Doe.[50]

191. Defendant Lohman oversees the mental health staff employed by MHM as their Statewide Mental Health Director. Defendant Lohman ratified the statements of Defendants Skibinski, Cleary, and Billings by failing to intervene when Ms. Doe notified MHM administration of the denial of care.[51]

192. GDC's Blanket Ban—which all of the named Defendants adopted, enforced, and implemented—has caused Ms. Doe to suffer serious injuries. In the

---

[47] *Id.*
[48] *See supra* ¶¶ 104–105.
[49] *See supra* ¶¶ 96, 98.
[50] *See supra* ¶¶ 121–122.
[51] *See supra* ¶ 108.

seven-year period that Defendants have unjustifiably denied Ms. Doe medically necessary and life-saving gender-affirming surgery,[52] Ms. Doe has self-harmed regularly and attempted self-castration due to her worsening gender dysphoria symptoms.[53] GDC's Blanket Ban policy enforced by Defendants has thus caused Ms. Doe grievous—yet entirely preventable—harm.

## Count 2
## 42 U.S.C. § 1983 – Eighth Amendment – Medical Deliberate Indifference – Damages
## Against Ausborn, Lane, Cleary, Moore, and Bowling, in their individual capacities

193. Under the Eighth Amendment to the United States Constitution, a party that has knowledge of the need for medical care in prison and intentionally refuses to provide that care is liable for deliberate indifference.[54]

194. Ms. Doe's gender dysphoria is a serious medical need.

195. Between February and May 2022, Defendants Ausborn,[55] Lane,[56] Cleary,[57] Moore,[58] and Bowling[59] (together, the 2022 Treatment Committee Defendants) actually knew Ms. Doe had gender dysphoria, a serious medical need

---

[52] *See supra* ¶ 70 (indicating 2016 as the first year Ms. Doe requested gender-affirming surgery).
[53] *See supra* ¶¶ 86, 94, 95, 101, 107, 109–113.
[54] *Mandel v. Doe*, 888 F.2d 783, 787–88 (11th Cir. 1989).
[55] *See supra* ¶¶ 71–72.
[56] *See supra* ¶¶ 95–96.
[57] *See supra* ¶¶ 96, 98.
[58] *See supra* ¶ 102.
[59] *See supra* ¶¶ 103, 107.

that posed a risk of serious harm without proper treatment. Ms. Doe's gender dysphoria, history of self-harm, and interest in pursuing gender-affirming surgery were well-documented in her GDC medical records. These Defendants therefore had notice that Ms. Doe required this care and that denying it would pose significant risks, such as castration or death by suicide.

196. The 2022 Treatment Committee Defendants acted under color of state law.

197. On information and belief, Defendants Ausborn, Lane, Cleary, and Moore convened on or around March 30, 2022 to discuss whether they could provide Ms. Doe with a mental health evaluation for gender-affirming surgery in their role as MHM employees.[60]

198. The 2022 Treatment Committee Defendants failed to provide Ms. Doe with medically necessary care in disregard of the serious risk of harm to Ms. Doe and in direct contradiction to GDC's policies and the WPATH Standards of Care, the accepted clinical standards for gender dysphoria care. The 2022 Treatment Committee Defendants' decision to deny Ms. Doe medically necessary care was based entirely on GDC's unconstitutional Blanket Ban on gender-affirming surgery. This Ban was based on nonmedical reasons and was not linked to an individualized

---

[60] *See supra* ¶ 97.

assessment of Ms. Doe's medical needs, as putatively required by GDC policy.[61]

199.   Dr. Cleary, speaking for the 2022 Treatment Committee, informed Ms. Doe that she could not conduct a clinical assessment or referral for the surgeries Ms. Doe had requested because MHM administration forbid their staff from performing psychological assessments for gender-affirming surgery.[62]

200.   After the 2022 Treatment Committee Defendants shared their decision with Ms. Doe, Dr. Bowling, another psychologist, refused Ms. Doe's requests for gender-affirming surgery evaluations.  In June 2022, Dr. Bowling told Ms. Doe: "If you were to attempt self-castration again, maybe while at the hospital, they'll just go ahead and cut your gonads out."[63]   Dr. Bowling's actions and statement indicate reckless indifference to Ms. Doe given her history of self-castration and the seriousness of her medical needs.

