# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF GEORGIA

|  |  |
|---|---|
| JANE DOE,<br><br>      Plaintiff,<br><br>v.<br><br>GEORGIA DEPARTMENT OF<br>CORRECTIONS, et al.,<br><br>      Defendants. | Civ. Case No. 1:23-cv-05578-MLB |

## EXPERT DECLARATION OF DR. ISABEL S. LOWELL, M.D., M.B.A.

I, Isabel S. Lowell, M.D., M.B.A., hereby declare and state as follows:

1.  I am over the age of 18, of sound mind, and in all respects competent to testify.

2.  I have been retained by counsel for Plaintiff Jane Doe as an expert in connection with the above-captioned litigation.

3.  I have actual knowledge of the matters stated herein. If called to testify in this matter, I will testify truthfully and based on my expert qualifications and opinions.

4.  I am submitting my expertise in support of Ms. Doe's[1] claims against the Georgia Department of Corrections and its agents for injuries against her person

---

[1] This declaration uses feminine pronouns to refer to Ms. Doe, consistent with her gender identity, her preference, modern judicial and common practice, and the advice of mental health professionals who work with transgender individuals.

resulting from the denial of medically necessary gender-affirming care in connection with her diagnosis of gender dysphoria.

5.   In preparing this report, I reviewed Ms. Doe's medical records, including her original diagnosis of gender dysphoria in 2015, as well as recent medical records. I also previously conducted a medical consultation of Ms. Doe via video on July 18, 2023, that lasted approximately 60 minutes, as well as two recent medical consultations detailed further below.

### BACKGROUND AND QUALIFICATIONS

6.   I am the Founder of and a Provider at QMed, LLC and the Attending Hospitalist at Maine Medical Center and Family Medicine Residency Program.

7.   I received my medical degree from the University of Connecticut School of Medicine in Farmington, Connecticut in 2010. I received my M.B.A. from the Goizueta Business School at Emory University in Atlanta, Georgia in 2016. I completed my residency in Family Medicine in Lawrence, Massachusetts.

8.   I have been licensed to practice medicine since 2010 and am currently licensed to practice in Georgia, Maine, New Hampshire, Kentucky, Virginia, West Virginia, North Carolina, South Carolina, Tennessee, Florida, Alabama, and Texas. I have been Board Certified in Family Medicine since 2013.

9.  I am a member of the American Academy of Family Physicians, the Georgia Academy of Family Physicians, the Gay and Lesbian Medical Association, and the World Professional Association for Transgender Health.

10. I have extensive experience working with patients with gender dysphoria. I have been treating patients with gender dysphoria since 2014.

11. I have presented as an expert in my field at more than a dozen professional conferences and have received numerous teaching awards while at Emory University. As part of my practice, I stay current on medical research and literature relating to the care of transgender persons and patients diagnosed with gender dysphoria. In 2022, I received the National Gay and Lesbian Medical Association Achievement Award recognizing my commitment to providing gender-affirming care to underserved communities throughout the southeastern states.

12. I have submitted written testimony in another case, as well as written and oral testimony in a separate case, but I have not previously testified as an expert in either deposition or at trial. I am being compensated at an hourly rate of $400 per hour for preparation of expert declarations and reports and $500 per hour for time spent conducting in-person work, such as giving a deposition or trial testimony. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

13. A true and accurate copy of my Curriculum Vitae is attached hereto as Exhibit A. It documents my education, training, research, and years of experience in this field.

## EXPERT OPINIONS

### A  Gender Dysphoria Is a Serious Medical Condition.

14. The term "gender identity" is a well-established concept in medicine, referring to one's internal sense of oneself as belonging to a particular gender. Nearly all human beings develop this elemental internal conviction of belonging to a particular gender, such as male or female.

15. At birth, infants are typically classified as male or female. This classification becomes the person's birth-assigned sex.

16. Typically, persons born with the external physical characteristics associated with males psychologically have a male gender identity (in other words, identify as male), and persons born with the external physical characteristics associated with females have a female gender identity (in other words, identify as female). However, for transgender individuals, this is not the case. Instead, for transgender individuals, the sense of one's gender—one's gender identity—differs from the birth-assigned sex, giving rise to a sense of being "wrongly embodied."

17. For some, the incongruence between gender identity and assigned gender does not create significant distress. However, for others, the incongruence results in

gender dysphoria, a serious medical condition characterized by a clinically significant and persistent feeling of distress and discomfort with the gender they were identified as at birth (their "assigned gender" or "birth-assigned sex").[2]

18. In 1908, the American Psychiatric Association ("APA") introduced the diagnosis Gender Identity Disorder ("GID") in the third edition of the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-III"). The GID diagnosis was maintained in a revised version of DSM-III, known as DSM-III-R (1987), as well as in DSM-IV which was issued in 1994.

