# EXHIBIT 4

**GOLDEN PSYCHOLOGY**

Golden Psychology
New York, NY
646.460.0097
golden-psychology.com
dr.golden@golden-psychology.com

## PSYCHOLOGICAL EVALUATION

**Name:** Ms. Doe
**Date of final report**: 10/31/2025
**Dates of Evaluation:**  5/13/25, 6/9/25, 6/10/25, 10/14/25
**Examiner:** Rachel Lynn Golden, Ph.D.

| Expert Background |
|---|

I am a Clinical Psychologist with direct experience in forensic evaluation and clinical care. I have training, education, and related experience in psychological assessment and treatment of transgender individuals in forensic and non-forensic settings. I received my doctorate in psychology from the University of Denver in 2017.

I developed the New York State Transgender Identity Program at the New York State Office of Mental Health (OMH). The program provided gender-affirming mental health care to individuals incarcerated within 29 of the New York State prisons run by the Department of Corrections and Community Services (DOCCS) where OMH provided mental health services. In that capacity, I developed a system of gender-affirming mental health evaluation and therapeutic support to support individuals seeking access to gender-affirming medical care and placement. I treated many people including those who were experiencing Serious Mental Illness, antisocial personality disorder, borderline personality disorder, narcissistic personality disorder, schizophrenia, psychosis, those who had experienced Intimate Partner Violence (IPV), chronic abuse, trauma and complex trauma, and those with histories of substance misuse. I worked with many people who were imprisoned for sex offenses, and consulted and collaborated with the Secure Treatment and Rehabilitation Center (STARC) a secure post carceral treatment and rehabilitation center in Utica, NY, on their provision of care for Transgender and Nonbinary people with sex offenses in their care. I provide expert witness services and testimony for cases primarily but not limited to involving LGBTQ2IA+ individuals and their families. I have provided evaluations and reports for individuals involved in civil and criminal cases in Family, State, and Federal courts. I have testified in Family and State Courts in New York, and have been retained as an expert regarding gender dysphoria and the treatment of gender dysphoria in multiple court cases, including cases involving the treatment of individuals with gender dysphoria in prison settings.

In my capacity at NYSTIP, I focused on diagnosis and treatment, especially providing differential diagnosis of complex presentations of mental health symptoms in people who experience serious mental illness alongside gender dysphoria. I also developed online trainings for all forensic mental health staff at NYS OMH and delivered in-person trainings to hundreds of NYS OMH medical and mental health staff in the provision of gender-affirming care. I trained a team of doctoral psychology student trainees in the comprehensive evaluation and treatment of incarcerated Transgender and Nonbinary individuals. I also collaborated with interdisciplinary teams on the provision of gender-affirming care, including with DOCCS staff. I regularly conduct evaluations of Transgender individuals who are court involved for the first time, who have prior incarceration history, or who are incarcerated in prisons or jails at the time of interview.

I graduated from the University of Denver's Clinical Psychology program in 2017 with a PhD in Clinical Psychology. I hold a Master's Degree in Clinical Psychology as well as two Bachelor of Arts Degrees, one in Clinical Psychology and the other in Romance Languages. I am licensed in the states of New York, New Jersey, Pennsylvania, Texas, Vermont, and Washington D.C.. I also can provide services across 43 states and territories in the United States with my PSYPACT Temporary Authority to Practice (TAP) and Authority to Practice Interjurisdictional Telepsychology (APIT).

I serve on the New York City Transgender, Non-Conforming, Nonbinary and Intersex (TGNCNBI) People in Custody Task Force and am an author on the soon to be released Second Report of the Task Force on Issues Faced by TGNCNBI People in Custody. I am a member of the Trans Prisoners' Rights Coalition of New York. I also am a member of the Transgender Health Advocates of New York (THANY). Our coalition works to advance insurance and health equity for Transgender and Nonbinary citizens in the State of New York. Through my advocacy, I have worked with state Senators and Assembly members as well as the Governor's Office to ensure protections of Transgender individuals in New York. I continue to provide training nationally and internationally on gender and sexuality expansiveness and affirmation in legal, academic, and medical settings. I also consult with NYS DOCCS to support them in their provision of gender affirming surgeries to Transgender and Nonbinary individuals housed in NYS prisons.

I held an Assistant Professor position at Columbia University Medical Center Department of Psychology (in Psychiatry) and served as adjunct faculty at Columbia University Teacher's College. I taught graduate and undergraduate courses on gender and sexuality at both the University of Denver, and at Columbia University's Teacher's College graduate psychology program.

I founded and am the CEO and Mental Health Director of Golden Psychology PLLC, a private practice located in New York City that provides trauma-informed, evidence-based therapies including but not limited to comprehensive Dialectical Behavior Therapy (DBT), Eye Movement Desensitization and Reprocessing (EMDR), Cognitive Processing Therapy (CPT), and Ketamine Assisted Psychotherapy (KAP) to treat trauma, suicidality, self-harm, substance use, and serious mental illness. We also treat couples and families and are establishing an Intensive Outpatient Program for people who need more intensive services. My private practice includes 14 employees who provide these therapies as well as groups. We also have a highly competitive, robust yearly internship program where we train and educate social work students to provide therapeutic care to the clients who seek services at our practice. I provide supervision and training to early-career clinicians with the goal of supporting their growth as clinicians and provision of evidence-based gender and sexuality affirming therapies and psychedelic-assisted psychotherapy. I am also the Mental Health Director of the Bassett Health Gender Wellness Center in Oneonta, NY. There, we work within an Interdisciplinary medical and mental health team and collaborate with surgical teams across the Bassett Network. As Mental Health Director, I supervise a team of 5 in delivering services on a New York State grant where we provide gender-affirming mental health care and assessment for patients to access gender-affirming medical care.

I also offer consulting services for businesses looking to improve their gender and sexuality-affirming practices and their business environment, and have worked with businesses such as the New York City Health and Hospital System (Elmhurst) to develop their gender-affirming care practices and improve their provision of care.

Regarding my training in gender-affirming diagnosis and mental health care, I began to specialize in the provision of gender-affirming mental health care during my psychology internship (like a medical residency) at the Mount Sinai Adolescent Health Center in New York City, in 2015. There I trained in adolescent mental health care (ages

12-24) and specialized in care for Transgender and Nonbinary Adolescents and their families. After graduating, I held a position at the New York Presbyterian Hospital Special Needs Clinic where I continued to work with children, adolescents, young adults, and adults diagnosed with chronic medical illness. There, I was tasked to support individuals with complex mental health presentations and co-occurring medical conditions. I collaborated with interdisciplinary teams on coordination of medical and mental health care. I left that position to develop the NYSTIP program and was already well established as having expertise in gender-affirming care at that time.

I have held an Assistant Professorship at Columbia University Medical Center Department of Psychology (in Psychiatry) and served as adjunct faculty at Columbia University Teacher's College. I have taught graduate and undergraduate courses on gender and sexuality.

I provide supervision and training to early-career clinicians with the goal of supporting their growth as clinicians and provision of evidence-based gender and sexuality affirming therapies and psychedelic-assisted psychotherapy. I am also the mental health director of the Bassett Health Gender Wellness Center in Oneonta, NY. I supervise a team of 5 directing services for a New York State grant where we provide gender-affirming, trauma-informed mental health care. At Golden Psychology, we also have a robust yearly internship program where we train and educate social work students to provide therapeutic care to the clients who seek services at our practice.

I serve on the New York City Transgender, Non-Conforming, Nonbinary and Intersex (TGNCNBI) People in Custody Task Force. I am a member of the Trans Prisoners' Rights Coalition of New York. I also am a member of the Transgender Health Advocates of New York (THANY) where our coalition works to advance health equity for Transgender and Nonbinary citizens in the State of New York. Through my advocacy, I have worked with state Senators and Assembly members as well as the Governor's Office to ensure protections of Transgender individuals in New York. I continue to provide training nationally and internationally on gender and sexuality expansiveness and affirmation in legal, academic, and medical settings.

I have presented at the United States Professional Association for Transgender Health (USPATH) and at the LGBTQ+ Bar Lavender Law conference- regarding care for incarcerated Transgender and Nonbinary people. I have been a consultant to news media and have been interviewed or cited as an expert on gender identity, and Trans experience in prison and jail for television, and print outlets throughout the country.

I also offer consulting services for businesses looking to improve their gender and sexuality-affirming practices and their business environment, and have worked with the New York City Health and Hospital System (Elmhurst) as well as the New York State Department of Corrections and Community Services to improve their provision of Gender Affirming care.

A true and correct copy of my Curriculum Vitae, which provides a complete overview of my education, training, and work experience and a full list of my publications, is attached hereto as Appendix C. I am being compensated at the hourly rate of $600.00 for my time spent preparing this report deposition testimony or trial testimony. My out-of-town travel is reimbursed for reasonable expenses incurred. My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I provide.

I have considered information from various sources in forming my opinions enumerated herein, in addition to drawing on my extensive experience and review of the literature related to gender dysphoria over the past decade.

The materials I have relied upon in preparing this report are the same types of materials that experts in my field regularly rely upon when forming opinions, they include peer-reviewed journal articles, other evidence-based publications, and 10 years of experience in the provision of care to Trans and Nonbinary people, including those who are incarcerated.

---

**Identifying Data and Reason for Referral**

---

**Patient and Referral**: I have been retained in the Doe v. GDC et al., Case No. 1:23-cv-05578-MLB litigation as an expert by Plaintiff's counsel, Rights Behind Bars, and Baker Botts L.L.P., to evaluate the Plaintiff's mental health functioning and the impact on her life of being denied access to gender-affirming medical care by the Georgia Department of Corrections. In accordance with the protective order in this case, I refer to the Plaintiff as Plaintiff or Ms. Doe.

Plaintiff, Ms. Doe (she/her), is a Transgender Woman. Ms. Doe presents with a history of severe mental illness including severe depression, suicidality, anxiety, and PTSD. A comprehensive psychological evaluation was conducted to gain information about Ms. Doe's current mental state and to provide an in-depth evaluation of her trauma history and experiences.

In order to do this, I met with Ms. Doe virtually for one session. However, we had to switch to in person when it no longer became feasible for the facility to have her meet using their video equipment. I then traveled to Georgia to complete the evaluation in-person at Laurens County Detention Center in Dublin, GA. We met for seven and a half hours over two days. I also reviewed provided records regarding Ms. Doe's medical and mental health history and treatment.

**Evaluation Considerations**: Ms. Doe demonstrated good eye contact, no psychomotor disturbances and was appropriately engaged for the duration of the interviews. Ms. Doe's speech was fluent and regular in rate, tone and rhythm. Her thought form was linear and goal directed with content that was appropriate. She directly answered all questions asked. She presented as pleasant and engaged and hopeful that she will someday be able to accomplish her transition goals. She expressed that she understood the purpose of the evaluation and how it would be shared. She consented freely to participate. The history she provided during this evaluation is consistent with the documented history that I reviewed. During the evaluation, there was no evidence of internal preoccupation; she denied any auditory, visual, tactile or olfactory hallucinations.

During the interview and assessment, Ms. Doe was provided with several measures to assess her mental health functioning. Ms. Doe was very responsive to direction and demonstrated good effort for all tasks throughout the evaluation. There were brief times when Ms. Doe became distressed and dysregulated during the evaluation, especially when talking about traumatic experiences, or her long history of denial of gender-affirming care. However, she was able to regulate with the help of the evaluator, and returned to being able to complete the evaluation. There also were times when she appeared to dissociate during the evaluation and the evaluation had to be paused for several minutes. However, eventually, she was able to use grounding techniques as guided by this writer in order to return to the tasks at hand.

Challenges with the conditions of the visiting room that obstructed visibility of one measure as well as interruptions by staff to bring Ms. Doe lunch interfered with the administration of one measure. The conditions resulted in tremendous distress for Ms. Doe, therefore the results of the measure were discarded.

Overall, Ms. Doe was cooperative and appeared to put forth a good effort during all evaluation sessions; therefore, test results are deemed valid and representative of her current functioning.

**Methodology**: This report followed a typical comprehensive social emotional report procedure. It involved the following procedure: a structured interview, self-reported emotional and behavioral measures, questionnaires, and a 344-item paper-and pencil personality assessment. The evaluation was administered across several sessions so as to reduce fatigue with extensive testing, and to determine whether there was consistency in responses.

---

### Case Conceptualization and Diagnostic Impressions

I met with Ms. Doe on May 13th, 2025 (4 hours), June 9, 2025 (4.75 hours), June 10, 2025 (2.5 hours), and October 14, 2025 (1 hour) for a total of 12.25 hours to complete a comprehensive psychological evaluation.

During the interview and testing administration, it became clear that Ms. Doe experiences post-traumatic stress disorder (PTSD), gender dysphoria, anxiety, depression, and suicidality. These symptoms coalesce in tremendous distress, dysregulation, and despair.

By interview, Ms. Doe's gender dysphoria is clear and her distress related to it is impairing. Ms. Doe undeniably meets all 6 of the criteria for gender dysphoria. She also has experienced symptoms of dysphoria since her youth, which more than meets the duration criteria (6 months).

