# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA

JANE DOE,

     Plaintiff,

v.

GEORGIA DEPARTMENT OF CORRECTIONS; former STATEWIDE MEDICAL DIRECTOR SHARON LEWIS, in her individual and official capacities; STATEWIDE MEDICAL DIRECTOR MARLAH MARDIS, in her individual and official capacities; former PHILLIPS STATE PRISON WARDEN DESHAWN JONES, in his individual and official capacities; PHILLIPS STATE PRISON WARDEN AARON PINEIRO, in his individual and official capacities; MHM CORRECTIONAL SERVICES, LLC D/B/A CENTURION HEALTH; CENTURION OF GEORGIA, LLC; PHILLIPS STATE PRISON MENTAL HEALTH DIRECTOR RHONDA BILLINGS, in her individual and official capacities; DR. SHERRI SKIBINSKI, in her individual and official capacities; DR. CATHLEEN CLEARY, in her individual and official capacities; DR. DONALD BOWLING, in his individual and official capacities; NURSE PRACTITIONER SIDNEY MOORE, in his individual and official capacities; DR. WIL AUSBORN, in his individual and official capacities; JEREMY LANE, in his individual and official capacities; and DR. ANTHONY

Civ. Case No. 1:23-cv-5578-MLB

**FINAL AMENDED COMPLAINT AND REQUEST FOR RELIEF**

1

MULLOY, in his individual and official capacities,

     Defendants.

## FINAL AMENDED COMPLAINT

### INTRODUCTION

1.     Jane Doe is a transgender woman who has long been denied reasonable accommodations for her gender dysphoria by the Georgia Department of Corrections ("GDC"), MHM Correctional Services LLC ("MHM") and Centurion of Georgia, LLC ( "Centurion").

2.     GDC and MHM are well aware that without adequate treatment for her disability, Ms. Doe experiences debilitating anxiety, depression, suicidality, and attempts at suicide, self-harm, and self-castration. In fact, GDC's own medical providers (including three psychiatrists, a cardiologist, and a psychologist) have already recommended that Ms. Doe *requires* gender-affirming surgery and other medically necessary forms of gender-affirming care for her gender dysphoria. But GDC bans such medically necessary healthcare, so it has ignored those recommendations for years.

3.     In April 2024, this Court held that Ms. Doe is a qualified individual with debilitating gender dysphoria, which is a disability under the Americans with Disabilities Act ("ADA"). Dkt. 131 at 14-15, 45. *See, e.g., Compulife Software, Inc. v. Newman*, 111 F.4th 1147, 1156 (11th Cir. 2024) ("Under the law-of-the-case

doctrine, [the resolution of] an issue decided at one stage of a case is binding at later stages of the same case."). This Court also made several critical findings of fact, including that hormone replacement therapy ("HRT") resulting in feminizing changes to Ms. Doe's body is medically necessary to treat her gender dysphoria. *Id.* at 17-18. Still, Defendants continue to demonstrate deliberate indifference towards Ms. Doe's medical needs and to discriminate against Ms. Doe on the basis of her gender dysphoria by refusing to provide reasonable accommodations such as the gender-affirming surgery and adequate HRT.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3)–(4), as this action arises under 42 U.S.C. § 1983, the Eighth Amendment of the U.S. Constitution, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act.

5. Venue lies in this district because the events giving rise to this action took place here and MHM is headquartered in this district.

## PARTIES

### Plaintiff

3

6.      Plaintiff Jane Doe is a transgender woman incarcerated at Phillips State Prison, a medium-security prison for men located in Buford, Gwinnett County, Georgia. Outside of a brief six-month stay in the custody of the U.S. Marshal Service in 2025, she has been in GDC custody since 1992.  Ms. Doe is a qualified individual under the ADA with the disability of gender dysphoria. She also suffers from hypertension, chronic obstructive pulmonary disease ("COPD"), and asthma.

### State Defendants

7.      Defendant Georgia Department of Corrections ("GDC") is the state agency responsible for the administration of Georgia's prisons.  It is headquartered at 300 Patrol Road, Forsyth, Georgia 31029. As an agency of the State, GDC is a state actor for purposes of 42 U.S.C. § 1983. As a public entity and recipient of federal funding, GDC is subject to the ADA and the Rehabilitation Act.

8.      The following individual GDC employees are sued in their individual and official capacities and acted at all relevant times under color of state law:

a.  Defendant Dr. Sharon Lewis was GDC's Statewide Medical Director until April 1, 2024. She was responsible for overseeing the medical policies and services across GDC facilities.

b.  Defendant Dr. Marlah Mardis became GDC's Statewide Medical Director on April 1, 2024 and serves in that capacity today. Dr. Mardis is responsible for overseeing the medical policies and services across GDC

4

facilities.

c.  Defendant DeShawn Jones was Warden of Phillips State Prison until June 2024. He was responsible for the daily administration of that facility and served on Ms. Doe's treatment team.

d.  Defendant Aaron Pineiro became Warden of Phillips State Prison in June 2024 and serves in that capacity today. Warden Pineiro is responsible for the daily administration of that facility and served on Ms. Doe's treatment team.

e.  Defendant Dr. Anthony Mulloy is an endocrinologist employed by Augusta University, a public university in Georgia. He contracts with GDC to provide specialized medical services to various GDC facilities.  Dr. Mulloy treated Ms. Doe.

### MHM/Centurion[1] Defendants

9.      Defendant MHM Correctional Services, LLC ("MHM") is a private

---

[1] Since the time of Ms. Doe's incarceration, Defendant MHM has undergone several corporate changes. MHM Services entered a joint venture with Centene Corporation in 2011, operating under the name "Centurion." In 2018, Centene Corporation acquired MHM Services, consolidated MHM Services' operations with Centurion, and rebranded that combined entity as "Centurion Health." Centurion Health operates in Georgia under the subsidiary name of Centurion of Georgia, LLC. For the avoidance of doubt, this complaint names MHM Correctional Services, LLC and Centurion of Georgia, LLC, separately, although references to "MHM," "Centurion," and their employees refer, interchangeably, to each of these entities at appropriate times.

limited liability company operating as a subsidiary of Centene Corporation. MHM is contracted by the Georgia Department of Corrections to provide comprehensive medical and mental health services.  Because MHM contracts with the State to provide functions traditionally reserved to the State, MHM is considered a government entity under 42 U.S.C. § 1983. For the purposes of the ADA, MHM "operates" a place of public accommodation: the prison medical unit.  MHM maintains offices located at 289 S Culver Street, Lawrenceville, GA 30046.

