**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

JANE DOE,

        *Plaintiff*,

v.

GEORGIA DEPARTMENT OF COR-
RECTIONS, *et al.*,

        *Defendants*.

Case No. 1:23-cv-5578-MLB

**STATE DEFENDANTS' MEMORANDUM
IN SUPPORT OF THEIR MOTION TO DISMISS
PLAINTIFF'S FINAL AMENDED COMPLAINT**

**TABLE OF CONTENTS**

Table of Authorities.............................................................................................. iii

Introduction & Statement of the Case ................................................................ 1

Argument.............................................................................................................. 5

    I.    Statutes of limitations bar Plaintiff's claims before December 6, 2021. .. 5

    II.   Sovereign immunity bars all claims pleaded against the Georgia
        Department of Corrections. ...................................................................... 6

    III.   Qualified immunity bars Plaintiff's claims for damages against individual
        State Defendants in their personal capacities. .......................................... 8

    IV.   Plaintiff does not plausibly allege that Defendants violated the Eighth
        Amendment. ............................................................................................. 9

        A.    The Eighth Amendment does not prohibit state officials from
            making categorical judgments regarding inmate medical
            treatment. ..................................................................................... 11

        B.    Plaintiff has no constitutional right to sex-reassignment surgery. 16

        C.    Plaintiff's disagreement with the specific dosage of cross-sex
            hormones is not cruel and unusual punishment. ........................... 21

        D.    The Eighth Amendment does not require access to feminizing
            cosmetic and clothing items........................................................ 26

        E.    Plaintiff's administrative segregation does not violate the
            Eighth Amendment. ..................................................................... 29

    V.    Plaintiff does not plausibly allege violations of the ADA or RA. .......... 32

        A.    Gender dysphoria is not a "disability" under the ADA or RA. .... 34

        B.    Plaintiff cannot repackage an Eighth Amendment or medical
            malpractice claim as a denial of benefits under the ADA or RA. 35

        C.    Plaintiff has not plausibly alleged any denial was "because of"
            Plaintiff's gender dysphoria......................................................... 36

        D.    Plaintiff's proposed accommodations are not reasonable............. 39

        E.    Plaintiff alleges no facts to show intentional discrimination........ 39

Conclusion.......................................................................................................... 40

Certificate of Compliance.................................................................................. 42

Certificate of Service.......................................................................................... 43

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Crouch*,
169 F.4th 474 (4th Cir. 2026) ...................................................... passim

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................... passim

*Bayse v. Dozier*,
2019 WL 3365854 (M.D. Ga.) ........................................................ 16

*Bayse v. Ward*,
147 F.4th 1304 (11th Cir. 2025) .................................................. passim

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................... 26, 38

*Benjamin v. Oliver*,
800 F. Supp. 3d. 1314 (N.D. Ga. 2025).................................... 2, 17, 21

*Bucklew v. Precythe*,
587 U.S. 119 (2019)............................................................ 20

*Burger v. Bloomberg*,
418 F.3d 882 (8th Cir. 2005) ....................................................... 35

*Cameron v. Thomas*,
2018 WL 3521190 (S.D. Ala. Jun. 22) ............................................ 24

*Campbell v. Kallas*,
936 F.3d 536 (7th Cir. 2019) ....................................................... 21

*Carter as next friend of Carter v. City of Shreveport*,
144 F.4th 809 (5th Cir. 2025) ................................................. 35, 36

*Crocker v. Beatty*,
995 F.3d 1232 (11th Cir. 2021) ................................................ 8, 9, 21

*Doe v. Ga. Dep't of Corr.*,
2025 WL 1206229 (11th Cir. Mar. 6)............................................... 1

*Druley v. Patton*,
601 F. App'x 632 (10th Cir. 2015) .................................................. 25

*Edmo v. Corizon, Inc.*,
949 F.3d 489 (9th Cir. 2020) (en banc) ........................................... 20

*Eknes-Tucker v. Gov. of Ala.*,
114 F.4th 1241 (11th Cir. 2024) (en banc) ................................... 4, 18

*Eknes-Tucker v. Gov. of Ala.*,
  80 F.4th 1205 (11th Cir. 2023) ........................................................ 4, 12, 14, 15

*Est. of May by & through Myrick v. Fulton Cnty.*,
  2020 WL 5541086 (N.D. Ga. Aug. 13) ........................................................... 35

*Everett v. Cobb Cnty. Sch. Dist.*,
  138 F.3d 1407 (11th Cir. 1998) ......................................................................... 5

*Finn v. Haddock*,
  459 F. App'x 833 (11th Cir. 2012) .................................................................. 35

*Gibson v. Collier*,
  920 F.3d 212 (5th Cir. 2019) .................................................................... passim

*Grissom v. Roberts*,
  902 F.3d 1162 (10th Cir. 2018) ....................................................................... 32

*Havens v. Colo. Dep't of Corr.*,
  897 F.3d 1250 (10th Cir. 2018) ....................................................................... 39

*Heller v. Doe*,
  509 U.S. 312 (1993) .......................................................................................... 3

*Hilyer v. Dunn*,
  2016 WL 7093437 (S.D. Ala. Oct. 28) ............................................................ 24

*Hoffer v. FDC*,
  973 F.3d 1263 (11th Cir. 2020) ......................................................... 11, 16, 25, 28

*Jackson v. Harrison*,
  2024 WL 5668841 (M.D. Ga. May 20) .............................................................. 7

*Jackson v. West*,
  787 F.3d 1345 (11th Cir. 2015) ....................................................................... 23

*Jones v. Rutherford*,
  546 F. App'x 808 (11th Cir. 2013) .................................................................. 36

*Keohane v. Fla. Dep't of Corr. Sec'y*,
  952 F.3d 1257 (11th Cir. 2020) ................................................................ passim

*Kincaid v. Williams*,
  143 S. Ct. 2414 (2023) .................................................................................... 34

*Lamb v. Norwood*,
  899 F.3d 1159 (10th Cir. 2018) ....................................................................... 25

*Lange v. Houston Cnty., Ga.*,
  152 F.4th 1245 (11th Cir. 2025) (en banc) ................................................. 12, 37

iv

*LaVergne v. Stutes*,
  82 F.4th 433 (5th Cir. 2023) .................................................................. 31

*McGugan v. Aldana-Bernier*,
  752 F.3d 224 (2d Cir. 2014) .................................................................. 37

*Michaels v. Akal Sec., Inc.*,
  2010 WL 2573988 (D. Colo.) ................................................................. 34

*Miller v. Palm Beach Cnty. Sheriff's Off.*,
  129 F.4th 1329 (11th Cir. 2025) ............................................................. 8

*Muscogee (Creek) Nation v. Rollin*,
  119 F.4th 881 (11th Cir. 2024) ............................................................... 6

*Nance v. GDC*,
  59 F.4th 1149 (11th Cir. 2023) ............................................................... 5

*Onishea v. Hopper*,
  171 F.3d 1289 (11th Cir. 1999) (en banc) ............................................. 39

*Otto v. City of Boca Raton, Fla.*,
  981 F.3d 854 (11th Cir. 2020) ............................................................... 19

*Porter v. Penn. Dep't of Corr.*,
  974 F.3d 431 (3d Cir. 2020) .................................................................. 32

*Schiavo ex rel. Schindler v. Schiavo*,
  403 F.3d 1289 (11th Cir. 2005) ............................................................. 35

*Sheley v. Dugger*,
  833 F.2d 1420 (11th Cir. 1987) .............................................. 29, 31, 32

*Shelton v. Ark. Dep't of Human Servs.*,
  677 F.3d 837 (8th Cir. 2012) ................................................................ 36

*Silberman v. Miami Dade Transit*,
  927 F.3d 1123 (11th Cir. 2019) ............................................................. 33

*Stevens v. Gay*,
  864 F.2d 113 (11th Cir. 1989) ................................................................. 7

*Tardif v. City of New York*,
  991 F.3d 394 (2d Cir. 2021) .................................................................. 36

*United States v. Georgia*,
  546 U.S. 151 (2006) ................................................................. 7, 8, 33, 41

*United States v. Skrmetti*,
  605 U.S. 495 (2025) ...................................................................... passim

v

*Vital Pharms. v. Alfieri*,
  23 F.4th 1282 (11th Cir. 2022) ........................................................ 27

*Wade v. McDade*,
  106 F.4th 1251 (11th Cir. 2024) (en banc) ................................. passim

*Wade v. McDade*,
  2024 WL 5200546 (11th Cir. Dec. 23)........................................ 23, 24

*Washington v. Howard*,
  25 F.4th 891 (11th Cir. 2022) ........................................................... 9

*Will v. Mich. Dep't of State Police*,
  491 U.S. 58 (1989).......................................................................... 7

*Williams v. Kincaid*,
  45 F.4th 759 (4th Cir. 2022) ........................................................... 34

