# Exhibit Q

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

REVEREND RONNIE FULLER,

    Plaintiff,

    v.

GEORGIA DEPARTMENT OF
CORRECTIONS, *et al.*,

    Defendants.

Case No. 1:25-cv-00246-TRJ-CCB

## STATEMENT OF INTEREST OF THE UNITED STATES

**INTRODUCTION**

The United States respectfully submits this Statement of Interest to express its views on the proper interpretations of the Americans with Disabilities Act (ADA) and of the Eighth Amendment to the Constitution.  Neither the ADA nor the Eighth Amendment require state prisons to provide surgical interventions to inmates in response to a gender-dysphoria diagnosis.

Plaintiff Ronnie Fuller, who is incarcerated by the Georgia Department of Corrections (GDC), claims Defendants are violating Titles II and III of the ADA by refusing to provide a mastectomy in response to Fuller's gender-dysphoria diagnosis.  Fuller alleges that gender dysphoria is a disability that falls outside the ADA's exclusion for "gender identity disorders not resulting from physical impairments."[1]

When the ADA was passed in 1990, Congress's use of the term "gender identity disorders" would have been commonly understood to include gender

---

[1] Fuller also claims GDC is violating Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which prohibits recipients of federal funds from excluding individuals from participation in, denying them the benefits of, or subjecting them to discrimination under any program or activity based on disability.  Like the ADA, the Rehabilitation Act also excludes individuals with "gender identity disorders not resulting from physical impairments" from the statute's definition of "individual with a disability."  29 U.S.C. § 705(20)(F)(i).  Because of the textual similarities between Title II of the ADA and Section 504, "the same standards govern claims under both" and courts rely on cases construing these provisions "interchangeably."  *Ingram v. Kubik*, 30 F.4th 1241, 1256 (11th Cir. 2022) (quoting *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1133 (11th Cir. 2019)).

1

dysphoria.  Gender dysphoria is thus expressly excluded from the ADA's coverage unless it results from a physical impairment.

In addition, Plaintiff alleges that the denial of a subcutaneous mastectomy violated the Eighth Amendment.  It does not.  Where there are multiple options available, a prisoner's preferred option does not rise to the level of an Eighth Amendment violation.

## INTEREST OF THE UNITED STATES

The United States submits this Statement of Interest pursuant to 28 U.S.C. § 517, which permits the Attorney General to attend to the interests of the United States in any case pending in federal court.  Congress charged the Department of Justice with enforcing and implementing Titles II and III of the ADA, 42 U.S.C. §§ 12131-34, 123181-89.  The United States therefore has a strong interest in supporting the proper and uniform application of the ADA, and in furthering Congress's intent to create "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities," and to reserve a "central role" for the federal government in enforcing the ADA.  42 U.S.C. § 12101(b)(2)-(3).  The United States also enforces the Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997, which authorizes the Department of Justice to investigate conditions of confinement in correctional facilities and bring a civil action against a State or local government to enforce the rights of

2

incarcerated people subjected to unconstitutional conduct or conditions.

Additionally, Fuller's Complaint (ECF No. 21) cites an incorrect Statement of Interest previously filed by the United States that asserted, based on debunked evidence, that gender dysphoria is not excluded from ADA coverage and that prison officials violate the Eighth Amendment by refusing to provide surgery inmates with gender dysphoria. *See* Statement of Interest of the United States, *Doe v. Ga. Dep't. of Corr.*, ECF No. 69, No. 1:23-cv-5578 (N.D. Ga. Jan. 8, 2024). (*Doe* SOI).[2]

The United States has since disavowed the scientific theories on which the *Doe* SOI was based. *Id.* (citing World Pro. Ass'n for Transgender Health (WPATH), Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, at S106 (Sept 15, 2022)). It is now the view of the United States that WPATH Standards of Care lack scientific integrity and should not be relied upon. *Cf. Gibson v. Collier*, 920 F.3d 212, 220 (5th Cir. 2019) (citing *Kosleck v. Spencer*, 774 F.3d 63, 90-91 (1st Cir. 2014) (en banc)) (describing a previous version of the WPATH Standards of Care as "hotly contested" and "a matter of contention within the medical community"); *see also* Executive Order 14187, *Protecting Children from Chemical and Surgical Mutilation* (Jan. 28, 2025)

---

[2] But for a bankruptcy stay entered in the *Doe* matter, the United States would have earlier withdrawn the *Doe* SOI, which no longer represents the views of the United States. *See Doe* Dkt. 230. The United States has since withdrawn the *Doe* SOI.

