**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA**

JANE DOE,

     Plaintiff,

v.

GEORGIA DEPARTMENT OF      Civ. Case No. 1:23-cv-5578-MLB
CORRECTIONS; *et al.*,

     Defendants.

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
STATE DEFENDANTS'
MOTION TO DISMISS THE FINAL AMENDED COMPLAINT**

**INTRODUCTION**

Before the Court is a Motion to Dismiss (the "State Motion"), Dkt. 321, filed on behalf of the Georgia Department of Corrections ("GDC"), Deshawn Jones, Aaron Pineiro, Sharon Lewis, Marlah Mardis, and Anthony Mulloy (collectively, "GDC Defendants"). For the following reasons, the Court must deny the State's Motion in its entirety.

**BACKGROUND**

Plaintiff Jane Doe is a transgender woman in GDC's custody suffering from severe gender dysphoria. She has long been denied adequate gender-affirming care by GDC and its agents. *See* generally Dkt. 315 (the "FAC"). Ms. Doe brought this action to remedy past and continuing violations of the Eighth Amendment, the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act ("RA"). The FAC alleges the following facts in support of Ms. Doe's claims.

**I.    Statement of Facts**

A. GDC Defendants Engaged in A Continuous Pattern of Denying Ms. Doe Gender-Affirming Care.

In October 2015, Ms. Doe was diagnosed with gender dysphoria by her treating GDC psychologist and began hormone replacement therapy ("HRT") at her own request shortly thereafter. *Id*. ¶¶20-22. Defendant Mulloy started Ms. Doe's HRT regimen with 2 mg of estradiol and once-daily 50 mg of spironolactone, and, by May of 2019, had gradually increased it to 10 mg of estradiol biweekly and 200

1

mg of spironolactone. *Id*. ¶¶23-26. In June of 2019, her HRT was abruptly discontinued and her requests to resume the treatment were ignored for the next four years. *Id*. ¶¶32-33. As a result of the abrupt cessation, all of the feminizing effects caused by her HRT reversed in their entirety, leaving Ms. Doe with debilitating gender dysphoria symptoms. *Id*. ¶¶33-34. Ms. Doe's symptoms, compounded by solitary isolation, led her to attempt suicide in December 2019.  *Id*. ¶¶34-36. GDC Defendants were well aware of Ms. Doe's gender dysphoria symptoms and her corresponding history of suicide attempts and self-injurious behavior. *Id*. ¶¶21, 30-31. Nevertheless, they provided her no treatment for the four years that followed, which exacerbated her physiological and psychological suffering. *Id*. ¶¶30-31, 36.

GDC Defendants prevented Ms. Doe from resuming HRT until April 2023. *Id*. ¶64.[1] Even then, Defendant Mulloy prescribed HRT at dosages he admitted would not cause any feminine changes. *Id*. ¶66. GDC Defendants failed to consistently administer her HRT. *Id.* ¶67. Defendant Mulloy reduced her estradiol dosages even more, and, through 2024, denied all requests to increase her HRT dosages to amounts that had previously feminized her body. *Id*. ¶¶ 66-67, 69-73. Even though the Court instructed Defendant Mulloy to physically examine Ms. Doe, *id.* ¶68, he and his successors have refused to do so. *Id.* ¶¶69-72.

---

[1] In April 2023, Ms. Doe was allowed to continue her spironolactone at a lower dosage than she had before. Ms. Doe was not allowed to resume transdermal estradiol until July 2023.

When Ms. Doe filed for a preliminary injunction in this action, *see* Dkt. 2, the Court determined that HRT resulting in feminizing changes to Ms. Doe's body is medically necessary to treat her gender dysphoria, *id*. at 17-18, and that Defendants were obligated to provide her with HRT meeting that standard. *Id*. at 17. Since then, however, GDC Defendants have routinely refused to administer HRT dosages likely to cause any feminizing changes that could substantially reduce her dysphoric symptoms. FAC ¶¶69-73. Instead, GDC Defendants have routinely ignored her concerns, and the concerns and recommendations of other qualified physicians. *See id.* ¶¶72-73, 90-94.

B. Ms. Doe's Requests for Gender-Affirming Surgery.

Since 2015, Ms. Doe has also repeatedly requested to have gender-affirming surgery. *See id.* ¶¶27-30, 39-43, 44-48, 55-56. GDC Defendants and others responsible for her care have routinely denied her request pursuant to GDC's blanket ban on gender-affirming surgeries. *See id.* ¶¶29-30, 44, 46, 59-62. GDC Defendants prevented Ms. Doe from even being evaluated for the surgery until after she attempted to self-castrate. *See id.* ¶¶29-30, 44, 46, 50-52. Ms. Doe was evaluated for gender-affirming surgery by numerous physicians after her self-castration attempt, *see id*. ¶¶52-53, 74, and she was recommended for gender-affirming surgery repeatedly, *see id.* ¶¶54, 58, 74-76. Still, GDC Defendants prevented Ms. Doe from receiving the surgery. *See id.* ¶¶59-63.

3

This Court previously opined that Ms. Doe's request for gender-affirming surgery was "not yet ripe" because the Defendants had not completed its decision-making process. Dkt. 131 at 16-17. The Court requested status updates on this process. *Id.* at 16-17. In November 2024, Defendant MHM Correctional Services, LLC declared before this Court that "the recommended treatment plan for Ms. Doe is gender reassignment surgery." FAC ¶76; Dkt. 197. Since then, GDC Defendants have interfered and prevented Ms. Doe from receiving the approved surgery. FAC ¶¶77-78.

C. Prolonged Incarceration in Administrative Segregation

While in state custody, Ms. Doe has remained incarcerated in administrative segregation for seven cumulative years. *Id.* ¶99. Her mental and physical health have deteriorated as a direct result of this prolonged isolation. *Id*. ¶100. She daily remains confined to a tiny cell for almost 24 hours per day, barring certain exceptions such as legal calls. *Id*. ¶¶109-111. Ms. Doe rarely has contact with anyone except correctional officers—who refuse to even use her pronouns and legal name—and her attorneys. *Id.* When Ms. Doe is allowed out-of-cell recreation time, which she only recently started receiving, her weekly legal calls have been counted against her "one (1) hour of *exercise* per day." *Id*. ¶111.

Since at least December 2019, Ms. Doe has repeatedly self-harmed and attempted suicide in lockdown. FAC ¶¶49-51, 79-80, 99-100. Ms. Doe has formally

requested removal from administrative segregation, but nevertheless remains there by vague and indeterminable institutional order.[2] *Id*. ¶¶112-13.

Despite these unconscionable acts, GDC Defendants filed the instant Motion to Dismiss each of Ms. Doe's claims. Dkt. 321.[3] For the reasons set forth below, Ms. Doe asks the Court to deny this motion.[4]

**ARGUMENT**

**I.      Motion-to-Dismiss Standard**

When ruling on a motion to dismiss, the Court must accept all well-pleaded facts in the complaint as true to determine if the complaint states a claim for "relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing

---

[2] Ms. Doe currently has an Administrative Segregation Assignment Memo outside her cell on which GDC Defendants note that she is not a threat to herself or others.
[3] Defendants MHM Correctional Services, LLC ("MHM"), Centurion of Georgia, LLC, and other named defendants (collectively, "MHM Defendants") have filed an additional Motion to Dismiss all of Plaintiff's claims against them with their own respective supportive memorandum. *See generally* Dkt. 319 & Dkt. 319-1. Plaintiff likewise asks the Court to deny that motion. *See* Plaintiff's Opposition to MHM Defendants' Motion to Dismiss the Final Amended Complaint, Dkt. 326.
[4] Plaintiff also opposes State Defendants' request for Judicial Notice and incorporation of documents outside of the FAC, as such consideration is not properly before the Court at this state. *See* Plaintiff's Opposition to State Defendants' Request for Judicial Notice and Consideration of Documents Incorporated by Reference, Dkt. 327.