201.   As a result of the 2022 Treatment Committee Defendants' decision and Dr. Bowling's decision to deny Ms. Doe access to medically necessary treatment in the form of gender-affirming surgery, Ms. Doe has suffered emotional and physical injuries, her suicidal ideations exacerbated, she has repeatedly engaged in self-harm, and she attempted self-castration, causing her pain that has lasted at least through

---

[61] *See supra* ¶ 98.
[62] *See id*.
[63] *See supra* ¶ 107.

the present time.[64]

## Count 3
## 42 U.S.C. § 1983 – Eighth Amendment – Medical Deliberate Indifference –
## Injunctive Relief and Damages
## Against James and Mulloy, in their official and individual capacities

202.    Under the Eighth Amendment to the United States Constitution, a party that has knowledge of the need for medical care in prison and intentionally refuses to provide that care is liable for deliberate indifference.[65]

203.    Ms. Doe's gender dysphoria is a serious medical need.

204.    Defendants James[66] and Mulloy[67] actually knew Ms. Doe had gender dysphoria, a serious medical need that posed a risk of serious harm to her without proper treatment.  Ms. Doe's gender dysphoria, history of self-harm, and interest in pursuing gender-affirming surgery were well-documented in her GDC medical records.

205.    Dr. James and Dr. Mulloy failed to provide necessary medical care to Ms. Doe in disregard of the serious risk of harm to Ms. Doe and in direct contradiction to the WPATH Standards of Care, the accepted clinical standards for gender dysphoria care.  They suddenly discontinued Ms. Doe's HRT in 2019 and again in August 2023, causing negative medical side effects and leaving Ms. Doe's

---

[64] *See supra* ¶¶ 109–111.
[65] *Mandel v. Doe*, 888 F.2d 783, 787–88 (11th Cir. 1989).
[66] *See supra* ¶¶ 128–130.
[67] *See supra* ¶¶ 63–64, 79, 124–128, 131–132.

gender dysphoria completely untreated.[68]  To this day, Ms. Doe's HRT continues to be at inadequate dosage levels.[69]

206.   Dr. James and Dr. Mulloy's conduct caused Ms. Doe severe injuries, including vomiting and bodily pain from the sudden shift in her hormones, a self-castration attempt, a suicide attempt, repeated self-harm, and serious emotional harm.

**Count 4**
**Title II of the Americans with Disabilities Act – Disability Discrimination /**
**Failure to Accommodate**
**Against Defendant GDC**

207.   Under Title II of the Americans with Disabilities Act ("ADA"), a public entity may not deny a qualified individual with a disability the opportunity to participate in or benefit from a service, program, or activity.[70]  Title II also requires covered parties to provide "reasonable accommodations" to individuals with disabilities so they can fully participate in the benefits administered by these parties under the ADA.[71]  Because of the dates of the actions complained of, the greatly expanded definition of "disability" in the ADA Amendments Act of 2008 ("ADAAA") applies to this case.

208.   Ms. Doe is a qualified individual with a disability.  A "disability" under

---

[68] *See supra* ¶¶ 79, 124–132.
[69] *See supra* ¶¶ 132–33.
[70] 42 U.S.C. § 12132; 28 C.F.R. § 35.130(b).
[71] 28 C.F.R. § 35.130(b)(7).

the ADA is "a physical or mental impairment that substantially limits one or more major life activities."[72]   Ms. Doe suffers from multiple mental impairments, including gender dysphoria, anxiety, and depression.  Ms. Doe's gender dysphoria substantially limits her ability to perform major life activities, including sleeping, showering, thinking, and concentrating.[73]  She is often overwhelmed by thoughts of her body's misalignment with her gender.  She self-harms by slamming her head against the wall almost daily, attempting suicide, and attempting self-castration—all a result of her gender dysphoria distress.[74]  Others in her living area remind her of her apparent gender often by calling her slurs such as "faggot" and sexually harassing her.[75]  Her underlying anxiety and depression are both exacerbated by her gender dysphoria.