19. In 2013, with the publication of DSM-V, the GID diagnosis was removed, and a new diagnostic term was added: Gender Dysphoria.[3] This new diagnostic term was based on significant changes in the understanding of the condition of individuals whose birth-assigned sex differs from their gender identity. The term was intended to acknowledge that gender incongruence, in and of itself, does not constitute a mental disorder. Nor is an individual's identity disordered. Rather, the diagnosis is based on the distress or dysphoria that some transgender people experience because of the incongruence between birth-assigned sex and gender identity and the social challenges that ensue. The DSM-V explained that the outdated GID diagnosis

---

[2] American Psychiatric Association, *The Diagnostic and Statistical Manual of Mental Disorders*, 5th ed. (2013).

[3] *Id.*

5

connoted "that the patient is 'disordered.'"[4] With the revisions, the APA explained, "[i]t is important to note that gender nonconformity is not in itself a mental disorder. The critical element of gender dysphoria is the presence of clinically significant distress associated with the condition."[5]

20. The diagnostic criteria for Gender Dysphoria in adults in DSM-V-TR, which was published in 2022, are as follows:

- A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:

    o A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics.

    o A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender.

    o A strong desire for the primary and/or secondary sex characteristics of the other gender.

    o A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).

---

[4] *Id.*

[5] *Id.*

  o A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

  o A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).

- The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

21. Symptoms experienced by those with gender dysphoria can be severe and debilitating. In the absence of proper treatment, people with gender dysphoria may experience significant distress, depression, self-mutilation, self-castration, and suicidality.[6]

22. Transgender adults are significantly more at risk of death by suicide than the general population, especially when they are denied gender-affirming healthcare. For example, one study consisting of the largest survey of transgender people in the U.S. to date found that "transgender adults have a prevalence of past-year suicide

---

[6] *See, e.g.*, E. Coleman *et al.*, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, INTL. J. OF TRANSGENDER HEALTH, S106 (Sept. 15, 2022), available at https://www.tandfonline.com/doi/pdf/10.1080/26895269.2022.2100644 ("Standards of Care").

ideation that is nearly twelve times higher, and a prevalence of past-year suicide attempts that is about eighteen times higher, than the U.S. general population."[7]

## B. Gender-Affirming Healthcare Is Medically Necessary to Treat Gender Dysphoria.

23. Gender-affirming healthcare aims to treat gender dysphoria "by aligning a transgender person's physical body and gender presentation with their gender identity."[8]

24. Gender-affirming healthcare is medically necessary[9]—in other words, "needed to diagnose or treat an illness, injury, condition, disease or its symptoms and that meet[s] accepted standards of medicine."[10]

25. The World Professional Association for Transgender Health ("WPATH") is the premier organization for gender-affirming healthcare standards and transgender health. The standards of care for treatment of Gender Dysphoria are currently set forth in the WPATH *Standards of Care for the Health of Transexual, Transgender and Gender-Nonconforming People* (8th Version 2022) ("Standards of Care"). The

---

[7] Jody L. Herman *et al.*, *Suicide Thoughts and Attempts Among Transgender Adults: Findings from the 2015 U.S. Transgender Survey*, 1 (Sept. 2019), available at https://williamsinstitute.law.ucla.edu/wp-content/uploads/Suicidality-Transgender-Sep-2019.pdf.

[8] *Outlawing Trans Youth: State Legislatures and the Battle over Gender-Affirming Healthcare for Minors*, 134 HARV. L. REV. 2163, 2165 (2021).

[9] *See, e.g.,* Standards of Care.

[10] U.S. Center for Medicare & Medicaid Services, *Medically necessary*, https://www.healthcare.gov/glossary/medically-necessary/ (last visited Oct. 23, 2022).

WPATH–promulgated Standards of Care are the internationally recognized guidelines for the treatment of persons with gender dysphoria and inform medical treatment throughout the world. The American Medical Association, the Endocrine Society, the American Psychological Association, the American Psychiatric Association, the World Health Organization, the American Academy of Family Physicians, the American Public Health Association, the National Association of Social Workers, the American College of Obstetrics and Gynecology, and the American Society of Plastic Surgeons all endorse treatment protocols in accordance with the Standards of Care.[11]

26. As set out in the Standards of Care, many transgender individuals with gender dysphoria undergo a medically indicated and supervised gender transition in order to ameliorate the debilitation of gender dysphoria and live life consistent with their gender identity. The Standards of Care recommend, *inter alia*, one or more of the following protocol components of evidence-based gender affirming care for treatment of those experiencing gender dysphoria:

- Changes in gender expression and role (which may involve living part- or full-time in another gender role, consistent with one's gender identity);[12]

---

[11] *See, e.g.*, American Medical Association Resolution 122 (A-08) (2008); American Psychological Association, *Policy Statement on Transgender, Gender Identity, and Gender Expression Nondiscrimination* (2009).