Ms. Doe meets every domain necessary for a diagnosis of gender dysphoria:

    A. Marked incongruence between one's experienced/expressed gender and assigned gender, lasting at least 6 months, as manifested by two or more of the following:

        1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics)
        2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics)
        3. A strong desire for the primary and/or secondary sex characteristics of the other gender
        4. A strong desire to be of another gender
        5. A strong desire to be treated as another gender
        6. A strong conviction that one has the typical feelings and reactions of another gender (or some alternative gender)
    B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Ms. Doe experiences a clear incongruence between her experienced and expressed gender and her primary and secondary sex characteristics, and her sex assigned at birth. She has a strong desire to be and to be treated like a woman. She wishes to correct her primary and secondary sex characteristics to those of a woman because of the marked incongruence with her experienced and expressed gender. She has a strong desire to be perceived and treated as a woman. She knows that she has the typical feelings and reactions of a woman. These symptoms cause her significant distress manifested by feelings of dysphoria, and associated feelings of depression (hopelessness,

helplessness) and anxiety (worry about vulnerability to being attacked or sexually assaulted for being Trans, worry about never gaining access to gender-affirming care).

By interview and measures provided, Ms. Doe's experiences of anxiety and depression were evident. She experiences every domain of major depressive disorder, including depressed mood, anhedonia, appetite and sleep changes, feelings of worthlessness, diminished ability to concentrate, and frequent bouts of suicidal ideation paired with attempts. She also experiences all domains of generalized anxiety disorder, including excessive worry, trouble controlling the worry, multiple symptoms such as restlessness, physiological symptoms, and sleep disturbance resulting in clinically significant distress for more than the past 6 months.

Throughout her life, Ms. Doe has experienced abuse, harassment, and gender-related discrimination. Her experiences of abuse began in childhood, as an adult she has also experienced sexual assault and violent victimization as well as persistent rejection of her gender identity, and requests for care, as well as extreme distress and isolation related to being kept in solitary confinement for years.

Ms. Doe s PTSD symptoms include every domain of PTSD experience:

a. Traumatic experience such as abuse and sexual assault;
b. Intrusive symptoms such as unwanted memories or sudden reminders of the trauma that lead to reexperiencing of the traumatic event;
c. Avoidance of memories and reminders of the trauma;
d. Negative alterations in mood and cognition;
e. Increased alertness such as being jumpy, watchful, or on guard.

These symptoms cause her to experience intrusive memories and nightmares about the traumas she experienced, reexperiencing of the trauma, having strong physiological responses when reminded of the experiences, hypervigilance and sensitivity to trauma triggers, avoidance of situations similar to the trauma, and trouble experiencing positive feelings. These experiences result in holding negative beliefs about herself, others, and the world, especially when she is in situations where she feels like she will be victimized or denied care again or when she is reminded of her traumatic experiences.

Taken together, Ms. Doe's experiences of trauma across her lifetime have had a tremendous impact on her life and her functioning. They have been compounded by the chronic traumatic gender invalidation and denial of care she has experienced in the Georgia Department of Corrections. This lifetime of trauma, particularly the ongoing negative experiences, combine to increase her difficulty with emotion regulation, and her challenges with distress tolerance. Her history and current presentation coalesce in a more nuanced trauma diagnosis than typically seen with PTSD.

What best describes the combination of pervasive interpersonal difficulties, dysregulation and posttraumatic stress disorder symptoms for Ms. Doe is a diagnosis of Complex Posttraumatic Stress Disorder (c-PTSD) (ICD-11). Complex PTSD characteristics is defined by experiencing multiple instances of trauma across one's lifetime, or sustained trauma across time. This can include witnessing violence, chronic physical or sexual abuse or assault, and pervasive gender harassment and violence. With c-PTSD, the PTSD symptomatology is present and the individual meets criteria for diagnosis of PTSD; in addition to PTSD symptomatology, the individual also experiences chronic and pervasive disturbance in emotion regulation, identity, and relationships, without meeting full criteria for borderline personality disorder. Though Complex PTSD is not included as a diagnosis in the DSM-

5, it is a diagnosis in the World Health Organizations diagnostic manual, International Classification of Diseases-11 or, ICD-11.

Her gender dysphoria, PTSD, anxiety and depression symptoms coalesce in tremendous distress, thoughts of suicide, suicide attempts, and chronic feelings of invalidation, which deteriorate Ms. Doe's mental health.

Ms. Doe qualifies for the following diagnoses:

Gender Dysphoria in Adolescents and Adults 302.85 (F 64.1)
Posttraumatic Stress Disorder 309.81 (F43.10)
Generalized Anxiety Disorder 300.2 (F41.1)
Major Depressive Disorder, Severe, 296.33 (F33.2)

---

**Summary of Mental Health Recommendations**

---

Given this presentation, it is my recommendation that Ms. Doe receive access to gender affirming, medically-necessary surgical and hormonal care immediately. Her mental health symptoms have deteriorated due to her lack of access to medically-necessary, gender affirming care. Access to gender affirming medical and surgical care is the only direct treatment of gender dysphoria, her distress will continue if she continues to be denied care. Ms. Doe should receive gender-affirming medical care by well-trained surgeons and endocrinologists who have expertise in the nuances of gender-affirming medication management and who have vast experience in the provision of surgical care. This will allow Ms. Doe to complete her gender-affirmation surgical goals to better align her body with her affirmed gender identity and reduce her gender dysphoria.

Ms. Doe is also clearly in need of intensive mental health treatment to appropriately ameliorate and manage her mental health symptoms related to years of denial of care and the ongoing distress of being held in solitary confinement. The treatment of her complex PTSD symptoms is paramount. This care should include comprehensive therapy for trauma, depression, and anxiety. Ms. Doe should receive comprehensive mental health care that treats trauma directly, such as Cognitive Processing Therapy and/or Eye Movement Desensitization and Reprocessing (EMDR). Ms. Doe should additionally receive mental health treatment targeted at building emotion regulation and distress tolerance skills. Dialectical Behavior Therapy is the most appropriate fit for treatment of these symptoms. It is possible that, with therapy, Ms. Doe's PTSD, anxiety and depression symptoms may be remediated.

Finally, 6 years of living in solitary confinement, have gravely impacted Ms. Doe's wellbeing, mental functioning, and ability to stay regulated. In addition, Ms. Doe's current, extreme restrictions while in solitary confinement have seriously negatively impacted her mental health and are placing her at grave risk for another, severe mental health crisis. She is at risk of additional suicide attempts and further mental health deterioration.

**<u>Summary:</u>**

- Ms. Doe should immediately receive medically-necessary gender-affirming medical care including medication management and surgery access by well-trained providers to help her realize her gender affirmation goals.

- Ms. Doe should receive mental health care that treats trauma directly, such as Cognitive Processing Therapy, or EMDR. Anxiety and depression symptoms should also be addressed as trauma and gender dysphoria symptoms associated with lack of access to appropriate care are resolved.
- Ms. Doe should receive mental health treatment targeted at building emotion regulation and distress tolerance skills. Dialectical Behavior Therapy is the most appropriate fit for treatment of these symptoms.
- Ms. Doe should be placed in a housing facility that is less restrictive. She should be allowed communication with family, books and activities for intellectual nourishment and time outside of her cell.

---

### Review of Records, Including Medical and Mental Health Records

---

I reviewed the following records. Relevant information from these records is incorporated throughout the evaluation.

1. Second Amended Complaint and Request for Relief, filed 12/6/23
2. Medical Records from Georgia Department of Corrections, approx.: August 2015 – June 2024
3. Exhibit C: Jane Doe Affidavit in Support of Temporary Restraining Order, filed 12/17/24
4. Appendix in Support of Plaintiff's Motion for Preliminary Injunction, including Exhibits 1-14, filed 12/6/23
5. Exhibit 5: Jane Doe's Second Affidavit, filed 2/6/24
6. Forgotten Justice, I Am Jane Doe: The "Lena" Noel Doe Story
7. Handwritten letters from Ms. Doe, 12/21/24, 1/10/25, 1/26/25

---

### Background Information

---

**Family History:** Ms. Doe reported that she was born in Oklahoma to "two vagrant parents." She does not have a record of her early life. She has been told that she and her older brother were abandoned when she was three years old after being left with a babysitter by parents who never returned (*See trauma history*). She shared that she was adopted by her parents who were Mormon, after 1.5 years in State care. She and her brother were raised by their parents in Florida until 1982 when they moved to Georgia to attend better schools. Her father was in the Navy and her mother was a schoolteacher. She has one older brother, Robert, and a younger sister Theresa. She is not close with her siblings, but she remains very close with her mother. Her father passed away 10 years ago from a medical illness. She reported that she was married in 1987 for one year, and then filed for divorce. She has no children. She shared that she is well supported by her mother whom she has a close relationship with.

**Pregnancy, Birth History:** Ms. Doe does not have much information about her biological parents or her biological mother's pregnancy. She also has no information about her birth history or her early life up to about three years old when she was adopted by her parents.

**Medical History and Medications:**
Ms. Doe's Medical conditions include COPD, Asthma, and Hypertension, as well as neck pain. She was prescribed an oxygen tank for seven years, and was recommended to be housed in an air conditioned pulmonary dorm. However, she has not yet been transferred to a pulmonary dorm.

Ms. Doe was receiving the following medications at the time of her evaluation:
Topamax (50mg 2x daily), Claritin (10mg), Alvesco (160 mg, 2 puffs), Prozac (20 mg), Cingular (10 mg), Spironolactone (150 mg daily), Oxcarbazepine (450 mg 2x daily), Verapamil (240 mg), Effexor (37.5 mg 2x daily), hydrochlorothiazide (25 mg), and 10mg of Estradiol every other week.

**Developmental and School Histories:** Ms. Doe recalled that she had difficulties with concentration and cognition in elementary school. She shared that in grade school she received a psychological evaluation that revealed emotional concerns. As a result, she took part in a half day program (half day at school, half day in therapeutic care) where she received directed therapy. She shared that she returned to normal school attendance and was diagnosed with a learning disability- possibly dyslexia. She attended specialized classes through high school to support her in reading, math, and science. She reported that she was held back in the 3rd grade and that she was nearly held back in the 6th grade. She reported significant bullying in school due to her gender presentation (*See Trauma History)*. She dropped out of school halfway through her senior year due to the success of her limousine service. She has a high school diploma and has pursued an undergraduate degree through the Hope Scholarship Program. She also reported that she also has a paralegal degree, which she received while in prison, and is hopeful that some day she may get a law degree.

**Incarceration History:** Ms. Doe reported that she is serving time for kidnapping, false imprisonment, impersonation of a police officer charges, and a charge received during her sentence for creating an explosive device and mailing it to the Georgia Department of Corrections. She reported that she was sentenced when she was 23 years old. She has spent 6 years of that sentence in solitary confinement (since July, 2019). She estimates that she has been incarcerated in about 11 facilities- Valdosta State Prison, Ruteledge State Prison, Lee State Prison, Central State Prison, Baldwin State Prison, Johnson State Prison, Georgia State Prison, Ware State Prison, Wheeler State Prison, Autry State Prison, Georgia Diagnostic and Classification Prison, and Laurens County Detention Center where she was held at the time of initial interview. During the last visit with this writer she had been returned to Phillips State Prison.

**Family Mental Health and Family Substance Use History:**
As Ms. Doe is adopted, she does not know much about the mental health or substance use history of her birth-family. She did report that her adoptive parents experienced good mental health and did not use substances.

**Substance Use History:** Ms. Doe is Mormon and reports no substance use history and no alcohol use.

**Employment:** Ms. Doe reported that she started driving limousines for a company and then bought a limo and started her own business in high school. She reported the business was successful and that she dropped out of school to run the business. Prior to her incarceration she had about 6 limousines in total.

**Social-Emotional History:** Ms. Doe has a long history of struggles with mental health. She shared that as a child she was evaluated and was told that she had experienced "deep emotional scarring." Due to her challenges, she was placed in a program to help her manage her mental health alongside schooling. She was prescribed Ritalin by a psychiatrist to help her with focus and attention. She reports that she first started experiencing depression in about 6th or 7th grade, with suicidal ideation emerging when she was in 8th grade. She shared that the depression and suicidality was largely due to her gender dysphoria, and worries that her gender identity would be found out. She reported feeling anxiety starting in her teenage years, which she described as manageable then, and perilous now. She shared that her anxiety worsened over the years in the prison environment because she could not be herself, and because she felt so unsafe. She stated that it had a peak in 2010 –2012 when she was raped by a prison officer.

She reported not receiving any mental health care through her childhood and youth. In 1992 as a condition of parole she was required to see a psychologist in the community- Dr. Dean Black. She reported that he refused to give her a letter for gender-affirming care because of his religious beliefs. This rejection led her to first attempt self-castration by lacerating her scrotum.  Her mental health deteriorated sharply when she entered custody in Georgia. From 1995-2015 she received limited mental health care. She met with a psychologist in 2010 one time per week while she was in Jackson. She received limited individual and group psychotherapy through 2022. She noted that she has been provided with some mental health care in the last several years, but that little of it has been effective, as it has largely relied on skills learning to manage distress. She noted that skills do not resolve her distress, and are useless in helping her to regulate when the ongoing care denials and time in solitary exacerbates her distress so intensely. She receives medication management, that does not fully remediate her distress. She shared that the medication is not working because it is not treating the problem of receiving gender affirming care, and of getting relief from solitary.

There are three documented sources of her distress: her denial of gender affirming care, her isolation in solitary confinement, and her trauma history (which is also associated with the lack of care and placement in solitary). She reported that she experiences depression, anxiety, PTSD symptoms and emotion dysregulation which leads to suicidal ideation and self harm.

Ms. Doe reports constant hopelessness and helplessness, she states that the lack of action in helping her to resolve her problems is the source of these feelings.

There has been no effective treatment of her suicidal ideation or self harm. She reported that the mental health support she receives for her suicidal ideation is largely skills based, which she reports feels like an invalidation of her problems, as she sees that her struggles can be solved with access to gender-affirming care, alone. She has had multiple suicide attempts, and self harm incidents, as well as years of traumatic experiences (*see Suicidality and Self Harm History and Trauma History sections*).