10.    Defendant Centurion of Georgia, LLC ("Centurion") is a private limited liability company operating as a subsidiary of Centene Corporation, the same parent company as MHM Correctional Services, LLC. Centurion took over the contract for medical services with the Georgia Department of Corrections on July 1, 2024 and is responsible for various aspects of Ms. Doe's treatment plan. Because Centurion contracts with the State to provide functions traditionally reserved to the State, Centurion is considered a government entity under 42 U.S.C. § 1983. For purposes of the ADA, Centurion "operates" a place of public accommodation: the prison medical center. Centurion maintains offices located at 289 S Culver Street, Lawrenceville, GA 30046.

11.    The following individual MHM/Centurion employees are sued in their individual and official capacities and acted at all relevant times under color of state law:

a. Defendant Rhonda Billings is the Mental Health Director at Phillips State Prison. She is responsible for the administration of mental health policies, procedures, and services at that facility and has served on Ms. Doe's treatment team.

b. Defendant Dr. Sherri Skibinski is attending psychologist at Phillips State Prison and has served on Ms. Doe's treatment team.

c. Defendant Dr. Cathleen Cleary is an attending psychiatrist who treats patients in various GDC facilities. Dr. Clearly has treated Ms. Doe and is part of Ms. Doe's treatment team.

d. Defendant Dr. Donald Bowling is a psychologist and clinical director who treats patients in various GDC facilities. Dr. Bowling is responsible for training and supervising other mental health clinicians. He has treated Ms. Doe and evaluated her for gender-affirming surgeries.

e. Defendant Nurse Practitioner Sidney Moore is a mental health clinician who treats patients in various GDC facilities. NP Moore is responsible for training and supervising other mental health clinicians on GDC policies related to mental health. He has treated Ms. Doe and evaluated her for gender-affirming surgeries.

f. Defendant Dr. Wil Ausborn is a psychologist who treats patients in various GDC facilities. Dr. Ausborn has treated Ms. Doe and served on her

7

treatment committee.

g. Defendant Jeremy Lane is a mental health unit manager who works in various GDC facilities.

12.    Given the close corporate relationship between MHM and Centurion, and the interrelated scope of their treatment of Ms. Doe, as well as the uncertainty regarding ongoing changes to their corporate structure, both entities have been named in this complaint and have claims against them for their treatment of Ms. Doe. However, to that end, Plaintiff does not intend to seek double recovery against these entities and anticipates that, during discovery, the full scope of damages against each entity can be clarified.

## FACTUAL BACKGROUND

**A. Gender Dysphoria and GDC's Blanket Ban on Gender-Affirming Care**

13.    Gender dysphoria is as a disability under the ADA.

14.    According to the DSM-5, gender dysphoria is the "clinically significant distress or impairment in social, occupational, or other important areas of functioning" that arises from the "marked incongruence" between a transgender person's sex assigned at birth and their gender identity or gender expression.[2]

---

[2] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 511 (5th ed. text revision 2022) [hereinafter DSM-5-TR] at 513. This is the definition of gender dysphoria with which Ms. Doe was diagnosed in 2015. There has been a revision to the DSM in 2022, and this Complaint will cite to the most recent version, DSM-5-TR, as the authoritative source on gender dysphoria;

15.    The accepted clinical standard of care for treating gender dysphoria, established by the World Professional Association for Transgender Health ("WPATH"), the American Medical Association ("AMA"), the American Psychological Association ("APA"), and other major medical and mental health professional organizations is to enable a person to live consistently with their gender identity through counseling, hormone therapy, gender-affirming surgery, and the social and legal transition to the sex associated with a person's gender identity.

16.    According to the WPATH's most recent version of the "Standards of Care for the Health of Transgender and Gender Diverse People" ("WPATH Standards of Care"), "social transition" is the process through which transgender people begin and continue to express their gender identity in ways that are authentic and socially perceptible.[3]

17.    GDC's Standard Operating Procedure ("SOP") 507.04.68 (Management and Treatment of Offenders Diagnosed with Gender Dysphoria) provides that patients who "have been diagnosed with Gender Dysphoria will receive a current individualized assessment and evaluation" which, among other things, will take into account the patient's "own views" with respect to their

---

this definition, however, is unchanged between the different versions and thus does not impact any argument herein.

[3] E. Coleman et al., Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, 23 Int'l J. of Transgender Health S1, S107 (2022) [hereinafter "WPATH SOC-8"].

treatment.

18.     According to SOP 507.04.68, "[i]f a referral from Mental Health is made to Medical, a treatment plan will be developed" that uses "accepted standards of care . . . as a reference." The treatment plan, or denial thereof, "must be approved by the Contract Vendor Statewide Medical Director and reviewed with the GDC Statewide Medical Director and GDC Statewide Mental Health Director." GDC has mistreated and continues to mistreat Ms. Doe by violating its own SOPs with respect to treatment of transgender individuals.

**B. GDC Diagnoses Ms. Doe with Gender Dysphoria**

19.     Ms. Doe entered GDC custody in 1992. In 1993, she was diagnosed with gender identity disorder by the clinical director at Valdosta State Prison.

20.     On October 19, 2015, GDC psychologist Dr. Duane Harris diagnosed Ms. Doe with gender dysphoria. At the time, she was incarcerated at Johnson State Prison in Wrightsville, Georgia.

21.     Gender dysphoria substantially limits Ms. Doe's life activities, primarily because it causes her constant and severe emotional and psychological distress. On multiple occasions, Ms. Doe has attempted self-castration and suicide as a result of her gender dysphoria.

22.     At her request, Ms. Doe began HRT in November of 2015. Her initial treatment was limited to spironolactone, a testosterone blocker.

10

23. In early 2016, GDC Defendant Dr. Mulloy prescribed Ms. Doe 2 mg of estradiol and 50 mg of spironolactone, to be taken orally each day.

24. In May 2019, Ms. Doe's HRT dosages were increased to 10 mg of transdermal estradiol every two weeks, and 200 mg of oral spironolactone every day.

25. Ms. Doe's HRT regimen laid the foundation for feminizing changes to her body: she began to develop breasts; her balding slowed; her facial and body hair growth slowed; fat redistributed to her hips, thighs, and buttocks; and her penis and testicles reduced in size.