*Williams v. Reckitt Benckiser LLC*,
  65 F.4th 1243 (11th Cir. 2023) ....................................................... 10

*Youmans v. Gagnon*,
  626 F.3d 557 (11th Cir. 2010) .................................................... 21, 26

**Statutes**

29 U.S.C. §705 ................................................................................ 34

29 U.S.C. §794 ................................................................................ 34

42 U.S.C. §12211 ............................................................................ 34

Ga. Code Ann. §42-5-2(e)(1) ...................................................... 2, 17

**Rules**

Fed. R. Civ. P. 25(d)........................................................................ 10

**Regulations**

28 C.F.R. §115.43(c) ....................................................................... 30

**Constitutional Provisions**

U.S. Const. amend. VIII .................................................................... 21

## INTRODUCTION & STATEMENT OF THE CASE[1]

Plaintiff is an offender in a male state prison serving life sentences for violent felonies. In December 2023, Plaintiff sued the Georgia Department of Corrections (GDC), state officials, and medical providers for alleged violations of the Eighth Amendment, the Americans with Disabilities Act (ADA), and the Rehabilitation Act (RA). Plaintiff sought a preliminary injunction for sex-reassignment surgery, transfer to women's prison, a higher dose of cross-sex hormones, and various feminizing items. This Court denied the motion except with respect to two cosmetic and clothing items. Dkt.131 at 53. Defendants appealed, but the appeal was dismissed as moot following Plaintiff's temporary transfer to federal custody on March 3, 2025. *See Doe v. Ga. Dep't of Corr.*, 2025 WL 1206229, at *1 (11th Cir. Mar. 6); FAC ¶81.

On July 29, 2025, while still in federal custody, Plaintiff filed a "Second Amended Complaint." Dkt.259. Plaintiff no longer requested injunctive relief but added another count of deliberate indifference. Dkt.259. After Defendants moved to dismiss that complaint, Dkts.278, 280, Plaintiff requested leave to file a "Third Amended Complaint." Dkt.287. Defendants filed their opposition, and Plaintiff filed a reply. Dkts.288-89, 292. On March 4, 2026, before the Court could rule, Plaintiff again requested a preliminary injunction even though the operative complaint sought

---

[1] State Defendants and MHM Defendants have conferred and worked together to streamline their arguments and avoid redundancy across their filings, per the Court's instruction.

damages only. Dkt.299. The Court ordered Plaintiff to file a "final amended complaint" and denied Plaintiff's other motions. Dkt.312.

State Defendants (GDC, DeShawn Jones, Aaron Pineiro, Dr. Sharon Lewis, Dr. Marlah Mardis, and Dr. Anthony Mulloy) now move to dismiss Plaintiff's Final Amended Complaint under Federal Rule of Civil Procedure 12(b)(1), (6).

*First,* many of Plaintiff's claims are barred by various statutes of limitations and immunities. All claims based on conduct that occurred prior to December 6, 2021 are time-barred. And all claims pleaded against GDC are barred by sovereign immunity. Plaintiff's remaining claims are against state officials. Plaintiff fails to state a claim against any of them. At a minimum, the claims against officials in their individual capacities are barred by qualified immunity, as the alleged conduct does not violate law clearly established by the Supreme Court or the Eleventh Circuit.

*Second,* the Eighth Amendment does not require Georgia to use taxpayer funds to facilitate the unproven medical interventions Plaintiff demands. Plaintiff does not even cite Senate Bill 185, which prohibits the use of public funds for several of Plaintiff's requested interventions. Ga. Code Ann. §42-5-2(e)(1). Another court in this district has granted injunctive relief against SB185 with respect to hormones. *See Benjamin v. Oliver*, 800 F. Supp. 3d. 1314, 1348 (N.D. Ga. 2025), *appeal pending*, No. 25-14263 (11th Cir.) (argued Apr. 24, 2026). Plaintiff continues to receive cross-sex hormones pursuant to this injunction. But no court has enjoined SB185

2

with respect to sex-reassignment surgery or cosmetic prosthetics to alter sex charac-

teristics. Defendants have an obligation to comply with these provisions of SB185

unless and until they are found unconstitutional. *See Heller v. Doe*, 509 U.S. 312,

320 (1993) (state laws are presumptively constitutional). Despite this, the complaint

nowhere even *mentions* SB185, much less explains why this Court should enjoin this

presumptively constitutional state law.

Even if Plaintiff were challenging the constitutionality of SB185, Plaintiff

would fail to state a claim. The Eighth Amendment deliberate-indifference standard

is one of the most deferential in constitutional law. An inmate's medical treatment

does not violate this standard unless it is "'so grossly incompetent, inadequate, or

excessive as to shock the conscience or to be intolerable to fundamental fairness.'"

*Bayse v. Ward*, 147 F.4th 1304, 1312 (11th Cir. 2025). Even conscience-shocking

treatment is not unconstitutional unless state officials act with "'subjective reckless-

ness as used in the criminal law.'" *Wade v. McDade*, 106 F.4th 1251, 1253 (11th

Cir. 2024) (en banc). And even then, an official "cannot be found liable … if he

'responded reasonably to th[e] risk.'" *Id.* Thus, a "simple difference in medical opin-

ion … fails to support a claim…." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d

1257, 1266 (11th Cir. 2020) (cleaned up).

In short, the Eighth Amendment standard is at least as deferential as rational

basis review—a standard under which courts have permitted states to outright ban

3

many of Plaintiff's requested interventions in certain circumstances. *See Eknes-Tucker v. Gov. of Ala.*, 80 F.4th 1205 (11th Cir. 2023), *rehearing denied* 114 F.4th 1241 (11th Cir. 2024) (en banc); *United States v. Skrmetti*, 605 U.S. 495 (2025).

This deliberate-indifference standard does not require Defendants to provide any of Plaintiff's demanded interventions. "[S]ex reassignment surgery is fiercely debated within the medical community." *Gibson v. Collier*, 920 F.3d 212, 224 (5th Cir. 2019); *see also Anderson v. Crouch*, 169 F.4th 474, 491-92 (4th Cir. 2026) (noting "[t]he evidence … shows that there is an ongoing debate" over the "medical efficacy and necessity" of sex-reassignment surgery and holding that "[t]he fact that these procedures may be ineffective, or worse, harmful" justified West Virginia's decision to exclude them from Medicaid); *Kosilek v. Spencer*, 774 F.3d 63, 68-96 (1st Cir. 2014) (en banc).

Plaintiff also takes issue with the dosage of hormones being administered but those allegations do not even approach deliberate indifference. And the Eleventh Circuit has already held that withholding feminizing clothing and cosmetic items does not constitute deliberate indifference because they are at most "psychologically pleasing." *Keohane*, 952 F.3d at 1274-75. Moreover, these items raise significant security concerns, especially for a high-risk offender like Plaintiff with a lengthy record of possessing contraband. *See id.* at 1277-79 (officials' judgment that "social-transitioning requests … would present significant security concerns in an all-male

prison" were reasonable and fatal to deliberate-indifference claim). This Court has already recognized that a "rational security concern warrants against … provid[ing]" many of Plaintiff's requested items. Dkt.131 at 24.

***Third,*** the Eighth Amendment did not require Jones or Pineiro to transfer a dangerous offender like Plaintiff out of administrative segregation. The complaint omits Plaintiff's violent, extensive, and recent criminal history. As a matter of public record, it provides ample security-based reasons for keeping Plaintiff separate from the general population. At a minimum, qualified immunity applies.

***Fourth,*** Plaintiff does not state a violation of the ADA or RA. Gender dysphoria is not a covered "disability." Even if it were, the complaint does not plausibly allege either a constitutional violation or a denial due to Plaintiff's gender dysphoria.

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Plaintiff fails to do so for any claim.

## I.  Statutes of limitations bar Plaintiff's claims before December 6, 2021.

"A claim brought under section 1983 is subject to the state statute of limitations governing personal injury actions, … which is two years in Georgia." *Nance v. GDC*, 59 F.4th 1149, 1153 (11th Cir. 2023). So too for Plaintiff's ADA and RA claims. *Everett v. Cobb Cnty. Sch. Dist.*, 138 F.3d 1407, 1409-10 (11th Cir. 1998). Any claims based on conduct before December 6, 2021, are time-barred and must

be dismissed. *See, e.g.*, FAC ¶¶32-33, 64 (alleging discontinued hormone therapy after June 2019); *id.* ¶¶27, 51-52 (alleging ignored requests for surgery since 2015 or 2016); *id.* ¶¶99, 170 (alleging solitary confinement for past 5-6 years).