(recognizing WPATH guidance's lack of scientific integrity).

The United States believes that the WPATH Standards of Care lack scientific integrity and should not be relied upon for a few reasons. First, public reporting indicates that the prior administration manipulated the WPATH guidance to remove age minima for the provision of chemical or surgical mutilation.[3] Second, WPATH's unreliability has similarly been highlighted in other litigation, including revelations that:

- WPATH violated multiple international standards for the creation of clinical guidelines that WPATH itself claimed to follow in Standards of Care 8 ("SOC-8");
- WPATH restricted the ability of SOC-8's evidence review team to publish the systematic evidence reviews finding scant evidence for transitioning treatments;
- WPATH intentionally used SOC-8 as a political and legal document to increase coverage for transitioning treatments and advance WPATH's political goals;
- WPATH caved to outside political pressure by Admiral Rachel Levine and others to remove age minimums for hormones and surgeries in SOC-8; and
- WPATH "muzzle[d]" its own members who tried to inform the public of their concerns over pediatric transitioning treatments.

*See* Defendants' Motion for Summary Judgment and Brief in Support, *Boe v.*

---

[3] Nava, Victor, "Biden admin official pressured medical experts to nix age limit guidelines for transgender surgery: court doc," NY Post, June 26, 2024, *available at* https://nypost.com/2024/06/26/us-news/biden-administration-official-rachel-levine-pressured-medical-experts-to-remove-age-limit-guidelines-for-transgender-surgery/ (citing Plaintiff-Intervenor United States of America's Brief in Support of Its Motion to Exclude Certain Testimony, Ex. 24, *Boe v. Marshall*, 22-cv-184, M.D. Al., June 24, 2024).

*Marshall*, No. 22-cv-00184, ECF No. 619, at 5 (M.D. Ala. June 26, 2024).  Third, a member of the Eleventh Circuit signaled a deep skepticism of WPATH.  *Eknes-Tucker v. Governor*, 114 F.4th 1241, 1261 (11th Cir. 2024) (Lagoa, J., concurring in denial of rehearing *en banc*) ("recent revelations indicate that WPATH's lodestar is ideology, not science").  Because the *Doe* SOI rests its entire foundation on shaky WPATH guidance, it is unreliable.

The prior *Doe* SOI also wrongly asserted that gender dysphoria necessitated elective care to abate risk of suicide.  A recent comprehensive report in the United Kingdom found that while deaths by suicide in trans-identifying individuals are tragically above the national average, there is "no evidence that gender-affirmative treatments reduce this."  The Cass Review, Independent Review of Gender Identity Services for Children and Young People:  Final Report at 195 (Apr. 2024), perma.cc/D728-LUM8.[4]  The *Doe* SOI was based on inaccurate information and debunked science, and the United States disavows its contents.  Accordingly, this Court should not rely on the *Doe* SOI.

This Statement is necessary to set the record straight about the government's current views that gender dysphoria was in fact excluded from ADA coverage and

---

[4] *Examining gender-specific mental health risks after gender-affirming surgery: a national database study.*  The Journal of Sexual Medicine (Feb. 2025) ("From 107583 patients, matched cohorts demonstrated that those undergoing surgery were at significantly higher risk for depression, anxiety, suicidal ideation, and substance use disorders than those without surgery.")

that prison officials do not violate the Eighth Amendment by refusing to provide elective surgeries to inmates with gender dysphoria when other options exist. *See Arizona v. City and County of San Francisco*, 596 U.S. 763, 765 (Roberts, C.J., concurring) (explaining that "[a] new administration is of course as a general matter entitled" to change its legal positions).[5]

## BACKGROUND

Plaintiff Fuller's Complaint (ECF No. 21) details Fuller's medical history and treatment while incarcerated in GDC. The United States summarizes the allegations on which this Statement of Interest relies.[6]

Fuller is a 45-year-old individual who is a female, but self identifies as a male. Compl. ¶ 39. Fuller has been incarcerated in GDC facilities since 2003 and is currently housed at Pulaski State Prison. *Id.* In or around April 2017, while incarcerated, Fuller informed a mental health counselor of feelings of depression and body hatred. Compl. ¶ 41. The counselor referred Fuller to a GDC psychiatrist who diagnosed Fuller with gender dysphoria. Compl. ¶ 17. Fuller subsequently

---

[5] *See also* Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025), ("E.O. 14168") ("It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality.")