*Twombly*, 550 U.S. at 556). This is not a high bar, particularly because the Court must view all allegations in the light most favorable to the plaintiff. *Pielage v. McConnell,* 516 F.3d 1282, 1284 (11th Cir. 2008); *see Estate of Cummings v. Davenport*, 906 F.3d 935, 937 (11th Cir. 2018). A plaintiff's complaint must only allege enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting her claim. *Twombly*, 550 U.S. at 556. As such, a complaint need only allege enough facts that are sufficient to "raise a right to relief above the speculative level." *Id.* at 555. As set forth below, Ms. Doe meets this standard.

## II. Ms. Doe's Eighth Amendment Claims Must Survive the State's Motion to Dismiss.

### A. Ms. Doe States a Viable Medical Deliberate Indifference Claim

#### 1. *GDC Defendants Do Not Refute that Denying Medically Necessary Treatment is Unconstitutional.*

Ms. Doe's FAC properly alleges that GDC Defendants have acted with "deliberate indifference to [her] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A plaintiff states an Eighth Amendment claim for medical deliberate indifference by alleging she suffered a deprivation that was "objectively, sufficiently serious," and that the prison official "acted with subjective recklessness as used in the criminal law, . . . and to do so he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff." *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc)

6

(internal quotation marks and citations omitted).

GDC Defendants do not "dispute either that Plaintiff has gender dysphoria or that gender dysphoria is an objectively serious medical need." Dkt. 131 at 14. Strangely enough, they do not even dispute knowing the substantial risk of harm their failures would cause Ms. Doe. *Id.* at 15 ("Given Plaintiff's prior attempts at self-castration and suicide, Defendants clearly know the risk of harm…").

Instead, GDC Defendants improperly contest the truth of Ms. Doe's allegations and argue that their self-described "quite minimal" effort to treat Ms. Doe's gender dysphoria is sufficient to avoid Eighth Amendment liability as a matter of law. State Mot. at 11. For the following reasons, these arguments must fail.

*Estelle v. Gamble* governs this case, and the State's Motion wholly fails to apply that precedent. The determinative questions are whether the FAC alleges that GDC Defendants "intentionally interfer[ed] with [medical] treatment once prescribed," *Estelle*, 429 U.S. at 104, "fail[ed] to provide service acknowledged to be necessary," *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985), or "refused to take the steps to see that [the prisoner was] properly evaluated," *id*. The FAC clearly alleges *each* of these categories of conduct. *See, e.g.,* FAC ¶¶ 68 ("... the evidence suggests Dr. Mulloy is not properly examining whether Plaintiff's current HRT regimen is providing the changes to her body that Defendants agree are medically necessary…"), 73 ("Despite Dr. Kelly's

7

prescription, however, a GDC pharmacist refused to administer Ms. Doe any dosage above 10 mg every other week"), 78 ("... Dr. Mardis never rendered a decision on Ms. Doe's surgery…").

Although GDC Defendants prefer a contrary finding, this Court has already opined that they cannot avoid liability "'simply by providing *some* measure of treatment.'" Dkt. 131 at 15 (citing *Jones v. Muskegon Cty.*, 625 F.3d 935, 944 (6th Cir. 2010) (citation omitted)). GDC Defendants' conduct, as alleged in the FAC, "amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate" and "is the very definition of 'deliberate indifference'— anti-medicine, if you will." *Id.* (citing *Keohane v. Fla. Dept. of Corr., Sec'y*, 952 F.3d 1257, 1266–67 (11th Cir. 2020)).

For example, on November 1, 2024, GDC's medical contractor, Centurion of Georgia, LLC, cleared Ms. Doe for gender-affirming surgery, and Defendant MHM declared before this Court "that the recommended treatment plan for Ms. Doe *is* gender reassignment surgery." FAC ¶76; *see* Dkt. 197 at 1. Thereafter, without explanation, GDC Defendant Dr. Mardis interjected and prevented the surgery from moving forward. FAC ¶78 ("...considering Ms. Doe never received this surgery, [GDC] has effectively denied the request.").[5] Dr. Mardis interfered with the

---

[5] In May of 2026, Ms. Doe filed another grievance requesting gender-affirming surgery. Her grievance was promptly denied because she had already received a final decision on the same request through her prior grievance.

8

administration of Ms. Doe's recommended treatment plan. *Id.* These allegations, alone, are sufficient to state an Eighth Amendment deliberate indifference claim. *See Ancata*, 769 F.2d at 704 ("[i]ntentional failure to provide service acknowledged to be necessary is the deliberate indifference proscribed by the Constitution.") (internal citations omitted).

The FAC also alleges that GDC Defendants, especially Defendant Mulloy, exhibited deliberate indifference by knowingly administering inadequate HRT dosages. *Id*. ¶¶68-72. Previously in this litigation, "[GDC] concede[d] HRT resulting in feminizing changes to Plaintiff's body is medically necessary for treatment of her gender dysphoria." Dkt. 131 at 17-18. The FAC alleges that "Defendant Mulloy told Ms. Doe that she would not experience any feminizing effects unless she received at least 10 mg of estradiol," and then proceeded to prescribe "only 8 mg of estradiol." FAC ¶66. Rather than increasing her HRT dosages to achieve the intended results, Ms. Doe alleges that GDC Defendants recklessly failed to consistently administer the minimal HRT doses they prescribed her. *See, e.g.*, *id.* ¶90 ("Since her return to state custody, … [GDC] Defendants have failed to consistently provide Ms. Doe with her required estradiol injections, including four separate lapses [between 19 and 44 days in length each]."). After more than two years of medical care like this, Ms. Doe has experienced no feminizing changes from her HRT dosages.[6] FAC ¶94. GDC

---

[6] The Court previously opined that "[i]f, after enough time has passed, Plaintiff still

9

Defendants are not shielded from liability for providing "quite minimal" medical care that has consistently been visibly inadequate. *See Rogers v. Evans*, 792 F.2d 1052, 1062 (11th Cir. 1986) (even "[g]rossly incompetent or inadequate medical care can violate the eighth amendment"); *Murrell v. Bennett*, 615 F.2d 306, 310 n.4 (5th Cir. 1980) ("*Gamble* does not necessarily excuse one episode of gross misconduct merely because the overall pattern reflects general attentiveness"). These allegations, taken as true, state a viable Eighth Amendment medical deliberate indifference claim.

i. *SB185 Is Not a Lawful Reason to Violate the Eighth Amendment.*

Much of the State's Motion is irrelevant to Ms. Doe's allegations. Instead of focusing on the Eighth Amendment deliberate indifference standard that exclusively governs Ms. Doe's claim, the State devotes nearly a third of its Motion to justifying SB185 as a reasonable legislative response to what they insist is a controversial medical treatment. State Mot. at 11–20. To the extent GDC Defendants justify their deliberately indifferent conduct by referencing SB185, their position is factually and legally untenable.