209.   GDC is currently, and at all times relevant to this action has been, a "public entity" as defined by the ADA[76] and provides a "program," "service," or "activit[y]" within the meaning of the ADA, including correctional and rehabilitative programs and services.[77]  GDC denied Ms. Doe the benefits of GDC's services when GDC officials, including Defendant Jones, denied Ms. Doe the surgical evaluation

---

[72] 42 U.S.C. § 12101(1).
[73] *Id.* § 12102(2)(A); *see supra* ¶¶ 85, 153, 167, 171.
[74] *See supra* ¶¶ 75, 82, 86, 94, 95.
[75] *See supra* ¶ 139.
[76] 42 U.S.C. § 12131(1)(B).
[77] *Id.* § 12131(2).

recommended by four mental health clinicians in the prison system.[78]  GDC Defendants Jones, Sauls, and Lewis also denied Ms. Doe access to other medically necessary care, including adequate HRT, access to commissary items, and access to the special package program.[79]

210.  GDC's denial of its medical services was by reason of Ms. Doe's disability.  People with other disabilities and medical needs do not face the same barriers to accessing surgical care.  GDC, through the 2023 Treatment Committee Defendants, denied Ms. Doe's surgical evaluation because of GDC's unconstitutional Blanket Ban that applies only to gender dysphoria care, including gender-affirming surgery.  GDC's Blanket Ban on gender-affirming surgery has no medical basis.  This determination was not based on an individual assessment of Ms. Doe's medical needs but instead solely on Ms. Doe's gender dysphoria.[80]  Therefore, this Ban is based on discrimination, which is illegal under the ADA.

211. Accessing gender-affirming surgery is also a reasonable accommodation.  Ms. Doe requires this reasonable accommodation to GDC's Blanket Ban against providing gender-affirming surgeries because of her severe mental illnesses caused by her disability (gender dysphoria) and the risk to her health and safety that will result without proper treatment.  Defendants did not engage in

---

[78] *See supra* ¶¶ 106, 108, 113, 121–122.
[79] *See supra* ¶¶ 74, 106, 108, 113.
[80] *See supra* ¶ 112.

the mandated interactive process to arrive at appropriate alternatives, if any, and instead simply enforced the Blanket Ban. Ms. Doe's mental health evaluations show the strong need for access to these medical services as a reasonable accommodation to GDC's policy. And because of Defendants' denial of her HRT, Ms. Doe's gender-affirming surgery was all the more necessary; without it, she has been denied treatment in total.

212. The 2023 Treatment Committee Defendants, which included Warden Jones,[81] also denied Ms. Doe's access to gender-affirming care in the form of wigs, padding, and items from the women's commissary list and the special package program that would have assisted her social transition. These items were also denied by reason of Ms. Doe's gender dysphoria, and these decisions thus constitute discriminatory denials that violate the ADA.

213. Further, these items, as well as transfer to a women's facility, are reasonable accommodations that would alleviate the stresses caused by Ms. Doe's gender dysphoria that impair her ability to participate in basic life activities.

214. GDC's Blanket Ban—which all the named Defendants adopted, enforced, and implemented and which violates the ADA—has caused Ms. Doe to suffer serious injuries. In the seven-year period that Defendants have unjustifiably

---

[81] *See supra* ¶¶ 106, 108, 113, 121–122.

denied Ms. Doe gender-affirming surgery,[82] Ms. Doe has self-harmed regularly and attempted self-castration due to her worsening gender dysphoria symptoms.[83] GDC's Blanket Ban policy enforced by Defendants has thus caused Ms. Doe grievous—yet entirely preventable—harm.

## Count 5
### Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 – Disability Discrimination
### Against Defendant GDC

215.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination on the basis of disability in any program or activity receiving federal assistance.    Section 504 also requires covered parties to provide "reasonable accommodations" to individuals with disabilities so they can fully participate in the benefits administered by the covered parties.[84]

216.    Ms. Doe is a qualified individual with a disability.  A "disability" under the Rehabilitation Act, which shares the ADA's definition, is "a physical or mental impairment that substantially limits one or more major life activities."[85]  Ms. Doe suffers from multiple mental impairments, including gender dysphoria, anxiety, and depression.  Ms. Doe's gender dysphoria substantially limits her ability to perform

---

[82] *See supra* ¶ 70 (indicating 2016 as the first year Ms. Doe requested gender-affirming surgery).
[83] *See supra* ¶¶ 86, 94, 95, 101, 107, 109–113.
[84] 35 C.F.R. § 104.12(a).
[85] 42 U.S.C. § 12101(1); 29 U.S.C. § 705(9)(B) (noting that "disability" is given the same meaning as in 42 U.S.C. § 12101).

major life activities, including sleeping, showering, thinking, and concentrating.[86] She is often overwhelmed by thoughts of her body's misalignment with her gender. She self-harms by slamming her head against the wall almost daily, attempting suicide, and attempting self-castration—all a result of her gender dysphoria distress. Others in her living area remind her of apparent her gender often by calling her slurs such as "faggot" and sexually harassing her.[87]  Her underlying anxiety and depression are both exacerbated by her gender dysphoria.