[12] *See, e.g.*, Standards of Care at 11.5.

- Hormone therapy to feminize or masculinize the body;[13]

- Surgery to change primary and/or secondary sex characteristics (*e.g.*, breast/chest, external and/or internal genitalia, facial features, body contouring);[14]

- Psychotherapy for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience.[15]

27. The Standards of Care apply to all patients without regard to carceral status. Notably, the National Commission on Correctional Healthcare cites the WPATH Standards of Care and recommends that healthcare systems "follow accepted standards developed by professionals with expertise in transgender health" and determine gender-affirmative treatment for prisoners with gender dysphoria "on an individualized case-by-case basis."[16] WPATH also clearly recommends in SOC-8 that "health care professionals responsible for providing gender-affirming care to individuals residing in institutions (or associated with institutions or agencies)

---

[13] Standards of Care at 12.20–21.

[14] Standards of Care at 12.19.

[15] Standards of Care at 7.8–7.10.

[16] *See* NCCHC Policy Statement, *Transgender and Gender Diverse Health Care in Correctional Settings* (Oct. 18, 2009; reaffirmed with revision Apr. 12, 2015, and Nov. 1, 2020), https://www.ncchc.org/transgender-and-gender-diverse-health-care

recognize the entire list of recommendations of the SOC-8 apply equally to people living in institutions."[17]

28. The evidence-based benefits of gender-affirming healthcare include improved psychological outcomes such as increased quality of life and decreased depression, suicidal ideation and suicide attempts, and anxiety.[18] In fact, individuals diagnosed with gender dysphoria "who wanted, and subsequently received, hormone therapy and/or surgical care had a substantially lower prevalence of past-year suicide thoughts and attempts than those who wanted hormone therapy and surgical care and did not receive them."[19]

***Hormone Therapy***

29. For transgender women[20] such as Ms. Doe, medically necessary hormone therapy typically consists of the prescription of estrogen taken in combination with a testosterone blocker. As the Standards of Care note, "[t]he consequences of . . . lack of initiation of hormone therapy when medically necessary include a significant likelihood of negative outcomes, such as surgical self-treatment by autocastration, depressed mood, increased gender dysphoria, and/or suicidality."[21]

---

[17] Standards of Care at S104.

[18] *See, e.g.,* Wilson Baker *et. al*, *Hormone therapy, mental health, and quality of life among transgender people: A systematic review*, J. OF THE ENDOCRINE SOCIETY, 1-16 (2021).

[19] Herman*, supra*, at 5.

[20] A transgender woman was assigned the male sex at birth but has a female gender identity.

[21] Standards of Care at S106.

30. Estradiol and Spironolactone are typical medications prescribed for such treatment. Estradiol is an estrogen pill, patch, or injection that causes breast development and body fat redistribution, typically producing noticeable physical changes within three to six months. Spironolactone is a testosterone blocker that can provide more immediate relief. These safe medications have been used for decades to treat gender dysphoria, among many other things. For example, Estradiol is regularly prescribed to help reduce menopause symptoms, and Spironolactone is used as a treatment for high blood pressure and heart failure. I routinely prescribe these medications in combination for patients I treat to help alleviate their gender dysphoria.

### Gender Expression & Role

31. Changes in gender expression and role, also known as the "real life experience" or "social transition," are an important part of medical treatment as well.

32. Facilitating changes in gender expression and role is considered <u>medical</u> treatment because, as the Standards of Care note, "[t]hese elements of gender expression and social transition, individually or collectively as indicated by the individual's needs, reduce gender dysphoria/incongruence, depression, anxiety, self-harm ideation and behavior, suicidal ideation and attempts" while "enhanc[ing] well-being and functioning."[22]

---

[22] *Id.* at S107 (internal citations omitted).