Ms. Doe has been told by corrections officials that she is on indefinite administrative protective custody (solitary confinement), due to being considered a risk both to herself and the prison. As a result of this placement, she has experienced deterioration in her mental health, as well as her physical health. She experiences muscle weakness, joint pain, deteriorated cognition, and worsening mental health. She reports that she receives no therapy that positively impacts her wellbeing. At one point in her time in solitary the made a friend for herself to interact with named Lucy, "she was stuffed with state clothes and towels, with a mop for hair." She has used the time to write her story, and to keep her cell obsessively clean.

Upon return to Phillips State Prison Ms. Doe was allowed to keep her personal items from Laurens State which included a wig that she was provided there after receiving a prescription for it as a medical item. However, she is currently being punished for having the wig in Laurens State, and is additionally being blamed for writing that was on her cell wall that was not done by her. Her anxiety and PTSD symptoms were at a peak because she is being denied access to <u>all</u> resources for 120 days, and <u>all</u> of her items were taken away from her. She is being held in a 7x11 cell with the window covered. She is not allowed packages or any visits during that time, and mental health is not even allowed to provide her with items on paper. This severe and torturous punishment is rapidly deteriorating her mental health. Additionally, she has been told by staff that this punishment is retaliatory by the warden who is ordering that she be found guilty and is setting the degree of the punishment. She was told

this by the hearing officer in her case. She expressed clear signs of severe emotional distress and suicidal ideation as a result of her punishment.

**Suicidality and Self Harm History:** Ms. Doe first reported a serious suicidal gesture at 16 years of age when she traveled to a local park and considered jumping off of a cliff there, she reported being talked off of the ledge by a park ranger.

In July, 1998 she made a suicide attempt by asphyxiation. In the same year, she made a suicide attempt by cutting her wrists with a razor. She still bears scars from this attempt. She made a suicide attempt by asphyxiation with the cannula from her respirator in about January of 2017 secondary to persistent gender dysphoria, and ongoing denial of care. She attempted suicide again through asphyxiation in December of 2019. She reported that she had to be resuscitated but that she was not taken to a mental health crisis unit. She also reported that she has continued serious pain in her neck since then. She was elevated to a higher level of mental health services, Level III, in April of 2022. She was placed in a suicide safety vest and was held on strip cell observation status. She believed that this happened because she had become despairing after hearing about a meeting that had been held, denying her requests for surgery.

She made an attempt to hang herself in 2023, 3 days before Christmas. She reported this attempt was due to the distress of being held in solitary confinement, and being denied hormones and time outside. She reported that this attempt caused damage to her neck and has resulted in significant pain. She made an additional suicide attempt in January of 2025. She reported active suicidal ideation during the evaluation at Laurens State, though she also stated that she could keep herself safe, and had support in the facility. During the last meeting of the evaluation, she was experiencing deteriorating mental health and increasing suicidality.

She first reported engaging in self-injury in1992 while she was out on parole. She attempted to self-castrate by cutting her scrotal sack with a razor. She again self-harmed in 1994, by making lacerations to her face, She began banging her arms and head on the wall in 2016.  She again attempted self-castration in July of 2022 using string to cut off blood flow to her testicles. This resulted in incredible pain, swelling and a foul smell for five days until she told a counselor about it and she received medical attention to remove the strings. She was in the medical unit for several weeks during her recovery and still experiences pain when sitting, as well as a large scar.  She shared that she self-injures multiple times weekly, banging her head against the wall, once so strongly that she knocked out a tooth, which is still missing from the right side of her mouth (2022), and also resulting in a scar on her forehead on a different occasion. She also slams her arms on her locker box.

She estimated that throughout the time she has been in custody, she has been held in the Crisis Stabilization Unit approximately 8 times. As a note, she sometimes experiences mood congruent visual and auditory hallucinations when she is highly depressed and suicidal, she notes that she has been visited by deceased historical figures, her father, and a deceased park attendant while in these states.

**Trauma History:** Trauma began in infancy for Ms. Doe's. She and her brother were abandoned by their birth parents when she was 3 years old, and she was told that their Department of Child and Family Services records stated that the two children had experienced much abuse. She reported that she was bullied in school regarding her femininity, and that at one point a boy who she had been intimate with told the school about her and told her "everyone is saying that you are a faggot."

Her trauma continued when she was incarcerated. She reported multiple instances of sexual assault while incarcerated. In 1996 she was raped by a gang member. From October 2010 to October 2011 and April 2012 to May 2021, she was repeatedly raped and physically assaulted by officer steven hall. In April of 2018 she was raped at knifepoint. In January of 2019 she was physically assaulted by another detainee. She has been robbed at knifepoint while housed in a cell without a lock – from April 2022 to October 2023.

She has witnessed the assault of her neighbor- a Transgender woman, and the suicides of people being held in solitary confinement with her. She has also experienced Transphobic, and demeaning remarks from officers, and has not had access to safe and private showers. She reports that she is denied food, and her food has been spat in. Recently she heard another inmate on her floor had "cut his guts out" and was being denied medical care, she reported that the inmate was left in his cell and died the next day.

She has also experienced rejection from family members regarding her transition. Her sister, when she found out about Ms. Doe's identity, stated that she did not want to have a sister. In addition, her biological mother stated that "if she had kept me, I wouldn't be Trans." She shared that both of these statements have been rejecting and upsetting to her.

Undeniably, the ongoing rejection of Ms. Doe's requests for gender affirming care have been a traumatic experience for Ms. Doe. Ms. Doe experiences her distress from gender dysphoria as a largely resolvable problem, that has a clear medical answer and where the result of undertreatment is disabling distress. Having the primary resolution to her distress held out of reach for years, despite clear medical necessity and distress has been traumatizing and torturous. She is told by staff that she has been manipulative when she is unceasing in her requests for help and when she becomes highly distressed due to lack of access to care. Notably, while in Laurens state, when she was allowed a wig, her spironolactone dose was doubled and when she was housed with others, her mood was improved and her distress was somewhat decreased, though her upset over the continued denial of care was still destabilizing and associated with suicidal ideation.

Her solitary confinement has also clearly been a traumatic experience, she describe that before solitary she was. Dealing well with stressors, able to relax by watching TV, talking with people, using the phone to stay in touch with loved ones. Ms. Doe says that being in solitary "means I have no way to deal with my stress," so self harm and suicidal ideation and attempts become the only mechanisms she feels she has to reduce stress.

**<u>Gender History:</u>** Ms. Doe reported that she knew that her gender was different than others at about 6-7 years old. She expressed a preference for feminine toys at an early age, as she had a sister, she was able to play with her barbies and easy bake oven. She reported not liking the toys she was given, like baseballs and footballs. She noted that when she was around 8 or 9 she was enrolled in cub scouts. At that time, she realized that she had a romantic interest in boys her age. She shared that in middle school she dressed as a girl for Halloween, and that the feeling was positive. She stated that she "knew I was different, but I didn't know how to express or tag it." When she approached puberty, she realized that she felt that "something wasn't right." She disliked the boys briefs she was given, as well as other boys clothes and the military haircut that she received. She dressed in her mothers and her grandmothers' clothes in secret. She felt she had to live a double life. When she reached 8th grade, feelings of depression and suicidal ideation began, related to her gender identity and lack of ability to be herself. In 11th grade, she worked for a limousine service. During that time she dressed as a woman and reported that "no one knew." She then ran her own limo service, and continued to dress as a woman during that time. She reported

that she was diagnosed with transsexualism (which later became known as gender identity disorder, and now gender dysphoria) in 1993.

While incarcerated, Ms. Doe reported that she has endured extensive challenges with harassment, assault, and abuse related to her gender. She has also experienced denial of medically necessary care, safety, and affirming items such as wigs, makeup, and clothing. She describes this as an  This denial of her gender identity results in suicidal ideation and attempt. She has also attempted self-castration to address her lack of access to medical care, and remediate her problems with her secondary sex characteristics on her own.

Ms. Doe said that she is not allowed feminine clothing. She reports that she is has made make up and nail polish for herself from wax and regular items she purchased in commissary- markers, pens. She stated that she has been denied access to makeup and was told it poses a security risk. Ms. Doe reported that being unable to express her gender in an affirming way causes significant distress.  She has been given access to hair removal cream after a court order. However she was then told that she needed to buy the cream from commissary which is made for coarse hair, and irritates her skin. At the time of her housing in Laurens County, she had access to padded bras. Upon her return to Phillips State, her spironolactone was once again halved. She shared that with the HRT regimen she was reduced to, she was noticing hair growth over her body, larger testicular size and a reduction in breast size, which was leading to her experiencing increased distress.

She shared that in the past she has had access to private showers, and felt much safer. She also has been housed with other Trans people in the past, and as a result felt affirmed and happier. She has been able to pad her body (hips, bra, buttocks) and it helped her with her feelings about who she is. Of the limited affirming care she has received, she shared that the wig was the most helpful, especially because when people saw her, they interpreted her as a woman. This bolstered her self-esteem and improved her mood and regulation.

She is clear about the gender affirming care she wishes to have- access to gender-affirming items (wig, padding, feminine clothing and underwear, makeup and toiletries), access to appropriately dosed HRT including spironolactone and estrogen, and access to gender affirming surgeries. She has asked for an orchiectomy (the removal of her testicles), vocal feminization surgery (to raise the pitch of her voice), facial feminization surgery (to reduce masculine features), laser hair removal (to remove facial and body hair), breast augmentation surgery (implants to increase breast size), liposuction of the waist, and body contouring (adding fat to her buttocks), and a vaginoplasty. These are all surgeries available to individuals in the community.

She also requested gender affirming commissary items- that are typically available in women's facilities and that in other carceral settings are made available to individuals housed in "male" facilities. She also requested continued access to gender affirming items such gender affirming clothing, padding for her breasts and buttocks, and a wig.  She has also made requests to be moved to a gender aligned, women's facility since 2021. She believes that in a women's facility she will be misgendered less, will have access to gender affirming clothing and showers, searches, and commissary items. She has felt exhausted by the transphobic and abusive remarks said to her, as well as fear of being assaulted or raped again. Her requests have been consistently rejected.

## Behavioral Observations and Test Results

Specific test scores are reported at the end of this report.

**General Presentation**: Ms. Doe presented as an engaging individual who was willing to participate in the evaluation. She demonstrated appropriately modulated eye contact and reciprocal conversation. She demonstrated normal gait and balance with no apparent dysmorphology. Ms. Doe was very responsive to direction. Ms. Doe demonstrated good apparent effort for all tasks throughout the evaluation sessions. Her affect was predominantly euthymic throughout, though she demonstrated much anxiety and sadness when recounting traumatic experiences. At times, she also appeared to be dissociated. She was responsive to redirection as needed, as well as coaching to help her to regulate in the moment.

The testing environment was not ideal for one measure (TOMM) requiring her to observe drawings, and remember the ones that she had seen. Visibility for material was poor due to there being a thick grate between the examiner and Ms. Doe. In addition, Ms. Doe became dissociated, tearful and dysregulated after being distracted by staff bringing her lunch during administration of the test and then losing track of the purpose of the test. As tests such as this one need to be administered in a consistent and controlled way to be deemed comparable with other measures, and the administration of the test was significantly impacted by the environment, the test results were discarded. Overall, Ms. Doe was cooperative, engaged, and appeared to put forth a good effort during all evaluation sessions; therefore, evaluation and measure results are deemed valid and representative of her current functioning.

**Measures Completed:**
Ms. Doe completed several measures including
- Beck Depression Inventory (BDI)
- Beck Anxiety Inventory (BAI)
- Connor's Adult ADHD Rating Scale – Self-Report, Long Version (CAARS-S:L)
- PTSD Checklist for DSM-5 (PCL-5)
- Columbia Suicide Severity Rating Screen (C-SSRS)
- Adult Suicidal Ideation Questionnaire (ASIQ)
- Personality Assessment Inventory (PAI)
- The Test of Memory Malingering (TOMM) (discarded after testing conditions rendered it invalid)

**Attention and Executive Control:** History and testing results using the Connors Adult ADHD Rating Scales (CAARS) reflect some borderline significant symptoms of hyperactivity and restlessness, but no other borderline clinical or clinical symptoms. These symptoms may be more reflective of anxiety or other distress. During interview, Ms. Doe endorsed some of the symptoms most associated with ADHD, however, the reported severity of these symptoms is below the threshold for clinical significance and these symptoms seem much more related to the difficulties with inattention and concentration that can be related to depression, anxiety and PTSD, and the impulsivity that can be related to emotion dysregulation.

**Social/Emotional Functioning:** Ms. Doe's evaluation highlighted numerous strengths. She was engaging, forthcoming, and willing to participate. She was interested in learning more about her mental health and possible treatment, and still has hope that she can live a happier life if she gains access to gender affirming medical and surgical care.

When talking about her traumatic experiences across her life Ms. Doe became visibly upset; she was crying and at times had trouble speaking and had to take a break for up to 5 minutes to re-regulate. Given enough time, and

some resources for regulating her distress (breathing exercises, grounding exercises), she was able to talk about her experiences and their impacts. Ms. Doe certainly has good reason to be distressed about many of the experiences she has had in her life, including sexual trauma, harassment, abuse, bullying, and mistreatment by other inmates and denial of medically necessary care.