26. As Ms. Doe's physical transition progressed, the symptoms from her gender dysphoria diminished, but were not eliminated.

## C. Defendants Deny Ms. Doe's Request for Medically Necessary Surgery and Discontinue her HRT.

27. Ms. Doe has requested gender-affirming surgery repeatedly since her 2015 gender dysphoria diagnosis.

28. In 2016, MHM Defendant Dr. Ausborn, along with other treating physicians, assessed Ms. Doe's candidacy for gender-affirming surgery, even though she was already taking HRT.

29. Due to GDC's ban on gender-affirming surgery, GDC and MHM disregarded MHM Defendant Dr. Ausborn's assessment of Ms. Doe's candidacy for gender-affirming surgery.

30. In June 2016, while incarcerated in Johnson State Prison, Ms. Doe filed

a grievance requesting consideration for gender-affirming surgery. Non-party Warden Shawn Emmons denied it. Ms. Doe filed an appeal, which was denied by Defendant Dr. Lewis, GDC's Statewide Medical Director at the time.

31. In a state of despair, Ms. Doe attempted suicide by asphyxiation in February of 2017. She continues to suffer from significant neck pain as a result.

32. Ms. Doe was eventually transferred to Georgia State Prison. On June 4, 2019, a physician there abruptly discontinued her estradiol and then her spironolactone.

33. For the next four years, Defendants ignored Ms. Doe requests to resume HRT. As a result, her gender dysphoria was left completely untreated.

34. Without HRT, Ms. Doe's facial and chest hair returned. Her breasts shrunk, and her testicles and penis grew. The fatty tissue around her hips, thighs, and buttocks diminished. The quick cessation of hormones caused Ms. Doe frequent nausea, in addition to emotional anguish, depression, and hopelessness.

35. To cope with the extreme anguish caused by her gender dysphoria, Ms. Doe resorted to severe self-harm. Almost daily, Ms. Doe would beat her head against the wall until she bled. She constantly considered self-castration and suicide.

36. By this point—2019—Defendants were well aware of Ms. Doe's debilitating gender dysphoria and her compulsory self-harm when it was untreated.

37. Still, they did not provide treatment or reasonable accommodations for

12

Ms. Doe's gender dysphoria.

38.    In April 2022, GDC transferred Ms. Doe to Phillips State Prison.

**D. Ms. Doe's 2022 Treatment Team Denies Her Request for a Mental Health Evaluation for Gender-Affirming Surgery Because of GDC's Blanket Ban.**

39.    In March 2022, Ms. Doe's treatment team convened to consider her repeated requests for a mental health evaluation for gender-affirming surgery.

40.    The treatment team included MHM/Centurion Defendants Dr. Ausborn, Dr. Cleary, Dr. Lane, Dr. Bowling and NP Moore.

41.    Each member of the treatment team, including Defendants, knew that Ms. Doe was diagnosed with gender dysphoria and had a significant history of self-harm.

42.    The treatment team denied Ms. Doe's request for a mental health evaluation for gender-affirming surgery.

43.    MHM Defendant Dr. Cleary later told Ms. Doe that because GDC banned gender-affirming surgery, MHM administration prohibited their staff from performing mental health evaluations for such procedures.

44.    On May 13, 2022, Ms. Doe met with MHM Defendant NP Moore. Again, Ms. Doe requested an evaluation for gender-affirming surgery. Defendant NP Moore denied the request on the basis of GDC's Blanket Ban.

45.    On May 22, 2022, Ms. Doe wrote to MHM Defendant Dr. Bowling to

13

request an assessment for gender-affirming surgery.  He did not respond.

46. On May 27, 2022, Ms. Doe met with MHM Defendant Dr. Skibinski and again requested an evaluation for gender-affirming surgery. Defendant Dr. Skibinski explained that she was not qualified to provide that evaluation, but that GDC banned gender-affirming surgery anyway.

47. On May 29, 2022, Ms. Doe again wrote to Defendant Dr. Skibinski requesting a surgical assessment. Defendant Dr. Skibinski did not respond.

48. Ms. Doe also sent multiple grievances, letters, and health service requests to GDC Defendants Former Warden Jones, Dr. Lewis, and other GDC officials.  Her grievances and appeals were all denied.

**E. MHM Defendants Finally Evaluate Ms. Doe and Recommend Evaluation for Surgery.**

49. On June 21, 2022, MHM Defendant Dr. Bowling told Ms. Doe that he was not qualified to evaluate her for gender-affirming surgery, even though he had previously provided those same evaluations to other patients.

50. During that same conversation, Defendant Dr. Bowling advised Ms. Doe that "[i]f you were to attempt self-castration again, maybe while at the hospital, they'll just go ahead and cut your gonads out."

51. On July 17, 2022, Ms. Doe followed Defendant Dr. Bowling's advice and attempted self-castration.

52.     After Ms. Doe attempted self-castration, and notwithstanding GDC's Blanket Ban (and after ignoring Ms. Doe's requests for six years), MHM Defendants Bowling, Skibinski, Moore, and Cleary finally granted Ms. Doe's request for a mental health evaluation for gender-affirming surgery.

53.     MHM psychiatrists, non-Defendants Dr. Howard and Dr. Frady, conducted those mental health evaluations in July, August, September, and October 2022.

54.     Both MHM psychiatrists recommended that Ms. Doe receive gender-affirming surgery.

**F. Ms. Doe's 2023 Treatment Committee Denies Ms. Doe's Request for Surgery**

55.     In January of 2023, Ms. Doe's treatment committee convened to consider her repeated requests for gender-affirming surgery.

56.     This time, Ms. Doe's treatment committee included GDC Defendants Jones and Lewis, and MHM Defendants Billings and Skibinski (collectively, the "2023 treatment committee").

57.     Each member of the 2023 treatment committee, including Defendants, knew that Ms. Doe was diagnosed with gender dysphoria and had a significant history of self-harm.

58.     On January 3, 2023, Dr. Frady recommended to MHM Defendant Dr.

15

Skibinski that Ms. Doe receive gender-affirming surgery.

59.     Nevertheless, that same day, the 2023 treatment committee denied Ms. Doe's request for gender-affirming surgery on the basis of GDC's Blanket Ban.

60.     GDC Defendant former Warden Jones, who had authority at the facility level to order the evaluation, told Ms. Doe that GDC "doesn't do gender-affirming surgeries."