## II. Sovereign immunity bars all claims pleaded against the Georgia Department of Corrections.

"Courts must consider sovereign immunity and any exceptions to it on a claim-by-claim and defendant-by-defendant basis." *Muscogee (Creek) Nation v. Rollin*, 119 F.4th 881, 887 (11th Cir. 2024). That proves difficult here, because although this is Plaintiff's seventh filed complaint, it still "bears features of 'shotgun pleading.'" *Id.* at 888. "It contains 'multiple counts' and 'each count adopts the allegations of all preceding counts.'" *Id.* "And several counts assert 'multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against.'" *Id.* "The lack of reference to specific claims in the prayer for relief … further muddies the analysis." *Id.* "This kind of pleading fails to give defendants 'adequate notice' of the 'grounds upon which each claim rests'" and "impairs the ability of courts to perform the claim-by-claim analysis that is necessary here." *Id.*

For example, Plaintiff ostensibly lodges four counts against GDC: three violations of the ADA/RA, FAC ¶¶125-159 (Counts 2-4), and one violation of the Eighth Amendment under 42 U.S.C. §1983, *id.* ¶¶169-178 (Count 6). And although the Count 4 subheading nominally states the claim is against both GDC and

6

Centurion and seeks both damages and injunctive relief, Count 4 ends by addressing and seeking damages only from Centurion and not GDC. FAC ¶¶157-158. In short, Count 4 fails to adequately plead a claim against GDC and must be dismissed.

Count 6, which seeks to enjoin GDC (and only GDC) from keeping Plaintiff in segregation under 42 U.S.C. §1983, must also be dismissed. The Eleventh Amendment "insulates a state from suit brought by individuals in federal court unless the state either consents to suit or waives its Eleventh Amendment immunity." *Stevens v. Gay*, 864 F.2d 113, 114 (11th Cir. 1989). GDC is an agency of the State of Georgia. FAC ¶7. Because Georgia has not waived immunity or consented to suit, "[t]he Eleventh Amendment bars this action against the Georgia Department of Corrections … whether [Plaintiff] seeks money damages or prospective injunctive relief." *Id.* at 115. Moreover, the State of Georgia, like all states, is also not a person amenable to suit under §1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 64 (1989). Thus, GDC "is not a proper defendant," and Count 6 must be dismissed. *Jackson v. Harrison*, 2024 WL 5668841, at *4 (M.D. Ga. May 20), *report and recommendation adopted*, 2024 WL 5668844 (M.D. Ga. Jun. 28).

Counts 2-3 (alleged ADA violations) must also be dismissed. Congress validly abrogated sovereign immunity for Title II of the ADA "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment." *United States v. Georgia*, 546 U.S. 151, 159

7

(2006) (emphasis in original). But courts must determine, "on a claim-by-claim basis": "(1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but … not … the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid." *Id.* Counts 2-3 fail to plead a constitutional violation, *infra* 33, or that Congress validly abrogated GDC's sovereign immunity here.

### III. Qualified immunity bars Plaintiff's claims for damages against individual State Defendants in their personal capacities.

Plaintiff sues all individual State Defendants in their personal capacities for failing to provide Plaintiff's demanded gender-dysphoria interventions, FAC ¶¶114-124 (Count 1), and Jones and Pineiro in their individual capacities for keeping Plaintiff in administrative segregation, *id.* ¶¶169-178 (Count 6).

Even if Plaintiff plausibly alleged a constitutional violation, this Court should dismiss the damages claims because Plaintiff cannot overcome qualified immunity. "As an immunity from suit," it must be resolved at the motion-to-dismiss stage. *Miller v. Palm Beach Cnty. Sheriff's Off.*, 129 F.4th 1329, 1333-34 (11th Cir. 2025).

Qualified immunity "shields 'all but the plainly incompetent or those who knowingly violate the law.'" *Crocker v. Beatty*, 995 F.3d 1232, 1239 (11th Cir. 2021) (cleaned up). Where the officials acted within their discretionary authority, the burden is on the plaintiff to prove "both that the defendant violated [Plaintiff's]

8

constitutional right and that 'the right was clearly established at the time of the violation.'" *Washington v. Howard*, 25 F.4th 891, 898 (11th Cir. 2022). "Because only clearly established law gives an officer fair notice that her conduct was unlawful, the Supreme Court has held that the contours of the constitutional right at issue must be sufficiently clear so that a reasonable official would understand that what he is doing violates that right." *Crocker*, 995 F.3d at 1240 (cleaned up). Broad statements of legal principles rarely suffice; a plaintiff will typically need to cite "'case law with indistinguishable facts'" to show clearly established law. *Id.* "A right is clearly established only if the state of the law on the date of the alleged misconduct makes it obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue." *Washington,* 25 F.4th at 903 (cleaned up).

Here, there is no controlling Supreme Court or Eleventh Circuit precedent holding that the Eighth Amendment requires prison officials to provide sex-change interventions or release an offender similar to Plaintiff into the general population. The Court must therefore grant qualified immunity and dismiss all claims brought against State Defendants in their individual capacities (Counts 1 and 6).

IV.   **Plaintiff does not plausibly allege that Defendants violated the Eighth Amendment.**

Plaintiff requests that the Court order all individual State Defendants to provide Plaintiff's demanded interventions, FAC ¶¶114-124 (Count 1), and GDC to remove Plaintiff from administrative segregation, *id.* ¶¶169-178 (Count 6). Plaintiff

9

does not seek an injunction against Jones or Pineiro with respect to Plaintiff's segregation. *Id.*

As an initial matter, the claims against Jones and Dr. Lewis in their official capacities must be dismissed for lack of standing, as they are no longer the warden or state medical director, respectively. *Id.* ¶8. "[B]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief only if his injury in fact is a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." *Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243, 1253 (11th Cir. 2023) (cleaned up). Enjoining Jones or Dr. Lewis would thus accomplish nothing.

To state a claim that a prison official violated the Eighth Amendment by acting with deliberate indifference to serious medical needs, "the plaintiff must demonstrate, as a threshold matter, that he suffered a deprivation that was, objectively, sufficiently serious." *Wade*, 106 F.4th at 1262 (cleaned up). "Second, the plaintiff must demonstrate that the defendant acted with subjective recklessness as used in the criminal law, and to do so he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff." *Id.* (cleaned up). Finally, "even if the defendant actually knew of a substantial risk to inmate health or safety, he cannot be found liable under the Cruel and Unusual Punishments Clause if he responded reasonably to the risk." *Id.* (cleaned up).

There is thus no Eighth Amendment violation for providing "'minimally adequate care.'" *Hoffer v. FDC*, 973 F.3d 1263, 1277 (11th Cir. 2020). This care is "quite minimal"; it need not be "perfect, the best obtainable, or even very good." *Id*. (cleaned up). "[P]risoners aren't constitutionally entitled to their preferred treatment plan." *Keohane*, 952 F.3d at 1277. Officials violate the Eighth Amendment only when the care "'is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id*. at 1266. "[A] simple difference in medical opinion between the prison's staff and the inmate … fails to support a claim of cruel and unusual punishment." *Id.* (cleaned up). And "[a]s long as prison administrators make judgments balancing security and health concerns that are 'within the realm of reason and made in good faith,' their decisions do not amount to a violation of the Eighth Amendment." *Kosilek*, 774 F.3d at 92.

### A. The Eighth Amendment does not prohibit state officials from making categorical judgments regarding inmate medical treatment.

Plaintiff cannot plausibly allege that the gender-dysphoria treatment provided by Defendants is "'so grossly incompetent, inadequate, or excessive as to shock the conscience.'" *Hoffer*, 973 F.3d at 1271. Indeed, courts have rejected constitutional challenges to state laws that defund or *even outright ban* similar interventions for large segments of the general public. And those courts did so by applying rational basis review, a standard even more demanding than the "conscience-shocking," "criminally reckless," *id.* at 1272, deliberate-indifference standard.

11

In *Eknes-Tucker*, the Eleventh Circuit applied rational basis review to reject due process and equal protection challenges to an Alabama law that criminalized providing hormones to a minor "'for the purpose of attempting to alter the appearance of or affirm the minor's perception of his or her gender or sex, if that appearance or perception is inconsistent with the minor's sex.'" 80 F.4th at 1210. The Supreme Court applied rational basis review to reject similar challenges to a Tennessee law prohibiting hormones for the purpose of "'[e]nabling a minor to identify with, or live as, a purported identity inconsistent with the minor's sex'" or "'[t]reating purported discomfort or distress from a discordance between the minor's sex and asserted identify.'" *Skrmetti*, 605 U.S. at 506. And the Fourth Circuit recently held that the Constitution allows West Virginia to exclude sex-change surgeries from Medicaid coverage. *Anderson*, 169 F.4th at 480, 492 ("Simply put, if a State can reasonably ban it, of course a State can reasonably refuse to pay for it."). *See also Lange v. Houston Cnty., Ga.*, 152 F.4th 1245, 1248 (11th Cir. 2025) (en banc) (rejecting a Title VII challenge to a county health insurance policy that excluded "'[d]rugs for sex change surgery' and '[s]ervices and supplies'" for such surgeries).