[6] The facts asserted in Fuller's Complaint are assumed to be true for purposes of evaluating Defendants' motions to dismiss, *see Taylor v. Polhill*, 964 F.3d 975, 979 (11th Cir. 2020), and therefore also for this Statement of Interest.

requested and was eventually provided with hormone replacement therapy, which Fuller calls "adequate." Compl. ¶ 44, n.21.

Beginning in 2017, Fuller made multiple requests that GDC provide a subcutaneous mastectomy. Compl. ¶ 45. In 2022, a treating Nurse Practitioner asserted that a mastectomy was medically necessary. Comp. ¶ 21. Since 2022, Fuller has not received a mastectomy. Compl. ¶¶ 59-76. Fuller alleges GDC has "a *de facto* blanket ban" on providing surgical treatment for gender dysphoria. Compl. ¶ 37. Fuller claims emotional distress and mental anguish for want of a preferred top surgery. Compl. ¶¶ 51, 79. The Complaint does not allege that Fuller has been diagnosed with breast cancer, a predilection for breast cancer, or any other illness or diagnosis that would typically be made prior to radical surgery like a mastectomy.

In January 2025, Fuller sued Defendants alleging violations of the ADA and the Eighth Amendment to the U.S. Constitution. ECF No. 1.

## DISCUSSION

Fuller asks the Court to order Defendants to provide medical care and accommodations for gender dysphoria, including Fuller's preferred mastectomy. Compl. 49. Fuller's claims implicate the proper interpretation of the ADA's exclusion for gender identity disorders and the right to adequate medical care under the Eighth Amendment. This Statement of Interest provides the United

7

States' view of those provisions.

## I.     Gender Dysphoria Is Not a Disability under the ADA.

The ADA's protections are limited to disabilities as Congress legislated in 1990 and amended in 2008.  42 U.S.C. § 12102(1)(A).  The ADA specifically excludes from its definition of "disability" "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, *gender identity disorders* not resulting from physical impairments, or other sexual behavior disorders."  42 U.S.C. § 12211(b)(1) (emphasis added).  This provision is sometimes called the "GID exclusion."

Fuller alleges that "gender dysphoria is the 'clinically significant distress or impairment in social, occupational, or other important areas of functioning' that arises from the 'marked incongruence' between a transgender person's sex assigned at birth and their gender identity or gender expression."  Compl. ¶ 24 (citing Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 513 (5th ed. text rev. 2022) (DSM-5-TR)).  Fuller does not allege that gender dysphoria resulted from a physical impairment.  As explained below, gender dysphoria is a "gender identity disorder" subject to the ADA's GID exclusion, and thus not a protected disability under the ADA.

Because the ADA does not define "gender identity disorders," the phrase must be given its ordinary public meaning at the time of the statute's enactment.

8

*See Wis. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018).  Fuller relies on the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM"), a publication classifying mental disorders that is periodically revised.  *See Hall v. Florida*, 572 U.S. 701, 704 (2014) (recognizing DSM as a text used by psychiatrists and experts).  To understand the meaning of "gender identity disorders" when the ADA was passed, it is thus informative to look at the DSM edition then in use: the third, revised, edition or DSM-III-R.  *See Williams v. Kincaid*, 45 F.4th 759, 767 (4th Cir. 2022) (relying on the version of the DSM in use when the ADA was passed to construe "gender identity disorders"), *cert. denied*, 143 S. Ct. 2414 (2023).

In 1990, the DSM-III-R identified "the essential feature" of all gender identity disorders as "an incongruence between assigned sex (i.e., the sex that is recorded on the birth certificate) and gender identity."  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 71 (3rd ed. rev. 1987).  The DSM-III-R also explained that while "some forms of gender identity disturbance are on a continuum," even "mild" cases involve feeling "discomfort and a sense of inappropriateness about the assigned sex."  *Id.*  Indeed, the DSM-III-R's first "diagnostic criteria" for gender identity disorder is "persistent or recurrent discomfort and a sense of inappropriateness about one's assigned sex."  *Id.* at 77; *see also Williams*, 45 F.4th at 782 (Quattlebaum, J., dissenting in relevant part).