---

has not experienced feminizing changes to her body sufficient to relieve her distress, the Court would probably find her likely to succeed on her claim that Dr. Mulloy is refusing to provide her medically necessary care by declining to judge the HRT's efficacy based on physical changes to Plaintiff's body. If that becomes the case, Plaintiff should let the Court know, at which point it will be better positioned to address this issue." Dkt. 131 at 21. Ms. Doe's FAC maintains that her HRT still has not yielded any feminizing changes to her body sufficient to relieve her distress.

10

For starters, much of the alleged conduct occurred before SB185 was even proposed. SB185 was not implemented until May of 2025, by which time Ms. Doe's approval for gender-affirming surgery had been pending for at least 5 months. *See* FAC ¶76 ("... the recommended treatment plan for Ms. Doe *is* gender reassignment surgery."). GDC Defendants make no attempt to justify preventing the surgery within that 5-month period—nor can they.

The State's Motion argues that before SB185 was passed, Ms. Doe's surgery requests were "subject to security, prison-administration, and cost considerations." State Mot. at 37. GDC Defendants allude to other factors it *could have* weighed to suggest that it is "implausible" that they denied the surgery because of Ms. Doe's gender dysphoria. *Id.* GDC's argument must be disregarded because the "plausibility" of Ms. Doe's allegations are not at issue at this stage in litigation. *See Iqbal*, 556 U.S. at 678 (the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," but "is not akin to a 'probability requirement.'"). Even if it were, Defendants do not supply the Court with any "security, prison-administration, [or] cost" rationale that disposes of Ms. Doe's claim *as a matter of law*, which would be required to warrant dismissal.

Further, SB185 is not a legally supported reason to deny access to medically necessary treatment. The Supremacy Clause provides that state constitutional or statutory laws do not supersede the U.S. Constitution and the rights guaranteed

11

therein. U.S. Const. art. VI, § 2; *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 180 (1803) ("a law repugnant to the constitution is void."). Even if states are afforded "broad discretion" "to implement [] general policy regarding medical interventions," State Mot. at 14, they are not permitted to ignore federal constitutional minimums. In the Eleventh Circuit, courts are "aware that systemic deficiencies in medical care may be related to a lack of funds allocated to prisons by the state legislature," but "[s]uch a lack, however, [does] not excuse the failure of correctional systems to maintain a certain minimum level of medical service necessary to avoid the imposition of cruel and unusual punishment." *Harris v. Thigpen*, 941 F.2d 1495, 1509 (11th Cir. 1991).

The argument that "SB185 now forbids state funding for this procedure," is premised upon a legal fallacy, State Mot. at 37, and is *ipso facto* an admission that GDC Defendants denied or delayed Ms. Doe's surgery for nonmedical reasons. *See Murrell*, 615 F.2d at 310 n.4. Ms. Doe's Eighth Amendment right to the medical care she needs to treat her serious medical condition cannot lawfully be denied because of ambiguities relating to funding. *Estelle*, 429 U.S. at 104; *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 245 (1983) ("as long as the governmental entity ensures that the medical care needed is in fact provided, the Constitution does not dictate how the cost of that care should be allocated…").

ii. *GDC Defendants Misappropriate Authority to Evade Defending Their Eighth Amendment Violations.*

12

GDC Defendants' Motion must also fail for its legally deficient analysis of Ms. Doe's requested care. GDC Defendants believe dismissal is appropriate because "there is no controlling Supreme Court or Eleventh Circuit precedent holding that the Eighth Amendment requires prison officials to provide sex-change interventions." *See* State Mot. at 9. However, the converse is also true—there is no controlling Supreme Court or Eleventh Circuit authority finding that the Eighth Amendment *permits* prison officials to deprive a prisoner of medical care deemed necessary to treat a serious medical need pursuant to a categorical ban. GDC Defendants cannot present such authority because the Eighth Amendment prohibits such conduct. *Estelle*, 429 U.S. at 104.

The State's Motion evades discussing the Eighth Amendment and Ms. Doe's specific mistreatment for this very reason. Instead, GDC Defendants justify their unconscionable conduct by extrapolating cases brought under different laws applying different legal standards in completely different contexts. Unpersuasively, their Motion argues that the Blanket Ban complies with the Eighth Amendment because "courts have rejected constitutional challenges to state laws that defund or *even outright ban* similar interventions" under rational basis review in the Fifth and Fourteenth Amendment contexts. *See* State Mot. at 11 (emphasis in original). This contention has no legal basis because these decisions do not address the Eighth Amendment at all. *See United States v. Skrmetti,* 605 U.S. 495 (2025) (applying the

Fourteenth Amendment Equal Protection Clause); *Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205 (11th Cir. 2023) (alleging Fifth and Fourteenth Amendment violations); *Lange v. Houston Cnty., Ga.*, 152 F.4th 1245, 1254–55 (11th Cir. 2025) (alleging Title VII violations); *Anderson v. Crouch*, 169 F.4th 474 (4th Cir. 2026) (alleging violations of the Equal Protection Clause and Affordable Care Act). Cases applying different legal standards are simply not controlling. *See, e.g., Graham v. Connor*, 490 U.S. 386, 395 (1989) (declining to apply a different legal standard where the claim was governed by "an explicit textual source of constitutional protection").

GDC's arguments are supported by a slew of decisions from noncontrolling cases sharing few factual similarities to this case. *See Eknes-Tucker*, 80 F.4th at 1205 (addressing parental rights to seek certain gender-affirming treatment for their minor children); *Lange*, 152 F.4th at 1254–55 (regarding a county's denial of health insurance coverage for gender-reassignment surgery); *Anderson,* 169 F.4th at 480-81 (regarding West Virginia's exclusion of gender dysphoria from a list of eligible diagnoses for Medicaid coverage of gender-reassignment surgeries). For example, GDC relies heavily on *Skrmetti,* which only considered the right to gender-affirming care for *minors*, not adults. [7] *Id.* at 495 ("SB1 incorporates two classifications: one

---

[7] *Skrmetti* was also decided on a preliminary injunction, where a party must establish a likelihood of succeeding on the merits of their claim, rather than a complaint, which only requires the plaintiff to state a viable claim. *See* 605 U.S. at

14

based on age (allowing certain medical treatments for adults but not minors) and another based on medical use…").

Further, despite significant factual differences, GDC attempts to extend the Fourth Circuit's analysis in *Anderson* to this case. 169 F.4th 474 (4th Cir. 2026). The "disagreement[s] among experts about the efficacy and necessity" of gender-affirming surgeries in *Anderson* is neither persuasive nor relevant here—not only because *Anderson* never mentions the Eighth Amendment, but most crucially, because Ms. Doe's medical team determined that gender-affirming surgery is medically necessary for her. *See id.* at 491 n.15; FAC ¶¶54, 74–76. GDC Defendants cannot defend their deliberate indifference towards Ms. Doe's serious medical needs using decisions with no legal application to the facts alleged in the FAC.

GDC Defendants also cite authority applying the Eighth Amendment where the facts are easily distinguishable. First, GDC Defendants cite *Gibson v. Collier*, 920 F.3d 212, 216 (5th Cir. 2019) to contend that states can establish general rules about medical treatment for prisoners. *See* State Mot. at 14. However, the FAC is not concerned with whether prisons can generally make "prophylactic judgments" about medical care. Rather, Ms. Doe alleges that GDC's enforcement of its Blanket Ban is unconstitutional, as applied to her, because her medical team determined that gender-affirming surgery is medically necessary for her. *See Keohane*, 952 F.3d at

---

507–08.