217.   GDC receives federal financial assistance for its operation of programs and activities.

218.   GDC is currently, and at all times relevant to this action has been, a "public entity" as defined by the Rehabilitation Act[88] and provides a "program," "service," or "activit[y]"  within the meaning of the Rehabilitation Act, including correctional and rehabilitative programs and services.[89]   GDC denied Ms. Doe the benefits of GDC's services when GDC officials, including Defendant Jones, denied Ms. Doe the surgical evaluation recommended by four mental health clinicians.[90] GDC Defendants Jones, Sauls, and Lewis also denied Ms. Doe access to other medically necessary care, including adequate HRT, access to commissary items, and

---

[86] 42 U.S.C. § 12102(2)(A); *see supra* ¶¶ 85, 153, 163, 171.
[87] *See supra* ¶ 139.
[88] 42 U.S.C. § 12131(1)(B).
[89] *Id.* § 12131(2).
[90] *See supra* ¶¶ 106, 108, 113, 121–122.

access to the special package program.

219.   GDC's denial of its medical services was by reason of Ms. Doe's disability.  People with other disabilities and medical needs do not face the same barriers to accessing surgical care.  GDC denied Ms. Doe's surgical evaluation because of GDC's illegal Blanket Ban that applies only to gender-affirming surgery.  GDC's Ban on gender-affirming surgery has no medical basis.  This determination was not based on an individual assessment of Ms. Doe's medical needs but instead solely on Ms. Doe's gender dysphoria.   Therefore, this Ban is based on discrimination, which is illegal under the Rehabilitation Act.

220.   Accessing   gender-affirming   surgery   is   also   a   reasonable accommodation.   Ms. Doe requires this reasonable accommodation to GDC's Blanket Ban against providing gender-affirming surgeries because of her severe mental illnesses caused by her disability (gender dysphoria) and the risk to her health and safety that will result without proper treatment.  Defendants did not engage in the mandated interactive process to arrive at appropriate alternatives, if any, and instead simply enforced the Blanket Ban.  Ms. Doe's mental health evaluations show the strong need for access to these medical services as a reasonable accommodation to GDC's policy.  And because of Defendants' denial of her HRT, Ms. Doe's gender-affirming surgery was all the more necessary; without it, she has been denied treatment in total.

221. The 2023 Treatment Committee Defendants, which included Warden Jones,[91] also denied Ms. Doe's access to gender-affirming care in the form of wigs, padding, and items from the women's commissary list and the special package program that would have assisted her social transition. These items were also denied by reason of Ms. Doe's gender dysphoria, and these decisions thus constitute discriminatory denials that violate the Rehabilitation Act.

222. Further, these items, as well as transfer to a women's facility, are reasonable accommodations that would alleviate the stresses caused by Ms. Doe's gender dysphoria that impair her ability to participate in basic life activities.

223. GDC's Blanket Ban—which all the named Defendants adopted, enforced, and implemented and which violates the Rehabilitation Act—has caused Ms. Doe to suffer serious injuries. In the seven-year period that Defendants have unjustifiably denied Ms. Doe gender-affirming surgery,[92] Ms. Doe has self-harmed regularly and attempted self-castration due to her worsening gender dysphoria symptoms.[93] GDC's Blanket Ban policy enforced by Defendants has thus caused Ms. Doe grievous—yet entirely preventable—harm.

## Count 6
## Title III of the Americans with Disabilities Act – Disability Discrimination Against Defendants MHM and Wellpath

[91] *See supra* ¶¶ 106, 108, 113, 121–122.

[92] *See supra* ¶ 70 (indicating 2016 as the first year Ms. Doe requested gender-affirming surgery).

[93] *See supra* ¶¶ 86, 94, 95, 101, 107, 109–113.

224.  Title III of the ADA prohibits discrimination by private entities in places of public accommodation.[94]  Title III also requires covered parties to provide "reasonable modifications in policies, practices, or procedures" for individuals with disabilities so they can fully participate in the benefits administered by the covered parties under the ADA.[95]  Because of the dates of the actions complained of, the greatly expanded definition of "disability" in the ADAAA applies to this case.