12

33. Changes in gender expression and role may include dressing, grooming, and presenting oneself in a manner consistent with one's gender identity. Specifically, the Standards of Care recommend that, "[t]o allow for expressing gender identity," patients with gender dysphoria be "allowed to wear gender congruent clothing and hairstyles, to obtain and use gender-appropriate hygiene and grooming products, to be addressed by a chosen name or legal last name (even if unable to change the assigned name legally yet), and to be addressed by a pronoun consistent with one's identity."[23]

## C. The Georgia Department of Corrections Should Provide Ms. Doe With Gender-Affirming Healthcare.

34. On October 15, 2025, I spoke with Ms. Doe over video conference. The consultation lasted one hour.

### *Diagnosis*

35. I reaffirm Ms. Doe's diagnosis of gender dysphoria that she originally received in 2015. Ms. Doe clearly meets the DSM-5-TR's diagnostic criteria for gender dysphoria. Additionally, she clearly exhibits symptoms of severe anxiety due to her gender dysphoria and GDC's denial of the necessary gender-affirming treatment.

---

[23] *Id.*

*Hormone Therapy*

36. Ms. Doe reported that in September 2024, Dr. Malloy refused to do a physical exam to determine if her hormone therapy was having the proper feminizing effects, and then refused to increase doses of Estradiol or Spironolactone, despite Ms. Doe reporting that the hormone therapy was not having the intended effects. A nurse practitioner later conducted a physical exam and confirmed that Ms. Doe's therapy was not increasing her breast size. Dr. Kelly then increased Ms. Doe's Spironolactone to 150 mg twice daily (to 300 mg total per day) and increased her Estradiol injections to 10 mg weekly. However, the pharmacist miswrote the Estradiol prescription for 10 mg every *other* week and would not change the order.

37. Ms. Doe reported that in March 2025, she was transferred to a federal holding facility, where her doses remained the same the entire time she was there (that is, half the intended dose of Estradiol).

38. Ms. Doe had labs done in early September 2025 at the federal facility, but the labs were drawn three days after injection, which is typically the peak level. Labs are more helpful drawn at the mid-point between injections, as this better approximates the average level. The medical staff had planned to draw labs again because the labs were done at the wrong time, but Ms. Doe was transferred back to GDC's custody before they could do so.

39. Upon Ms. Doe's arrival back to GDC's custody, her dose of Spironolactone dose was cut in half, to 150 mg once daily. Ms. Doe saw a PA who said it was the pharmacy who changed it, and there was nothing they could do. After my consultation with Ms. Doe, I was informed by Ms. Doe's attorneys that Ms. Doe had a telehealth appointment with Dr. Wynne via Zoom on Friday, October 17, 2025. Dr. Wynne apparently refused to increase her spironolactone (currently, 150 mg/day) because he claimed it would be ineffective to achieve physical feminization and because it could impair cardiac function. Dr. Wynne said "there's nothing I can do" to treat or accommodate Ms. Doe's gender dysphoria, even though her spironolactone dosage had been 300 mg for nearly a year prior to her recent transfer.

40. Since Ms. Doe's Spironolactone dose was decreased to once daily, she has had more hair growth and more masculinizing symptoms. She used to shave once weekly but now has to shave every day. Her arm, chest, buttock hair has regrown, which makes her feel very distressed, especially considering her lack of access to hair care products (such a razor, and hair removal cream). Doe Affidavit ¶ 9.

41. Ms. Doe's labs of October 1, 2025 do show suppressed testosterone, however, Ms. Doe is still having masculinizing symptoms. Spironolactone is meant to be dosed twice daily, not once daily. The effects may be wearing off during the period 12-24 hours after her dose. Ms. Doe's Spironolactone must be given twice daily, at least 100 mg twice daily or go back to 150 mg twice daily, given that she

felt much better at that dose. Her labs do not show any adverse effects from Spironolactone (potassium and kidney function are both normal), so it is entirely reasonable to increase her Spironolactone dose. As with all medical care, labs are an important component of treatment. However, a single lab number should not be solely relied upon for treatment decisions, particularly when the patient's symptoms persist. I have many patients who take Spironolactone at similar doses, and their testosterone levels are technically "suppressed" but they report a significant worsening in masculinizing symptoms when Spironolactone is decreased. In these cases, as long as there are no medical reasons not to increase the dose, I routinely go back up to the dose of Spironolactone that successfully alleviated their symptoms.

42. Another treatment option would be to switch Ms. Doe to Bicalutamide, 50 mg once daily. This medication was also recommended over a year ago by Rubicon Endocrinology eConsult on November 4, 2024, stating "If this [referring to Spironolactone] is not getting patient the desired effect, then bicalutamide can be started in lieu of spironolactone." Exhibit B, November 4, 2024 Rubicon Endocrinology eConsult. The consult also states "consider bicalutamide in lieu of spironolactone for better testosterone blocking effect." *Id.*

43. Of note, Spironolactone is primarily a testosterone-lowering medication and is not typically used for "feminization." Estradiol is the feminizing hormone medication. Regarding cardiac function, Spironolactone is actually a blood pressure-

lowering cardiac medication. It is typically used in patients with moderate to advanced heart failure and elevated blood pressure. Ms. Doe has a history of hypertension (high blood pressure), and Spironolactone would be beneficial for the treatment of her hypertension. Rarely, Spironolactone can cause elevated potassium, but not typically in someone with normally functioning kidneys, and this can be easily monitored with lab testing. To be clear: Spironolactone does not impair cardiac function; rather, it is a key medication used to improve cardiac function in the treatment of cardiac conditions.