Ms. Doe becomes immediately quite distressed when she speaks about her trauma history, she experiences clear physical and emotional distress. She endorsed symptoms of trauma at an elevated level, including nightmares, disturbing memories, physiological symptoms (heart pounding, trouble breathing), avoidance, negative feelings such as fear, guilt, anger and shame, mood deterioration, and hypervigilance. Taken together, her symptoms are consistent with a diagnosis of PTSD. Her score on the PCL-5, a measure of PTSD symptoms found in the DSM-5 was 56, which is well above the cutoff score of 28. This finding is also supported by her scores on the Personality Assessment Inventory (PAI) (87) indicating Traumatic Stress at a clinical level ($\geq$70).

**Mood Disorders:** Ms. Doe completed two specific measures related to mood disorders. She completed the Beck Depression Inventory, a measure of depressive symptoms. She received a score of 43, indicating severe depression. Her symptoms included: hopelessness, failure, loss of pleasure, punishment, self-dislike, self-criticalness, irritability, fatigue, suicidal thoughts and wishes, agitation, loss of interest, indecisiveness, worthlessness, energy loss, and loss of sleep.

Ms. Doe also completed the Beck Anxiety Inventory where she received a score of 49, indicating severe anxiety. Notably she endorsed symptoms of being unable to relax, feeling terrified or afraid, nervousness, fear of the worst happening, and fear of dying, as well as multiple physiological symptoms of anxiety such as wobbliness, feeling of choking, faintness and lightheadedness, difficulty breathing, heart racing, and nervousness and dizziness, among others. She also completed the PAI which demonstrated clinically significant experiences of anxiety (81).

Ms. Doe endorsed high levels of suicidality throughout the evaluation and measures. On the Beck Depression Inventory, she endorsed item 9 "Suicidal thoughts or wishes" as "I would kill myself if I had the chance." She completed the Columbia Suicide Severity Rating Scale (CSSRS) where she endorsed a wish to be dead, suicidal thought with a method, and intent with a specific plan. On the Adult Suicidal Ideation Questionnaire (ASIQ), a 25-item measure rating the frequency of suicidal thoughts over the last month, scores range from 0 to 150, and a typical cutoff indicating the presence of clinical levels of suicidal ideation is 31. Ms. Doe's scores indicate clinical level of distress (114, 99th percentile). She also endorsed high suicidal ideation between sessions, as she said that recalling her trauma history and history of denial of care had activated her suicidality greatly.

**Testing Results:** Formal assessment of Ms. Doe's social-emotional functioning included self-ratings on the Personality Assessment Inventory (PAI) completed in the first and second evaluation session. The PAI is a 344-question measure of adult personality and mental health experience across a broad range of symptoms. It assesses psychopathological syndromes and provides information relevant for clinical diagnosis, treatment planning, and screening for psychopathology. Ms. Doe completed this measure on her own, reading each item and responding accordingly.

There are several measures in the PAI designed to assess the validity of testing results. These can include incomplete items, carelessness, challenges in reading, confusion about the questions, exaggeration of symptoms, falsely endorsing symptoms, and defensiveness. These measures also evaluate the consistency (ICN, INF) and appropriateness of responses to the test item content. Ms. Doe's scores were below threshold for concern.

The validity of the Positive Impression Management scale (trying to portray oneself in a more positive light, free of mental health concerns, and a reluctancy to admit to minor faults) and Negative Impression Management scale (trying to portray oneself in a more negative pathological light) has been contested (Yoxall, Bahr, and O'Neill, 2017). Namely, the Negative Impression Management Scale is more sensitive to predicting deliberate feigning of severe mental health disorders (schizophrenia) but is not as accurate at detecting feigning of mental health issues like depression (Rogers, Ornduff, & Sewell, 1993). Thus, these scales are interpreted with some caution and are used to inform but not determine overall interpretation of the PAI and the diagnoses provided in the report.

Ms. Doe's inconsistency validity scale Negative Impression Management Scale (NIM)(73) warrant some exploration. As her scores on the schizophrenia scales are below clinical threshold, and other elevated scores are consistent with scores on other measures, history and current treatment, the NIM scale is considered to simply be sensitive to the elevated levels of distress she experiences.

Ms. Doe's PAI clinical profile is marked by significant elevations across a number of different scales, indicating a broad range of clinical features. The configuration of the clinical scales suggests difficulties related to somatic complaints, anxiety, depression, suicidality, cognitive and physiological anxiety symptoms, obsessive compulsive disorder, traumatic stress, affective and physiological symptoms of depression, thought disorder, and identity problems.

On the PAI Ms. Doe's anxiety symptoms are elevated at a clinical level (81) and are consistent with a diagnosis of generalized anxiety disorder when taken together with other measures of anxiety (BAI), she also experiences clinical levels of cognitive symptoms of anxiety (82) and physiological symptoms of anxiety (83), as well as borderline scores on affective symptoms of anxiety (68).

Her depression scores on the wholistic depression scale (80) and the subscales of depression, affective (80), physiological (79) are at a clinical level and are consistent with a diagnosis of major depressive disorder. They are consistent other measures of depression (BDI, BAI).

The Trauma symptoms measured on the PAI are consistent with a diagnosis of PTSD when taken together with other measures of PTSD (PCL-5). The suicidality symptoms are consistent with other indicators of suicidality on other measures (CSSRS, ASIQ) as well as history of suicide attempts. Ms. Doe also had elevated scores on the anxiety-related disorders (81) subscale, which includes obsessive-compulsive disorder (73). This score is more likely related to the symptoms she endorsed related to keeping her cell clean and organized, and presented without the compulsive component of OCD.

Ms. Doe also experiences borderline elevation across other scales that contribute to the impairment she experiences. Notably, she experiences somewhat elevated symptoms related to borderline personality disorder but does not experience all symptoms to suggest that a diagnosis of borderline personality disorder alone would be appropriate. On the PAI her score for Identity Problems associated with borderline personality disorder were at a clinical level, this suggests challenges with uncertainty about life goals poor self image and lack of purpose. Her scores on the affective instability scale (57) indicates challenges with emotional regulation, mood swings, and emotionality she experiences. Her borderline score on the negative relationships scale (59) indicates some challenges with interpersonal relationships. These scores were all below even the borderline (60 and above) range.

Her score on the Schizophrenia Thought Disorder Subscale was elevated, but the other scales that make up the composite were not. This subscale includes items that assess confusion, distractibility, and difficulties with concentration and logical communication, as well as loose associations and difficulties with expression. Ms. Doe complained of challenges with concentration and distractibility related to being in solitary confinement for such an extensive time. These challenges may have been detected up by the subtest.

As a note, Ms. Doe's scores on the obsessive-compulsive subscale were elevated. After a clinical interview, it was determined that these scores are not reflective of a diagnosis of OCD, but rather relate to the high level of cleanliness that she maintains in her cell environment. This is not uncharacteristic of people in traumatizing environments to wish to maintain as much control as they can of this environment by keeping it very clean. This may be more related to symptoms of Obsessive-Compulsive Personality Disorder though, they do not meet criteria for full diagnosis.

**<u>Gender Dysphoria in Adolescents and Adults:</u>**
Gender dysphoria diagnoses are rendered after careful and thorough interview and evaluation regarding gender dysphoria symptoms, impairment, and duration of distress. There is no measure or test of dysphoria that is accepted outside of the interview process.

The diagnostic criteria for gender dysphoria has been determined by the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision (DSM-5-TR) (American Psychiatric Association, 2022) as follows:
    A. Marked incongruence between one's experienced/expressed gender and assigned gender, lasting at least 6 months, as manifested by two or more of the following:

        a.  A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics)
        b.  A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics)
        c.  A strong desire for the primary and/or secondary sex characteristics of the other gender
        d.  A strong desire to be of another gender
        e.  A strong desire to be treated as another gender
        f.  A strong conviction that one has the typical feelings and reactions of another gender (or some alternative gender)
    B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Ms. Doe meets all 6 of the criteria, for far more than 6 months, and with clinically significant impairment in functioning. Further, the gender incongruence itself is not a mental health condition, rather, the clinically significant distress associated with the incongruence is the critical requirement for diagnosis with Gender Dysphoria (American Psychiatric Association, 2022).

All scores are consistent with the presentation of Ms. Doe and the history she provided.

Further, there are no other conditions that are considered rule outs for gender dysphoria, not PTSD, Borderline Personality Disorder, antisocial personality disorder, or otherwise. People with all types of mental health

diagnoses experience co-occurring gender dysphoria, and none are rule outs for a diagnosis of gender dysphoria itself.

The DSM-5-TR(CITE) lists six primary differential diagnoses for Gender Dysphoria in Adolescents and Adults:

- Nonconformity to gender roles
- Transvestic disorder (in males)
- Body dysmorphic disorder
- Schizophrenia and other psychotic disorders
- Other disorders of sex development (DSDs)
- Cultural or social identity exploration

In order for the above conditions to be better explanations for the experiences of an individual above and beyond the diagnosis of gender dysphoria the following would have to be true.

  - Some criteria are met, but the full diagnostic threshold isn't.
  - There's conflicting or incomplete information.
  - Other possible causes have not yet been excluded.

First, an alternative diagnosis has to provide a better wholistic categorization and description of the symptoms and has to more clearly define the distress related to the condition than the diagnosis of gender dysphoria. For example, "body dysmorphic disorder is characterized by preoccupation with one or more perceived defects or flaws in physical appearance that are not observable or appear only slight to others, and by repetitive behaviors (e.g., mirror checking, excessive grooming, skin picking, or reassurance seeking) or mental acts (e.g., comparing one's appearance with that of other people) in response to the appearance concerns" (APA, 2022). This is distinct from the diagnosis of gender dysphoria where the source of the distress is the incongruence of individual's own experience of their gender as it compares to their known experience of their gender. People with gender dysphoria can also experience body dysmorphia at the same time as the dysphoria, but dysmorphia alone is not a better explanation for gender-related distress.

Schizophrenia and other psychotic disorders in and of themselves are not a rule out for gender dysphoria, rather, there is a likely greater than chance co-occurrence of gender dysphoria and schizophrenia (Rajkumar, 2014). It is when during the course of schizophrenia a transient alternative gender presents itself in the context of a delusion, and is not present otherwise.

The DSM also specifies that the gender dysphoria cannot be better explained by challenges with physical differences related to a difference in sex development, but do not include gender incongruence or distress and impairment beyond that related to the sex development difference.

It cannot also be associated solely with an erotic focus related to dressing in clothing of another gender alone, as is pathologized by the diagnosis of transvestic disorder.

And finally, it cannot be associated with temporary cultural or social identity exploration. IT must be persistent and related to distress over time.

Ms. Doe's experiences of gender are not better explained by any of these diagnoses. She experiences grave distress, thus simple nonconformity is ruled out. She is not simply dressing in women's clothing, thus transvestic disorder is ruled out. She does not experience any part of her body to be malformed, thus body dysmorphic disorder is ruled out. Her experiences of gender are not occurring in the context of a psychotic event. She does

not have a difference in sex development. Finally, her identity is not a part of a cultural or social exploration, it is a longstanding experience of gender incongruence since a young age with all of the criteria necessary for a full diagnosis of gender dysphoria.

Perhaps equally important, there are no other conditions that are considered rule outs for gender dysphoria, not PTSD, Borderline Personality Disorder, antisocial personality disorder, depression, anxiety or other diagnoses.

It is important to highlight that due to the extensive gender invalidation Transgender and Nonbinary individuals experience, there can be an overlap between gender dysphoria and dysregulation. People who experience emotion dysregulation related to complex PTSD, or borderline personality disorder often are interpreted as being untrustworthy in describing their own experiences of distress due to a perceived over-amplification of distress. However, due to the amplification of distress that is intrinsically linked with chronic gender invalidation, this distress supports a diagnosis of gender dysphoria rather than acting against it. In addition, in diagnosing gender dysphoria, one must remember that people with all types of mental health diagnoses experience co-occurring gender dysphoria, and none are rule outs for a diagnosis of gender dysphoria itself.

## Summary and Key Conclusions

Plaintiff, Ms. Doe (she/her), is a 50-year-old white, bisexual, Transgender woman. Ms. Doe presents with a history of severe mental illness including depression, anxiety and PTSD. She has experienced tremendous distress related to lack of access to gender-affirming medical care while in custody in the Georgia Department of Corrections. This evaluation substantiated the complex array of symptoms that Ms. Doe experiences, and the continuation of impairment she experiences from under treated gender-dysphoria, PTSD, anxiety, and depression symptoms. These mental health disorders exist alongside the challenges she faces in her everyday experience and her attempts to manage her symptoms. Clearly, Ms. Doe's traumatic experiences have contributed substantially to the myriad challenges she faces today. However, her experience of ongoing identity invalidation, and her ongoing denial of access to medically necessary gender-affirming care has had the greatest impact on her wellbeing and clearly leads to the greatest current distress.

*Experiences of Identity-Related Trauma*

Ms. Doe has experienced chronic identity related trauma, which is commonly experienced by people who are Transgender (Bockting et al., 2013). Instances of chronic identity related trauma is well documented in research such as that provided by the United States Transgender Survey in 2015, which surveyed over 28,000 Trans and Nonbinary individuals (James et. al., 2016). The results demonstrated prevalent experiences of verbal abuse, bullying at school, home, and work, family rejection based on gender identity and withdrawal of resources related to holding a Transgender identity. All of these effects are associated with poorer mental and physical health, housing instability, and substance use (Sevelius, 2013).

Research points to the disproportionate burden of discrimination on Transgender people and its direct relationship with PTSD symptoms, even above and beyond other traumatic experiences (Reisner, et al. 2016). In addition, gender dysphoria, like that which Ms. Doe experiences, has been recognized by every major U.S. medical and psychological body. The World Health Organization, American Medical Association, the American Psychiatric Association, the American Psychological Association, and the National Association of Social Workers, among others, concur that medical and social affirmation of gender can greatly reduce psychological distress and improve self-confidence and wellbeing (American Psychiatric Association, 2017;

American Psychological Association, 2024; Madara, 2021; National Association of Social Workers, 2023; World Health Organization, 2024).