61.     MHM Defendant Billings told Ms. Doe, "Why can't you accept things the way they are?"

62.     MHM Defendant Dr. Skibinski refused to evaluate Ms. Doe for gender-affirming surgery in reliance on the MHM policy—that is, to conform with the GDC's Blanket Ban—and GDC's Blanket Ban.[4]

63.     MHM Defendant Dr. Cleary told Ms. Doe that MHM administrators had warned her, "You must follow our rules or find somewhere else to work."

**G. Defendants Resume and Then Discontinue Ms. Doe's HRT**

64.     After four years without HRT and countless requests for medically necessary care, Ms. Doe was finally granted an appointment with endocrinologist GDC Defendant Dr. Mulloy around April 26, 2023.

65.     Dr. Mulloy did not conduct a physical examination during that appointment.

---

[4] *See supra* ¶¶ 45–**Error! Reference source not found.**.

66.    Dr. Mulloy told Ms. Doe that she would not experience any feminizing effects unless she received *at least* 10 mg of estradiol. Inexplicably, he then prescribed only 8 mg of estradiol every two weeks and 100 mg of spironolactone daily. These dosages were lower than what Ms. Doe had previously received, and explicitly inadequate to achieve feminizing effects.

67.    On August 23, 2023, however, a treatment provider in Phillips State Prison suddenly removed Ms. Doe from HRT once again, preventing her from getting her estradiol shot.  Once again, Ms. Doe experienced frequent nausea and headaches from HRT withdrawals, and a spike in her other gender dysphoria symptoms. Ms. Doe was not given any HRT until three weeks later, on November 1, 2023, when Dr. Mulloy again reduced her estradiol to 6 mg every two weeks.

**H. Ms. Doe's HRT Treatment through 2024**

68.    On April 17, 2024, this Court ordered Defendants to provide Ms. Doe access to breast and buttock padding and hair removal cream until the HRT has the intended feminizing effects on her body.[5] The Court observed that "the evidence suggests Dr. Mulloy is not properly examining whether Plaintiff's current HRT regimen is providing the changes to her body that Defendants agree are medically necessary—something common sense (and Plaintiff's experts) suggest he should be

---

[5] Dkt. 131 at 53.

doing."[6]

69.    On May 15, 2024, Defendant Dr. Mulloy met virtually with Ms. Doe. He refused to increase her HRT dosage on the grounds that her lab results were within the normal range.

70.    On September 4, 2024, Defendant Dr. Mulloy again denied Ms. Doe's request to increase her dosage. During a virtual appointment that day, Ms. Doe heard non-party Nurse Practitioner Feriola (who was present during her examination) explain to Dr. Mulloy that Ms. Doe's lab results were appropriate for increased HRT dosages. Dr. Mulloy ultimately agreed to return Ms. Doe's estradiol dosage to 8 mg every two weeks.

71.    During both appointments, Dr. Mulloy only met with Ms. Doe virtually. He did not conduct a physical examination to inform her HRT dosages, as this Court recommended.

72.    After the September appointment, Wellpath physician, Dr. Byron Kelly told Ms. Doe that, in his opinion, Dr. Mulloy's treatment plan and virtual examination were both insufficient.

73.    On September 9, 2024, Dr. Kelly and NP Feriola conducted a physical examination of Ms. Doe. Dr. Kelly then prescribed Ms. Doe 10 mg of estradiol, weekly.  Despite Dr. Kelly's prescription, however, a GDC pharmacist refused to

---

[6] Dkt. 131 at 20-21.

administer Ms. Doe any dosage above 10 mg every *other* week.

## I. Ms. Doe is cleared for gender-affirming surgery.

74. On May 2, 2024, non-party plastic surgeon, Dr. Fara Movagharnia, affirmed Ms. Doe's longstanding diagnosis of gender dysphoria and recommended surgeries for (1) a "bilateral breast augmentation with silicone implants" and (2) a "bilateral orchiectomy / castration."

75. From June through September 2024, Ms. Doe had a series of cardiology consultations. She was cleared for surgery.

76. On November 1, 2024, Defendant Centurion's Gender Dysphoria Committee medically cleared Ms. Doe for surgery. Centurion informed GDC and this Court "that the recommended treatment plan for Ms. Doe is gender reassignment surgery."[7]

77. GDC Defendant Dr. Mardis received Centurion's recommendation on November 1, 2024. On December 17, 2024, Dr. Mardis responded with several questions for Centurion, which were to be discussed at the Gender Dysphoria Committee meeting in January of 2025.

78. From that point until Ms. Doe was transferred out of GDC custody on March 3, 2025, Dr. Mardis never rendered a decision on Ms. Doe's surgery and, considering Ms. Doe never received this surgery, has effectively denied the request.

---

[7] Dkt. 197 at 1.

79.    On December 23, 2024, Ms. Doe again attempted suicide. Rather than moving Ms. Doe into a crisis stabilization unit, GDC left her in administrative segregation for another week.

80.    On or around December 31, 2024, while Ms. Doe was being moved into a crisis stabilization unit, Defendant NP Moore told Ms. Doe: "The GDC will never cut off your dick. You should have gone to the federal prison system when you had the chance. You're not the center of attention. We have other things going on."

### J. Ms. Doe spends six months in federal custody, where she receives gender-affirming care.

81.    On or around March 3, 2025, Ms. Doe was transferred from Defendant GDC's custody into the custody of the U.S. Marshal Service while she awaited sentencing on federal charges. That sentencing occurred on September 18, 2025.

82.    On or around September 18, 2025, Ms. Doe was transferred from federal custody back to GDC custody and directly back into administrative segregation at Philips State Prison, where she remains.

83.    During those six months in federal custody, from approximately March 3, 2025 to September 18, 2025, Ms. Doe was housed in a general population unit. She was provided with a high-quality wig and gender-affirming items like hair removal cream, a shaving razor, a brassiere, and padding. She received frequent medical and mental health care.  In federal custody, correctional officers used Ms. Doe's correct pronouns and legal name, rather than male pronouns and her previous,

20

male legal name. She had access to legal visits and mail. In federal custody, Ms. Doe received her prescribed dose of 300 mg of spironolactone per day and 10 mg of estradiol every other week without issue or interruption.

84.    Ms. Doe' accommodations and treatment in federal custody resulted in no security or safety incidents.

85.    Because of the reasonable accommodations she received in federal custody, Ms. Doe's symptoms of gender dysphoria lessened considerably.