In rejecting constitutional challenges to these laws and policies, these courts emphasized the contested and unproven scientific basis for sex-change interventions. *See, e.g.*, *Skrmetti*, 605 U.S. at 524-25 (highlighting a new systematic review finding "'no good evidence on the long-term outcomes of interventions to manage gender-

12

related distress'" and recognizing the case dealt with "fierce scientific and policy debates about the safety, efficacy, and propriety of medical treatments in an evolving field"); *Anderson*, 169 F.4th at 491-92 (noting "[t]he evidence on record shows … an ongoing debate" over sex-reassignment surgery and recognizing that "these procedures may be ineffective, or worse, harmful"). Significantly, this "disagreement among experts about the efficacy and necessity of transgender surgeries *extends to treatment of gender dysphoria in adults*." *Id.* at 491 n.15 (emphasis added).

As the Fourth Circuit aptly summarized: "It does not matter that some experts believe these procedures are safe and effective. Others insist they are dangerous and ineffective." *Id.* at 492. "The widespread disagreement and recent developments in transgender medicine only underscore the need for legislative flexibility in this area." *Id.* (cleaned up). "States certainly have a legitimate interest in protecting their citizens from such medical procedures." *Id.* at 491 n.15. *See also Skrmetti*, 605 U.S. at 524 (states afforded "'wide discretion'" in areas of "'medical and scientific uncertainty'"). Moreover, because the deliberate-indifference standard requires that a state official act not just unreasonably, but with criminal recklessness, *Wade*, 106 F.4th at 1257, 1261-62, that standard is, if anything, *more* deferential to state officials. Just as the Fourth Circuit allowed West Virginia to ensure that Medicaid funds were not spent for sex-change surgeries, this Court should respect the Georgia

13

General Assembly's judgment that taxpayer funds should not be spent on those same interventions within the correctional system.

More fundamentally, notwithstanding Plaintiff's suggestion that there is something inherently unconstitutional about a "blanket ban," *see* FAC at 8, 13, 16, 27, 30, 33, 38, 41-42, the Eighth Amendment does not prevent a state from crafting generally applicable rules regarding inmate medical care. *See Gibson*, 920 F.3d at 225 (holding that the Eighth Amendment does not "forbi[d] categorical judgments about the necessity and efficacy of certain medical treatments"). The Eleventh Circuit agrees. *See Keohane*, 952 F.3d at 1278-79 (explaining the Eighth Amendment does not "prohibit prison authorities from making a prophylactic judgment that [allowing inmates to obtain 'social transition' items] in a men's prison simply poses too grave a threat to institutional security") (cleaned up). It thus "defies common sense" to suggest a "blanket ban is unconstitutional" or that "an individualized assessment is required." *Gibson*, 920 F.3d at 216. After all, if the Eighth Amendment forbade "blanket bans" and "prophylactic judgments," states would be unable to implement *any* general policy regarding medical interventions, even a ban on lobotomies or assisted suicide or highly risky and experimental interventions.

In the end, Plaintiff cannot plead around *Skrmetti* and *Eknes-Tucker*. These binding precedents (and progeny like *Anderson* and *Lange*) firmly establish two propositions: (1) States have broad discretion to regulate sex-change interventions,

14

up to and including refusing to fund them and even banning them in certain circumstances; and (2) Courts should "decline … to second-guess the lines that [state legislatures] dra[w]" when responding to developments in the "evolving field" of gender-dysphoria treatment. *Skrmetti*, 605 U.S. at 524-25. The deliberate-indifference standard gives Georgia at least as much deference in the prison context as Tennessee, Alabama, and West Virginia received in *Skrmetti*, *Eknes-Tucker*, and *Anderson*. Plaintiff thus fails to plausibly allege that a "blanket ban" on sex-reassignment surgery, cross-sex hormones, or feminizing items violates the Eighth Amendment.

Because Plaintiff cannot plausibly allege that a law like SB185 is unconstitutionally "conscience-shocking," Plaintiff tries to make it seem like Defendants are not treating Plaintiff's gender dysphoria at all. Plaintiff characterizes GDC's policies as a "Blanket Ban on Gender-Affirming Care." *E.g.*, FAC at 8, 30, 33, 38, 41-42. *See also id.* ¶¶32-33 (alleging Plaintiff's gender dysphoria was "left completely untreated" for four years simply because hormones were discontinued). In other words, Plaintiff attempts to define Plaintiff's specific, preferred treatment plan—"gender-affirming care"—as the *only* treatment for gender dysphoria.

But the complaint itself confirms Plaintiff was and is receiving extensive treatment for gender dysphoria. *See*, *e.g.*, FAC ¶¶28, 39, 55 (treatment team convened to consider Plaintiff's specific requests); *id.* ¶53 (officials conducted mental health assessments); *id.* ¶¶64, 69-70 (meetings with Dr. Mulloy); *id.* ¶¶72-73 (additional

15

healthcare meetings); *id.* ¶93 (Plaintiff is prescribed 150mg of spironolactone daily); *id.* ¶96 (discussing Plaintiff's current visits with a mental health counselor).

That is, even the complaint shows Plaintiff's doctors are "assessing [Plaintiff's] risk of future harm" and "regularly monitoring and managing" Plaintiff's conditions. *Hoffer*, 973 F.3d at 1272. When an inmate's "complaint isn't that [officials are] providing no care, just that [they aren't] providing the more aggressive—[or] better—care that [the inmate] desire[s]," there is no deliberate indifference. *Id.*; *see also id.* ("'[S]ome medical attention' doesn't necessarily demand curative care.").

**B. Plaintiff has no constitutional right to sex-reassignment surgery.**

As the Court has already recognized, GDC did not prohibit sex-reassignment surgery during much of the time covered by Plaintiff's allegations. *See* Dkt.131 at 16-17; *Bayse v. Dozier*, 2019 WL 3365854, at *6 (M.D. Ga.) ("[T]he record does not show that the GDC has a blanket policy against referring transgender inmates for SRS."). However, Georgia law changed following Plaintiff's transfer to federal custody. As of May 8, 2025, SB185 prohibits the use of state funds or resources "for the following treatments for state inmates: (A) Sex reassignment surgeries or any other surgical procedures that are performed for the purpose of altering primary or secondary sexual characteristics; (B) Hormone replacement therapies; and (C) Cosmetic procedures or prosthetics intended to alter the appearance of primary or secondary sexual characteristics." Ga. Code Ann. §42-5-2(e)(1). This new law is subject

16

to an ongoing constitutional challenge and has been enjoined *solely* with respect to its restrictions on cross-sex hormones. *See Benjamin*, 800 F. Supp. 3d 1314, *appeal pending*, No. 25-14263 (11th Cir.) (argued Apr. 24, 2026).

SB185's ban on the use of public funds for sex-reassignment surgeries is in force today, Plaintiff does not challenge (or even mention) that law, and this Court should not override the General Assembly's judgments. Even before *Skrmetti*, the Fifth and First Circuits recognized that "sex reassignment surgery is fiercely debated within the medical community." *Gibson*, 920 F.3d at 224; *see, e.g.*, *Kosilek*, 774 F.3d at 68-96. "[R]espected doctors profoundly disagree about whether sex reassignment surgery is medically necessary to treat gender dysphoria." *Gibson*, 920 F.3d at 221. Defendants cannot be found liable for deliberate indifference for not providing interventions whose necessity or appropriateness is hotly debated within the medical community, as multiple other courts have recognized. *See id.* at 226.

Plaintiff asserts that Defendants acted with a "sufficiently culpable state of mind" in denying surgery by "[r]efusing to provide care that meets the WPATH Standards of Care"—what Plaintiff alleges constitute "[t]he accepted clinical standard of care for treating gender dysphoria." FAC ¶¶15, 119.[2] But these purported

---

[2] The complaint repeatedly asserts, incorrectly, that Defendants denied sex-reassignment surgery despite various medical providers recommending Plaintiff get it. *See*, *e.g.*, FAC ¶¶ 2, 52-54, 58, 75-76. As the Court has explained, "Dr. Frady's report contains no evidence he diagnosed the need for gender-affirming surgery."

"standards" are at most mere guidelines formed by an advocacy group. *See Bayse*, 147 F.4th at 1313 ("[T]he standards of care from [WPATH]—by their own terms— are 'flexible clinical guidelines' that list 'changes in gender expression' as a mere 'option' for treatment.") (cleaned up); *see* Ex.D at S3, S6, S31. These are "far too equivocal to be evidence" of medical necessity. *Bayse*, 147 F.4th at 1313. *See also Eknes-Tucker*, 114 F.4th at 1261 (Lagoa, J., concurring in denial of rehearing en banc) (criticizing a district court's "improper reliance on the scientific claims of an advocacy organization [WPATH] to craft constitutional law").