9

What is now called "gender dysphoria," therefore, is simply a subset of gender identity disorders as that term was used in 1990. In other words, gender dysphoria is a gender identity disorder with clinically significant distress or impairment—i.e., a particularly intense form of a gender identity disorder.

Fuller has alleged feeling depressed and body hatred. Compl. ¶ 41. Fuller desires a mastectomy to bring Fuller's chest "into alignment" with Fuller's asserted gender identity. *Id.* ¶ 45. These alleged symptoms reflect the diagnostic criteria existent when Congress legislated the ADA's GID exclusion: "persistent or recurrent discomfort and a sense of inappropriateness about one's assigned sex." Thus, Fuller's allegations fit squarely within the DSM-III-R's description of, and diagnostic criteria for, gender identity disorders. In other words, when the ADA was enacted, gender identity disorder would have been ordinarily understood to include what Fuller alleges to be gender dysphoria.

The DSM-III-R is only one of many sources confirming that the ordinary meaning of "gender identity disorder" in 1990 encompassed Fuller's allegations. Various other medical publications and dictionaries support the conclusion that, since 1990, "gender identity disorder" has consistently been understood to include "distress and discomfort from identifying as a gender different from the gender assigned at birth." *See Williams*, 45 F.4th at 783 (Quattlebaum, J. dissenting) (collecting sources); *see also Kincaid v. Williams*, 143 S.Ct. 2414, 2417 (2023)

10

(Alito, J. dissenting from denial of certiorari) ("[B]*oth* gender identity disorder and gender dysphoria have long been identified by 'persistent or recurrent discomfort' in connection with 'one's assigned sex.'") (emphasis in original).

ADA Section 12211(b)(1)'s use of the plural "gender identity disorders," is also telling.  While the DSM-III-R identified several specific gender identity disorders, it also included a category of "Gender Identity Disorder Not Otherwise Specified."  DSM-R-III at 77-78.  Even though "gender dysphoria," as Fuller alleges, is newer than the ADA or a diagnosis that was not commonly used in 1990, it is clearly a condition involving discomfort or distress involving discrepancy between Fuller's gender identity and sex.  And although the condition additionally must be associated with "clinically significant distress or impairment in social, occupational, or other important areas of functioning," DSM-5, such distress or impairment typically does not result from a physical impairment.  It is therefore subject to the ADA's GID exclusion, unless it is the result of a physical impairment, such as a developmental disorder.  *See Williams*, 45 F.4th at 784 (Quattlebaum, J. dissenting); *see also Kincaid*, 143 S.Ct. at 2417 (Alito, J. dissenting) (noting that the "broad brush used by Congress" in crafting the language of Section 12211(b)(1) suggests an intent to "prohibit the ADA's application to conditions that are sufficiently similar to the more specific categories of conditions" identified).

11

Based on the above reasoning, many federal courts have rightfully concluded that gender dysphoria is subject to the ADA's GID exclusion. *See, e.g.*, *Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 754 (S.D. Ohio 2018) (surveying cases and finding that "[t]he majority of federal cases have concluded" that the ADA excludes from its protection "both disabling and non-disabling gender identity disorders that do not result from a physical impairment"); *Duncan v. Jack Henry Assocs., Inc.*, 617 F. Supp. 3d 1011, 1056-57 (W.D. Mo. 2022) (concluding that ADA's exclusion of gender identity disorders "encompass[ed] Plaintiff's diagnosis of gender dysphoria"); *Lange v. Houston Cnty., Georgia*, 608 F. Supp. 3d 1340, 1361-63 (M.D. Ga. 2022) (holding that gender dysphoria not resulting from physical impairment is subject to the GID exclusion); *Doe v. Northrop Grumman Sys. Corp.*, 418 F. Supp. 3d 921, 930 (N.D. Ala. 2019) (same).