15

1278; FAC ¶117.

Moreover, *Gibson* is distinguishable on the most pivotal facts. In *Gibson*, the Fifth Circuit granted summary judgment and upheld a Texas policy excluding gender-affirming surgery from its gender dysphoria treatment protocol. 920 F.3d at 215. But unlike Ms. Doe, the *Gibson* plaintiff's claim did not arise from an individualized determination that surgery was medically necessary. *Id.* at 217–18. Here, Ms. Doe pleads that GDC Defendants refused to provide gender-affirming surgery "with knowledge that they were withholding medically necessary care." *Id.* at 220; FAC ¶77. Ms. Doe simply asks for treatment consistent with GDC's own medical assessment. FAC ¶74–76.

Even if *Gibson* was factually analogous, it was decided on summary judgment based on the developed factual record, not on the legal sufficiency of "the well-pleaded allegations of the complaint" which, at the motion to dismiss stage, must be taken as true. *City of Los Angeles v. Preferred Commc'ns, Inc.*, 476 U.S. 488, 493 (1986).

Second, GDC relies on *Hoffer* and *Keohane* to argue that their ongoing denial of any meaningful gender-affirming care is not "so grossly incompetent, inadequate, or excessive as to shock the conscience." *See* State Mot. at 11 (quoting *Hoffer,* 973 F.3d at 1271). Ironically, these cases establish the opposite.

In *Hoffer*, the plaintiff did not allege that a categorical ban precluded access

16

to medically necessary treatment, as Ms. Doe does here. Rather, the prison used a tiered system to assign treatment plans, after individualized assessments, to prisoners with Hepatitis C based on the severity of their symptoms. 973 F.3d at 1272. The prison would "monitor [low stage patients], … schedule infirmary visits and lab tests every six months, and if necessary, … re-stage their fibrosis annually" to determine whether the more effective medication would be appropriate. *Id.* at 1269.

Similarly, in *Keohane*, the Eleventh Circuit found no Eighth Amendment violation where the defendants banned a transgender woman's requested social-transition items for security concerns.[8] 952 F.3d at 1279. Although the defendants denied these items, the plaintiff's treatment team provided her "mental-health counseling, hormone therapy, the use of female pronouns, safer housing accommodations, and private shower facilities," which they determined was "sufficient to treat her gender dysphoria." *Id.* at 1277.

The *Hoffer* and *Keohane* defendants differ from the GDC Defendants because they created treatment plans that responded to each plaintiff's medical needs and actually followed them. The FAC alleges that the GDC Defendants made next-to-no effort to treat Ms. Doe's gender dysphoria according to her recommended treatment plan. FAC ¶76. Instead, GDC Defendants decided that gender-affirming surgery is

---

[8] Even though GDC Defendants argue the point anyway, the FAC does not request social transition items. Therefore, the Court need not address those arguments.

17

categorically *never* allowed, even when their own healthcare providers determined in 2024 that it is medically necessary for Ms. Doe. FAC ¶¶42–46, 76.

To the extent GDC Defendants treat Ms. Doe's gender dysphoria with HRT, they do so without concern for how and whether the HRT addresses her serious medical needs. *Id.* ¶¶3, 67-73, 90-96. These allegations clearly state a viable claim for Eighth Amendment medical deliberate indifference.

B. Ms. Doe's Prolonged Solitary Confinement Claim Must Be Resolved on a Developed Record.

Relying almost exclusively on *Sheley v. Dugger*, 833 F.2d 1420 (11th Cir. 1987), GDC Defendants offer the Court three reasons to dismiss Ms. Doe's Eighth Amendment Prolonged Solitary Confinement claim: the duration of her confinement is too short, the conditions of her segregation are constitutionally adequate, and her security profile supplies a penological justification. State Mot. at 29-32. None are persuasive. The State asks the Court to resolve questions of fact on the pleadings without a developed factual record. However, on a motion to dismiss, the Court must take the FAC's allegations as true. The Court should, therefore, deny the Motion.

i. *Nearly Six Years of Near-Total Isolation is Not, As A Matter of Law, Too Short to State a Claim.*

The State misreads *Sheley* to impose a minimum duration requirement on Eighth Amendment claims for solitary conditions. State Mot. at 29. In reality, *Sheley* establishes no such minimum. It requires courts to engage in a case-by-case fact-

18

specific inquiry rather than creating a categorical minimum. *Sheley*, 833 F.2d at 1428–29 (cleaned up) ("the length of time in isolation is *a* factor which must be considered"). The *Sheley* holding confirms that this fact-based inquiry is inappropriate for resolution at the pleading stage. *Id.* at 1429-30 (reversing dismissal entered and remanding so the parties could present evidence of "the reasons for [the] segregation, the conditions [in confinement], the effects of long-term confinement[], the psychological evaluations (if any) that Sheley ha[d] received, and the possibility of feasible alternatives.") The Eleventh Circuit has since reaffirmed that the duration of administrative segregation is just "a factor which must be considered" in conjunction with other conditions of confinement when analyzing an Eighth Amendment claim. *See Melendez v. Sec'y, Fla. Dep't of Corr.*, No. 21-13455, 2022 WL 1124753 (11th Cir. Apr. 15, 2022) (cleaned up).

Duration is thus only one factor to be weighed alongside the conditions and effects of confinement—and Ms. Doe pleads plenty for the Court to weigh. She alleges that GDC has held her in administrative segregation for nearly six years, confined nearly twenty-four hours a day in a roughly seven-by-eleven-foot cell with a metal plate over the window blocking natural light. FAC, ¶¶99, 109. The FAC alleges that her cell has no central air or heating, despite medical recommendations for each due to her COPD and asthma, and that she has been denied basic hygiene, social interaction, and, until recently, all out-of-cell recreation. *Id.* ¶¶109-11, 170.

19

Ms. Doe also pleads severe effects while in segregation: attempting self-castration in 2023 and suicide in 2024, and compulsory self-harm throughout. *Id.* ¶157. These are precisely the factors that *Sheley* and its progeny reserve for a developed record. *Sheley*, 833 F.2d at 1429–30. These factors cannot be weighed on a bare record. Any contrary reading would convert a fact-intensive standard into a bright-line rule that *Sheley* itself disclaimed. Under *Sheley*, Ms. Doe's allegations state an Eighth Amendment claim sufficient to survive the State's Motion.

###### ii. *GDC's Policies Cannot Be Considered on a Motion to Dismiss and Are Not Dispositive.*

GDC uses its own Standard Operating Procedures ("SOPs") to argue that the conditions of Ms. Doe's confinement "do not transgress constitutional limits" because all segregated inmates are required to receive adequate light, hygiene, ventilation, and recreation. State Mot. at 29–31. As a threshold matter, GDC cannot rely on its SOPs as evidence at the pleading stage because GDC inappropriately deploys them to contradict the FAC.

On a Rule 12(b)(6) motion, the Court must accept the FAC's well-pleaded factual allegations as true and construe them in the light most favorable to Ms. Doe. *See Iqbal*, 556 U.S. at 678. GDC asks the Court to do the opposite–to infer, from the mere existence of a written policy, that Ms. Doe received the conditions the policy prescribes, and that those conditions are *ipso facto* constitutional under the circumstances. But the SOPs do not establish these facts. To the contrary, the FAC

alleges that GDC has not followed those policies. Defendant Pineiro denied her out-of-cell recreation "in violation of GDC's own policies," GDC counts her legal calls as her required hour of exercise, and GDC has not complied with the review protocol its own SOPs require. FAC ¶¶110–113.