225.  Ms. Doe is a qualified individual with a disability.  A "disability" under the ADA is "a physical or mental impairment that substantially limits one or more major life activities."[96] Ms. Doe suffers from multiple mental impairments, including gender dysphoria, anxiety, and depression.  Ms. Doe's gender dysphoria substantially limits her ability to perform major life activities, including sleeping, showering, thinking, and concentrating.[97]  She is often overwhelmed by thoughts of her body's misalignment with her gender.  She self-harms by slamming her head against the wall almost daily, attempting suicide, and attempting self-castration—all a result of her gender dysphoria distress.  Others in her living area remind her of her apparent gender often by calling her slurs such as "faggot" and sexually harassing

---

[94] 42 U.S.C. § 12182(a).

[95] *Id.* § 12182(b)(2)(A)(ii).

[96] *Id.* § 12101(1).

[97] 42 U.S.C. § 12102(2)(A); *see supra* ¶¶ 85, 153, 167, 171.

her.[98]  Her underlying anxiety and depression are both exacerbated by her gender dysphoria

226.  Defendant MHM is a private entity that operates mental health services in GDC facilities, which are places of public accommodation.  MHM therefore operates a place of public accommodation.

227.  [This paragraph has been omitted upon amendment.]

228.  Defendant Wellpath operates medical services in GDC facilities, which are places of public accommodation.  Wellpath therefore operates a place of public accommodation.

229.  Defendants MHM and Wellpath employ the medical and mental health staff who comprised Ms. Doe's 2022 and 2023 Treatment Committee Defendants: in 2022, Defendants Ausborn,[99] Lane,[100] Cleary,[101] Moore,[102] and Bowling[103]; and in 2023, Defendants Billings, Skibinski, Lohman, and Clarke.[104]

230.  The 2022 and 2023 Treatment Committee Defendants' denial of medical services was by reason of Ms. Doe's disability.  People with other disabilities and medical needs do not face the same barriers to accessing surgical

---

[98] *See supra* ¶ 139.
[99] *See supra* ¶¶ 71–72.
[100] *See supra* ¶¶ 95–96.
[101] *See supra* ¶¶ 96, 98.
[102] *See supra* ¶ 102.
[103] *See supra* ¶¶ 103, 107.
[104] *See supra* ¶¶ 69–74, 114–123.

care. The 2022 and 2023 Treatment Committee Defendants denied Ms. Doe's surgical evaluation because of GDC's Blanket Ban that applies only to gender-affirming surgery. This Ban on gender-affirming surgery has no medical basis. This determination was not based on an individual assessment of Ms. Doe's medical needs but instead solely on Ms. Doe's gender dysphoria. Therefore, this Ban is based on discrimination, which is illegal under the ADA.

231. Accessing gender-affirming surgery is also a reasonable accommodation. Ms. Doe requires this reasonable accommodation to GDC's Blanket Ban against providing gender-affirming surgeries because of her severe mental illnesses caused by her disability (gender dysphoria) and the risk to her health and safety that will result without proper treatment. Defendants did not engage in the mandated interactive process to arrive at appropriate alternatives, if any, and simply enforced the Blanket Ban. Ms. Doe's mental health evaluations show the strong need for access to these medical services as a reasonable accommodation to GDC's policy. And because of Defendants' denial of her HRT, Ms. Doe's gender-affirming surgery was all the more necessary; without it, she has been denied treatment in total.

232. The 2023 Treatment Committee Defendants, which included Warden Jones,[105] also denied Ms. Doe's access to gender-affirming care in the form of wigs,

---

[105] *See supra* ¶¶ 106, 108, 113, 121–122.

padding, and items from the women's commissary list and the special package program that would have assisted her social transition. These items were also denied by reason of Ms. Doe's gender dysphoria, and these decisions thus constitute discriminatory denials that violate the ADA.

233. Further, these items, as well as transfer to a women's facility, are reasonable accommodations that would alleviate the stresses caused by Ms. Doe's gender dysphoria that impair her ability to participate in basic life activities.

234. The defendant-employees on Ms. Doe's treatment committees or who have provided Ms. Doe care include Mental Health Director Billings, Dr. Skibinski, Dr. Cleary, Dr. Ausborn, Mr. Lane, Dr. James, Dr. Mulloy, Dr. Bowling, Nurse Practitioner Moore, and Health Services Administrator Clarke. All these MHM and Wellpath employees had authority to address the discrimination and institute corrective measures, had actual knowledge of the discrimination, and failed to respond.