44. Since returning to GDC custody at Phillips State Prison, Ms. Doe still has not had a physical examination by a medical doctor, and she has not seen an Endocrinologist in over a year, since September 2024.

45. Ms. Doe reports that on her current Estradiol dose of 10 mg every other week, she experiences symptoms of low estrogen during the second week after her injection. She reports feeling irritated, gets hot flashes, and is emotionally labile, stating she feels like it is "a roller coaster of emotions." By the middle of the second week Ms. Doe reports feeling depressed, anxious, and occasionally suicidal. She reports that none of these symptoms occur during the first week after injection— during the first week she feels "perky" and feels "like herself." She has consistently felt poorly during the second week after her injection, which is why the Estradiol dosage was supposed to switch to weekly in the first place.

46. Ms. Doe should be given weekly Estradiol injections, as originally prescribed over a year ago. This is the standard of care for injected Estradiol. Furthermore, regardless of the exact level, if the patient is not experiencing the intended effects from this medication, the dose should be increased, assuming there are no contraindications that would prevent dose increases. According to the UCSF "Guidelines for the Primary and Gender-Affirming Care of Transgender and Gender Nonbinary People", an appropriate *initial* dose would be 4 mg Estradiol Valerate injected weekly (IM or SC.) Additionally, the guidelines are all based on weekly injections, and do not even include recommendations for dosing every two weeks, as this is known to lead to side effects during the second week after the injection has worn off. The half-life of Estradiol Valerate is approximately 4 days, meaning that by day 8 after an injection, there is only 25% of the medication left in one's system. By day 12, this decreases to 12.5%. In general, medicines are dosed at approximately the half-life, or at most 2 half-lives. For example, a medicine with a half-life of 24 hours can be taken once daily, so that the medication strength does not drop below 50%.

47. Based on Ms. Doe's recent labs, her Estradiol level is adequate, but it is clearly not lasting for two weeks. It is critical that Ms. Doe's Estradiol be given *weekly*. It is reasonable to keep her dose the same initially such that it totals 10 mg over a two-week period, starting at 5 mg weekly and monitor levels at that dose,

increasing from there if needed. Another recommendation from the online Endocrinology consult on November 13, 2024 was to add Progesterone to help with breast development. Exhibit C, November 13, 2024 Rubicon Endocrinology eConsult. I agree with this recommendation and would add Progesterone, 100 mg by mouth daily (given in the evening because it causes drowsiness) which is routine treatment for transgender women. While this may help her breast development slightly, it is unlikely to have a significant effect, and it is by no means a replacement for breast augmentation surgery.

48. It is imperative and urgent that Ms. Doe's hormone therapy dosages be corrected. Failure to do so puts her wellbeing and life at risk.

49. Denying or withdrawing necessary care also causes severe and worsening dysphoria symptoms, putting patients at grave risk of severe harm or death. Without adequate treatment, patients—including Ms. Doe—experience anxiety, depression, suicidality, and attempts at suicide, self-harm, and self-castration. In addition to exacerbating dysphoria symptoms, physiological harms arise from terminating or reducing clinically indicated hormone therapy, including hormonal disequilibrium, mood destabilization, and psychological and neuropsychiatric effects.

50. In order to fulfill GDC medical staff's professional obligations to the people in the care and custody of Phillips State Prison and to effectively treat Ms. Doe's

medical conditions, I urge GDC to find a medical professional with expertise in gender-affirming care who can appropriately treat Ms. Doe's gender dysphoria.

### Gender-Affirming Surgery

51. In the past, Ms. Doe has repeatedly requested that Dr. Mulloy refer her for surgical consultation for an orchiectomy (removal of the testicles) and other feminizing surgeries. Based on the WPATH Standards of Care 8 recommendations, Ms. Doe clearly meets the criteria for orchiectomy.[24] Her medical treatment has been insufficient in alleviating her symptoms of Gender Dysphoria. However, Ms. Doe reported that Dr. Mulloy "does not recommend surgical treatments" and will only provide hormone therapy. Dr. Mulloy refused to make any referrals for consultation regarding standard surgeries, despite repeated requests. WPATH, UCSF, and Endocrine Society guidelines all recommend orchiectomy as a standard procedure to treat gender dysphoria. Additionally, after orchiectomy, Ms. Doe would no longer require any testosterone-blocking medications such as Spironolactone.