*Medically Necessary Care and Informed Consent*

The World Professional Association of Transgender Health (WPATH) is an internationally recognized body of experts who have determined the standards of care for the treatment of gender dysphoria over the past 46 years. The 8th version of the scientifically-based standards of care was published in 2022, and is commonly referred to as SOC8 (Coleman et al., 2022). The guidelines set forth in the SOC8 are used across the world to inform medical care. The American Psychological Association, American Psychiatric Association, the Endocrine Society, American Medical Association, World Health Organization, American Public Health Association, American Academy of Family Physicians, American college of Obstetrics and Gynecology and the American Society of Plastic Surgeons, as well as the National Association of Social Workers all endorse the SOC8 for the treatment of Gender Dysphoria, and the utilization of treatment protocols aligned with SOC8.

The SOC 8 clearly states that there are multiple ways to treat gender dysphoria, which include Hormone therapy to achieve a more feminine or masculine physicality (Coleman et al., 2022, Statement 12.20-12.21), surgery that modifies primary or secondary sex characteristics (such as: chest masculinization, breast implants, vulvovaginoplasty, phalloplasty, body contouring, hair removal or implants, and facial feminization surgery) (Coleman et al., 2022, Statement 12.19), Aspects of social transition (hairstyle, clothing, vocal training, name changes) (Coleman et al., 2022, Statement 11.5), and finally supportive psychotherapy as needed to help to explore gender identity, manage distress and impacts of stigma and treat associated distress not limited to PTSD, anxiety, depression, suicidal ideation, self-harm, and other symptoms (Coleman et al., 2022, Statement 7.8-7.10). These standards of care have also been cited for use by the National Commission on Correctional Healthcare within carceral settings.

Decisions about what type of care patients would like to receive to affirm their gender and reduce their gender dysphoria are made by the patient alone, as only they can determine what gender affirming interventions and support they need, and only they can provide informed consent for the gender affirming medically necessary care they are to receive. Though their decision about care is their own, the decision may be made in concert with the patient's own research about the procedures- either formal or informal, and often is made after consultation with a medical provider who can detail reasonable expectations of surgery, important aspects of preparation and aftercare and any reasonable alternatives or other concerns. Informed consent does not imply that a patient have absolute medical level understanding of all of the complexities of a medical procedure, rather that they have understood the risks, expected outcomes and reasonable available alternatives (National Cancer Institute, n.d.). This is considered standard procedure for consent to any medically necessary surgical care and is aligned with informed consent practices across medical interventions. Given the often-lengthy evaluative process of accessing medical care for Transgender and Nonbinary people, they have often had more opportunities to bolster and prove their knowledge of the gender affirming care that they are wishing to receive. For people who are incarcerated, the bar for accessing care is frequently set even higher than for those in the community, they have often endured years between asking for medically necessary gender affirming care and attaining it, or hoping to, and have had ample time to consider their options and decisions around gender-affirming interventions.

Finally, it is important to address the actual risks of gaining access to gender-affirming surgical care. Given the current climate emphasizing singular stories of regret about the experience of transition, it is important to highlight the actual rates of regret about surgery and their source. The following is a list of surgeries people

undergo followed by their known rates of regret and satisfaction: Top surgery (0-4% regret), vaginoplasty (0-8% regret, 78-100, 5 satisfaction) phalloplasty (0% regret, 83-100% satisfaction), Facial gender affirming surgery 72-100% satisfaction) (Coleman et al., 2022). It is important to note that the rates of regret are typically associated with the surgical outcome and not the surgery itself. As many of these surgeries allow for revisions, that rate of regret due to surgical outcome can be improved.

*Gender-Affirming Care in Carceral Environments*

Transgender and Nonbinary People in custody often face extraordinary difficulty in receiving necessary gender affirmation. Some of this challenge is due to the gendered and binary nature of most carceral environments. Few states have housing that provides a more gender-affirming environment such as housing units for Trans and Nonbinary individuals, or placement of Transgender individuals in gender aligned housing (e.g. placing Trans Women in Women's facilities). This means that most incarcerated Trans and nonbinary people will not be housed in gender alignment, and will not be able to access the items readily provided for women in women's facilities (e.g. bras, gender affirming underwear, makeup, hairstyling products, toiletry items, and gender affirming clothing). Additionally, not being placed in aligned housing usually means that people are not searched by gender-aligned guards, and are frequently misgendered, harassed, abused or unsafe (Sylvia Rivera Law Project, 2007 & Sylvia Rivera Law Project & Take Root Justice, 2021).

The ability to socially transition is hampered multi-fold. First, as detailed above, access to items of social transition is often out of reach; second, if someone is not placed in gender-aligned housing, social transition may render them unsafe and therefore more vulnerable to harassment and abuse;  third, there may be lengthy processes of gaining approval for surgeries that make it almost impossible to access surgeries. For example, some carceral environments require surgery be approved by committees made up of individuals who often have little to no knowledge of gender affirming care, or may be populated by individuals who prevent access to gender affirming care via overly stringent or uncompromising barriers that are not aligned with the current standards of care.

Another barrier within custody-based access of gender affirming care is the focus on potential for malingering. As prison systems often center their determinations about detainees in perceived risk, this fear can override access to care that in other settings would be typically delivered without question. Therefore, people wishing to access care in carceral settings who experience other mental health symptoms such as anxiety, depression, psychosis, PTSD, Emotion Dysregulation, borderline personality disorder, suicidal ideation, self-harm and other personality disorders, are often regarded with higher scrutiny. These symptoms and their associated diagnoses should not serve as automatic barriers to care, nor should they be expected to be resolved before a person receives care. Rather, they should be understood as not only able to coexist, but often as being accelerated by the related distress of not gaining access to medically-necessary gender affirming care, care that serves to ameliorate the mental and emotional distress related to untreated gender dysphoria.

Prison environments often foster skepticism about the intentions of people being held within them. However, I would suggest that this skepticism is a product of the environment itself and should not be used to restrict access to care. These environments are deliberately restrictive, and people have little means to get their needs met outside of what is provided. This can result in high tensions, and beliefs that people are manipulating the restrictive system to gain access to care. Thus, there is a high expectation that individuals all present with antisocial personality disorder by virtue of being in a prison or by virtue of the behaviors that may be implicitly required to survive there, or having engaged in criminalized behaviors that led to a prison sentence.

There are three important critiques of this assumption. First, Transgender identities are some of the most maligned in our society, and transgender people face intense scrutiny, harassment and abuse. Therefore, it is highly unlikely that someone would sustain a ruse of embodying such a marginalized identity in order to receive the scrutiny this identity provides. Second, people can be diagnosed with antisocial personality disorder and still deserve access to medically-necessary gender-affirming care. Third, antisocial personality disorder is not a named rule out of gender dysphoria in the DSM-V meaning that it is not considered a diagnosis that would be conflated with that of gender dysphoria.

*DSM-V Diagnostic Criteria for PTSD (American Psychiatric Association, 2013)*

A diagnosis of PTSD is made if an individual meets the required criteria as designated in the Diagnostic and Statistical Manual of Psychiatric Disorders. Meeting these criteria first requires exposure to a traumatic stressor. Subsequently, individuals must experience impairment from the following symptom clusters: intrusive symptoms and reexperiencing, avoidance/numbing, changes in mood and cognitions, and arousal symptoms such as hypervigilance.

The "reexperiencing" symptom cluster involves the persistent and distressing reexperiencing of the traumatic event, including frequent memories of the trauma, distressing dreams, and flashbacks in which the person vividly relives the traumatic experience, or other intense psychological distress. For example, a survivor of a physical assault may experience frequent recollections of particularly disturbing aspects of the accident (*e.g.*, a memory of how the street looked where they were assaulted, or how their assailant smelled when the assault occurred).

The "avoidance" cluster is characterized by the trauma survivor's persistent avoidance of thoughts, feelings, activities, or other reminders associated with the trauma. For example, the assault survivor might refuse to walk down certain streets or may develop strategies to circumvent similar situations, such as never going out when it is dark, or always staying home.

The "negative cognitions and mood" cluster involves negative changes in feelings and alterations in mood. This may relate to a change in perceived ability to experience emotions, such as loving, happy, or carefree emotions. It may also relate to a feeling of numbing emotions, diminished interest in activities, estrangement from others or an inability to remember specific parts of the traumatic event. Additionally, it relates to a change in cognitions or beliefs about one's self, others and the world.

The final "arousal" cluster involves symptoms of increased behavioral activation, such as sleep disturbances, irritability, or being very watchful of one's surroundings, and always looking for danger (hypervigilance). It can also relate to risk taking, self-harming or aggressive behavior. It also relates to the behavioral fight or flight components of increased trauma reactivity.

*Experiences of Childhood Trauma*

As noted above, Ms. Doe developed complex PTSD in part due to her experience of childhood trauma. To understand the impact of childhood trauma, experts in this area refer to the Adverse Childhood Experiences Scale. This scale includes events related to abuse, neglect, and family dysfunction. The adverse events include parental separation, incidents of domestic violence, substance abuse, mental illness, parent criminal behavior, psychological, physical, sexual, and emotional abuse, and physical and emotional neglect. Though she experienced stability in her childhood home after her adoption, she experienced abuse  in her family of origin, and identity related invalidation from a young age.

Childhood abuse is associated with neurobiological dysfunction and negative mental health outcomes across the lifespan (Anda et al. 2006; Felitti et al. 1998, 2010).  The greater the frequency and intensity of exposure, the greater the neurobiological impact and mental health consequences (Felitti et al. 2010; Pietrek et al. 2013; Schalinski et al., 2016; Weber et al., 2008). Importantly, these traumatic experiences have an impact on adult behaviors, emotions and beliefs and are not simply relegated to childhood. Namely, neurobiological changes impact the structure of the brain, resulting in changes in sensitivity to stress and challenges in emotion regulation, or the ability to use healthy strategies to regulate intense emotions and respond appropriately to situations in adulthood (Teicher et al. 2013, 2016). Trauma is also associated with social immaturity and difficulties with age-appropriate decision making. This is believed to be due to an interruption in maturation, as trauma symptoms and ongoing trauma make it challenging to integrate new experiences into one's life (van der Kolk, 2015).

*Disabling Distress*

As defined by the American Disabilities Association (ADA) a "disability" is "a physical or mental impairment that substantially limits one or more major life activities" (Americans with Disabilities Act, 1990).

The diagnosis of gender dysphoria has evolved significantly from the far more pathologizing diagnoses utilized in the past. A diagnosis of gender dysphoria, by definition, requires clinically significant distress about the gender incongruence that individuals experience, or has to be associated with clinically significant impairment in social, occupational, or other important areas of functioning (APA, 2022). Dysphoria and gender incongruence itself can lead to tremendous disability in functioning including inability to work, maintain relationships, care for one's self, or engage in activities to maintain mental health for many transgender and nonbinary individuals. The distress of dysphoria and incongruence is associated with the tremendous invalidation that people experience from multiple sources, including societal rejection of gender identities, pressure to fit in to social norms about gender identities, lack of medical and surgical treatment or undertreatment of medically treatable dysphoria symptoms, and lack of ability to fully socially transition (name change, pronouns, attire, hairstyle and grooming, access to gendered facilities, and more).

The manifestation of this distress can be incredibly disabling to mental health, and include depression, anxiety, self-harm, suicidal ideation and attempts, and symptoms of PTSD. Depression, anxiety and PTSD are already listed as mental health experiences that can qualify as a disability when they substantially limit major life activities. Generally, attempts at improvement of this distress include treatment with therapy and psychopharmacology. While these treatments can ameliorate some of the associated symptoms by building skills to cope with complex emotions and building ability to self-advocate for one's needs, they are unable to address the underlying lack of treatment of gender incongruence, lack of social acceptance, and lack of access to social transition. Therefore, debilitating distress remains.

Finally, because the sources of distress with gender identity are both internal (for example: the incongruence itself, a desire for change and acceptance) as well as external (for example: lack of fitting in to cultural norms, non- acceptance, denial of access to care), the distress is wholistic. This wholistic distress amplifies the disabling nature of the dysphoria and incongruence, and creates its own circumstances that are deteriorating and impairing of functioning.

*Conclusions with Respect to Ms. Doe*

As described above, Ms. Doe meets the criteria for gender dysphoria. She also meets criteria for PTSD and complex PTSD as a result of her childhood trauma, and her experiences in the Georgia Department of Corrections. She also meets criteria for generalized anxiety disorder, and major depressive disorder, severe, recurrent. She experiences suicidal ideation, suicide attempts, self-harm, and tremendous distress that are not only symptoms of her existing diagnoses but are exacerbated by her ongoing denial of medically necessary gender affirming medical and surgical care. The continued, unreasonable denial of access to this care is certainly responsible for much of this distress. It is my belief that the continued denial of her access to this care is beyond the pale and certainly has no medical or mental health basis. Ms. Doe is certainly able to provide informed consent to this treatment as she understands well the risks, benefits and alternatives to receiving surgical care. There is no mental health concern that would allow for denial of her access of care. There is additionally no justifiable reason why she cannot provide informed consent to her surgical care.

Despite all of this, Ms. Doe wishes to lead a life in which she can be her true self and can fully embody her gender. She wishes to reduce the harassment that she is facing daily and longs to feel less distressed, and more regulated. It is my belief that this will only be ameliorated by providing her access to gender affirming HRT, surgery, gender affirmation items, same gender pat downs and gender-affirming housing.