### K. Current conditions

86.    When Ms. Doe was transferred back to GDC custody on September 18, 2025, all Defendants, but especially GDC Defendants, immediately ceased the reasonable accommodations provided to her in federal custody.

87.    For instance, GDC Defendants confiscated Ms. Doe's federally-issued wig. In fact, Defendants disciplined Ms. Doe for having the wig at all. As a result of this sanction, from October 7, 2025 through January 30, 2026, Ms. Doe lost access to a phone, mail, packages, recreational spaces, and the commissary for 120 days.

88.    GDC Defendants refuse provide Ms. Doe with reasonable accommodations such as gender-affirming social transition items available to women in Georgia's correctional system. These items include makeup, nail polish, hair removal cream, a wig, and a clean brassier and padding.

89.    GDC Defendants refuse to use Ms. Doe's pronouns (she/her) or her

legal name, and instead use male pronouns (he/him) and Ms. Doe's dead name.

90.   Since her return to state custody, each of the GDC and Centurion Defendants have failed to consistently provide Ms. Doe with her required estradiol injections, including four separate lapses: (i) a 43-day lapse between October 8, 2025 and November 20, 2025; (ii) a 40-day lapse between November 20, 2025 and December 30, 2025; (iii) 44-day lapse between December 30, 2025 and February 12, 2026; and (iv) a 19-day gap between February 12, 2026 and March 3, 2026.

91.   During each of these prolonged periods without estradiol, Ms. Doe experienced severe headaches and vomiting associated with hormonal withdrawal and recurrent episodes of depression, anxiety, and suicidal ideation.

92.   Ms. Doe notifies Defendants each time she is denied estradiol, but her concerns are routinely ignored.[8] As a result, Ms. Doe either missed doses entirely or only belatedly received her injections.

93.   Also on or around September 18, 2025, when Ms. Doe was returned to GDC custody, and without explanation, Defendants cut Ms. Doe's spironolactone dosage by <u>half</u>, to 150 mg daily.[9] Upon information and belief, a pharmacist—not an endocrinologist—made the decisions to halve Ms. Doe's medically-necessary dosages of spironolactone.

---

[8] Dkt. 299-7 ¶ 42
[9] Dkt. 299-7 ¶ 9.

94.    As a result, the minimal feminizing effects Ms. Doe began to experience are reverting: her testicles have grown, she wakes with erections, her body and facial hair have grown back, and her breasts have reduced in size. Consequently, the anxiety, depression, and distress associated with her gender dysphoria have worsened.

95.    Aside from a health assessment at intake, Ms. Doe has not been evaluated in person by a medical doctor or nurse practitioner since her return to GDC custody.

96.    As for mental healthcare, a counselor comes into the lockdown unit twice a week, for only about fifteen minutes at a time, to visit with Ms. Doe at her segregated cell, within earshot of other inmates and corrections officers. This is akin to no mental healthcare at all.

97.    Ms. Doe's experience in federal custody makes clear that Defendants' refusal to provide reasonable accommodations for her disability is unreasonable and unconscionable, and disregards the substantial risks of harm to her mental health.

## L.  Ms. Doe's Prolonged Placement in Administrative Segregation is Cruel and Unusual

98.    Aside from a six-month period in federal custody in 2025,[10] Ms. Doe

---

[10] This corresponds to Ms. Doe's temporary custody within a federal facility. During this time, she was placed within general population and received non disciplinary actions or other issues.

has remained in administrative segregation at Phillips State Prison ever since she was initially moved there.

99. GDC has housed Ms. Doe in administrative segregation for nearly six years, even though nationally-recognized standards strongly disfavor the use of involuntary segregation for transgender individuals unless no other option exists.[11]

100. As a result, Ms. Doe has experienced debilitating changes to her mental and physical health. While in segregation, Ms. Doe attempted self-castration in 2023, suicide in December 2024, and self-harm throughout.

101. GDC has classified Ms. Doe as "Mental Health Level III," an institutional designation which reflects a moderate impairment due to mental illness requiring mental health treatment in a Level III Supportive Living Unit ("SLU"). [12]

102. Per GDC policy, discharge planning for offenders from Mental Health Level III services shall be determined by "[t]he Treatment Team, led by the clinical director/psychologist" which includes the "treating psychiatrist/APRN, mental health unit manager and the assigned mental health counselor."[13]

103. Per GDC policy, a transfer to general population from Level III services is "a clinical decision and will be made when the Mental Health Treatment Team

---

[11] *See* 28 C.F.R. § 115.43(c).
[12] GDC SOP 508.16(IV)(C)(1).
[13] GDC SOP 508.16(IV)(C)(5)(a)

determines that an offender can function effectively in general population."[14]

104.  GDC policy provides that Level III individuals be housed in a "Supportive Living Unit dorm (SLU-III) with other Level III" individuals.[15]

105.  Importantly, it is the responsibility of mental health staff to ensure that mental health offenders are appropriately housed.[16]

106.  Despite this, Ms. Doe remains in administrative segregation because Defendant Warden Pineiro ordered GDC staff not to transfer her out. Defendant Jones similarly refused to remove Ms. Doe from administrative segregation while he was warden of Phillips State Prison, despite Ms. Doe's multiple requests.

107.  Administrative segregation is not a "Supportive Living Unit dorm."

108.  The conditions of Ms. Doe's administrative segregation do not differ from solitary confinement in any meaningful way.[17]

109.  Ms. Doe is confined nearly 24 hours a day to a segregated cell, measuring approximately 7 feet by 11 feet, with a metal plate over the window blocking natural light. The cell lacks central air and heating, even though a

---

[14] GDC SOP 508.16(IV)(C)(5)(f).

[15] GDC SOP 508.16(IV)(G)(2).

[16] GDC SOP 508.16(IV)(G)(6)

[17] *See generally Melendez v. Sec'y Fla. Dept. of Corr.*, 2022 WL 1124753 (11th Cir. Apr. 15, 2022) (per curiam) (referring to "solitary confinement," "administrative confinement status," and "close management" status interchangeably). For clarity, this Complaint will refer to administrative segregation throughout, as this is the term GDC has assigned to Ms. Doe's confinement. However, in practice, this confinement is functionally equivalent to solitary confinement.

25

pulmonary specialist recommended these accommodations for Ms. Doe's severe asthma and Chronic Obstructive Pulmonary Disease ("COPD").