WPATH guidelines are also supported by low-quality evidence. In *Skrmetti*, Justice Thomas explained that WPATH rests many of its recommendations "on self-referencing consensus rather than evidence-based research, which may help explain the group's confidence in the face of concededly inadequate evidence." 605 U.S. at 544 (Thomas, J., concurring). He also discussed the Cass Review, published in April 2024, which concluded, "'we have no good evidence on the long-term outcomes of

---

Dkt.131 at 8 n.2 (cleaned up). *See also* Ex.M at 3. Dr. Howard's and Dr. Ausborn's evaluations are similarly devoid of a surgery recommendation. Exs.N-P. A cardiologist "clear[ing]" Plaintiff "for surgery," FAC ¶75, does not demonstrate sex-reassignment surgery was medically necessary. *See Bayse*, 147 F.4th at 1312 (plaintiff bears burden "to prove medical necessity"). A plastic surgeon's "recommendation," FAC ¶74, is even less relevant. Finally, the complaint acknowledges that Centurion's November 2024 "recommendation" was quickly paused to consider follow-up questions from Dr. Mardis. *Id.* ¶77. *See also* Dkt.211 at 1 ("Given the unprecedented nature of the treatment at issue, the Committee is scheduled to meet in January and *begin* to carefully consider the questions posed in the letter.") (emphasis added).

18

interventions to manage gender-related distress.'" *Id*. at 539. Even WPATH's own document acknowledges its questionable evidentiary support. *See*, *e.g.*, Ex.D at S32-33 ("The empirical evidence base for the assessment of [transgender-identifying] adults is limited."). Elsewhere the document states that the "intervention-specific risks associated with the presence of specific physical conditions have not been well researched." *Id*. at S38.

WPATH's guidelines are also not "politically neutral." *Gibson*, 920 F.3d at 222 (cleaned up). "WPATH aspires to be both a scientific organization and an advocacy group for the transgendered," and "[t]hese aspirations sometimes conflict." *Id.* (cleaned up). Indeed, "newly released documents suggest that WPATH tailored its Standards of Care in part to achieve legal and political objectives," with one report showing "that WPATH changed its medical guidance to accommodate external political pressure." *Skrmetti*, 605 U.S. at 545-46 (Thomas, J., concurring).

The reality is "[p]rudent medical professionals … reasonably differ in their opinions regarding [WPATH's] requirements." *Kosilek*, 774 F.3d at 88. WPATH's standards "reflect not consensus, but merely one side in a sharply contested medical debate," including "over sex reassignment surgery." *Gibson*, 920 F.3d at 221. A flexible recommendation is not enough to show a constitutional violation, even if WPATH could set the constitutional standard (which it cannot). *See*, *e.g.*, *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 869 (11th Cir. 2020) ("[I]nstitutional

19

positions cannot define the boundaries of constitutional rights. They may hit the right mark—but they may also miss it.").

Plaintiff's request for surgery also raises "serious security concerns," which is independently fatal to this claim. *Keohane*, 952 F.3d at 1275. Housing a biological male post-sex-reassignment surgery in a *male* prison unquestionably raises security concerns. *Kosilek*, 774 F.3d at 93. The same is true with housing "a post-operative, male-to-female transsexual … within a female prison population." *Id.* That is especially so with a serial sex offender like Plaintiff. *See id.*; Exs.E, J, L. Granting Plaintiff's request also "would incentivize the use of suicide threats by prisoners as a means of receiving desired benefits," which is a concern that "cannot be discounted as a minor or invalid claim." *Kosilek*, 774 F.3d at 94. "Such threats are not uncommon in prison settings and require firm rejection by the authorities." *Id.*

Moreover, refusing to provide sex-reassignment surgery to an inmate is not "cruel and *unusual* punishmen[t]." U.S. Const. amend. VIII (emphasis added). A punishment is "unusual" if it "ha[s] long fallen out of use." *Bucklew v. Precythe*, 587 U.S. 119, 130 (2019). It is impossible for denial of this surgery to be "unusual" because "[n]o longstanding practice exists of prison-funded SRS." *Edmo v. Corizon, Inc.*, 949 F.3d 489, 508 (9th Cir. 2020) (Bumatay, J., dissental). Indeed, prisons "across the country" disagree on the wisdom of providing these surgeries. *Gibson*, 920 F.3d at 216.

At a minimum, this Court should dismiss the damages claims because Plaintiff cannot point to clearly established law. There is no Supreme Court or Eleventh Circuit precedent remotely holding, or even suggesting, that the Eighth Amendment requires providing inmates sex-reassignment surgery. Indeed, the Fifth Circuit has *upheld* a blanket ban on such procedures. *See Gibson*, 920 F.3d at 215-16; *see also Youmans v. Gagnon*, 626 F.3d 557, 565 (11th Cir. 2010) (no clearly established law "where judges … disagree on a constitutional question" because it is unfair to hold officials liable for picking the losing side of a split in federal courts) (cleaned up). And the Seventh Circuit expressly rejected a claim to damages based on denial of sex-reassignment surgery, holding that no such right was clearly established. *See Campbell v. Kallas*, 936 F.3d 536, 549 (7th Cir. 2019). Because no controlling authority clearly compelled individual State Defendants to provide sex-reassignment surgery, they are entitled to qualified immunity. *See Crocker*, 995 F.3d at 1240.

### C. Plaintiff's disagreement with the specific dosage of cross-sex hormones is not cruel and unusual punishment.

As noted, the Supreme Court and Eleventh Circuit have upheld outright *bans* on cross-sex hormones in certain circumstances. And, today, Plaintiff is actually *receiving* hormones pursuant to the district court's injunction in *Benjamin*. 800 F. Supp. 3d. at 1348. Thus, any claim for additional injunctive relief regarding hormones should be a non-starter. *See* Tr. of Mar. 17 Hearing (Dkt.320) at 29 (Court asking Plaintiff's counsel: "But do you really think I'm going to say do what you're

21

supposed to do?"). As for Plaintiff's damages claims, neither temporarily taking Plaintiff off hormones nor providing less than Plaintiff's preferred dose of these hormones constituted a constitutional violation, let alone a clearly established one.

**Temporary Pause in Hormones:** Plaintiff asserts that State Defendants were deliberately indifferent in stopping cross-sex hormones for four years after June 2019. FAC ¶¶32-33. Any claims preceding December 6, 2021 are barred by the statute of limitations. Moreover, Plaintiff *consented* to being taken off hormones due to medical concerns. *See* Dkt.259 ¶74 ("The primary care physician informed … Doe that he believed [Doe's] health risks (including [Doe's] age, risk for blood clotting, and risk for stroke) were too high to continue taking estradiol. … Doe felt that [Doe] had no option but to follow his medical advice and accept his recommendation to discontinue HRT."); *id.* ¶121 (documenting cardiac and pulmonary medical concerns). *See also* Ex.M at 2 (Plaintiff telling Dr. Frady in July 2022 that "hormonal treatment was discontinued" for three years "due to … an increase in hypertension as a result of the medication regimen"); Ex.N at 1 (Plaintiff telling Dr. Howard in September 2022 about "medical issues as a result of hormone treatment and the impact on [Plaintiff's] blood pressure and the risk for blood clots").

Plaintiff (now) disagrees with that pause in hormones. But "'a simple difference in medical opinion between the prison's medical staff and the inmate … [fails to] support a claim.'" *Keohane*, 952 F.3d at 1266.

22

Plaintiff also fails to plausibly allege that a "three wee[k]" disruption in estradiol administration in 2023, FAC ¶67, or four lapses in 2025 and 2026, *id.* ¶90, violate the Eighth Amendment. For deliberate-indifference claims, "'[e]ach individual Defendant must be judged separately and on the basis of what that person knows.'" *Jackson v. West*, 787 F.3d 1345, 1353 (11th Cir. 2015). Plaintiff does not allege facts—beyond a conclusory statement that GDC Defendants knew of "the ongoing constitutional violation," FAC ¶118—that any State Defendant had knowledge of these lapses. Plaintiff merely alleges "a treatment provider" stopped administering, *id.* ¶67, and that "GDC and Centurion Defendants" failed to provide estradiol, *id.* ¶90. Plaintiff does not allege any facts to show this pause led to an objectively serious deprivation—or that individual State Defendants knew about a potential risk of serious harm from a few missed doses and still failed to reasonably respond.[3]

The Eleventh Circuit's holding in *Wade* is instructive. There, prison officials failed to provide an inmate daily epilepsy medication for four days, resulting in two separate seizures and two trips to the hospital. 2024 WL 5200546, at *2-*3 (11th Cir. Dec. 23). None of the officials was found to meet the deliberate-indifference standard—not even the nurses who the Court assumed knew that the inmate wasn't

---

[3] Plaintiff previously alleged that the reason for the initial three-week interruption was a "reading of [Plaintiff's] blood pressure." Dkt.209 ¶129. This has been conspicuously omitted in subsequent complaints. *See* FAC ¶67; Dkt.259 ¶126.