The Fourth Circuit, in contrast, has applied an end-justifies-the-means assessment of the ADA that is unpersuasive and that this Court should disregard. *Williams*, 45 F.4th 759 (4th Cir. 2022). Instead of adhering to the plain meaning of the ADA's statutory text and DSM-III-R language, the Fourth Circuit focused on the "significant clinical distress" necessary for the diagnosis of gender dysphoria, and because gender dysphoria is a "clinical problem," the Fourth Circuit reasoned, it is not an identity disorder. *Williams*, 45 F.4th at 769. The reasoning makes little sense because the diagnosis of gender dysphoria is predicated on "a marked

12

incongruence between one's experienced/expressed gender and natal gender of at least 6 months in duration," as manifested by at least two of six conditions that relate to such incongruence. *See* DSM-5 (Criteria for Gender Dysphoria). As the dissenting judge in *Williams* rightly pointed out, the majority opinion's "lingual gymnastics" could not change the fact that the gender dysphoria alleged by Williams, like the gender dysphoria here alleged by Fuller, "falls comfortably with[in] the meaning of the phrase 'gender identity disorders'" as it is used in the ADA's GID exclusion. *Williams*, 45 F.4th at 787 (Quattlebaum, J., dissenting). *See also Kincaid*, 143 S.Ct. at 2417 (Alito, J. dissenting from denial of certiorari) (noting that "several aspects of the Fourth Circuit's reasoning [in *Williams*] are troubling").

Rather than embrace the Fourth Circuit's linguistic gymnastics in *Williams*, this Court should adhere to the plain meaning of the ADA's statutory text and conclude that Fuller's gender dysphoria is not a covered disability.

## II. The Eighth Amendment Does Not Provide a Right to Treatment of One's Choice.

Demonstrating a violation of the Eighth Amendment requires an incarcerated person to show an objectively serious medical need, to which prison officials displayed "deliberate indifference." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]he plaintiff must demonstrate an 'objectively serious medical need'— *i.e.*, 'one that has been diagnosed by a physician as mandating treatment or one that

13

is so obvious that even a lay person would easily recognize the necessity for a doctor's attention,' and, in either instance, 'one that, if left unattended, poses a substantial risk of serious harm.'" *Hoffer v. Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020) (quoting *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)). Deliberate indifference requires a showing that the officials had subjective knowledge of a risk of serious harm yet acted with subjective recklessness. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Wade v. McDade*, 106 F.4th 1251, 1255 (11th Cir. 2024). Subjective intent is necessary because "the Eighth Amendment bans only cruel and unusual punishment." *Wilson v. Seiter*, 501 U.S. 294, 300 (1991). Punishments require "a deliberate act intended to chastise or deter." *Id.* "Medical treatment violates the eighth amendment only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Harris v. Thigpen*, 941 F.2d 1495, 1504 (11th Cir. 1991) (citing *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)).

The Eighth Amendment does not give inmates "unqualified access to health care," *Hudson v. McMillian*, 503 U.S. 1, 9 (1992), nor does it permit inmates to "demand specific care." *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006). Indeed, the Eleventh Circuit squarely addressed the same legal issue presented here—whether an inmate's preference among options amounted to an Eighth Amendment violation—and found that the District Court has abused its discretion

14

in issuing an injunction mandating a choice of treatments. *Hoffer*, 973 F.3d at 1266. "There is no intentional or wanton deprivation of care if a genuine debate exists within the medical community about the necessity or efficacy of that care." *Gibson*, 920 F.3d at 220; *see also Hoffer*, 973 F.3d at 1272-73 (similar). *See also Kosilek*, 774 F.3d at 90-91 (upholding denial of surgical intervention where the prison provided other treatment options, even though the plaintiff disagreed with the prison's medical decisions). A difference of opinion over a course of medical treatment with an inmate fails to rise to the level of a constitutional violation. *Hoffer*, 973 F.3d at 1273 (citing *Harris*, 941 F.2d 1505); *accord Lamb v. Norwood*, 899 F.3d 1159, 1162 (10th Cir. 2018) ("We have consistently held that prison officials do not act with deliberate indifference when they provide medical treatment even if it is subpar or different from what the inmate wants."); *Kosilek*, 774 F.3d at 82 (1st Cir. 2014) (*en banc*) ("[The Eighth Amendment] does not impose upon prison administrators a duty to provide care that is ideal, or of the prisoner's choosing."); *Barr v. Pearson*, 909 F.3d 919, 921-22 (8th Cir. 2018) (citing *Meuir v. Greene Cty. Jail Emps.*, 487 F.3d 1115, 1118-19 (8th Cir. 2007)). Consequently, there is no per se Eighth Amendment right to the treatment of one's choice.