GDC's fallback argument that the FAC "does not allege that Plaintiff's confinement differs from that of any other inmate in GDC administrative segregation" fares no better. The relevant inquiry is not whether Ms. Doe is treated worse than others in the same conditions, but whether the duration and conditions of her confinement are cruel and unusual. Indeed, the Eleventh Circuit has recognized that such conditions may, "in combination," offend the Constitution even if none would alone. *Melendez*, 2022 WL 1124753, at *10. Ms. Doe's FAC pleads enough suspect conditions to state a claim. *See* FAC ¶¶109–110; *see Quintanilla v. Bryson*, 730 F. App'x 738, 745–47 (11th Cir. 2018) (vacating dismissal and remanding for further fact-finding in the face of materially similar allegations of prolonged isolation, poor sanitation, denial of human contact and out-of-cell recreation).

### iii. *GDC's Purported Security Rationale Does Not Defeat Ms. Doe's Claim, as it Must Be Balanced Against the Alleged Harm.*

GDC Defendants also argue that Ms. Doe's "security profile" supplies an "obvious alternative explanation" for her isolation. State Mot. at 31–32. In doing so, the State treats "totally without penological justification" as the only path to an Eighth Amendment violation—but the Eleventh Circuit has squarely rejected that

21

framing. While alleging an infliction of pain without penological justification is "one way" to state an Eighth Amendment claim, "that is not the *only* way an inmate can prove an Eighth Amendment violation." *Melendez,* 2022 WL 1124753, at \*12 (emphasis in original). Rather, "courts must balance [penological] justifications against [whether] countervailing considerations" are sufficiently serious. *Id.*

That balancing cannot be performed on the pleadings on an undeveloped factual record. The FAC's alleged deprivations are severe enough to state a plausible claim for relief. While in segregation, Ms. Doe attempted self-castration in 2023, attempted suicide in 2024, and engaged in self-harm throughout. FAC ¶¶100, 157. After her suicide attempt, GDC Defendants left her in segregation for another week, rather than moving her to a crisis stabilization unit. FAC ¶79. She is classified as "Mental Health Level III," and she alleges that prolonged isolation is particularly catastrophic for an individual with gender dysphoria, intensifying depression, anxiety, and known history of self-mutilation and suicide attempts. FAC ¶¶101, 171. The State Defendants' security interests must be weighed against, not in place of, the alleged harms. Therefore, Ms. Doe's claim must advance.

C. <u>GDC Defendants Are Not Entitled to Qualified Immunity for Violating Ms. Doe's Clearly Established Eighth Amendment Rights</u>.

GDC Defendants are not entitled to qualified immunity for any of the Eighth Amendment violations alleged in the FAC.

At all times relevant, Ms. Doe had a clearly established right to necessary

22

medical treatment, and the FAC alleges that GDC Defendants violated that right repeatedly. *See Estelle*, 429 U.S. at 97. Ms. Doe alleges that GDC Defendants enforced a Blanket Ban on gender-affirming surgery, which prevented her from being evaluated for the surgery for months. FAC ¶¶38-48; *see Ancata*, 769 F.2d at 704 ("...[d]eliberate indifference to serious medical needs is shown when … an inmate is denied access to medical personnel capable of evaluating the need for treatment."). When Ms. Doe was finally evaluated and recommended for the surgery, State Defendants "intentionally interfer[ed] with [the medical] treatment once prescribed." *Estelle,* 429 U.S. at 104; *see* FAC ¶¶76-80. Thereafter, GDC Defendants "failed to provide [the] service acknowledged to be necessary." *Ancata*, 769 F.2d at 704. The FAC alleges that GDC's prison officials enforced this Blanket Ban without making any exception for Ms. Doe's diagnosed medical need. *Keohane*, 952 F.3d at 1267 ("policies erecting blanket bans on gender-dysphoria treatments— without exception for medical necessity—have [been] held [to] evince deliberate indifference."). These allegations establish that GDC Defendants violated Ms. Doe's clearly established rights, precluding qualified immunity for these claims.

Ms. Doe also had a right to be free from placement in solitary confinement that is "arbitrary and without penological justification." *Quintanilla*, 730 F. App'x at 747 ("arbitrary placement in [administrative segregation without penological justification] surely constitutes [a] violation of the Eighth Amendment"). This right

23

was also clearly established. *See Gregg v. Georgia,* 428 U.S. 153, 183 (1976) ("the sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering"). Ms. Doe alleges that she has been detained in "prolonged administrative segregation (equivalent to solitary confinement) for at least five years," where she has been "confined to a cell for 23 to 24 hours a day with limited light, no social interaction, and restricted hygiene." FAC ¶170. These conditions serve no articulated penological justification. *See, e.g., id.* ¶173 ("Defendants Jones and Pineiro justified this isolation as protective custody or administrative necessity"). Defendants Jones and Pineiro segregated Ms. Doe with knowledge of her gender dysphoria diagnosis and symptoms, and "the resulting vulnerabilit[ies] of her mental health." *Id.* ¶172. Nevertheless, "they personally authorized, oversaw, or refused to terminate her placement in administrative segregation, disregarding the substantial risk of serious harm it posed to her." *Id.* These allegations are sufficient to defeat qualified immunity at this stage.

### III.    Ms. Doe Plausibly States ADA and RA Claims Against GDC.

Title II of the ADA provides: "[N]o qualified individual[9] with a disability

---

[9] GDC acknowledges that this Court has already rejected its argument that gender dysphoria is categorically excluded from ADA and Rehabilitation Act coverage under 42 U.S.C. §12211(b) and 29 U.S.C. §705(20)(F). State Mot. at 34–35. GDC "preserves" this argument but offers no new basis to revisit the Court's considered holding. The FAC plausibly alleges that Ms. Doe suffers from gender dysphoria, which constitutes a physical or mental impairment that substantially limits one or more major life activities. FAC ¶¶126-127, 138.

24

shall, by reason of such disability, be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. §12132; 28 C.F.R. §35.130(b). To prevail under Title II, Ms. Doe must show: "(1) that [s]he is a qualified individual with a disability; (2) that [s]he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007) (citations omitted).

Section 504 of the RA imposes materially identical obligations on federally funded programs. Because Title II and Section 504 "contain textual similarities," courts apply "the same standards" and "rely on cases construing these provisions interchangeably." *Ingram v. Kubik*, 30 F.4th 1241, 1256 (11th Cir. 2022); *see also Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1133 (11th Cir. 2019).

Importantly, this Court's prior assessment at the preliminary injunction stage applied a substantially higher standard—requiring a "substantial likelihood of success on the merits"—than the plausibility inquiry now before the Court. Dkt. 131 at 11. Still, this Court determined that gender dysphoria is a disability covered by the ADA and RA. *See* Dkt. 131 at 44. Any argument to the contrary at this stage in the case is frivolous. Further, GDC does not contest that it denied Ms. Doe's

25

accommodation requests for surgery and other relief. *See* State Mot. at 36-37.

Therefore, Ms. Doe need not address these elements herein.