235. GDC's Blanket Ban—which all the named Defendants adopted, enforced, and implemented and which violates the ADA—has caused Ms. Doe to suffer serious injuries. In the seven-year period that Defendants have unjustifiably denied Ms. Doe gender-affirming surgery,[106] Ms. Doe has self-harmed regularly and

---

[106] *See supra* ¶ 70 (indicating 2016 as the first year Ms. Doe requested gender-affirming surgery).

attempted self-castration due to her worsening gender dysphoria symptoms.[107] GDC's Blanket Ban policy enforced by Defendants has thus caused Ms. Doe grievous—yet entirely preventable—harm.

## Count 7
### 42 U.S.C. § 1983 – Eighth Amendment – Failure to Protect
### Against Defendant Jones in his official and individual capacities

236.    A prison official's deliberate indifference to a known, substantial risk of serious harm to the health or safety of a person in custody violates the Eighth Amendment to the United States Constitution.[108]

237.    Defendant Jones's long delay in placing a lock on Ms. Doe's cell constitutes deliberate indifference to the substantial risk of serious harm she faces and the actual harm she has faced in a men's facility in violation of the Eighth Amendment to the United States Constitution.[109]

238.    There is a substantial risk that housing Ms. Doe in a cell with no lock on it would subject her to harm from others.  This risk is made evident by the history of actual events that have harmed Ms. Doe: since 1996, she has been raped at knifepoint, assaulted, threatened, robbed at knifepoint, and harassed in GDC facilities.[110]  Specifically in unlocked cells in Phillips State Prison, Ms. Doe has

---

[107] *See supra* ¶¶ 86, 94, 95, 101, 107, 109–113.
[108] *See Campbell v. Sikes*, 169 F.3d 1353, 1370 (11th Cir. 1999).
[109] *See supra* ¶¶ 142–145, 151.
[110] *See supra* ¶¶ 135–144.

experienced sexual harassment and robbery at knifepoint.[111]

239.   As a prison warden, Defendant Jones actually knew of the substantial risk of sexual and physical assault that Ms. Doe faced as a transgender woman housed at a male facility like Phillips State Prison, with no lock on her cell and no privacy during showers.  This risk is also obvious to individuals in this line of work.

240.   Defendant Jones disregarded the risk to Ms. Doe's safety and failed to take reasonable measures to protect her from harm by putting a lock on her cell for over 18 months or transferring her to a different part of the facility that could better ensure her safety, despite her repeated requests.[112]

241.   Defendant Jones acted under color of state law when he decided to disregard Ms. Doe's requests.

242.   As a result of Defendant Jones's disregard of the very real risk, Ms. Doe has been sexually harassed,[113] sexually assaulted in the shower,[114] robbed at knife point,[115] and threatened.[116]  Ms. Doe also suffers emotional harm: she is unable to sleep at night and has increased anxiety as a result of living in a cell with no lock. Defendant Jones's decision to keep Ms. Doe in a cell with no lock caused these

---

[111] *See supra* ¶¶ 143–144.
[112] *See supra* ¶¶ 142, 150–152.
[113] *See supra* ¶¶ 143–44, 153–54.
[114] *See supra* ¶ 155.
[115] *See supra* ¶ 143.
[116] *See supra* ¶ 144.

injuries.[117]

**Count 8**
**42 U.S.C. § 1983 – Eighth Amendment – Failure to Protect**
**Against Defendant Kinte in his individual capacity**

243.   A prison official's deliberate indifference to a known, substantial risk of serious harm to the health or safety of a person in custody violates the Eighth Amendment to the United States Constitution.[118]

244.   Defendant Kinte's decision to remove a lock from Ms. Doe's temporary cell constitutes deliberate indifference to the substantial risk of serious harm she faces and the actual harm she has faced in a men's facility in violation of the Eighth Amendment to the United States Constitution.[119]

245.   There is a substantial risk that housing Ms. Doe in a cell with no lock on it would subject her to harm from others.  This risk is made evident by the history of actual events that have harmed Ms. Doe: since 1996, she has been raped at knifepoint, assaulted, threatened, robbed at knifepoint, and harassed in GDC facilities.[120]  Specifically in unlocked cells in Phillips State Prison, Ms. Doe has experienced sexual harassment and robbery at knifepoint.[121]

246.   As a prison guard, Defendant Kinte actually knew of the substantial risk

---

[117] *See supra* ¶ 142.
[118] *See Campbell v. Sikes*, 169 F.3d 1353, 1370 (11th Cir. 1999).
[119] *See supra* ¶¶ 149–152.
[120] *See supra* ¶¶ 135–144.
[121] *See supra* ¶¶ 143–144.

of sexual or physical assault that Ms. Doe faced as a transgender woman being housed at Phillips State Prison in an unlocked cell, as evidenced by the fact that Sgt. Kinte lied about removing the lock the next day.[122]  This risk is also obvious to individuals in this line of work.