52. Finally, after nearly a year since Ms. Doe filed this lawsuit due in part to GDC's refusal to consider surgery as a treatment option, on November 1, 2024, Centurion of Georgia, LLC "medically cleared Ms. Doe for surgery and informed the Georgia Department of Corrections that the recommended treatment plan for Ms. Doe is gender reassignment surgery." Eighth Status Report, Dkt. No. 197 at 1 (Dec.

---

[24] *See* Standards of Care at S257.

2, 2024). However, GDC never approved these surgeries, despite Ms. Doe's requesting gender-affirming surgery for many years. Ms. Doe got so frustrated with this unexplained delay that she attempted to hang herself in late December. Ms. Doe heard nothing more regarding GDC's decision on whether to provide her these surgeries, and then she was transferred to federal custody in March 2025.

53. Ms. Doe clearly meets the requirements for orchiectomy and breast augmentation, as determined by myself and the surgeons who have evaluated her. In my previous evaluation from December 2023, I recommended waiting for breast augmentation until she had been treated with Estradiol for 1-2 years to see what breast growth occurred in that time. According to her more recent physical evaluation by GDC, she has experienced minimal breast development. Altering her hormone therapy dosages and/or adding Progesterone also will not change her breast development such that the need for breast augmentation surgery would be eliminated. Thus, breast augmentation is now appropriate. It is urgent and imperative that GDC proceed with these medically necessary treatments of Ms. Doe's gender dysphoria.

### Social Transition Items

54. Ms. Doe reports that at the federal facility she was able to use razors. Doe Affidavit ¶ 16. She also requested a wig, which the federal prison staff gave to her without argument, and she was even able to get a second extra wig. *Id.* All federal prison staff used her correct pronouns and were respectful of her gender. *Id.* ¶ 28.

Ms. Doe reports the experience was incredibly affirming, she felt like "those people cared about me, I felt respected.  I have never experienced that before." Additionally, she was housed in general population, where she was able to socialize with others and build a community. *Id.* ¶ 21. Ms. Doe became tearful talking about being seen for who she is and misses that so much. She said, "The environment, the way they treated me, how they helped me, it was amazing. The day I got back here they took my wig and wrote a disciplinary report about it." GDC charged Ms. Doe with providing a false report and possession of an escape device. GDC determined that the wig was not authorized for inmate possession. All of this was despite the recommendation of Nurse Practitioner Feriola from 2024 stating that a wig is medically necessary to treat Ms. Doe's gender dysphoria. This is also in contradiction to GDC policy saying wigs are authorized, but the inmate must pay for it.

55. Upon return to GDC custody, Ms. Doe was provided with one tube of Magic Shave and instructed to purchase more from the commissary. *Id.* ¶ 19. However, GDC barred Ms. Doe from purchasing items from commissary until January 30, 2026, and thus will no longer have access to any type of hair removal cream once her current tube of Magic Shave is finished until after that date at the earliest. *Id.* ¶ 33.

56. Until Ms. Doe develops additional breast tissue, it is imperative that GDC allow her to continue to pad her bra so that she can present as her true gender, thereby further alleviating her gender dysphoria.

57. To treat Ms. Doe's gender dysphoria, it is imperative and urgent that Ms. Doe have consistent, uninterrupted access to hair removal products, such as shaving products and hair removal cream. The growth of body hair for a transgender woman like Ms. Doe causes her extreme psychological distress and exacerbates her gender dysphoria symptoms in a manner that could be life-threatening.

58. It is also imperative that Ms. Doe have access to feminine makeup products, a wig until her hair becomes longer, and padding until she achieves feminizing fat redistribution and has breast augmentation surgery.

59. The risks of delaying the above treatment for Ms. Doe's gender dysphoria include severe psychological suffering, self-harm, and suicide. The risks of self-castration and suicide are particularly acute in prisons, especially where, as here, officials withhold treatment based on categorical rules and limit provisions for social transition care, all contrary to accepted standards of care.

***Withheld Medications***

60. I am aware that GDC has withheld multiple doses of medication they have prescribed Ms. Doe. This includes doses of her Estradiol, Spironolactone, steroid

inhaler to treat her asthma, a rescue inhaler, and medication to manage her blood pressure.

61.  Most egregiously, GDC withheld Ms. Doe's Estradiol injection from her for nearly a month, between October 24, 2025 and November 19, 2025, and then again in a period spanning multiple weeks from sometime in January to February 12, 2026. Suddenly altering a patient's hormone therapy regimen can have negative health impacts. Ms. Doe suffered severe headaches and vomiting as a result of these missed injections.