Despite all of this, Ms. Doe longs for a life without the distress related to gender dysphoria, ongoing rejection of treatment and the severe mental health crises she experiences related to gender dysphoria and lack of access to care. She also wishes to be able to live in a place where she is affirmed in her identity. She wishes to understand if her mental health symptoms can be treated after access to gender-affirming care is granted, and hopes to find a therapist who can thoughtfully work with her to regain "typical" functioning in her life. She is beginning to be aware that this will entail a tremendous amount of work, and may also take a long time. To this end, Ms. Doe should be provided access to extensive, comprehensive complex trauma treatment as soon as possible in order to swiftly aid her recovery, reduce her tremendous mental health distress and aid her return to "typical" functioning. She knows that as long as she is not granted access to gender affirming surgery, medically aligned hormone care, and is continually held in solitary, she will not be able to make the mental health gains that she would be able to make if these pressures were relieved.

Rachel Lynn Golden, PhD
New York State Psychology License #022898
New Jersey State Psychology License #35SI00673500
Vermont State Psychology License #048.0135154
Texas State Psychology License #40478
Washington, D.C. Psychology License # PSY200001674
PSYPACT Authority to Practice Interjurisdictional Telepsychology (APIT) Mobility #20176
PSYPACT Temporary Authority to Practice Mobility # 20716

## Score Results

### Social-Emotional Functioning

<u>Definition of Terminology:</u>
T: T-Score (Mean = 50, Standard Deviation = 10)
RS: Raw Score

**Post-Traumatic Stress Disorder**
Post Traumatic Diagnostic Scale-5 (PDS-5)
Total = 57, Greater than the cutoff score of 28 (Foa et al., 2016)

**Beck Depression Inventory** = 43 indicating Severe Depression

**Beck Anxiety Inventory total** = 51 indicating Severe Anxiety

**CAARS – Self-Report, Long Version** (T-Scores)
*Scores ≥ 70 is Clinically Significant ***
*Score 60-69 is Borderline **
     A.     Inattention/memory problems: 43
     B.     Hyperactivity/restlessness: 64*
     C.     Impulsivity/emotional lability: 45
     D.     Problems with self-concept: 48
     E.     DSM-IV inattentive symptoms:  44
     F.     DSM-IV hyperactive-impulsive symptoms: 51
     G.     DSM-IV ADHD symptoms total: 48
     H.     ADHD index: 51

**C-SSRS**: very high risk

**ASIQ Total** = T=114, 99th percentile, Raw score 82, above threshold

**PAI (Personality Assessment Inventory)**
*T ≥ 70 = Clinically Significant ***
*50-69 = Borderline/at risk*

| Validity Scales & Subscales | | | |
|---|---|---|---|
| Inconsistency: 46 | | Negative Impression: 73* | |
| Infrequency: 63 | | Positive Impression: 48 | |
| **Clinical Scales & Subscales** | | | |
| Somatic Complaints: 77* | | Paranoia: 59 | |
| *Conversion* | 81 | *Hypervigilance* | 60 |
| *Somatization* | 70 | *Persecution* | 60 |
| *Health Concerns* | 71 | *Resentment* | 52 |
| Anxiety: 81* | | Schizophrenia: 56 | |

| | | | |
|---|---|---|---|
| *Cognitive* | 67 | *Psychotic Experiences* | 43 |
| *Affective* | 80 | *Social Detachment* | 46 |
| *Physiological* | 79 | *Thought Disorder* | 75 |
| Anxiety-Related Disorders: 81* | | Borderline Features: 61 | |
| *Obsessive-Compulsive* | 73 | *Affective Instability* | 57 |
| *Phobias* | 56 | *Identity Problems* | 74 |
| *Traumatic Stress* | 87 | *Negative Relationships* | 59 |
| Depression: 80* | | *Self-Harm* | 41 |
| *Cognitive* | 67 | Antisocial Features: 50 | |
| *Affective* | 80 | *Antisocial Behaviors* | 59 |
| *Physiological* | 79 | *Egocentricity* | 42 |
| Mania: 59 | | *Stimulus Seeking* | 45 |
| *Activity Level* | 60 | Alcohol Problems: 41 | |
| *Grandiosity* | 51 | Drug Problems: 48 | |
| *Irritability* | 60 | | |
| **Treatment Consideration Scales & Subscales** | | | |
| Aggression: 42 | | Suicidal Ideation: 109* | |
| *Aggressive Attitude* | 34 | Stress: 59 | |
| *Verbal Aggression* | 42 | Nonsupport: 64 | |
| *Physical Aggression* | 56 | Treatment Rejection: 38 | |
| **Interpersonal Scales & Subscales** | | | |
| Dominance: 56 | | Warmth: 51 | |

References

American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.). https://doi.org/10.1176/appi.books.9780890425596

American Psychiatric Association. (2022). Diagnostic and statistical manual of mental disorders (5th ed., text rev.). https://doi.org/10.1176/appi.books.9780890425787

Americans With Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. (1990). https://www.ada.gov/pubs/adastatute08.htm

Anda, R. F., Felitti, V. J., Bremner, J. D., Walker, J. D., Whitfield, C., Perry, B. D., et al. (2006). The enduring effects of abuse and related adverse experiences in childhood. A convergence of evidence from neurobiology and epidemiology. *Eur Arch Psychiatry Clin Neurosci., 256*, 174–86. 10.1007/s00406-005-0624-4

Bockting W., Miner M., Swinburne R. R., Hamilton A., Coleman E. (2013). Stigma, Mental Health, and Resilience in an Online Sample of the US Transgender Population. *Am. J. Public Health* 103, 943–951. 10.2105/AJPH.2013.301241

Coleman, E., Radix, A. E., Bouman, W. P., Brown, G. R., de Vries, A. L. C., Deutsch, M. B., Ettner, R., Fraser, L., Goodman, M., Green, J., Hancock, A. B., Johnson, T. W., Karasic, D. H., Knudson, G. A, Leibowitz, S. F., Meyer-Bahlburg, H. F. L., Monstrey, S. J., Motmans, J., Nahata, L., Nieder, T. O…. Arcelus, J. (2022). Standards of care for the health of transgender and gender diverse people, version 8. *International Journal of Transgender Health, 23*(sup1), S1-S259. doi: 10.1080/26895269.2022.2100644

Felitti, V. J. & Anda, R. F. (2010). The relationship of adverse childhood experiences to adult medical disease, psychiatric disorders and sexual behavior: implications for healthcare. In R. A. Lanius, E. Vermetten, & C. Pain (Eds.), *The Impact of Early Life Trauma on Health and Disease: The Hidden Epidemic* (pp. 77-87). Cambridge University Press. https://doi.org/10.1017/CBO9780511777042.010

Felitti, V. J., Anda, R. F., Nordenberg, D., Williamson, D. F., Spitz, A. M., Edwards, V., Koss, M. P., & Marks, J. S. (1998). Relationship of childhood abuse and household dysfunction to many of the leading causes of death in adults. The Adverse Childhood Experiences (ACE) Study. *Am J Prev Med., 14*(4), 245–58. 10.1016/S0749-3797(98)00017-8

Foa, E. B., McLean, C. P., Zang, Y., Zhong, J., Powers, M. B., Kauffman, B. Y., ... Knowles, K. (2016). Psychometric properties of the Posttraumatic Diagnostic Scale for DSM-5 (PDS-5). *Psychological Assessment, 28*, 1166-1171. doi:10.1037/pas0000258

James S. E., Herman J. L., Rankin S., Keisling M., Mottet L., Anafi M. (2016). *The Report of the 2015 U.S. Transgender Survey*. https://transequality.org/sites/default/files/docs/usts/USTS-Full-Report-Dec17.pdf

National Cancer Institute. (n.d.). *NCI Dictionary of Cancer Terms*. Retrieved August 15, 2025, from https://www.cancer.gov/publications/dictionaries/cancer-terms/def/informed-consent

Pietrek, C., Elbert, T., Weierstall, R., Muller, O., & Rockstroh, B. (2013). Childhood adversities in relation to psychiatric disorders. *Psychiatry Res., 206,* 103–10. 10.1016/j.psychres.2012.11.003

Reisner S. L., Hughto J. M. W., Gamarel K. E., Keuroghlian A. S., Mizock L., Pachankis J. E. (2016). Discriminatory experiences associated with posttraumatic stress disorder symptoms among transgender adults. *J. Couns. Psychol.* 63, 509–519. 10.1037/cou0000143

Schalinski, I., Teicher, M. H., Nischk, D., Hinderer, E., Müller, O., & Rockstroh, B. (2016). Type and timing of adverse childhood experiences differentially affect severity of PTSD, dissociative and depressive symptoms in adult inpatients. *BMC Psychiatry, 16*(295). 10.1186/s12888-016-1004-5

Sevelius J. M. (2013). Gender Affirmation: A Framework for Conceptualizing Risk Behavior among Transgender Women of Color. *Sex roles*, *68*(11-12), 675–689. https://doi.org/10.1007/s11199-012-0216-5

The Sylvia Rivera Law Project. (2007). *"It's War In Here": A Report on The Treatment of Transgender and Intersex People In New York State Men's Prisons*. https://srlp.org/wp-content/uploads/2007/04/Its-War-In-Here-full-version.pdf

The Sylvia Rivera Law Project & Take Root Justice. (2021). It's Still War In Here: A Statewide Report on The Trans, Gender Non-Conforming, Intersex (TGNCI) Experience In New York Prisons and The Fight for Trans Liberation, Self-Determination, and Freedom. https://srlp.org/wp-content/uploads/2025/01/Its-Still-War-In-Here-1-2.pdf

Teicher, M. H. & Samson, J. A. (2013). Childhood maltreatment and psychopathology: a case for ecophenotypic variants as clinically and neurobiologically distinct subtypes. *Am J Psychiatry, 170*, 1114–33. 10.1176/appi.ajp.2013.1207095736.

Teicher, M. H. & Samson, J. A. (2016). Annual research review: enduring neurobiological effects of childhood abuse and neglect. *J Child Psychol Psychiatr., 57*, 241–66. 10.1111/jcpp.12507

Van der Kolk, B. A. (2015). *The body keeps the score: brain, mind, and body in the healing of trauma.* New York, New York, Penguin Books.

Weber, K., Rockstroh, B., Borgelt, J., Awiszus, B., Popov, T., Hoffmann K, Schonauer, K., Watzl, H., Pröpster, K. (2008). Stress load during childhood affects psychopathology in psychiatric patients. *BMC Psychiatry, 8*(63). 10.1186/1471-244X-8-63

Appendices

A.  Prior Testimony
B.  Compensation
C.  Curriculum Vitae

## APPENDIX A

PRIOR TESTIMONY

1.      *People v. Terrance S.*, Ind. No. 2849/2017 (Kings County Crim. Ct.)

2.      Docket No. NN-22346-18 (Bronx Fam. Ct. Sept. 4, 2018)

## **APPENDIX B**

COMPENSATION

I am being compensated at a rate of $600 per hour for all hours worked on this case, including evaluation and testimony.

## APPENDIX C

CURRICULUM VITAE

**RACHEL LYNN GOLDEN, Ph.D.**
**Curriculum Vitae**

**Date of Preparation:** 10/10/2025

**Personal Data:**
Name:           Rachel Lynn Golden, Ph.D.
Address:        80 Fifth Avenue
                New York, NY  10011
Telephone:      646-460-0097
E-mail:         dr.golden@golden-psychology.com

**Academic Appointments:**
1/2022 – 10/2022    Assistant Adjunct Professor, Columbia Teacher's College, Columbia University, New York, NY

7/2019 – 7/2021     Assistant Professor of Clinical Medical Psychology (in Psychiatry) Columbia University Irving Medical Center, Department of Psychiatry, New York, NY

**Other Work Experience:**
10/2018 – present   Founder, Chief Executive Officer, Mental Health Director, Golden Psychology PLLC, New York, NY
- Direct private practice specializing in trauma diagnosis and treatment, providing Evidence-Based Therapies primarily to gender and sexuality-expansive individuals and their families.
- Provide Ketamine Assisted Psychotherapy.
- Provide training and supervision in Evidence-Based Therapies and supervision for a team of 5 clinicians.

Expert Consultation
- Provide expert evaluation and testimony.
- Lead a team in providing comprehensive psychosocial evaluations for court-involved individuals.
- Provide 18b mitigation reports, alternative to incarceration letters and expert testimony in family, civil, criminal cases in city, state, and federal courts.

Justice, Equity, Diversity and Inclusion Consulting
- Provide research consulting services and trainings for businesses building LGBTQ2IA+ competency and strengthening the LGBTQ2IA+ inclusivity of their practice.
- Consult on projects for corrections based LGBTQ2IA+ programs and services, including for the Multidisciplinary Association for Psychedelic Studies (MAPS) psychedelic assisted psychotherapy programs and services, and the Elmhurst Hospital Infectious Disease Clinic in Queens, New York.

Rachel Lynn Golden, Ph.D. 2

- Perform a review of current programs and practices regarding gender and sexuality-affirming care. Provide reports with tailored trainings to advance the provision of gender and sexuality affirming care.

6/2025- present  Mental Health Director, Bassett Hospital, Gender Wellness Center, Oneonta, NY
- Serve as Mental Health Director of Bassett Health's Gender Wellness Center in Oneonta, NY.
- Lead a team of 5 staff in completing grant deliverables for a New York State Office of Mental Health Grant.
- Supervise 4 clinicians in the provision of gender-affirming care.
- Integrate staff and interns on a multidisciplinary team serving Transgender and Nonbinary New Yorkers.