110.    Alarmingly, Ms. Doe has been denied basic human needs like social interaction, and until recently, out-of-cell recreation time. The denial of out-of-cell recreation time was imposed by Defendant Warden Pineiro in violation of GDC's own policies requiring at least one hour of exercise outside of an assigned cell, five days per week, and without any articulated security or safety considerations dictating otherwise.[18]

111.    Defendant GDC has been counting Ms. Doe's weekly calls with her legal counsel as her "one (1) hour of *exercise* per day" outside of her cell. She does not receive any out-of-cell recreation time on days she meets with her legal counsel.

112.    GDC policy sets out a detailed protocol requiring authorized staff to continually determine whether an individual should remain in administrative segregation.   *See* SOP 209.06 (IV).

113.    GDC has not complied with that policy with respect to Ms. Doe.

**CLAIMS FOR RELIEF**

**COUNT 1**

**42 U.S.C. § 1983 – Eighth Amendment – Medical Deliberate Indifference –**

**Against MHM/CENTURION DEFENDANTS AUSBORN, LANE,
CLEARY, MOORE, BOWLING, BILLINGS, SKIBINSKI, and GDC**

---

[18] *See* GDC SOP 209.06 (IV)(H)(19).

**DEFENDANTS MULLOY, LEWIS, PINEIRO, JONES, and MARDIS,**

**in their individual capacities for Damages, and in their official capacities for Injunctive Relief**

114.  Ms. Doe incorporates by reference all preceding paragraphs as if fully set forth herein.

115.  At all times relevant, Ms. Doe has suffered from gender dysphoria, a serious medical condition that, if left untreated or undertreated, results in severe physical and psychological distress, including risks of self-harm and suicide.

116.  All Defendants had actual, subjective knowledge of Ms. Doe's serious medical needs through medical records, formal grievances, and face-to-face encounters.

117.  These Defendants, in their official capacities, were deliberately indifferent to Ms. Doe's needs by:

a. Personally denying or affirming the denial of gender-affirming care (hormones, surgery, or accommodations) despite medical recommendations.

b. Enforcing the GDC Blanket Ban, which prioritizes bias over the clinical requirements of gender dysphoria.

118.  GDC Defendants Jones, Pineiro, Lewis, and Mardis, and MHM/Centurion Defendant Billings, acting in their individual capacities, received

27

direct notice of the ongoing constitutional violation through the grievance process and failed to exercise their authority to provide necessary care, thereby ratifying the unconstitutional conduct.

119.    GDC Defendants Lewis, Mardis, and Mulloy, and MHM/Centurion Defendants Ausborn, Lane, Cleary, Moore, Bowling, Billings, and Skibinski, acting in their individual capacities as medical providers or administrators, acted with a sufficiently culpable state of mind by:

    a.  Refusing to provide care that meets the WPATH Standards of Care.

    b.  Allowing non-medical factors (including bias) to override their professional medical judgment.

    c.  Failing to supervise the medical staff to ensure disability-related protocols were followed.

120.    Each Defendant was personally involved in the decision-making chain. Each had the individual authority to provide or authorize care and consciously chose to withhold it, despite the known risk of harm to Ms. Doe.

121.    As a direct result of these Defendants' collective deliberate indifference, Ms. Doe has suffered irreparable physical and emotional injury.

122.    Ms. Doe is entitled to an injunction requiring Defendants to provide the necessary medical accommodations for her gender dysphoria.

123.   Ms. Doe is also entitled to compensatory and punitive damages against each Defendant in their individual capacity to punish their reckless disregard for Ms. Doe's life and safety.

124.   Ms. Doe also seeks reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988 and the Prison Litigation Reform Act.

## COUNT 2
**Title II of the Americans with Disabilities Act – Failure to Accommodate – Against Defendant GDC for Damages and Injunctive and Declaratory Relief**

125.   Ms. Doe incorporates by reference all preceding paragraphs as if fully set forth herein.

126.   At all times relevant, Ms. Doe has been a "qualified individual with a disability" as defined by 42 U.S.C. § 12102. Ms. Doe suffers from gender dysphoria, a clinically significant distress resulting from the incongruence between her gender identity and her sex assigned at birth.

127.   Gender Dysphoria is a physical and mental impairment that substantially limits one or more of Ms. Doe's major life activities. It is not an "excluded condition" under 42 U.S.C. § 12211, as it has a known physical basis and is not a "gender identity disorder" resulting from a lack of physical impairment.

128.   Defendant GDC is a "public entity" under Title II of the ADA.

129.   Ms. Doe requested reasonable accommodations for her disability,

including adequate HRT, mental health evaluations for gender-affirming surgery, and access to gender-affirming items from the women's commissary list and the special package program.

130.   Despite notice of Ms. Doe's disability and her specific needs, GDC failed to provide reasonable accommodations. Instead, GDC enforced a blanket policy denying gender-affirming care and placed Ms. Doe in a segregated housing unit where she cannot access services.

131.   GDC's failure to accommodate Ms. Doe was not a mere oversight, but was done with deliberate indifference to her federally protected rights. Defendant had actual knowledge of the risk of harm to Ms. Doe—including severe psychological distress and risk of self-harm—and failed to act.

132.   As a direct and proximate result of GDC's discriminatory actions and refusal to accommodate, Ms. Doe has suffered and continues to suffer physical injury, extreme emotional distress, and debilitating anxiety.

133.   Ms. Doe is entitled to an injunction requiring GDC to provide the necessary medical accommodations for her gender dysphoria.

134.   Ms. Doe is also entitled to declaratory judgment declaring that Defendant GDC's policy placing a blanket ban on gender-affirming care for persons with gender dysphoria violates Title II of the ADA, 42 U.S.C. § 12131 *et seq.*

135.   Ms. Doe is also entitled to compensatory damages for the injuries

sustained due to GDC's intentional violations of the ADA.

136.   Ms. Doe also seeks reasonable attorney fees and costs pursuant to 42 U.S.C. § 12205.

## COUNT 3

**Title II of the Americans with Disabilities Act – Intentional Discrimination – Against Defendant GDC for Damages and Injunctive and Declaratory Relief**

137.   Ms. Doe incorporates by reference all preceding paragraphs as if fully set forth herein.

138.   Ms. Doe is a person with a disability under the ADA. Her diagnosis of gender dysphoria constitutes a physical or mental impairment that substantially limits major life activities, including but not limited to interacting with others, caring for oneself, and the operation of major endocrine functions.