23

receiving his medication, knew he faced a risk of serious harm, "knew about [a] backup … supply, had access to it, and had the ability to order medications." *Id.* at *5-*7. The nurses "responded reasonably to the risk" simply by confirming more medication would arrive in a few days. *Id.* at *7 (cleaned up). *See also Cameron v. Thomas*, 2018 WL 3521190, at *15 (S.D. Ala. Jun. 22) ("[T]he law is clear that isolated incidents of missed medication do not establish deliberate indifference."); *Hilyer v. Dunn*, 2016 WL 7093437, at *6 (S.D. Ala. Oct. 28) ("Isolated incidents of missed medication *and a medical emergency* do not establish deliberate indiffer-ence.") (emphasis added).

Here, the complaint alleges Plaintiff was prescribed estradiol every two weeks, FAC ¶66. It alleges Plaintiff missed, at most, a few doses over a period of multiple years. Plaintiff has not alleged facts to show specific State Defendants knew about any lapse, let alone that State Defendants knew there was a significant risk of harm from Plaintiff missing a few doses of estradiol, or that they failed to reasonably respond. The complaint certainly does not allege that Plaintiff suffered an "objec-tively, sufficiently serious" deprivation, *Wade*, 106 F.4th at 1262 (cleaned up), as a result of missing a handful of doses.

Plaintiff also alleges "Defendants" halved a spironolactone dose. FAC ¶93. But Plaintiff explicitly blames an unnamed pharmacist and does not plead knowledge or any other necessary element against any named State Defendant. *Id.*

24

**Lower Doses:** Plaintiff further alleges the level of hormones provided after April 2023 was "inadequate." FAC ¶¶64-66. So Plaintiff's "complaint isn't that [officials are] providing no care, just that [they aren't] providing the more aggressive—[or] better—care that [the inmate] desire[s]." *Hoffer*, 973 F.3d at 1272.[4]

Again, "a simple difference in medical opinion between the prison's medical staff and the inmate as to … [a] course of treatment" fails to state a claim because "prisoners aren't constitutionally entitled to their preferred treatment plan." *Keohane*, 952 F.3d at 1266, 1277 (cleaned up). And, as explained, Plaintiff cannot rely on WPATH's standards to support a deliberate-indifference claim. *Supra* 17-19. Courts have repeatedly denied deliberate-indifference claims based on the argument that a hormonal intervention deviates from WPATH's standards. *See*, *e.g.*, *Lamb v. Norwood*, 899 F.3d 1159, 1162-63 (10th Cir. 2018); *Druley v. Patton*, 601 F. App'x 632, 634-36 (10th Cir. 2015).

At a minimum, no constitutional violation was clearly established. There is no Supreme Court or Eleventh Circuit decision holding—or even suggesting—that the Eighth Amendment dictates a specific *dosage* of cross-sex hormones. And the

---

[4] Plaintiff acknowledges suffering from "hypertension, [COPD], and asthma." FAC ¶¶6, 109. But, once again, allegations from previous complaints are curiously absent—like the fact Dr. Mulloy prescribed the doses being administered after "reiterat[ing]" that Plaintiff's "age, hypertension, and cardiac and pulmonary issues put [Plaintiff] at a higher risk when taking hormones." Dkt.259 ¶121.

25

Eleventh Circuit has flatly rejected the notion that prison officials violate the Constitution when they deviate from WPATH guidelines. *See Bayse*, 147 F.4th at 1313; *see also Youmans*, 626 F.3d at 565 (no clearly established law "where judges … disagree on a constitutional question") (cleaned up). Any damages claim regrading Plaintiff's hormone dosage is squarely barred by qualified immunity.

### D. The Eighth Amendment does not require access to feminizing cosmetic and clothing items.

Plaintiff does not request any specific feminizing items in the Prayer for Relief. In Count 1, Plaintiff merely demands "accommodations" without explaining what those are. FAC ¶117. Similarly, Plaintiff requests an injunction requiring Defendants to provide "accommodations" without more. *Id.* ¶122. This lack of specificity is fatal on its own, as it prevents Defendants from knowing precisely what is allegedly required of them. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (plaintiff must provide more than "labels and conclusions" to give defendant "'fair notice of what the … claim is and the grounds upon which it rests'"). But even assuming Plaintiff is demanding the list of cosmetic and clothing items identified earlier in the complaint, FAC ¶88, Plaintiff fails to state an Eighth Amendment claim. At a minimum, qualified immunity bars the damages claims.[5]

---

[5] This Court previously issued a preliminary injunction with respect to padding and hair-removal cream. *See* Dkt.131 at 21-28. State Defendants respectfully submit that this order was incorrect for the reasons stated here and in their Eleventh

First, it is Plaintiff's burden "to prove medical necessity." *Bayse*, 147 F.4th at 1312. And the Eleventh Circuit has already held the requested items are *not* medically necessary. *Keohane* held that clothing items and cosmetics were at most "psychologically pleasing" for an inmate with gender dysphoria, which is "not nearly close enough" to proving medical necessity. 952 F.3d at 1274 & n.9. *Bayse* went even further, explaining that neither a "previous treatment plan from Georgia State Prison" nor WPATH's guidelines showed that "social transitioning accommodations were medically necessary." 147 F.4th at 1313. And "the standards of care from [WPATH]—by their own terms—are flexible clinical guidelines that list changes in gender expression as a mere option for treatment." *Id.* (cleaned up). These are "far too equivocal to be evidence" of medical necessity. *Id.*

Second, Plaintiff cannot plausibly allege that Defendants lacked a rational security reason for the denial of these items. As this Court recognized, "officials do not act with deliberate indifference when they act based on rational security concerns." Dkt.131 at 23 (cleaned up). The Eleventh Circuit agrees: an inmate's "social-transitioning-related requests" present "serious security concerns—including, most obviously, that an inmate dressed and groomed as a female would inevitably become

---

Circuit briefing. No. 24-11382, ECF Nos. 26, 54 (11th Cir.). Preliminary injunctions are not binding on later merits proceedings. *See, e.g.*, *Vital Pharms. v. Alfieri*, 23 F.4th 1282, 1290 (11th Cir. 2022) ("A preliminary injunction" does "not … replace" a "merits decision.") (cleaned up).

a target for abuse in an all-male prison." *Keohane*, 952 F.3d at 1275. Plaintiff bears the burden of showing "all aspects of [Plaintiff's] Eighth Amendment claim[s]." *Hoffer*, 973 F.3d at 1274. Yet Plaintiff makes no plausible allegation that Defendants lacked a rational security concern in denying these "accommodations," presumably because it is "obviou[s]" these items "would inevitably" make Plaintiff "a target for abuse in an all-male prison" and hinder "the ability to … detect contraband." *Keohane*, 952 F.3d at 1263, 1275. Plaintiff's history of making and mailing bombs *while incarcerated* only makes the security risk of providing Plaintiff flammable nail polish or additional items in which to hide contraband more obvious.

*Keohane* and *Bayse* mandate dismissal of this claim in its entirety. At a minimum, this Court should dismiss any damages claims on qualified-immunity grounds. Far from there being clearly established law in Plaintiff's favor, the most on-point precedents from the Eleventh Circuit *reject* claims that the Eighth Amendment requires providing cross-sex cosmetics and clothing to inmates with gender dysphoria. *See, e.g., Bayse*, 147 F.4th at 1313 (granting qualified immunity for prison officials' denial of "social transitioning accommodations" because "*Keohane* should have made it clear that the wardens did not violate clearly established law").

28

**E. Plaintiff's administrative segregation does not violate the Eighth Amendment.**

Plaintiff says that "nearly six years" of administrative segregation violates the Constitution. FAC ¶99.[6] But "administrative segregation and solitary confinement do not, in and of themselves, constitute cruel and unusual punishment." *Sheley v. Dugger*, 833 F.2d 1420, 1428-29 (11th Cir. 1987). Plaintiff fails to allege facts sufficient to state a claim for three independent reasons.

First, Plaintiff's duration of confinement does not raise a constitutional issue. The Eleventh Circuit has held that a prisoner's "twelve-year confinement in" solitary confinement "raises serious constitutional *questions*." *Id.* at 1429 (emphasis added). Plaintiff's term of "nearly six years," FAC ¶99, is nowhere close to the "long period of segregation" that merely "raise[d] … questions" in *Sheley*. 833 F.2d at 1429.

Second, the conditions alleged do not reflect cruel and unusual punishment. The complaint alleges Plaintiff is without "social interaction and, until recently, out-of-cell recreation time." FAC ¶¶110-11. It also asserts that the cell "lacks central air

---

[6] Plaintiff claims to be in "solitary confinement," using the term interchangeably with "administrative segregation," because they supposedly "do not differ … in any meaningful way." FAC ¶108 & n.17. But there are crucial differences. Inmates in administrative segregation have not only the same visitation privileges, but also the same food, bedding, clothing, laundry, and medication administration afforded to general population. Ex.C at 10-13. The relevant SOP even contemplates cellmates. *See, e.g., id.* at 9 ("Under the following conditions, it *might* be necessary to house an offender in Administrative Segregation in a single cell.") (emphasis added). Disciplinary isolation, by contrast, does not allow visitation privileges and involves restrictions on peer contact and personal property. *See* Ex.B.