This principle—that the Eighth Amendment does not guarantee the treatment of one's choice—is especially relevant where, as here, courts have found

15

a lack of medical consensus regarding whether cross-sex surgeries are medically

necessary to treat gender dysphoria.[7] *See Kosilek*, 774 F.3d at 76 (noting

testimony from Johns Hopkins physicians that there are "many people in the

country who disagree with" WPATH's surgical recommendations); *Gibson*, 920

F.3d at 220 ("But where, as here, there is robust and substantial good faith

disagreement dividing respected members of the expert medical community

[regarding cross-sex surgeries], there can be no claim under the Eighth

Amendment." *citing Kosilek*, 774 F.3d at 96).[8]  Plaintiff is requesting cross-sex

surgery, the medical benefit of which is at best debatable.  The denial of such

surgery, therefore, is not cruel and unusual punishment under the Eighth

Amendment.  *See Keohane*, 952 F.3d at 1274–76 ("[W]hen the medical

---

[7] We also note that, to establish the "accepted clinical standard of care for treating gender dysphoria," Plaintiff relies, in part, on the most recent version of the WPATH Standards of Care.  Compl. ¶¶ 26-28.  As noted above, the scientific integrity of the WPATH Standards of Care fails to hold up to scrutiny.  *See supra* at 3-6 .  Scientific research also shows a lack of support for surgical interventions for treating gender dysphoria.  Authors who set out to prove that surgery provides mental-health benefits were forced to retract their study after a re-analysis of their data showed "no advantage of surgery in relation to subsequent mood or anxiety disorder-related health care visits or prescriptions or hospitalizations following suicide attempts." Bränström *et al.*, Reduction in Mental Health Treatment Utilization Among Transgender Individuals after GenderAffirming [*sic*] Surgeries: A Total Population Study, 177 Am. J. Psychiatry 727, 734, Correction (2020).
[8] Indeed, there is a growing body of research questioning whether surgical intervention can ever effectively treat gender dysphoria.  *See* Amicus Brief of Indiana, Idaho, and 22 Other States In Support of Defendants, *Kingdom v. Trump*, No. 1:25-cv-00691-RCL, ECF No. 45 at *12-16 (D.D.C. Apr. 1, 2025).

16

community can't agree on the appropriate course of care, there is simply no legal basis for concluding that the treatment provided is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *quoting Harris*, 941 F.2d at 1505); *id.* at 1276-78 (holding that prison officials did not violate the Eighth Amendment by denying an inmate's requested "social-transitioning-related accommodations," *i.e.*, growing longer hair to look more feminine, using makeup, and wearing female undergarments, when it had provided mental-health counseling and hormone therapy, among other things).

## CONCLUSION

The plain text of the ADA precludes coverage of gender dysphoria unless it results from a physical impairment. In addition, the Eighth Amendment does not confer a per se right to the medical treatment of a prisoner's choice. For these reasons, the United States respectfully requests that the Court consider this Statement of Interest in this litigation.

17

Dated: April 25, 2025

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

R. JONAS GEISSLER
Acting Senior Counsel
Civil Rights Division

REBECCA B. BOND
Chief, Disability Rights Section

REGAN RUSH
Chief, Special Litigation Section

*/s/ Jennifer K. McDannell*
JENNIFER K. MCDANNELL
Deputy Chief, Disability Rights Section
Civil Rights Division
U.S. Department of Justice
150 M Street, N.E.
Washington, D.C. 20002
jennifer.mcdannell@usdoj.gov

*Attorneys for the United States of America*

18

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated: April 25, 2025

*/s/ Jennifer K. McDannell*
Jennifer K. McDannell
*Attorney for the United States of America*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 25, 2025, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which will send e-mail notification of this filing to counsel of record.

/s/ Jennifer K. McDannell
Jennifer K. McDannell
*Attorney for the United States of America*

1