A. Plaintiff's ADA/RA claims are not repackaged medical malpractice or Eighth Amendment claims.

GDC's central argument is that Ms. Doe's ADA/RA claims are merely relabeled claims for inadequate medical treatment. GDC cites *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1294 (11th Cir. 2005), *Finn v. Haddock*, 459 F. App'x 833, 837–38 (11th Cir. 2012), and several out-of-circuit decisions for the proposition that the ADA "does not create a remedy for medical malpractice." Those cases state a correct general principle but are readily distinguishable from this case.

i. *Plaintiff does not allege mere negligence or a dispute over clinical judgment.*

In each case GDC cites, the plaintiff alleged that medical providers rendered *substandard* care—i.e., the providers attempted to treat the disability but did so poorly. Ms. Doe's claim is fundamentally different. She does not allege merely that she received negligent care or that she disagrees with a medical opinion. Rather, she alleges that GDC *categorically denied* medically necessary treatment *because of* her disability of gender dysphoria, pursuant to policies that uniquely burden individuals with that condition. FAC ¶¶1-2, 17-18, 29, 37, 42-44, 55-60, 129-131, 141-143, 154-156. Where prison officials deny accommodations or benefits to a disabled person on the basis of their disability, the ADA supplies an independent cause of action

26

regardless of whether the same facts might also support constitutional claims. *See United States v. Georgia*, 546 U.S. 151, 159 (2006).

Ms. Doe alleges that a 2023 Treatment Committee, including GDC employees, denied Ms. Doe's request for gender-affirming surgery after Dr. Frady recommended that surgery. FAC ¶¶55-60, 74-78, 83-88. GDC staff allegedly informed Ms. Doe that GDC "doesn't do gender-affirming surgeries." *Id.* ¶60. This is not a difference of medical opinion; it is a categorical exclusion from services administered by a public entity.

### ii. Overlapping Eighth Amendment and ADA claims are neither novel nor improper.

GDC attempts to mischaracterize Ms. Doe's ADA/RA claims by importing her separate Eighth Amendment arguments, as if the existence of a constitutional claim forecloses a statutory one. It does not. The Supreme Court has squarely held that the same prison conduct can simultaneously violate both the Eighth Amendment and Title II of the ADA.

In *United States v. Georgia*, a paraplegic prisoner was denied accessible facilities, physical therapy, medical treatment, and prison programs. 546 U.S. at 151. The Court stated that the "alleged deliberate refusal of prison officials to accommodate [an inmate's] disability-related" hygiene and medical care needs "constituted 'exclu[sion] from participation in or . . . deni[al of] the benefits of'" the prison's "services, programs, or activities." *Id.* at 157 (quoting 42 U.S.C. §12132)

27

(alterations in original). The Supreme Court held that Title II validly abrogates state sovereign immunity "insofar as [the challenged conduct] violated Title II but did not the Fourteenth Amendment," such as where the claim arises from conduct that also violates the Eighth Amendment. *Id.* at 159; *see, e.g., Valentine v. Collier*, 993 F.3d 270, 281 (5th Cir. 2021) ("Because the Eighth Amendment applies to the states through the Fourteenth Amendment, an ADA violation that is also an Eighth Amendment violation actually violates the Fourteenth Amendment"). Courts have repeatedly declined to grant sovereign immunity when claims brought under Title II and the Eighth Amendment arose from the same conduct. *See, e.g., Durham v. Kelley*, 82 F.4th 217, 228-29 (3rd Cir. 2023) (reversing sovereign immunity dismissal where the Title II and the Eighth Amendment claims arose from the same conduct).[10]

Thus, it is not merely permissible but entirely ordinary for an Eighth Amendment violation also to be an ADA violation. GDC's argument that ADA claims must be *different from* any Eighth Amendment theory finds no support in *United States v. Georgia* or any other binding precedent. *See Harvard v. Inch*, 411 F. Supp. 3d 1220 (N.D. Fla. 2019) (denying dismissal of Eighth Amendment, ADA,

---

[10] Although the State's Motion is unclear on the point, sovereign immunity does not apply to Ms. Doe's RA claim. *See Garrett v. Univ. of Alabama at Birmingham Bd. of Trs.*, 344 F.3d 1288, 1293 (11th Cir. 2003) ("[the statute] unambiguously conditions the receipt of federal funds on a waiver of Eleventh Amendment immunity to claims under section 504 of the [RA]").

28

and RA claims arising from prison policies related to isolation of prisoners); *see also Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998) (holding that "services, programs, or activities" within the meaning of §12132 include prison medical "services").

B. The denial was "by reason of" Plaintiff's disability.

GDC next argues that Ms. Doe has not plausibly alleged that any denial of services was "by reason of" her disability. This argument fails at the pleading stage.

> i. *The complained-of denials are inextricably linked to Plaintiff's disability.*

The accommodations and services Ms. Doe has been denied—access to evaluations for and implementation of gender-affirming surgery, as well as adequate gender-affirming HRT—are treatments and accommodations sought *only* by individuals with gender dysphoria and denied pursuant to GDC's alleged blanket policies that uniquely burden that condition. FAC ¶¶129-130, 141-143, 154-156. No person without gender dysphoria would seek, or could be denied, this care. *See Lange v. Houston County*, 101 F.4th 793, 798–99 (11th Cir. 2024) (causation established where "a blanket denial of coverage for gender-affirming surgery" applied only to the "participants who would seek" or "who qualify for gender-affirming surgery"). The causal nexus between Ms. Doe's disability and GDC's alleged denials is self-evident from the face of her complaint.

GDC's reliance on *Tardif v. City of New York*, 991 F.3d 394, 405 (2d Cir. 2021), and *McGugan v. Aldana-Bernier*, 752 F.3d 224, 231 (2d Cir. 2014), is

29

**Commented [H1]:** Links the causation argument to the complaint's ADA and RA counts.

unavailing. Those cases address situations where treatment was withheld for reasons of legitimate medical judgment having nothing to do with disability-based animus (as is the case here). *McGugan* itself recognized that ADA discrimination occurs where treatment is withheld "for reasons having no relevance to medical appropriateness—reasons dictated by bias rather than medical knowledge." 752 F.3d at 231. That is precisely what Ms. Doe alleges: GDC's categorical policies and committee decisions foreclosed individualized medical assessment and denied access to care that her treating providers recognized as beneficial—not because those treatments were medically inappropriate for her, but because GDC has refused, as a matter of policy, to provide them to anyone with gender dysphoria. FAC ¶¶17-18, 42-46, 52-60, 74-78, 129-131, 141-143, 154-156.

> ii. *Security, cost, and penological considerations do not defeat plausibility.*

GDC argues that security concerns, prison-administration considerations, and cost explain the denial of surgery and other gender-affirming care. But these are factual defenses that cannot be resolved at the pleading stage. *See Lonergan v. Fla. Dep't of Corr.*, 623 F. App'x 990, 992, 994 (11th Cir. 2015) (reversing dismissal of ADA claim and holding that whether prison interests outweigh plaintiff's interests was not appropriate for resolution on the pleadings). Whether legitimate penological interests justify denying Ms. Doe's requested accommodations is a fact-intensive inquiry requiring discovery. At this stage, Ms. Doe need only plausibly allege that

30

her disability was a reason for the denial—and she has.