247.  Sgt. Kinte's decision therefore was malicious or at least recklessly indifferent.

248.  Sgt. Kinte acted under color of state law.

249.  Sgt. Kinte's decision to remove the lock caused Ms. Doe severe emotional harm.  During the roughly 24-hour period when there was no lock on her door in the temporary J-Unit, Ms. Doe was threatened and propositioned for sex multiple times.  Ms. Doe feared for her safety given that her neighbor, another transgender woman, was brutally assaulted by a man in their unit while their doors were unlocked during this 24-hour period.[123]

**Count 9**
**42 U.S.C. § 1983 – Eighth Amendment – Solitary Confinement**
**Against Defendants Oliver and Lohman in their official capacities and**
**Defendant Jones in his official and individual capacity**

250.  A prison official's deliberate indifference to a known, substantial risk of serious harm to the health or safety of a person in custody violates the Eighth

---

[122] *See supra* ¶¶ 149–152.
[123] *See supra* ¶¶ 150–152.

Amendment to the United States Constitution.[124]

251. Prolonged solitary confinement can pose a serious risk to the health or safety of a person in custody.

252. Defendants Oliver and Jones have held Ms. Doe in solitary confinement since 2019.[125] Ms. Doe has not been provided with the required number or frequency of classification hearings to assess her ability to return to general population.[126] On information and belief, and in violation of their SOPs, GDC regularly houses transgender women in solitary confinement as involuntary administrative segregation.

253. Defendants knew there was a substantial risk that keeping Ms. Doe in solitary confinement for four years would cause serious mental, psychological, and emotional damage.

254. Defendants actually knew of the risks to Ms. Doe's health. Commissioner Oliver and Warden Jones were aware of the risks to Ms. Doe's welfare because she sent letters to them, as did her counsel. Defendant Lohman's predecessor, Statewide Mental Health Director Ducklinger, was aware that Ms. Doe requested a return to general population.[127] And Defendant Jones was aware that

---

[124] *See Campbell v. Sikes*, 169 F.3d 1353, 1370 (11th Cir. 1999).
[125] *See supra* ¶¶ 157–158.
[126] *See* GDC SOP 209.06(IV)(J)(1).
[127] *See supra* ¶ 164.

Phillips State Prison guards treated Ms. Doe discriminatorily by preventing her from accessing adequate food and harassing her.[128]

255.   GDC defendants disregarded the risk of the harms facing Ms. Doe and failed to reassess Ms. Doe's ability to be removed from solitary confinement in Phillips State Prison.[129]

256.   GDC's decision to keep Ms. Doe in prolonged solitary confinement caused her physical and emotional injuries.  Ms. Doe has experienced damage to her thinking, her vision, and her physical health due to her prolonged stay in solitary confinement.   Her mental health has also deteriorated significantly, leading to overwhelming feelings of depression, anxiety, and hopelessness.   She has experienced frequent suicidal ideation, has attempted suicide, and has attempted self-castration in the past year, which resulted in physical injuries.[130]   GDC's decision to keep Ms. Doe in solitary confinement has therefore caused her serious and life-threatening harm.

**Count 10**
**42 U.S.C. § 1983 – Eighth Amendment – Failure to Protect by Failing to Transfer to Women's Facility**
**Against Defendant Oliver in his official capacity and Defendant Jones in his official and individual capacities**

257.   A prison official's deliberate indifference to a known, substantial risk

---

[128] *See supra* ¶¶ 149–150.
[129] *See supra* ¶¶ 158, 163, 168.
[130] *See supra* ¶¶ 167–168.

of serious harm to the health or safety of a person in custody violates the Eighth Amendment to the United States Constitution.[131]  Liability extends to the failure to protect trans women from harm by housing them in men's facilities when they are at risk of sexual violence.

258.    There is a substantial risk that housing Ms. Doe, a transgender woman, in a men's facility puts her at continuous risk of harm from men in her facility.