62. Furthermore, over the course of 30 days in January, GDC withheld doses of Ms. Doe's steroid inhaler on at least 8 separate occasions. Medications are dosed based on the half-life, such that a sufficient concentration is maintained. Typically, the dosing is between 1-2 half-lives, so that the concentration does not drop below 25-50%, allowing the medication to be effective. MHM reported that the active component of Ms. Doe's steroid inhaler has a half-life of at least 6 hours. With a half-life of 6 hours, there would be approximately 6% of the medication remaining after 24 hours. While there may be a low risk of an inflammatory event from missing a single dose, this is not what happened. Ms. Doe missed 8 doses in a month, which is much more than a single dose here and there. As such, it becomes much more likely that Ms. Doe would have complications from missing a dose of her medication on nearly one out of every three days. Additionally, there is a psychological impact

24

from the stress of not knowing whether she will receive her essential medications, which could further contribute to an exacerbation of her existing mental health issues.

63. Inhalers are the cornerstone of therapy for asthma, as they decrease the risk of harmful exacerbations, improve an individual's control over their asthma, and decrease the loss of lung function over time. Furthermore, the potential comorbidity between Ms. Doe's asthma with her existing chronic obstructive pulmonary disease ("COPD") demonstrates that she has a higher burden of disease and increased respiratory exacerbations compared to individuals with asthma or COPD alone.

64. Given her asthma diagnosis, Ms. Doe also should be able to readily access a rescue inhaler should she experience a sudden asthma attack.

65. At the very least, GDC should be administering the medications they have prescribed Ms. Doe at the intervals that they themselves have prescribed. Withholding prescribed doses of any medication from a patient without a medical reason is clearly medically inappropriate.

**D. The Georgia Department of Corrections Should Stop Its Unmerited Retaliation Against Ms. Doe and Release Her From Solitary Confinement.**

66. I am also extremely concerned that GDC's retaliation against Ms. Doe and her solitary confinement is impacting her mental health. Ms. Doe described how she recently went to disciplinary court after she arrived back in GDC's custody, and the

judge said that Noel was clearly not guilty of any of any of the three charges. However, according to Ms. Doe, Warden Pineiro instructed the judge to find her guilty. The judge found her guilty of only one of the three charges, for having a wig (the very wig she was allowed to have in federal custody). Ms. Doe got 30 days of restricted privileges as her punishment, but the judge recommended appealing the ruling, stating she would "make some phone calls." Ms. Doe appealed the ruling, but instead of overturning it, Warden Pineiro found her guilty of all three. A week and a half later, Ms. Doe received another disciplinary report for allegedly writing on her cell wall, even though it was documented that the prior occupant of the cell had done it and had been disciplined for it.

67. Ms. Doe described how she fears this Warden Pineiro's retaliation against her will escalate. Ms. Doe reported that one of her friends who is gay and just two doors down from her cut open his abdomen. Instead of calling for medical attention immediately, GDC left Mr. Nichols in his cell for three days until he died the morning before my evaluation session of Ms. Doe. Ms. Doe said she could smell the blood from her cell, and when she walked by his cell, she saw her friend's "guts hanging out." Warden Pineiro told nurses and staff not to tend to him. Ms. Doe fears that if she needs emergency medical attention going forward, GDC will likewise not provide medically necessary care, especially because GDC already has a history of refusing to properly treat her gender dysphoria and delaying the decision of whether

she should receive gender-affirming surgery far beyond any amount of time that is reasonable for no discernible reason.

68. In addition to the retaliation Ms. Doe is experiencing, solitary confinement is deeply distressing for Ms. Doe. She reports, "in solitary, I can't go outside, can't get mail, can't have my mother visit." She said that this is "taking a big toll on me, it feels murderous." Ms. Doe feels devasted by all of this, and is frustrated by the injustice of it, given that she was not in solitary confinement in federal custody, and she was immediately put into solitary confinement upon her return to GDC custody. Ms. Doe has not been told of the reason for the significant change in her living conditions. She feels stuck alone with her thoughts and feels especially bad without having enough hormone therapy medication.

69. Ms. Doe has been "seriously considering suicide" but is worried that if it doesn't work quickly, Warden Pineiro will "just sit outside my cell and watch and laugh about it." Ms. Doe said, "I curse the day they brought me back after I almost died in 2019."