1/2019 – 6/2021  Licensed Psychologist, New York State Transgender Identity Program, Central New York Psychiatric Center - Office of Mental Health, New York, NY
- Develop and deliver statewide training initiatives on gender-affirming clinical care.
- Provide gender-affirming therapy for Transgender and nonbinary inmates.
- Develop research protocol and model of care.
- Collaborate with Statewide Sex Offender Treatment Program to develop gender-affirming models of care including informing directives and improving access to gender-affirming hormones and supplies.
- Develop and lead Externship program to train psychology trainees in the provision of gender -affirming care in a forensic setting.

9/2017 – 11/2018  Psychologist, Special Needs Clinic, Department of Psychiatry, New York Presbyterian Hospital, Columbia University Medical Center, New York, NY
- Provided therapy for individuals, and families of individuals living with HIV/AIDS and chronic medical illness.

**Education:**

1/2014 – 8/2017  PhD, Clinical Psychology, University of Denver, Denver, CO
9/2011 – 1/2014  MA, Clinical Psychology, University of Denver, Denver, CO
9/2008 – 5/2010  BA, Psychology, University of Colorado, Denver, Denver, CO, *summa cum laude*
9/1997 – 6/2001  BA, Romance Languages, Carleton College, Northfield, MN, *cum laude*

**Training:**

7/2016 – 6/2017  Psychology Intern, Mount Sinai Adolescent Health Center, Icahn School of Medicine, New York, NY
9/2014 – 11/2015  Psychology Extern, Child and Adolescent Outpatient Behavioral Health Services, Denver Health Medical Center, Denver, CO

**Licensure and Board Certification:**
Licenses:
New York State Psychology License #022898 (Issued 9/24/2018; valid through 2/28/2027)

Pennsylvania State Psychology License #PS019358 (Issued 08/17/2021; valid through 11/30/2025)

New Jersey State Psychology License #35SI00673500 (Issued 7/15/2022; valid through 6/30/2027)

Vermont State Psychology License #048.0135154 (Issued 9/25/2024; valid through 1/31/2026)

Texas State Psychology License #40478 (Issued 11/20/2024; valid through 03/31/2027)

Washington, D.C. Psychology License # PSY200001674 (Issued 12/30/2024; valid through 03/31/2027)

PSYPACT Authority to Practice Interjurisdictional Telepsychology (APIT) Mobility #20176 (Issued 1/24/25; valid through 1/24/2026)

PSYPACT Temporary Authority to Practice Mobility # 20716 (Issued 1/22/2025; valid through 1/22/2026)

**Honors and Awards:**

Postdoctoral Awards:
- 2018 Hemera Fund, Zen Mountain Monastery (Mount Tremper, NY)
  Awarded to mental health practitioners to learn mindful practice in therapy.  Attended "Introduction to Zen Training Weekend" 2/2019

Predoctoral Awards:

- 2016 Outstanding Teaching Award, Department of Psychology, University of Denver, Denver, CO

- 2015 Travel Award (Conference Presentation), Graduate Affairs Committee, University of Denver, Denver, CO

- 2014 Travel Award (Conference Presentation), Office of the Graduate Students of the Four Faculties, University of Denver, Denver, CO

- 2014 Travel Award (Conference Presentation), Graduate Affairs Committee, University of Denver, Denver, CO

- 2013 Scholarship Hours Award (Additional Coursework), University of Denver, Denver, CO

- 2013 Travel Award (Conference Presentation), Office of the Graduate Students of the Four Faculties, University of Denver, Denver, CO

- 2013 Travel Award (Conference Presentation), Graduate Affairs Committee, University of Denver, Denver, CO

- 2012 Scholarship Hours Award (Additional Coursework), University of Denver, Denver, CO

**Professional Organizations and Societies:**
- Memberships and Positions:
  - American Psychological Association (current member)
    - APA Division 53: Society of Clinical Child and Adolescent Psychology (past member)
    - APA Division 54: Society of Pediatric Psychology (past member)
    - APA Division 44: Society for the Psychological Study of Lesbian, Gay, Bisexual and Transgender Issues (past member)
  - Gender Affirmative Working Group (current member)

Rachel Lynn Golden, Ph.D. 4

- o Society for Research on Adolescence (past member)
- o Society for Research on Child Development (past member)
- o World Professional Association of Transgender Health (current member)
- Consultative
  - o 2023 – present Trans Prisoners' Rights Coalition of New York. Coalition member working towards the passing of the Gender Identity Respect, Dignity and Safety act (G.I.R.D.S) bill to allow Transgender and Nonbinary individuals held in New York State Prisons access to gender-affirming commissary items, gender-affirming housing, and clothing.
  - o 2023 – present Transgender Health Advocates of New York (THANY). Coalition member working to advance health equity for Transgender and Nonbinary individuals in the State of New York.
  - o 2022 – present New York City Task Force on Issues Faced by TGNCNBI People in Custody. Serve as a part of the Task Force to address the crises facing TGNCNBI people housed in New York City Jails.
  - o 2022 – present National Transgender Prison Management/Clients/Advocates Group. Attend monthly meetings to discuss concerns and provide support to clinicians delivering gender-affirming care in jails and prisons across the United States.
  - o 2021 – 2023 Transgender Nonbinary Intersex (TGNBI) Housing and Facility Navigation Committee and Gabby Foster Reentry Group. Provide consultation and advocacy along with lawyers, community advocates, and providers for the New York City Department of Correction (DOC) about housing and wellbeing of TGNBI individuals held in New York City jails and upon release.
  - o 2020 – present Advisory Board Member, Fitwel Covid-19 Viral Response Module, *Fitwel is the world's leading certification system committed to building health for all™, originally created by the U.S. Centers for Disease Control (CDC) and Prevention and U.S. General Services Administration. The Fitwel Viral Response module provides annual, third-party certification of policies and practices informed by the latest public health research on mitigating the spread of contagious diseases.*
- Journal Reviewer
  - o 2020 – European Child and Adolescent Psychiatry

**Fellowship and Grant Support:**
- Past Support:
  - o 2023 Healing Hearts Changing Minds Award (Research), Healing Hearts Changing Minds, Boston, MA
  - o 2016 Graduate Studies Dissertation Award (Dissertation Research), Office of Graduate Studies, University of Denver, Denver, CO
  - o 2013 – 2014 Vice Provost Doctoral Fellowship for Inclusive Excellence, Graduate School Support, University of Denver, Denver, CO
  - o 2014 Lawrence Miller Fellowship Award (Research Methodology Training), University of Denver, Denver, CO
  - o 2011 Graduate Studies Doctoral Fellowship, University of Denver, Denver, CO
  - o 2010 Faculty Undergraduate Research Grant, University of Colorado, Denver, Denver, CO

**Educational Contributions:**
- Direct Teaching/Precepting/Supervising:
  - 2021 – present Mental Health Director. Develop program structure, provide training and clinical supervision for social workers, and psychology trainees specializing in gender affirming care, DBT, Trauma-informed care, and Ketamine Assisted Psychotherapy, Golden Psychology PLLC, New York, NY.
  - 2019 – 2021 Externship and Volunteer Program Supervisor. Develop program structure, provide didactics on gender affirming care in a forensic setting, provide clinical supervision for psychology externs, supervise volunteers, Office of Mental Health, New York State Transgender Identity Program, New York, NY.
  - 2019 Research Supervisor, Provide 1 hour per week of research supervision to a postdoctoral fellow, Columbia University Irving Medical Center, New York, NY.
  - 2016 – 2017 Extern Supervisor, Provided 1 hour/week of individual clinical supervision for psychology extern, Mount Sinai Adolescent Health Center, New York, NY.
  - 2015 Co-Instructor, *Gender and Sexuality in Society* (undergraduate level) for 3 hours/week to 35 students, Spring and Fall, University of Denver, Denver, CO.
  - 2014 – 2015 Clinical Supervision Trainee, Provided 2 hours/week of individual clinical supervision for 2 psychology students, University of Denver, Denver, CO.

**Community Education:**
1. 2025 – Served as a speaker for New Pride Agenda. Provided training regarding gender and sexuality-affirming care protections with the updated Shield Law. Provided reflections on and tools for protecting providers of gender-affirming care.
   1. **Golden, R. L.** (2025, May). New Pride Agenda: Shield Law 2.0 Educational Teach-In. Guest speaker to providers and community members, New York, NY.
2. 2024 – Served as a speaker at Montefiore Hospital. Provided training regarding gender and sexuality-affirming care. Provided reflections on and tools for expanding practices to be gender inclusive. Served as a speaker for New Pride Agenda. Provided training regarding gender and sexuality-affirming care protections with the updated Shield Law. Provided reflections on and tools for protecting providers of gender-affirming care.
   1. **Golden, R. L.** (2024, December). New Pride Agenda: Protecting Progress, Advancing Protections. Guest speaker to providers and community members, New York, NY.
   2. **Golden, R. L.** (2024, March). KAP with gender and sexuality-expansive individuals. Guest lecturer to Vancouver Island University Psychedelics Program students, Nanaimo, British Columbia, Canada.
   3. **Golden, R. L.** (2024, March). *Care for LGBTQ2IA+ youth.* Guest lecturer to Montefiore Hospital psychiatry department, Queens, NY.
3. 2023 – Served as a speaker at Elmhurst Hospital. Provided training regarding letter writing for Transgender and gender expansive individuals as well as gender-affirming care. Provided reflections on and tools for expanding practices to be gender inclusive.
   1. **Golden, R. L.**, Rinaldi-Rose, R. (2023, June). *Gender-affirming letter writing and care.* Guest lecturer to Elmhurst Hospital Psychology and medical department, Queens, NY.

4.  2022 – Served as a speaker to community organizations, and the Legal Aid Society. Provided information regarding mental health, trauma, gender identity and HIV/AIDS related care, as well as affirming care of court-involved clients. Provided reflections on and tools for expanding practices to be gender inclusive.
    1.  **Golden, R. L.** (2022, April). *Affirming sexual orientation, gender identity and gender expression in client care.* Guest lecturer to the Legal Aid Society, NY, NY.
    2.  **Golden, R. L.**, Langer, S. J. (2022, February). *An intersectional approach to gender care.* Guest lecturer to Columbia University Teacher's College. Columbia University, NY, NY.
5.  2021 – Served as a speaker to community organizations, and an academic medical center. Provided information regarding mental health, trauma, gender identity and HIV/AIDS related care. Provided reflections on and tools for expanding practices to be gender inclusive.
    1.  **Golden, R. L.** (2021, November). *Affirming sexual orientation, gender identity and gender expression in client care.* Guest lecturer (total of four trainings for managers and staff), The Legal Aid Society, LGBTQ+ Law and Policy Unit, New York, NY.
    2.  **Golden, R. L.** (2021, June). *Addressing barriers for the LGBTQ+ population.* Guest lecturer to Columbia University HIV Behavioral Health Training Program, AIDS Center of Queens County, Queens, NY.
    3.  **Golden, R. L.** (2021, May). *An intersectional approach to therapy with Transgender adolescents and their families, Part 2.* Guest lecturer to Lucy Wicks Clinic for HIV Mental Health, New York Presbyterian/Columbia University Medical Center, New York. NY.
    4.  **Golden, R. L.** (2021, April). *An intersectional approach to therapy with Transgender adolescents and their families.* Guest lecturer to Mount Sinai Adolescent Health Center psychology trainees, New York, NY.
    5.  **Golden, R. L.** (2021, March). *An intersectional approach to therapy with Transgender adolescents and their families.* Guest lecturer to Pace University Department of Psychology trainees, New York, NY.
    6.  **Golden, R. L.** (2021, February). *An intersectional approach to therapy with Transgender adolescents and their families, Part 1.* Guest lecturer to Lucy Wicks Clinic for HIV Mental Health, New York Presbyterian/Columbia University Medical Center, New York. NY.
    7.  **Golden, R. L.** (2021, February). *Affective disorders in gender and sexual orientation expansive individuals.* Guest lecturer to University of Alcala (Madrid). Madrid, Spain.
    8.  **Golden, R. L.**, Langer, S. J. (2021, March). *An intersectional approach to gender care.* Guest lecturer to Columbia University Teacher's College. Columbia University, New York. NY.
    9.  **Golden, R. L.** (2021, March). *An intersectional approach to therapy with Transgender adolescents and their families.* Guest lecturer to Columbia University School of Nursing Individual Psychotherapy: Theories and Techniques class. Columbia University Medical Center, New York. NY.
6.  2020 – Served as a speaker to community organizations, and an academic medical center. Provided information regarding mental health, trauma, gender identity and HIV/AIDS related care. Provided reflections on and tools for expanding practices to be gender inclusive.
    1.  **Golden, R. L.** (2020, May). *Addressing barriers for Transgender persons with HIV.* Guest lecturer to Columbia University HIV Behavioral Health Training Program, NJ.
7.  2019 – Served as a speaker to community organizations and an academic medical center. Provided information regarding mental health, trauma, gender identity and HIV/AIDS related care. Provided reflections on and tools for expanding practices to be gender inclusive.