139.   Defendant GDC is a "public entity" pursuant to 42 U.S.C. § 12131, making it subject to the mandates of the ADA.

140.   Defendant GDC had actual knowledge of Ms. Doe's disability and her need for disability-related accommodations and protections. This knowledge was provided through medical records, formal grievances, and prior diagnoses.

141.   Defendant GDC, through its policies, customs, and the actions of its agents, intentionally discriminated against Ms. Doe because of her disability. This discrimination included:

    a.  Denying Ms. Doe access to programs, services, and safe housing provided to non-disabled inmates.

    b.  Maintaining a blanket policy regarding gender-affirming care that categorically excludes individuals with gender dysphoria from individualized assessment and medically-necessary care.

142. Defendant GDC acted with deliberate indifference to Ms. Doe's federally protected rights. Despite being put on notice that their failure to provide adequate HRT, gender-affirming surgery, and access to gender-affirming items would result in a violation of the ADA and cause Ms. Doe severe harm, GDC knowingly failed to adopt a non-discriminatory alternative.

143. GDC's failure to provide accommodations did not result from a lack of resources, but from a deliberate choice by GDC officials to ignore the clinical and safety requirements of Ms. Doe's disability based on bias.

144. As a direct result of GDC's intentional discrimination, Ms. Doe has suffered irreparable harm, including but not limited to severe mental anguish and physical deterioration.

145. Ms. Doe seeks a permanent injunction enjoining Defendant GDC from further discriminatory acts and requiring GDC to provide all necessary accommodations for her gender dysphoria.

146.   Ms. Doe also seeks declaratory judgment declaring that Defendant GDC's policy placing a blanket ban on gender-affirming care for persons with gender dysphoria constitutes unlawful disability discrimination, in violation of Title II of the ADA, 42 U.S.C. § 12131 *et seq.*

147.   Because GDC's conduct was intentional and deliberately indifferent, Ms. Doe is entitled to compensatory damages for the pain, suffering, and loss of dignity she has endured.

148.   Ms. Doe also seeks reasonable attorney fees and costs pursuant to 42 U.S.C. § 12205.

## COUNT 4

**Section 504 of the Rehabilitation Act – Disability Discrimination and Intentional Failure to Accommodate –**

**Against Defendants GDC and MHM/CENTURION for Damages, and Injunctive and Declaratory Relief**

149.   Ms. Doe, incorporates by reference all preceding paragraphs as if fully set forth herein.

150.   Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination on the basis of disability in any program or activity receiving federal assistance. Section 504 also requires covered parties to provide "reasonable accommodations" to individuals with disabilities so they can fully participate in the benefits administered by the covered parties.

151.   Ms. Doe is a qualified individual with a disability as defined by 29 U.S.C. § 705(20). Her gender dysphoria is a physical and mental impairment that substantially limits major life activities, including the operation of her endocrine system and her ability to maintain mental health stability.

152.   Defendant MHM/Centurion is a private entity that receives federal financial assistance, including but not limited to federal funds for healthcare services, grants, or participation in federally funded programs through its contract with the Georgia Department of Corrections. As such, MHM/Centurion is subject to the mandates of Section 504 of the Rehabilitation Act.

153.   Defendant GDC is a government program receiving federal financial assistance under 29 U.S.C. § 794, making it subject to the mandates of the Rehabilitation Act.

154.   GDC, through its prison officials, administrators, and medical staff, and MHM/Centurion, through its medical staff and clinical directors, have denied Ms. Doe access to necessary medical treatment for her gender dysphoria, including adequate hormone therapy and gender-affirming surgery.

155.   GDC and MHM/Centurion acted with deliberate indifference to Ms. Doe's federally protected rights. GDC and MHM/Centurion had actual knowledge that its failure to accommodate Ms. Doe's disability would result in a violation of

Section 504 and cause her severe harm. Despite this knowledge, GDC and MHM/Centurion:

    a.  Refused to provide accommodations that were medically necessary and reasonable.

    b.  Enforced GDC's blanket, non-individualized ban on gender-affirming surgery.

    c.  Ignored clinical standards of care in favor of discriminatory internal protocols.

156. The denial of care was not a result of medical judgment, but was motivated by discriminatory animus or a categorical refusal to treat gender dysphoria on the same terms as other medical conditions. This constitutes intentional discrimination under Section 504.

157. As a direct and proximate result of MHM/Centurion's intentional discrimination and deliberate indifference, Ms. Doe has suffered substantial damages, including extreme physical pain, permanent psychological trauma, a self-castration attempt in 2023, a suicide attempt in 2024, near-constant self-harm, and a loss of dignity and well-being.

158. Ms. Doe seeks compensatory damages from Defendant MHM/Centurion for the physical and emotional injuries sustained.

159.    Ms. Doe also seeks reasonable attorney fees and costs pursuant to 29 U.S.C. § 794a.

## COUNT 5

**Title III of the Americans with Disabilities Act – Disability Discrimination – Against Defendant MHM/CENTURION for Injunctive and Declaratory Relief**

160.    Ms. Doe incorporates by reference all preceding paragraphs as if fully set forth herein.

161.    Defendants MHM/Centurion are private entities that owns, leases, or operates a "place of public accommodation" within the meaning of 42 U.S.C. § 12181(7)(F). Specifically, MHM/Centurion operates the professional offices of healthcare providers and medical facilities within Phillips State Prison and other GDC facilities.

162.    Ms. Doe is an individual with a disability (gender dysphoria) who is entitled to the "full and equal enjoyment" of the medical services and facilities provided by MHM/Centurion.

163.    MHM/Centurion discriminated against Ms. Doe on the basis of her disability by:

    a. Denying her the opportunity to participate in or benefit from medical services and treatments (such as gender-affirming care) that are provided to other patients.

b. Providing services that are not equal to those afforded to other individuals.

c. Failing to make reasonable modifications in policies, practices, or procedures when such modifications are necessary to afford medical services to individuals with gender dysphoria.

164. Upon information and belief, MHM/Centurion utilizes eligibility criteria or internal "protocols" that screen out or tend to screen out individuals with Gender Dysphoria from receiving necessary medical care, in violation of 42 U.S.C. § 12182(b)(2)(A)(i).

165. The discriminatory practices of MHM/Centurion are ongoing. As long as MHM/Centurion remains the contracted medical provider and continues to deny Ms. Doe necessary accommodations, she is being subjected to continuous discrimination.