29

and heating" and has "restricted hygiene" and "limited light." *Id.* ¶¶109, 170. These conditions, however, do not transgress constitutional limits. For example, GDC's standard operating procedures require that all inmates have "adequat[e]" light. Ex.C at 10. Similarly, GDC policy provides that offenders in segregation "shall be provided the same opportunities for personal hygiene available to the general population, except that an offender may be limited to showering and shaving three (3) times per week." *See id.* And cells can be cooled and warmed without central air and heating. Plaintiff's complaint demonstrates why "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to state a claim]." *Iqbal*, 556 U.S. at 678.

The FAC does not allege that Plaintiff's confinement differs from that of any other inmate in GDC administrative segregation.[7] The SOP the complaint references, *id.* ¶112, reveals administrative-segregation inmates have access to a cell that is "well ventilated, adequately lighted, appropriately heated and maintained in a sanitary condition always" and "equipped and furnished in a manner like cells in the general population." Ex.C at 10. They also have visitation privileges, "suitable

---

[7] Plaintiff alleges "nationally-recognized standards strongly disfavor the use of involuntary segregation for transgender individuals unless no other option exists." FAC ¶99 & n.11. But the cited authority, 28 C.F.R. §115.43(c), simply addresses when segregated housing may be used as a form of protective custody, which is not at issue here.

clothing," and food of "the same quality and quantity as that provided in the general population." *Id.* at 10-11. They even receive one hour of exercise per day, five days per week, "unless security or safety considerations dictate otherwise." *Id.* at 13. "Because [Plaintiff] apparently has adequate food, clothing, and sanitation," and security reasons justify restricting Plaintiff's exercise, "the conditions of [Plaintiff's] confinement … do not on their face violate the Eighth Amendment." *Sheley*, 833 F.2d at 1429; *see LaVergne v. Stutes*, 82 F.4th 433, 435, 437 (5th Cir. 2023).

Third, Plaintiff does not plausibly allege that the confinement is "punitive" *and* "shocks the conscience, is grossly disproportionate to the offense, or is totally without penological justification." *Sheley*, 833 F.2d at 1429. The "more likely explanatio[n]," *Iqbal*, 556 U.S. at 681, for Plaintiff's assignment to administrative segregation was to protect the inmate population *from Plaintiff*, not the other way around. The SOP governing administrative segregation makes clear that GDC "may place in Administrative Segregation an offender whose continued presence in the general population poses a serious threat to life, property, self, staff, or other offenders, or to the security or orderly running of the facility." Ex.C at 2.

Plaintiff is an extremely dangerous offender currently serving multiple life sentences for aggravated sodomy and kidnapping with bodily injury. Exs.L, M at 1. Before those convictions, Plaintiff committed a slew of other felonies, including aggravated sodomies. Exs.E, J, M at 1. And Plaintiff has continued to commit violent

31

crime. In 2020, while incarcerated, Plaintiff pleaded guilty to conspiring with a known gang member to murder state and federal officials. Ex.F. Plaintiff admitted to making and mailing two bombs to the warden of Georgia State Prison, and two more bombs were found in Plaintiff's cell. Exs.K, M at 2. And even more recently, Plaintiff was convicted in federal court (and sentenced to another 80 years in prison) for constructing bombs and mailing them to federal buildings. Exs.G-I.

Plaintiff's security profile is an "'obvious alternative explanation'" for Plaintiff's administrative segregation. *Iqbal*, 556 U.S. at 682. Plaintiff's segregation does not "shoc[k] the conscience," and it certainly is not "grossly disproportionate to the offense, or … totally without penological justification." *Sheley*, 833 F.2d at 1429.

At a minimum, qualified immunity requires dismissal of the damages claims. There is no controlling Supreme Court or Eleventh Circuit case that would have put Jones and Pineiro on notice that placing an inmate like Plaintiff in administrative segregation for six years violated the Eighth Amendment. Indeed, courts have granted qualified immunity for far longer confinement periods. *See, e.g.*, *Grissom v. Roberts*, 902 F.3d 1162, 1174-75 (10th Cir. 2018) (20 years); *Porter v. Penn. Dep't of Corr.*, 974 F.3d 431, 440, 450-51 (3d Cir. 2020) (33 years).

## V.   Plaintiff does not plausibly allege violations of the ADA or RA.

With respect to GDC, Plaintiff asserts two violations of the ADA, *see* FAC ¶¶125-148 (Counts 2-3), and one of the RA, *id.* ¶¶149-159 (Count 4). Plaintiff does

32

not name any individual State Defendants. But Count 4 ends by addressing and seeking damages only from Centurion. FAC ¶¶157-158. Count 4 thus fails to state a claim against or seek relief from GDC and must be dismissed for this reason alone. And Counts 2-3 must be dismissed on sovereign immunity grounds because Plaintiff has failed to allege a Fourteenth Amendment violation. *See Georgia*, 546 U.S. at 158.

Even if GDC were not entitled to sovereign immunity, Plaintiff would still fail to state a claim. "Under [ADA] Title II, 'no qualified individual with a disability shall, by reason of such disability, … be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1133 (11th Cir. 2019). Section 504 of the RA "is pretty much identical; it provides, … that '[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.'" *Id.* (quoting 29 U.S.C. §794(a)). Plaintiff fails to plead an actionable ADA or RA violation for multiple independent reasons.[8]

---

[8] Defendants refer to the ADA and RA interchangeably. *See Silberman*, 927 F.3d at 1133 (explaining that cases construing the two statutes can be relied on "interchangeably").

33

### A. Gender dysphoria is not a "disability" under the ADA or RA.

At the preliminary injunction stage, this Court rejected the argument that Plaintiff's condition is expressly excluded from the ADA and RA. Dkt.131 at 39-45. State Defendants respectfully disagree and preserve their contrary argument.

The ADA and RA provide that "'disability'" excludes "transvestism," "transsexualism," "gender identity disorders not resulting from physical impairments," and "other sexual behavior disorders." 42 U.S.C. §12211(b) (ADA); 29 U.S.C. §705(20)(F) (RA). Properly construed, gender dysphoria falls under "gender identity disorders not resulting from physical impairments" or the catchall phrase "other sexual behavior disorders" and is thus expressly excluded from the ADA's coverage. *See Williams v. Kincaid*, 45 F.4th 759, 780-90 (4th Cir. 2022) (Quattlebaum, J., concurring in part and dissenting in part); *Kincaid v. Williams*, 143 S. Ct. 2414, 2414-19 (2023) (Alito, J., dissenting). Courts have reached the same conclusion with respect to the RA. *See, e.g.*, *Michaels v. Akal Sec., Inc.*, 2010 WL 2573988, at *6 (D. Colo. Jun. 24) ("Gender dysphoria, as a gender identify disorder, is specifically exempted as a disability by the Rehabilitation Act."). And the United States filed a Statement of Interest last year in another case in this district taking the view that the ADA and RA both exclude gender dysphoria. *See* Ex.Q (*Fuller v. Georgia Dep't of Corr., et al.*, No. 1:25-cv-246-TRJ-CCB (N.D. Ga. April 25, 2025), Doc.44).

34

Plaintiff's ADA and RA claims thus fail at the starting gate because they are premised on a "disability" that is expressly *not* treated as a disability under the plain text of the statutes. But even if this Court adheres to its previous ruling, Plaintiff cannot state an ADA or RA claim for several other independent reasons.

### B. Plaintiff cannot repackage an Eighth Amendment or medical malpractice claim as a denial of benefits under the ADA or RA.

Plaintiff alleges GDC violated the ADA because it did not provide surgery, "adequate HRT," and certain clothing and cosmetic items. *E.g.*, FAC ¶¶129-30. But the ADA "'does not create a remedy for medical malpractice.'" *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005). Neither does the RA. *See Finn v. Haddock*, 459 F. App'x 833, 837-38 (11th Cir. 2012) ("[F]ailure to provide adequate medical treatment … does not violate the ADA or Rehabilitation Act."). Other courts agree. *See, e.g.*, *Burger v. Bloomberg*, 418 F.3d 882, 883 (8th Cir. 2005) ("[A] lawsuit under the Rehab[ilitation] Act or the [ADA] cannot be based on medical treatment decisions."); *Carter as next friend of Carter v. City of Shreveport*, 144 F.4th 809, 815 (5th Cir. 2025) ("'Courts confirm that the ADA does not provide a remedy for negligent medical treatment.'"); *Est. of May by & through Myrick v. Fulton Cnty.*, 2020 WL 5541086, at *11 n.11 (N.D. Ga. Aug. 13) ("[F]ailure to provide adequate medical treatment … is not a cause of action under the ADA.").