          *iii.   GDC's characterization of Ms. Doe's hormone claims as a "difference of medical opinion" is premature.*

GDC contends that Ms. Doe's allegations regarding hormone therapy merely reflect a "difference of medical opinion." State Mot. at 37. The Court should reject this characterization at the motion-to-dismiss stage. The FAC alleges not merely that Ms. Doe prefers a different dosage, but that GDC reduced or restricted previously prescribed hormone therapy in a manner inconsistent with clinical standards, pursuant to institutional policy rather than individualized clinical judgment. FAC ¶¶ 22-25, 32-34, 64-67, 69-73, 90-94, 117-119, 129-131, 142, 154-156. Ms. Doe further alleges that GDC refused to prescribe hormone therapy at a dosage likely to improve or ease her gender dysphoria symptoms. *Id.* ¶¶3, 67-73, 90-96, 142. Whether such decisions reflect disability-based discrimination or legitimate medical discretion is precisely the sort of factual question that cannot be resolved without discovery.[11]

---

[11] Defendant GDC's categorical denial policies even satisfy the RA's "solely by reason of" standard. A policy that, by definition, applies only to individuals with a specific disability (and a benefit that is denied on that basis) plausibly meets any such causation standard and should survive the motion to dismiss stage at least because it raises specific factual questions best resolved through discovery of the parties. *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1334 (11th Cir. 1999) ("Therefore, we simply require that a disability be shown to be a determinative, rather than the sole, decision-making factor.").

C. Ms. Doe's requested accommodations are not unreasonable as a matter of law.

GDC argues that Ms. Doe's requested accommodations are unreasonable and would burden prison security and administration. GDC cites *Havens v. Colorado DOC*, 897 F.3d 1250, 1269–70 (10th Cir. 2018), and *Onishea v. Hopper*, 171 F.3d 1289, 1300 (11th Cir. 1999) (en banc), for the proposition that courts must consider legitimate penological interests.

Ms. Doe does not dispute that prison interests are relevant to the reasonableness inquiry. But that inquiry is inherently fact-intensive and inappropriate for resolution at the pleading stage. *See Lonergan*, 623 F. App'x at 992, 994 (reversing dismissal of ADA accommodation claim against prison). Ms. Doe need only plausibly allege that the requested accommodations are tied to her disability and bear a facially reasonable connection to the services at issue. She has done so. *See* FAC ¶¶ 83-85, 88, 97. Whether GDC's security and administrative justifications ultimately prevail is a question a factual question best resolved at a later stage in this case. *See also infra* Sec. II.A.1.i.

D. Plaintiff plausibly alleges intentional discrimination.

GDC argues that Count 3 fails because Ms. Doe has not alleged "animus" and that the FAC shows she "has a treatment plan" with which she merely disagrees. This misstates both the pleading standard and the FAC's allegations.

At the pleading stage, intentional discrimination under the ADA may be

32

established by showing deliberate indifference to the rights of disabled persons. *See, e.g.*, *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 344 (11th Cir. 2012) (affirming that a violation of the Rehabilitation Act allows for an inference of intentional discrimination upon a showing a defendant's deliberate indifference).

Here, the FAC alleges that GDC was on notice of Ms. Doe's disability and her disability-related needs through her repeated formal and informal requests for accommodations, *see* FAC ¶¶27, 30, 39-48, 55-60, 88-90, 129; that GDC personnel knew of her self-harm and the risk to her safety, FAC ¶¶21, 35-36, 41, 57, 79, 91, 131-132, 140-142; and that GDC maintained policies categorically refusing to provide gender-affirming surgery to any inmate regardless of any individualized assessment of need, FAC ¶¶29, 43-44, 46, 59-60, 88, 130, 141, 154-156. A categorical refusal to consider individualized accommodation requests from persons with a particular disability, in the face of known harm, plausibly supports an inference of intentional discrimination at this stage.[12]

GDC's argument that SB185 does not "facially discriminate on transgender status" under *Skrmetti* is irrelevant to whether the FAC *in this case* plausibly alleges intentional discrimination. The question at the motion-to-dismiss stage is not whether a statute discriminates, but whether the complaint contains factual

---

[12] The FAC also alleges that GDC maliciously refuses to use Ms. Doe's pronouns and legal name, which are such easy accommodations for her gender dysphoria, that refusing them is probative of GDC's intent to discriminate. FAC ¶89.

allegations from which the Court may reasonably infer that GDC acted with deliberate indifference to Ms. Doe's disability-related needs. The FAC does.

E. SB185 does not defeat Ms. Doe's ADA claims.

GDC next argues that SB185, which now prohibits state funding for certain gender-affirming procedures, undermines Ms. Doe's ADA/RA claims. This argument fails for multiple reasons.

As argued above, the majority of the wrongdoing alleged in the FAC occurred before SB185's enactment. A subsequently enacted statute cannot retroactively render lawful the conduct that is the basis of Plaintiff's claims for damages. *See, e.g., Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994) ("It will frequently be true . . . that retroactive application of a new statute would vindicate its purpose more fully. That consideration, however, is not sufficient to rebut the presumption against retroactivity").

*Second*, Ms. Doe is not required at the pleading stage to anticipate and preemptively rebut every potential affirmative defense. If GDC believes SB185 provides a defense to certain claims for prospective relief, it may raise that defense at the appropriate time; it does not warrant dismissal of the FAC.

**IV.   GDC's Remaining Procedural Arguments Also Fail.**

B. Ms. Doe's Claims Are Timely Under the Continuing Violations Doctrine.

Although the applicable statute of limitations for §1983, ADA, and RA claims

34

is two years, the continuing violation doctrine renders all of Ms. Doe's claims timely.

Under this well-established doctrine, "a plaintiff [is permitted] to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period." *Ctr. for Biological Diversity v. Hamilton*, 453 F.3d 1331, 1334 (11th Cir. 2006). In the Eleventh Circuit, when a plaintiff experiences "continuing and accumulating harm" within the limitations period, connected claims predating that period remain timely. *See Lovett v. Ray*, 327 F.3d 1181, 1183 (11th Cir. 2003) (while "the present consequence of a one time violation" does not extend the limitations period, "the continuation of a violation into the present" does).

The Eleventh Circuit and district courts have repeatedly applied the continuing violation doctrine to cases involving prisons' failures to provide adequate medical treatment to incarcerated plaintiffs. *See, e.g., Baker v. Sanford*, 484 F. App'x 291 (11th Cir. 2012); *Robinson v. United States*, 327 F. App'x 816 (11th Cir. 2007); *Albritton v. Centurion of Fla.*, No. 3:21-cv-712-MMH-JBT, 2023 WL 34703 (M.D. Fla. Jan. 4, 2023); *Dipietro v. Lockhart*, No. 4:20-cv-00035-CDL-MSH, 2021 WL 9794746 (M.D. Ga. Mar. 8, 2021). In *Baker*, the Eleventh Circuit held that the district court erred in time-barring an incarcerated plaintiff's claims because "prison officials' prolonged failure to provide adequate medical treatment despite his repeated grievances constituted a continuous injury during the statute of limitations period." 484 F. App'x at 293. Similarly, in *Robinson*, the court found a prisoner's

35

Federal Tort Claims Act claim timely despite a two-year limitations period because denials of medical treatment dating back to 2003 constituted a continuous injury. 327 F. App'x at 818. Although *Baker* and *Robinson* are unpublished, district courts have relied on both, embracing the doctrine in cases with facts akin to Ms. Doe's claims. *See, e.g., Whitaker v. Hill*, No. 1:23-CV-3552-TWT, 2024 WL 454952, at *2 (N.D. Ga. Feb. 6, 2024); *Albritton*, at *9 (Middle District of Florida); *Dipietro*, 2021 WL 9794746, at *5-*7 (Middle District of Georgia); *Edwards v. Clark*, No. CV 316-019, 2018 WL 2323465, at *6 (S.D. Ga. May 22, 2018).