259.    Defendants Oliver and Jones actually knew of that risk, given that Ms. Doe was raped and assaulted numerous times in the recent past, and other transgender women in Phillips State Prison and other facilities have been raped and assaulted in recent years.   Since at least 2021, Ms. Doe has requested to be transferred to a women's facility, expressing the risk she faces and the actual harm she has experienced in men's facilities in her grievances and requests.   Ms. Doe also spoke with Warden Jones about her need to live in a women's facility in June 2023.[132]

260.    Defendants Oliver and Jones disregarded the risk to Ms. Doe and failed to transfer her to a women's facility in response to that risk.   On information and belief, GDC houses transgender women who have not had gender-affirming surgery in men's facilities.   Because of GDC's Blanket Ban on accessing gender-affirming

---

[131] *See Campbell v. Sikes*, 169 F.3d 1353, 1370 (11th Cir. 1999).
[132] *See supra* ¶¶ 148, 169, 172.

surgery, there is no way for a transgender woman currently housed in a men's facility to be transferred to a women's facility. Warden Jones and Commissioner Oliver enforced and continue to enforce this policy as to Ms. Doe.

261. Since 1996, Ms. Doe has been raped at knifepoint, assaulted, threatened, robbed at knifepoint, and harassed in various men's facilities across GDC.[133] The deliberately indifferent decision by Defendants Oliver and Jones to keep Ms. Doe in a men's facility caused these injuries and subjects Ms. Doe to a predictable risk of serious harm.

## REQUEST FOR RELIEF

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

A. Enter judgment in favor of Plaintiff and against Defendants on each of the counts in this complaint;

B. Issue injunctive relief against Defendants by ordering Defendants to meet medical standards for Plaintiff's medically necessary gender-affirming care and provide Plaintiff with reasonable accommodations for her gender dysphoria, including but not limited to ordering Defendants to:

(1) Allow Plaintiff to meet with surgeons who can provide the gender-affirming surgeries recommended by her mental health clinicians;

(2) Direct that Ms. Doe receive the surgeries recommended in the evaluations

---

[133] *See supra* ¶¶ 135–144.

by 60 days after judgment entered in the case;

(3) Direct that Ms. Doe remain on HRT at therapeutic dosages, even after surgery;

(4) Direct that Plaintiff be provided regular mental health treatment as recommended by psychiatrists;

(5) Provide Plaintiff with medical treatment and disability accommodations for her gender dysphoria in the form of social transition care as recommended by GDC providers, including a wig, women's undergarments, buttock pads, breast pads, hair removal cream, grooming products such as make-up and hygiene products, and other women's commissary items and items from the special package program;

(6) Permit Plaintiff to shower during a separate time outside the presence of other incarcerated people and male guards, and with access to a shower curtain;

(7) Transfer Plaintiff to a general population unit in a women's facility;

C. Award Plaintiff compensatory, nominal, and punitive damages for her physical injuries and pain and suffering;

D. Award Plaintiff costs and reasonable attorney's fees as allowed by law;

E. Grant any other relief this Court deems just, equitable, and proper.

Respectfully submitted this 6th day of December, 2023.

*/s/ David Utter*
David J. Utter
Georgia Bar Number: 723144
THE CLAIBORNE FIRM, P.C.
410 East Bay Street
Savannah, Georgia 31401
(912) 236-9559 Telephone
(912) 236-1884 Facsimile
david@claibornefirm.com

*/s/ Christopher J. Murell*
Christopher J. Murell
Georgia Bar Number: 195116
Meghan Mutt*
MURELL LAW FIRM
2831 St. Claude Avenue
New Orleans, Louisiana 70117
(225) 413-0463 Telephone
(504) 233-6691 Facsimile
meghan@murell.law

D Dangaran *
Miriam R. Nemeth *
RIGHTS BEHIND BARS
416 Florida Avenue N.W. #26152
Washington, D.C. 20001-0506
(202) 455-4399
d@rightsbehindbars.org
miriam@rightsbehindbars.org

Sterling Marchand *
Scott Novak *
BAKER BOTTS, L.L.P.
700 K St NW
Washington, DC 20001
(202) 639-1316
sterling.marchand@bakerbotts.com
scott.novak@bakerbotts.com

Katie Jeffress *
BAKER BOTTS, L.L.P.
401 S 1st Street Suite 1300
Austin, Texas 78704
(512) 322-2672
katie.jeffress@bakerbotts.com

Hannah Roskey *
BAKER BOTTS, L.L.P.
910 Louisiana Street
Houston, Texas 77002
(713) 229-1234
hannah.roskey@bakerbotts.com

Nicholas F. Palmieri *
BAKER BOTTS, L.L.P.
30 Rockefeller Plaza
New York, New York 10112
(212) 408-2640
Nick.palmieri@bakerbotts.com

*Attorneys for Plaintiff*

**\* Admitted *pro hac vice***