70. Ms. Doe reported that she had an episode lasting about 6 months in 2010, where she remembered nothing about her past, did not know who staff were, and could not speak properly. She is unsure of the medical diagnosis, but says the doctor reported it was "like dealing with a 5 year old." She is worried that she is at risk for another episode because she is having some of the same initial symptoms, such as

headaches, forgetfulness, slurred speech, and bed wetting. All of these symptoms

started prior to the last episode.

71. Based on the recent trauma Ms. Doe has witnessed and the ongoing trauma

and stress from her solitary confinement, I suspect that she is also suffering from

Acute Stress Disorder. Acute Stress Disorder differs from Post-Traumatic Stress

Disorder "PTSD" in the duration of symptoms and timing in regards to the traumatic

event, with Acute Stress Disorder occurring up to 4 weeks after the traumatic even,

and PTSD occurring 4 or more weeks after the traumatic event.

72. On October 29, 2025, I met with Ms. Doe for 30 minutes, during which I

evaluated her for Acute Stress Disorder. Using both the "Acute Stress Disorder

Structured Interview-5" and the "Acute Stress Disorder Scale-5", Ms. Doe clearly

meets the diagnostic criteria for Acute Stress Disorder after witnessing the gruesome

and cruel death of her friend on October 14, 2025. In her answers, she described the

following items in additional detail.  Regarding memory disruption (Dissociative

Symptoms), Ms. Doe reported that her friend called out to her on the night he died,

saying, "I'm dying, please stay with me and comfort me." In response, she sang to

him for several hours. But she has no memory of the specific songs she sang.

Regarding Avoidance Symptoms, Ms. Doe reported that she has difficulty passing

her friend's room and has to "look the other direction to get by his door."  Regarding

Arousal Symptoms, Ms. Doe reported being "always on the lookout" for the warden,

and she fears him. Ms. Doe used to engage in casual conversation with some of the officers, but now is afraid to speak to any of them. She also reported difficulty concentrating. During the past two weeks, for example, she used to work on her book for 6-8 hours per day, but now she can barely focus for 30 minutes a day. Ms. Doe reported "jumping at any noise" and constantly worries she will be the next victim of the warden. She reported that the Correctional Emergency Response Team came through to "shake down the cells" and she thought they were going to plant something in her cell on the warden's orders. Overall, Ms. Doe is suffering from Acute Stress Disorder after witnessing what she feels was the "murder of her old friend and former lover." Her symptoms on nearly every metric are in the severe range. I am gravely concerned that her Acute Stress Disorder will continue and she will also suffer from Post Traumatic Stress Disorder, particularly if she remains in solitary confinement.

73. Ms. Doe reports no feelings of homicidality and would not hurt somebody unless they were actively trying to hurt her, and only in self-defense.

74. Ms. Doe is suffering serious harm from GDC's retaliation and solitary confinement. This extreme and cruel treatment is further exacerbating the harm to her mental health at a time when she is already experiencing significant distress due to GDC's inadequate treatment of her gender dysphoria. It is imperative that Ms. Doe be returned to the general population for her safety and wellbeing. Upon her return, Ms. Doe should be housed with any other transgender women for her safety.

## CONCLUSION

75. In summary, based on my expert opinion, review of Ms. Doe's medical records, and meetings with Ms. Doe, I reaffirm her diagnosis of gender dysphoria. To immediately help alleviate Ms. Doe's gender dysphoria, which is causing her severe psychological harm to the point of suicidality, it is medically necessary, imperative, and urgent that GDC correct Ms. Doe's hormone therapy doses, provide her with uninterrupted access to the previously mentioned gender-affirming social transition items (including bra and butt padding, access to hair removal products, makeup, and a wig), and be returned to the general prison population and housed with any other transgender women. Ms. Doe also meets the criteria for orchiectomy and breast augmentation surgeries and given her approval for these surgeries by medical staff, these surgeries should be completed without further delay. Ms. Doe is at significant risk of self-harm or suicide, and I am very concerned that her condition will continue to deteriorate without prompt intervention.

76. Ms. Doe is also experiencing Acute Stress Disorder, which may turn into Post Traumatic Stress Disorder, due to GDC's retaliation, solitary confinement, and her friend's death.

77. GDC also needs to ensure it is regularly administering the medications they have already prescribed Ms. Doe, including her Estradiol, Spironolactone, steroid

inhaler, and blood pressure medication. It is medically inappropriate to withhold medications that patients have been prescribed.

78. I hold each of the opinions expressed in this declaration with a reasonable degree of scientific certainty, based on the materials I have reviewed and on my education, experience, and knowledge.  I reserve the right to supplement, amend, or modify my opinions upon review of further information, including, but not limited to, testimony, documents, and reports I receive after the date of this declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ___3/4/26___          _____
                                        ISABEL S. LOWELL, M.D., M.B.A.