Rachel Lynn Golden, Ph.D. 7

1. **Golden, R. L.** (2019, December). *Understanding and addressing the needs of gender diverse patient inmates.* Guest lecturer New York State Office of Mental Health, Central New York Psychiatric Center mental health providers.
2. **Golden, R. L.**, & Byne, W (2019, September *Understanding and addressing the needs of gender diverse patient inmates.* Guest lecturer New York State Office of Mental Health Psychiatrists and Unit Chiefs.
3. **Golden, R. L.** (2019, September). *LGBTQ cultural competency.* Guest lecturer to Columbia University HIV Behavioral Health Training Program, NJ.
4. **Golden, R. L.** (2019, April). *Affirming care of Transgender and nonbinary teens and their families.* Guest lecturer at Columbia University Medical Center Division of Pediatric Education.
5. **Golden, R. L.** (2019, March). *LGBTQ cultural competency.* Guest lecturer at Rutgers DAYAM Clinic, NJ.
6. **Golden, R. L.**, Miley, A., & Byne, W. (2019, February). *Addressing the mental health needs of gender diverse patients.* Guest lecturer New York State Office of Mental Health prison-based Mental Health providers.
7. **Golden, R. L.**, (2019, January). *Breaking up with perfectionism.* Guest panelist at The Wing, DUMBO, NY as a part of educational series on mental health.

8. 2018 – Served as a speaker to community organizations and an academic medical center. Provided information regarding mental health, trauma, gender identity and HIV/AIDS related care. Provided reflections on and tools for expanding practices to be gender inclusive.
   1. **Golden, R. L.**, (2018, July). *Working with families of people living with HIV or AIDS.* Guest lecturer at Harlem United, NY.
   2. **Golden, R. L.**, (2018, June). *Barriers to PREP and general medication adherence with HIV-positive non-binary teens.* Guest lecturer at Incarnation Children's Center, NY.
   3. **Golden, R. L.**, (2018, June). *Addressing barriers for the HIV+ Transgender population.* Guest lecturer at Callen Lorde Community Health Center, NY.
   4. **Golden, R. L.**, (2018, May). *Clinical work with Transgender and nonbinary individuals and their families: A workshop for psychologists and other mental health professionals.* Guest lecturer at Sheppard Pratt, MD.
   5. **Golden, R. L.**, (2018, March). *Time's Up panel with Amber Tamblyn.* Guest panelist at The Wing, DUMBO, NY.

9. 2017 - Served as a panelist on three panels to large corporations and an academic institution. Provided education on sexuality, gender identity, and sexual orientation. Provided tools for practicing inclusion of Transgender and nonbinary individuals in the workplace and in the therapeutic milieu.
   1. **Golden, R. L.**, (2017, December). *Intersectionality and privilege in therapy practice, part two.* Guest lecturer to Mount Sinai Adolescent Health Center, NY Externs and Interns.
   2. **Golden, R.L.**, (2017, November). *Inclusion in the workplace.* Guest panelist at Wunderman, (New York, NY)
   3. **Golden, R. L.**, (2017, August). *Intersectionality and privilege in therapy practice, part one.* Guest lecturer to Mount Sinai Adolescent Health Center, NY Externship and Internship students.
   4. **Golden, R.L.**, (2017, July). *Inclusion in the workplace.* Guest panelist at Wunderman, (Chicago, IL)
   5. **Golden, R.L.**, (2017, June). *The landscape of Transgender talent.* Guest panelist to Goldman Sachs (New York, NY)

Rachel Lynn Golden, Ph.D. 8

10. 2016 - Served as a speaker to an academic medical institution. Provided information distinguishing differences among sexuality, gender identity, and sexual orientation. Provided reflections on and tools for practicing inclusion of Transgender and nonbinary individuals in the therapeutic milieu.

   1. **Golden, R.L.,** Oransky, M., Steever, J. (2016, September). *Medical and mental health treatment of Transgender adolescents.* Guest speaker to Albert Einstein Montefiori Hospital Endocrinology Department.

**Publications:**
1. **Peer-Reviewed Research Publications in Print:**
   1. Furman, W., Collibee, C., Spilker, A, & **Golden R. L.** (2019). Making movies instead of taking snapshots:  Studying change in youths' romantic experiences. *Child Development Perspectives*, *13*(3), 135-140.
   2. **Golden, R. L.** & Oransky, M. (2019). An intersectional approach to therapy with Transgender and nonbinary adolescents and their families. *Archives of Sexual Behavior*, *48,* 2011-2025.
   3. **Golden, R. L.,** Furman, W., & Collibee, C. (2016). The risks and rewards of sexual debut. *Developmental Psychology*, *52*(11), 1913-1925.

2. **Chapters:**
   1. Abrams, M., **Golden, R. L.,** & Cohen, J. R. (2020). Affirming and inclusive mental health care for Transgender and nonbinary young people. In *Social Work and Health Care Practice with Transgender and Nonbinary Individuals and Communities* (pp. 76-88). Routledge.

3. **Other Media:**
   1. **Golden, R.L.** "The Emotional Risks and Rewards of Losing One's Virginity" *Affirming Adolescence,* Psychology Today, November 13, 2018, https://www.psychologytoday.com/us/blog/affirming-adolescence/201811/theemotional-risks-and-rewards-losing-ones-virginity
   2. **Golden, R.L.** "#METOO, Your Adolescent, and You" *Affirming Adolescence,* Psychology Today, May 30, 2018, https://www.psychologytoday.com/us/blog/affirming-adolescence/201805/metooyour-adolescent-and-you
   3. **Golden, R.L.** "My Adolescent Came Out as Transgender, What's Next" *Affirming Adolescence,* Psychology Today, December 14 , 2017, https://www.psychologytoday.com/us/blog/affirming-adolescence/201712/myadolescent-came-out-Transgender-whats-next
   4. **Golden, R.L.** "Adolescent Identities and Our Biases" *Affirming Adolescence,* Psychology Today, November 7, 2017, www.psychologytoday.com/blog/affirming-adolescence/201709/can-we-havesex-positive-talk.
   5. **Golden, R.L.** "Talking About Sexuality with Transgender and Nonbinary Teens" *Affirming Adolescence,* Psychology Today, September 21, 2017, https://www.psychologytoday.com/blog/affirming-adolescence/201709/talkingabout-sexuality-Transgender-and-nonbinary-teens.

Rachel Lynn Golden, Ph.D. 9

6. **Golden, R.L.** "Can We Have a (Sex-Positive) Talk?" *Affirming Adolescence,* Psychology Today, September 20, 2017, [www.psychologytoday.com/blog/affirming-adolescence/201709/can-we-havesex-positive-talk](www.psychologytoday.com/blog/affirming-adolescence/201709/can-we-havesex-positive-talk).

**4. Thesis:**

1. 2017 - Doctoral Dissertation, Rachel Lynn Golden, Ph.D. *Sex partners: Exploring growth, change and impact across development*, University of Denver (Denver, CO)
2. 2014 - Master's Thesis, Rachel Lynn Golden, Ph.D. *The risks and rewards of sexual initiation,* University of Denver (Denver, CO)

**5. Invited and/or Peer-Selected Presentations at Regional, National, or International Levels:**

2025

1. **Golden, R. L.,** Saniyah, S., De Castro, W., Mukerjee, R., Sevelius, J., Stott, B. (2025, June). *Reclaiming Our Joy: The Liberatory Power of Psychedelics in Queer and Trans Communities.* Presentation at the Psychedelic Science conference, Denver, CO.

2. **Golden, R. L.,** Lolai, D., Saenz, R., Ingelhart, M. (2025, July). *The Art of Telling Client Stories, a Multidisciplinary Approach.* Presentation at the LGBTQ+ Bar Lavender Law Conference, New York, NY.

2024

1. **Golden, R. L.,** Sevelius, J, Stott, B (2024, November). *Ketamine Assisted Group Therapy for Identity Based Trauma Among Trans and Gender Expansive People.* Presentation at the Association of Behavioral Cognitive Therapies conference, Philadelphia, PA.

2. **Golden, R. L.,** St. Amand, C., Branstetter, G., Dickerson, L., & Bohm, A. (2024, September). *Demystifying challenging conversations: Effective messaging to support TGNCNB justice & policy.* Presentation at The New York State LGBTQIA+ Convening, Albany, NY.

3. **Golden, R. L.,** Kinkead, M., Lolai, D., Felder, K (2024, August). *The struggles faced by incarcerated Transgender, Gender Non-Conforming, Intersex and Nonbinary people: Using a multi-pronged harm reduction approach to effective reform.* Presentation at the LGBTQ+ Bar Lavender Law Conference, Washington D.C..

2023

1. **Golden, R. L.,** Kinkead, M., Graham, j., Felder, K (2023, November). *Voices of experience: Transgender and incarcerated—realities of Transgender experience in the United States prison industrial complex.* Presentation at the United States Professional Association for Transgender Health conference, Westminster, CO.

2. **Golden, R. L.** (2023, November). *Voices of experience: Ketamine-assisted group therapy for identity-based trauma among Trans and Gender-Expansive people.* Presentation at the United States Professional Association for Transgender Health conference, Westminster, CO.

3. **Golden, R. L.,** Sevelius, J (2023, August). *Psychedelic Therapy for Identity-Based Trauma Among Trans and Gender-Expansive People.* Presentation at the American Psychological Association conference, Washington, D.C.

4. **Golden, R. L.,** Huang, S (2023, February). *Psychedelics and the cosmos of gender expansiveness.* Presentation at the Queering Psychedelics conference, San Francisco, CA.

2020

1. Lee, L, Bockting, W. Ross, L. Byne, W, **Golden, R. L.** (2020, October). *Transgender mental health treatment in corrections.* Paper presentation at the American Academy of Psychiatry and the Law Conference, held online.

2. **Golden, R. L.**, Byne, W. (2020, January). *The New York State Transgender Identity Program: Providing gender-affirming mental health care for New York State prison inmates.* Guest lecturer at Columbia University Medical Center Division of LGBT Health, New York, NY.

2019

1. **Golden R. L.**, Oransky, M., Langer, S. J., Kaufman, R., Thomas, V (2019, May). *Applying intersectionality to therapy with Transgender and nonbinary adolescents and their families.* Panel presentation at Gender Conference New York City, New York, NY.

2. Co-presenter. **Golden R. L.**, Oransky, M. (2019, January). *An intersectional approach to therapy with Transgender and nonbinary adolescents and their families.* Presentation for the LGBT Health Series, New York, NY.

2018

1. Speaker. **Golden R. L.**, Furman, W. (2018, April). *Sexual partner history: associations with adjustment across development.* Paper presented at the annual meeting of the Society for Research on Adolescence, Minneapolis, MN.

2. Co-presenter. Collibee, C., Furman, W., **Golden R.L.,** (2018, April). *Within relationship longitudinal associations between sexual coercion and relationship risk.* Paper submitted for presentation at the annual meeting of the Society for Research on Adolescence, Minneapolis, MN. 2017

3. Speaker. **Golden, R. L.**, Davis, B., Seifert, S., Sequeira, G. (2017, November). *Let's talk about sex! The necessity of gender inclusive sexual health education curricula.* Panel presentation at Gender Conference East.

2016

1. Speaker. **Golden, R. L.** Collibee, C, & Furman, W. (2016, August). *Sexual Behaviors in early adult romantic relationships and positive relationship and mood correlates.* Symposium presented at the American Psychological Association Meeting.

2015

1. Speaker. **Miller, R. L.**, & Furman, W. (2015, March). *Timing of sexual initiation and longitudinal relationship outcomes.* Poster presented at the annual Society for Research in Childhood Development Meeting, Philadelphia, PA.

2014

1. Co-presenter. **Miller, R. L.**, Knopp, K., Lee, M., & Ritchie, L. (2014, April). *Let's talk about sex: De-stigmatizing conversations about sex to encourage better research, teaching and clinical practice.* University of Denver Summit on Diversity and Inclusive Excellence, Denver, CO.

2. Co-presenter. **Miller, R. L.**, Yi-Borromeo, V., & Schesselman-Tarango, G. (2014, April). *"What kind of Asian are you?" Stereotypes and microaggressions in the experiences of Asian American Pacific Islander college students.* University of Denver Summit on Diversity and Inclusive Excellence, Denver, CO.

3. Speaker. **Miller, R. L.**, & Furman, W. (2014, March). *Longitudinal improvement in feelings of regret about sexual initiation.* Poster presented at the annual Society for Research on Adolescence Meeting, Austin, TX.

2013

1. Speaker. **Miller, R. L.**, & Furman, W. (2013, April). *Timing of sexual debut and adjustment: A longitudinal study.* Poster selected for "Saving the Best for Last: Honoring Excellence in Child Development Research" poster session at the annual Society for Research in Childhood Development Meeting, Seattle, WA.

2. Co-presenter. **Miller, R. L.**, Parsons, A. M., & Mcfadyen-Ketchum, L. (2013, April). *Grassroots diversity organization development*. University of Denver Summit on Diversity and Inclusive Excellence, Denver, CO.

2012

1. Co-presenter. **Miller, R. L.**, Parsons, A. M., Mcfadyen-Ketchum, L. (2012, May). *I define myself! Change how you see the world to change how the world sees you.* Invited presentation to C.A.R.E program for teen girls.

2. Co-presenter. **Miller, R. L.**, Collibee, C., & Bianco, H (2012, April). *Statistics in the media*, University of Denver Summit on Diversity and Inclusive Excellence, Denver, CO.

2011

1. Co-presenter. Furman, W., Collibee, C., Stephenson, C., & **Miller, R. L.** (2011, November). *What is a healthy adolescent romantic relationship?* Invited address to Robert Wood Johnson Foundation meeting on Defining Healthy Teen Relationships, Atlanta, GA.

2010

1. Speaker. **Miller, R. L.**, Kalinka, C. J., Johns, K., Allen, E. S., Stanley, S., Markman, H., & Johnson, C. J. (2010, November). Racial/ethnic differences in attitudes about divorce, infidelity, and constraint in a mid-western sample. Poster presented at the annual Association for Behavioral and Cognitive Therapies Convention, San Francisco, CA.