166. Pursuant to 42 U.S.C. § 12188, Ms. Doe is entitled to an order requiring MHM/Centurion to:

a. Modify its policies to recognize gender dysphoria as a protected disability.

b. Cease the discriminatory denial of gender-affirming medical care.

c. Provide the specific medical accommodations requested by Ms. Doe.

37

167.  Ms. Doe seeks declaratory judgment declaring that Defendant MHM/Centurion's enforcement of GDC's policy placing a blanket ban on gender-affirming care for persons with gender dysphoria violates Title III of the ADA, 42 U.S.C. § 12181 *et seq.*

168.  Ms. Doe also seeks reasonable attorney fees and costs pursuant to 42 U.S.C. § 12205.

## COUNT 6
### 42 U.S.C. § 1983 – Eighth Amendment – Prolonged Solitary Confinement — Against Defendant GDC for Injunctive Relief and
### Against GDC Defendants JONES and PINEIRO in their individual capacities for Damages

169.  Ms. Doe incorporates by reference all preceding paragraphs as if fully set forth herein.

170.  At all times relevant, GDC Defendants Jones and Pineiro, acting under color of state law, subjected Ms. Doe to prolonged administrative segregation (equivalent to solitary confinement) for at least five years. During this time, Ms. Doe was confined to a cell for 23 to 24 hours a day with limited light, no social interaction, and restricted hygiene.

171.  Prolonged social isolation is a well-documented cause of severe psychological and physical trauma. For an individual with gender dysphoria, this isolation is particularly catastrophic, leading to intensified depression, anxiety,

38

hallucinations, or increased risk of self-mutilation and suicide.

172. GDC Defendants Jones and Pineiro had actual knowledge of Ms. Doe's diagnosis of gender dysphoria and the resulting vulnerability of her mental health. Despite this knowledge, they personally authorized, oversaw, or refused to terminate her placement in administrative segregation, disregarding the substantial risk of serious harm it posed to her.

173. Upon information and belief, Defendants Jones and Pineiro justified this isolation as protective custody or administrative necessity. However, using administrative segregation as a substitute for safe housing for a transgender individual constitutes a wanton and unnecessary infliction of pain and is not a legitimate penological objective.

174. Defendant GDC maintains a policy, custom, or practice of using prolonged isolation as a primary tool for managing transgender inmates rather than providing individualized safety assessments or appropriate housing. This systemic failure was a motivating force behind the violation of Ms. Doe's Eighth Amendment rights.

175. As a direct result of the Defendants' actions and omissions, Ms. Doe has suffered psychological trauma, physical deterioration, suicide attempts, and self-mutilation.

176. Ms. Doe seeks an order requiring GDC to remove her from

administrative segregation and house her in the least restrictive environment consistent with her safety and gender identity.

177.   Ms. Doe seeks compensatory and punitive damages against Defendants Jones and Pineiro in their individual capacities for their reckless disregard of her constitutional rights.

178.   Ms. Doe also seeks reasonable attorney fees and costs pursuant to 42 U.S.C. § 12205.

## **REQUEST FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

A.  Enter judgment in favor of Plaintiff and against Defendants on each of the counts in this complaint;

B. Issue injunctive relief against Defendants by ordering Defendants to meet medical standards for Plaintiff's medically necessary gender-affirming care and provide Plaintiff with reasonable accommodations for her gender dysphoria, including but not limited to ordering Defendants to:

   a. Allow Plaintiff to meet with surgeons who can provide the gender-affirming surgeries previously cleared and recommended by her mental health clinicians and Defendant Centurion/MHM's Gender Dysphoria Committee;

b. Direct that Ms. Doe receives the surgeries recommended in the evaluations by 60 days after judgment entered in the case;

c. Direct that Ms. Doe remain on HRT at therapeutic dosages, even after surgery;

d. Direct that Plaintiff be provided regular mental health treatment in a private setting as recommended by psychiatrists; and

e. Require Defendants to modify their policies, practices, and procedures so as to bring their medical practices into compliance with Title II and Title III of the ADA and its accompanying regulations, including but not limited to:

   i. Eliminating all policies placing a blanket ban on providing gender-affirming care to incarcerated persons diagnosed with gender dysphoria.

C. Enter declaratory judgment:

a. That Defendants' enforcement of a Blanket Ban on gender-affirming care is unconstitutional under the Eighth Amendment;

b. That Defendant Georgia Department of Correction's enforcement of a policy placing a blanket ban on gender-affirming care violates Title II of the ADA, 42 U.S.C. § 12131 *et seq.*, and its accompanying regulation, with respect to persons with gender dysphoria;

41

c. That Defendants MHM and Centurion's enforcement of GDC's policy placing a blanket ban on gender-affirming care violates Title III of the ADA, 42 U.S.C. § 12181 *et seq.*, and its accompanying regulation, with respect to persons with gender dysphoria; and

d. That Defendants' enforcement of a policy placing a blanket ban on gender-affirming care violates Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and its accompanying regulation, with respect to persons with gender dysphoria.

D. Award Plaintiff compensatory, nominal, and punitive damages for her physical injuries and pain and suffering;

E. Award Plaintiff costs and reasonable attorney's fees as allowed by law; and

F. Grant any other relief this Court deems just, equitable, and proper.

Respectfully submitted this 16th day of April, 2026.

/s/ Derrick Luster                                                          **Admitted *pro hac vice***
Lydia Wright *
Derrick Luster *
RIGHTS BEHIND BARS
1800 M Street NW Front 1 #33821
Washington, D.C. 20033
(202) 455-4399
lydia@rightsbehindbars.org
derrick@rightsbehindbars.org

Nicholas F. Palmieri *
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, New York 10112
(212) 408-2640
Nick.palmieri@bakerbotts.com

Sterling A. Marchand *
Scott Novak *
BAKER BOTTS L.L.P.
700 K St NW
Washington, DC 20001
Telephone: (202) 639-1316
sterling.marchand@bakerbotts.com
scott.novak@bakerbotts.com

Christopher J. Murell
Georgia Bar Number: 195116
Meghan Matt*
MURELL LAW FIRM
2831 St. Claude Avenue
New Orleans, Louisiana 70117
Telephone: (504) 717-1297
Facsimile: (504) 233-6691
chris@murell.law
meghan@murell.law

43

2

516336807.1