Because "the 'ADA does *not* set out a standard care for medical treatment,' … the 'ADA is not violated by a prison's simply failing to attend to the medical

35

needs of its disabled prisoners.'" *Carter*, 144 F.4th at 815. *See also Jones v. Rutherford*, 546 F. App'x 808, 811-12 (11th Cir. 2013) (same). A claim based on an "improper medical treatment decision may not be brought pursuant to either the ADA or the Rehabilitation Act." *Shelton v. Ark. Dep't of Human Servs.*, 677 F.3d 837, 843 (8th Cir. 2012). In short, Plaintiff may not simply repackage an Eighth Amendment denial-of-medical-care claim as an ADA claim premised on medical malpractice.

### C. Plaintiff has not plausibly alleged any denial was "because of" Plaintiff's gender dysphoria.

Plaintiff fails to state an ADA/RA claim for another independent reason. Plaintiff makes only conclusory assertions that these alleged denials were because of gender dysphoria. *E.g.*, FAC ¶¶ 132 (alleging "discriminatory actions"). But Plaintiff must allege facts that plausibly show that it is *because of* Plaintiff's disability that treatment was denied, not just that Plaintiff was denied treatment *for* that disability. *See Tardif v. City of New York*, 991 F.3d 394, 405 (2d Cir. 2021) (where a plaintiff's claim "relates solely to whether she received adequate medical treatment … *for* her disability, … such a claim is not cognizable under the ADA"). "To hold otherwise would allow inmates to litigate in federal court virtually every medical malpractice claim arising in a custodial setting under the auspices of the ADA." *Id.* Unlawful ADA discrimination "in the context of medical treatment" occurs only where treatment is withheld "for reasons having no relevance to medical appropriateness—reasons dictated by bias rather than medical knowledge." *McGugan v.*

*Aldana-Bernier*, 752 F.3d 224, 231 (2d Cir. 2014). That is not the case here.

**Sex-Reassignment Surgery:** SB185 now forbids state funding for this procedure, and Plaintiff does not challenge (or mention) that presumptively constitutional law. The Supreme Court has held that even outright prohibitions on sex-change interventions do not "classify on the basis of transgender status." *Skrmetti*, 605 U.S. at 517-18. They simply "remov[e] one set of diagnoses … from the range of treatable conditions." *Id.* at 518-19. *See also Lange*, 152 F.4th at 1252-53.

In any case, the contention that Plaintiff's surgery request was denied because of gender dysphoria is implausible. Even before SB185, inmates' medical needs were subject to security, prison-administration, and cost considerations. *See, e.g.*, Ex.A at 2 (Medical care "must be carried out with regard to administrative and security practices that serve to guide an effective correctional system."); *Keohane*, 952 F.3d at 1275 ("'When evaluating medical care and deliberate indifference, security considerations inherent in the functioning of a penological institution must be given significant weight.'"). There is thus no reason to believe surgery was denied "because of" Plaintiff's gender dysphoria.

**Hormones:** Plaintiff vaguely asserts GDC has failed to provide the "reasonable accommodatio[n]" of "adequate HRT." FAC ¶129. Once again, Plaintiff does not plausibly allege that any denial was because of Plaintiff's claimed disability, as opposed to a mere difference of medical opinion about the appropriate dosage in

light of Plaintiff's co-occurring medical conditions.

**Cosmetic and clothing items:** Plaintiff does not plausibly allege that denying certain clothing and cosmetic items was because of Plaintiff's gender dysphoria. Nothing in the complaint indicates that any purported denial was motivated by anything other than neutral security and prison-administration concerns, which are always relevant in the prison context. *See, e.g.*, *Keohane*, 952 F.3d at 1275-76.

**Housing:** Plaintiff alleges that GDC discriminated against Plaintiff through placement in segregated housing where Plaintiff "cannot access services." FAC ¶130. But the complaint does not allege what specific services Plaintiff is prevented from accessing. *Id.* This alone is sufficient to dismiss this claim. *See Twombly*, 550 U.S. at 555. Nor does Plaintiff plausibly allege that it is administrative segregation preventing Plaintiff from obtaining any such services. Again, the "'obvious alternative explanation,'" *Iqbal*, 556 U.S. at 682, for Plaintiff's housing in administrative segregation is Plaintiff's extremely dangerous security profile—not anything related to Plaintiff's gender dysphoria. *See supra* 31-32.[9]

---

[9] The FAC does not renew Plaintiff's previous requests for transfer to a women's prison. However, this is undoubtedly what Plaintiff will request should Plaintiff's other requests be granted. *See* FAC ¶176 (requesting GDC be ordered to move Plaintiff to "the least restrictive environment consistent with [Plaintiff's] safety and gender identity"). As this Court previously recognized, "Plaintiff has not identified any case in which a court has ordered a corrections department to transfer a pre-operative transgender individual to a facility that houses a different gender." Dkt.131 at 34.

### D. Plaintiff's proposed accommodations are not reasonable.

Plaintiff contends that the requests for "gender-affirming items from the women's commissary list and the special package program" were "reasonable accommodations." FAC ¶ 129. In reality, each "accommodation" was unreasonable and would obviously unduly burden prison administration and security.

"[W]hether accommodations are reasonable must be assessed through the prism of the prison setting." *Havens v. Colo. Dep't of Corr.*, 897 F.3d 1250, 1269 (10th Cir. 2018). Courts must consider "'legitimate penological interests,'" such as "security and cost." *Onishea v. Hopper*, 171 F.3d 1289, 1300 (11th Cir. 1999) (en banc). Courts also "accor[d]" officials "considerable discretion." *Havens*, 897 F.3d at 1270. Plaintiff's requests raised grave prison-administration and security concerns on their face, especially given Plaintiff's violent criminal history. *Supra* 31-32.

### E. Plaintiff alleges no facts to show intentional discrimination.

Count 3 claims GDC intentionally discriminates because inmates with gender dysphoria are excluded from "individualized assessment and medically-necessary care." FAC ¶141. Again, the complaint confirms Plaintiff has a treatment plan for gender dysphoria; Plaintiff just disagrees with it. *See supra* 15-16. Plaintiff also fails to allege any facts that demonstrate GDC bears any animus. SB185 also does not facially discriminate "on the basis of transgender status," and Plaintiff has not argued

39

it is a "mere pretex[t] … to effect … discrimination." *Skrmetti*, 605 U.S. at 518-19.

Finally, Plaintiff's allegation that GDC "den[ies] … Doe access to programs, services, and safe housing provided to non-disabled inmates," FAC ¶141, is entirely conclusory and not entitled to the presumption of truth. *See Iqbal*, 556 U.S. at 678, 681. Plaintiff also fails to specify what "programs, services, and safe housing" Plaintiff is unable to access. Indeed, the claim Plaintiff is being intentionally discriminated against with respect to "safe housing" is contradicted by the FAC's allegation that Plaintiff was placed in segregation to *protect* Plaintiff. FAC ¶173. Regardless, the complaint does not allege how Plaintiff's housing is any less safe than that provided to inmates without gender dysphoria who are in administrative segregation. And it certainly does not allege inmates with a similar security profile but no gender dysphoria are being released into the general population. All ADA/RA claims against GDC should therefore be dismissed.

## CONCLUSION

For these reasons, the Court should grant State Defendants' motion to dismiss.

Dated: June 1, 2026

Christopher M. Carr
  *Attorney General*
  Georgia Bar No. 112505
John Henry Thompson
  *Solicitor General*
  Georgia Bar No. 603321
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia 30334
404-458-3408
jhthompson@law.ga.gov

*Attorneys for Defendants Georgia Department of Corrections, DeShawn Jones, Aaron Pineiro, Sharon Lewis, Marlah Mardis, and Anthony Mulloy*

Respectfully submitted,

*/s/ Jeffrey M. Harris*
Jeffrey M. Harris*
Rachael C.T. Wyrick*
Julius Kairey*
Zachary P. Grouev*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
rachael@consovoymccarthy.com
julius@consovoymccarthy.com
zach@consovoymccarthy.com

*pro hac vice

*Special Assistant Attorneys General and Attorneys for Defendants Georgia Department of Corrections, DeShawn Jones, Aaron Pineiro, Sharon Lewis, Marlah Mardis, and Anthony Mulloy*

41

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief conforms to the requirements of L.R. 5.1C and this Court's subsequent orders. The brief is prepared in 14-point Times New Roman font.

*/s/ Jeffrey M. Harris*

## CERTIFICATE OF SERVICE

I certify that on June 1, 2026, I electronically filed the foregoing with the Clerk of the Court using the Court's ECF system, which will automatically send email notification to all counsel of record.

*/s/ Jeffrey M. Harris*