This Court recently applied the continuing violation doctrine in the §1983 context. *See Bradford v. City of Alpharetta*, No. 1:24-cv-04623-SEG-LTW, 2025 WL 4697056 (N.D. Ga. Aug. 1, 2025) (finding that the doctrine plausibly applied to a police officer's §1983 racial discrimination claim). *Bradford* confirms that this Court recognizes the doctrine's application to civil rights claims involving ongoing patterns of discriminatory conduct, like Ms. Doe's disability discrimination and deliberate indifference claims.

Ms. Doe has endured years of repeated, interconnected violations that continue to this day: precisely the acts that the continuing violation doctrine was designed to reach. Since her 2015 gender dysphoria diagnosis, Defendants have continually denied her requests for gender-affirming surgery. Since 2019, Defendants have discontinued her HRT, taken her on and off HRT without

explanation, and prescribed ineffective dosages of estradiol. Since 2022, Defendants have isolated Ms. Doe in administrative segregation, withholding basic social interaction and recreation time. Each time Ms. Doe filed a grievance seeking adequate medical treatment, Defendants either denied her requests, ignored her requests altogether, or provided inadequate treatment.

GDC Defendants' prolonged failure to provide Ms. Doe with adequate medical treatment has inflicted continuing and accumulating harm, compounding from 2015 to the present. As such, none of Ms. Doe's claims arising from Defendants' conduct prior to December 6, 2021, should be time-barred.

C. Ms. Doe's Minor Pleading Errors Are Insufficient Grounds to Dismiss The Complaint.

GDC accurately identifies two pleading errors contained in the FAC: Count 4 mistakenly fails to include a paragraph under Count IV identifying the specific relief she seeks from GDC; and Count 6 incorrectly seeks injunctive relief from "Defendant GDC" rather than "GDC Defendants Jones and Pineiro" in their official capacities, as is required by *Ex Parte Young* doctrine.[13] 209 U.S. 123, 159 (1908). Neither issue, however, warrants dismissal.

_____

[13] While Ms. Doe recognizes that the FAC supersedes all prior complaints filed in this action, it is still important to note that these pleading errors were not present in her prior complaints. Defendants Jones and Pineiro are, therefore, on notice of Plaintiff's intention to allege an Eighth Amendment Prolonged Solitary Confinement claim against them in their official capacities.

A complaint is only required to allege facts that establish that the plaintiff is entitled to "any relief that the court can grant." *A.W. by & Through J.W. v. Coweta Cnty. Sch. Dist.*, 110 F.4th 1309, 1315 (11th Cir. 2024) (citations omitted). Dismissal is only warranted if the allegations suggest that the plaintiff "is entitled to no relief under any state of facts." *Id.* Federal Rule of Civil Procedure ("FRCP") 54(c) permits the Court to "grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Therefore, failure to state a specific request for relief under a specific cause of action is not, itself, a proper reason to dismiss a claim. This is especially true where the remainder of the allegations make clear Defendant GDC's role in the violations alleged in Count 4. The section heading also identifies the categories of relief Ms. Doe's requests from GDC with this claim.[14] To the extent Ms. Doe's request for relief is unclear, her "Request for Relief" section enumerates each request sought through this litigation, including a catch-all for "any other relief this Court deems just, equitable, and proper." *See Levine v. World Fin. Network Nat'l Bank,* 437 F.3d 1118, 1123-25 (11th Cir. 2006) (reversing dismissal where plaintiff's complaint requested improper relief for a specific claim, but also included a demand that encompassed all other damages available). This error is easy to cure.

---

[14] The FAC asserts Count 4 "Against Defendants GDC and MHM/Centurion for Damages, and Injunctive and Declaratory Relief." FAC at 33.

Second, the FAC misidentifies Defendant GDC in Count 6, where the claim should be asserted against GDC Defendants Jones and Pineiro in their official capacities. This, too, is easy to cure. Under FRCP 15, an amendment to "change[] the party or the naming of the party against whom a claim is asserted" should be adopted so long as the party to be brought in by amendment "(i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity." *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 547 (2010). The only question at issue is "whether [the proper defendant] knew or should have known that it would have been named as a defendant but for an error." *Id.* at 548. "Rule 15(c)(1)(C)(ii) asks what the prospective defendant knew or should have known…, not what the plaintiff knew or should have known at the time of filing." *Id*. FRCP 15(c)(1)(C) was enacted to resolve mistakes of this exact variety. *Id.* at 550-51 (explaining that Rule 15(c)(1)(C) was added to "provide a general solution" to cure plaintiffs' mistakes asserting claims against the United States where the proper party was a U.S. Department Secretary in their official capacity).

The Court should permit this limited amendment. As it presently reads, Count 6 seeks injunctive relief from GDC for actions attributable to Defendants Jones and Pineiro. However, Defendants Jones and Pineiro are only named in Count 6 in their

39

personal capacities. Both defendants should have known that Count 6 should have also been asserted against them in their official capacities based on the allegations contained therein. Neither Defendant would be prejudiced by an amendment because this claim was properly asserted against these defendants in prior filings in this action, *see* Dkt. 105 at 77, and both defendants are named in the FAC "in [their] individual and official capacit[ies]," FAC at 1.

Where a pleading defect may be cured by amendment, leave to amend must "be freely given when justice so requires." *Shipner v. Eastern Air Lines, Inc.*, 868 F.2d 401, 407 (11th Cir. 1989) (citations omitted). Therefore, "unless a substantial reason exists to deny leave to amend, the discretion of the district court is not broad enough to permit denial," and leave should be freely granted. *Id*. No substantial reason exists to deny this limited amendment. The Court should, therefore, permit a limited amendment to remedy these minor pleading errors.

**CONCLUSION**

Based on the foregoing, the Court should deny GDC Defendants' motion to dismiss in its entirety.

40

Respectfully submitted this 15th day of July, 2026,

*/s/ Scott Novak*

Scott Novak *
BAKER BOTTS L.L.P.
700 K St N.W.
Washington, D.C. 20001
(202) 639-1316
scott.novak@bakerbotts.com

Nicholas F. Palmieri *
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, New York 10112
(212) 408-2640
nick.palmieri@bakerbotts.com

Sterling Marchand *
BAKER BOTTS L.L.P.
700 K St N.W.
Washington, D.C. 20001
(202) 639-1113
sterling.marchand@bakerbotts.com

Derrick Luster *
RIGHTS BEHIND BARS
1800 M Street NW Front 1 #33821
Washington, D.C. 20033
derrick@rightsbehindbars.org

Christopher J. Murell
Georgia Bar Number: 195116
Meghan Matt*
MURELL LAW FIRM
2831 St. Claude Avenue
New Orleans, Louisiana 70117
(504) 717-1297 Telephone
(504) 233-6691 Facsimile
chris@murell.law
        meghan@murell.law

***Admitted** *pro hac vice*

41

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief conforms to the requirements of L.R. 5.1 and 7.1. The brief is prepared as double-spaced between lines and in 14-point Times New Roman font.

*/s/ Scott Novak*

42

## CERTIFICATE OF SERVICE

I certify that, on July 15, 2026, I electronically filed the foregoing with the Court and served it on opposing counsel through the Court's CM/ECF system. All counsels of record are registered ECF users.

*/s/ Scott Novak*

43